Filed
D.C. Superior Court
02/23/2016 10:07AM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

### Civil Division

JENNIFER BRADLEY,
100 Lakewood Drive
Pequea, PA 17565

      Plaintiff,

*v.*

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, d/b/a NCAA
700 W. Washington Street
Indianapolis, Indiana 46206

Serve:  Dr. Mark A. Emmert
      President
      700 W. Washington Street
      Indianapolis, Indiana 46206

~and~

THE PATRIOT LEAGUE
3773 Corporate Parkway
Suite 190
Center Valley, PA 18034

Serve:  Carolyn Schlie Femovich
      Executive Director
      3773 Corporate Parkway
      Suite 190
      Center Valley, PA 18034

~and~

THE AMERICAN UNIVERSITY
4400 Massachusetts Ave., NW
Washington, DC 20016

Serve:  Douglas Kudravetz
      4400 Massachusetts Ave., NW
      Washington, DC 20016

~and~

Case No.  2014 CA 004932 B
Judge: Alfred S. Irvin
Calendar No.: 9
Next Event: Status Conference: 2/26/16



MARYLAND      SPORTS      MEDICINE
CENTER
3420 Morningwood Drive
Olney, M.D. 20832

      Serve:  David L. Higgins, M.D. P.C.
              3104 Black Chestnut LN
              Chevy Chase, M.D. 20815

~and~

DAVID L. HIGGINS, M.D. P.C.
17904 Georgia Avenue
Suite 215
Olney, MD 20832

      Serve:  Charlotte Higgins
             17904 Georgia Avenue
             Suite 215
             Olney, MD 20832

~and~

DAVID L. HIGGINS, M.D.
17904 Georgia Avenue
Suite 215
Olney, MD 20832

~and~

THE UNITED STATES OF AMERICA

      Serve:
      Derrick Wayne Grace, Esq.
      U.S. Attorney's Office for the District
      of Columbia
      555 Fourth Street, NW
      Washington DC 20530

          Defendants.

## AMENDED COMPLAINT

*COMES NOW,* Plaintiff, by and through the undersigned counsel, and files this complaint,

and for this cause of action states:

## JURISDICTION

1.       Jurisdiction of this court is invoked pursuant to D.C. Code § 11-921, and by virtue of the fact that all acts and omissions complained of occurred within the District of Columbia.

2.       Venue in this court is proper since the cause of action arose in the District of Columbia.

## PARTIES

3.       Plaintiff Jennifer Bradley is and, at all times relevant to this action, was a resident of the Commonwealth of Pennsylvania who was residing in the District of Columbia by virtue of her attendance as a student at The American University at the time of the occurrence subject to this Complaint.

4.       Defendant The National Collegiate Athletic Association d/b/a NCAA (hereinafter "NCAA") is an unincorporated association of private and public colleges and universities which governs intercollegiate athletics.  Its principal place of business is located in Indianapolis, Indiana. As an unincorporated association it is a citizen of each state its member is a citizen, including the District of Columbia.

5.       Defendant The Patriot League is and, at all times relevant to this action, was a corporation incorporated in the Commonwealth of Pennsylvania and comprised of private and public colleges and universities with a principal place of business in the Commonwealth of Pennsylvania and conducting business in all jurisdictions in which its member institutions are located, including the District of Columbia.

6.       Defendant The American University (hereinafter "AU") is an educational institution and a member institution of Defendant NCAA doing business in the District of

Columbia.

7.      Defendant David L. Higgins, M.D., P.C. is and, at all times relevant to this action, was a healthcare provider incorporated in the State of Maryland and conducting business in Washington, D.C.

8.      Defendant Maryland Sports Medicine Center is and, at all times relevant to this action, was a healthcare provider incorporated in the State of Maryland and conducting business in Washington, D.C.

9.      Upon information and believe, Defendant Maryland Sports Medicine Center is the trade name of Defendant David L. Higgins, M.D., P.C.

10.      Defendant David L. Higgins, M.D. is and, at all times relevant to this action, was a healthcare provider licensed in the District of Columbia and, upon information and belief, was an agent, servant, and/or employee of Defendants American University, Maryland Sports Medicine Center, and David L. Higgins, M.D. P.C.

11.      Aaron Williams, D.O. is and, at all times relevant to this action, was a healthcare provider practicing in the District of Columbia.  Upon information and believe, Dr. Williams is not nor at all times relevant to this matter was a licensed healthcare provider in the District of Columbia.  Furthermore, pursuant to the Federal Tort Claims Act, Dr. Williams has been deemed to have been working within the scope of his employment for the United States of America at all times relevant hereto, and pursuant to a ruling made by the United States District Court for the District of Columbia on December 10, 2015, the United States of America stands in the place of Dr. Williams.

12.      Upon information and belief,  Dr. Williams was a fellow hired by Defendant Higgins, Higgins, P.C. and/or Maryland Sports Medicine Center.  Upon information and belief Dr.

Williams is currently a practicing physician in the Commonwealth of Virginia.

13.    Upon information and belief, at all times relevant to the incident in question, Dr. Williams was an agent, servant, and/or employee of Defendants American University, Higgins, Higgins, P.C. and Maryland Sports Medicine Center.

14.    Steven Jennings is and, at all times relevant to this action, was the head coach of the women's field hockey team at AU.  Upon information and belief, Steven Jennings resides in the District of Columbia and conducts business at The American University in the District of Columbia.

15.    Sean Dash is and, at all times relevant to this action, was the head athletic trainer at the American University.   Upon information and belief, Mr. Dash resides in the District of Columbia and conducts business at The American University in the District of Columbia.

16.    Jenna Earls is and, at all times relevant to this action, was the head trainer of the women's field hockey team at AU.  Upon information and belief, Jenna Earls resides in the District of Columbia and conducts business at The American University in the District of Columbia.

## BACKGROUND

### MEDICAL RESEARCH ON CONCUSSIONS

17.    Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Traumatic Brain Injury ("TBI") and Mild Traumatic Brain Injury ("mTBI") with a heightened risk of long term, chronic neuro-cognitive sequelae.

18.    The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines TBI as

A blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

19.     The Centers for Disease Control ("CDC") defines concussion as "a type of traumatic brain injury, or TBI, caused by a bump, blow or jolt to the head that can change the way your brain normally works. Concussions can also occur from a fall or blow to the body that causes the head and brain to move quickly back and forth."

20.     Medical experts define a concussion as "a complex pathophysiological process affecting the brain, induced by traumatic biomechancial forces." (Consensus Statement of Concussion in Sport: The 3rd International Conference on Concussion in Sport [Zurich 2008]).

21.     Recently, a group of concussion specialists considered all the available medical evidence on concussions and provided a more detailed definition: "Concussion is defined as a traumatically induced transient disturbance of brain function and involves a complex pathophysiological process." (American Medical Society for Sports Medicine position statement: Concussion in Sport. *Br J Sports med*. 2013; 47:15-26).

22.     The mechanism of the injury flows from external forces (such as collisions between players or with the ground) acting on the head or anywhere on the body that transfer damaging energy to the brain cells, resulting in immediate injury to those cells. This causes a breakdown of the cell structure and metabolism and also causes impeded blood flow to the brain cells. The damage results in the cells' inability to continue functioning correctly to maintain their baseline activities and/or to recover. A concussion results in symptoms and signs that negatively affect the concussed student athlete's health and well-being for a period ranging from days to several weeks.

During this recovery period the brain is much more vulnerable to subsequent and permanent injury – even from lesser force.

23.     AANS has stated that "[p]eople who suffer a head injury may suffer from side effects that persist for weeks or months.  This is known as postconcussive syndrome.  Symptoms include memory and concentration problems, mood swings, personality changes, headache, fatigue, dizziness, insomnia and excessive drowsiness.  Patients with postconcussive syndrome should avoid activities that put them at risk for a repeated concussion.  Athletes should not return to play while experiencing these symptoms."

24.     The American Journal of Physical Medicine & Rehabilitation published a study in 2003 concluding that "[t]his large prospective cohort study indicates the risk of sustaining a cerebral concussion is nearly six times greater for individuals with a history of concussion than for individuals with no such history."

25.     The Journal of the American Medical Association published a report in 2003 identified as "The NCAA Concussion Study" in which it reported in its conclusion that "a history of previous concussions may be associated with an increased risk of future concussive injuries and that these previous concussions may be associated with slower recovery of neurological function following subsequent concussions."

DEFENDANTS' SUPERIOR KNOWLEDGE OF THE AFFECTS OF CONCUSSIONS

26.     Defendants knew or should have known of the medical and scientific knowledge pertaining to concussions, post concussive syndrome, and secondary concussion affects.

27.     In the early 1980's, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained mTBI and observed long-term damage in the form of unexpected cognitive impairment.   The studies were published in neurological journals and

treatises within the United States.

28.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered mTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

29.    The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma, including field hockey players.

30.    In 1982 the NCAA implemented an injury surveillance system.

31.    In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which were later updated in 2001.

32.    In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled, "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials.  The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries.  The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced."  In spite of this admonition, the NCAA did not proceed to educate its active student-athletes on the long term risks of concussions, nor provide necessary medical monitoring.

33.    In 2003, the University of North Carolina, Chapel Hill, published a study, funded

in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.  (McCrea, et al., *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players*, *The NCAA Concussion Study*, Journal of the American Medical Association, Vol. 290, No. 19, November 19, 2003, at 2561).  The study concluded that athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities.

34.     In 2003, the University of North Carolina, Chapel Hill, published another study, funded in part by the NCAA, examining the effects of multiple concussion sustained by a single athlete.  (Guskiewicz, et al., *Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICNA MEDICAL SSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549).  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

35.     This study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing.

36.     In 2004, the NCAA injury surveillance system documented a high rate of concussions in football and other sports, including field hockey.  No action was taken by the

NCAA to respond to this data in terms of educating student athletes or providing needed medical monitoring.

37.    In 2004, the National Athletics Trainers Association ("NATA") published concussion management guidelines repeating the need for return to play protections and symptom monitoring as earlier medical recommendations had outlined.

38.    In 2005, UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment ("MCI") and early onset Alzheimer's disease.  (Guakiewicz, et al., *Association between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, NEUROSURGERY, Vol. 50, October 2005, at 719).  In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early onset Alzheimer's disease.  The NCAA did not even acknowledge the study, let alone act on it or even alter its student athletes of these known risks.

39.    In 2005, the 2nd International Conference on Concussion in Sport published its summary and agreement statement in which they presented a "Concussion Management" System:

> When a player shows any symptoms or signs of a concussion, the following should be applied.
>
> (1) The player should not be allowed to return to play in the current game or practice.
> (2) The player should not be left alone, and regular monitoring for deterioration is essential over the initial few hours after injury.
> (3) The player should be medically evaluated after the injury.
> (4) Return to play must follow a medically supervised stepwise process.
>
> A player should never return to play while symptomatic.  "When in doubt, sit them out!"

40.    In 2008, the University of Michigan's Institute for Social Research conducted a

study on the health of retired players.  The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

41.     In June of 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease – Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

42.     In 2011, the NCAA put out and disseminated what is titled "2011-2012 NCAA Sports Medicine Handbook."  (hereinafter referred to as the "Handbook").

43.     The Handbook specifically states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

44.     The Handbook additionally states that "[t]he health and safety principle of the National Collegiate Athletic Association's constitution provides that it is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes."

45.     According to its own Handbook, "[c]oncussion or mild traumatic brain injury (mTBI) has been defined as 'a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces.'  Although concussion most commonly occurs after a direct blow to the head, it can occur after a blow elsewhere that is transmitted to the head."

46.     The Handbook goes onto state that a "concussion is characterized by the rapid onset of cognitive impairment that is self limited and spontaneously resolves."

47.     The Handbook also identifies "Signs and Symptoms of mTBI" in Table 1 on page

54. The signs and symptoms include:

    a.   Loss of consciousness (LOC)
    b.   Confusion
    c.   Post-traumatic amnesia (PTA)
    d.   Retrograde amnesia (RGA)
    e.   Disorientation
    f.   Delayed verbal and motor responses
    g.   Inability to focus
    h.   Headache
    i.   Nausea/vomiting
    j.   Excessive drowsiness
    k.   Visual Disturbances (Photophobia, blurry Phono/photophobia vision, double vision)
    l.   Disequilibrium
    m.  Feeling "in a fog", "zoned out"
    n.   Vacant stare
    o.   Emotional liability
    p.   Dizziness
    q.   Slurred/incoherent speech

48.     Additionally, as indicated in the Handbook, in 2010 the NCAA finally adopted a policy for Concussion Management. Said policy dictates that an "active member institution shall have a concussion management plan for its student-athletes."

49.     The Concussion Management Plan (hereinafter the "Plan") has four basic requirements, essentially modeled after the 2nd International Conference on Concussion in Sport's findings:

    a.   An educational component;
    b.   Evaluation of student-athletes who show signs, symptoms, or behaviors consistent with a concussion to be removed from athletic activities and evaluated by a medical staff member;
    c.   A policy preventing student-athletes diagnosed with concussions from return to play the same day; and
    d.   A policy preventing student-athletes diagnosed with concussions from returning until they have been medically cleared by a physician or his/her designee.

50.     However, rather than enforcing the member institutions to strictly comply with the Plan, the Plan instead attempts to put the responsibility upon the student-athletes by requiring each

such individual to "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."

51.    Such a requirement is required by any individual no matter their age or education to be entered into – whether they are a 17 year old minor freshman eager to start their life at the college they worked so hard to get into or a 21 year old senior who has been fortunate enough to make it through his or her first three collegiate years without suffering a concussion under the false pretenses that he or she would understand the potential risks and dangers associated with medical symptoms associated with concussions.

52.    Ironically enough, however, is the fact that the symptoms associated and recognized to be exhibited when one suffers a concussion are the exact symptoms that would preclude one from being aware or cognizant of to identify in many circumstances.

53.    Nevertheless, with knowledge of concussions being highly complex medical issues, the NCAA has attempted to shift the accountability of vigilance unto the players in many ways, including but not limited to disseminating to participating organizations flyers that state: "If you think you or your teammate has had a concussion don't hid it report it take time to recover."

54.    Such flyers specifically depict the actions of field hockey players.

55.    Despite the common public perception that concussions are only prevalent in known contact sports, the Handbook readily acknowledges that the "incidence in helmeted versus nonhelmeted sports is also similar.  In the years 2004 to 2009, the rate of concussion during games per 1,000 athlete exposures for football was 3.1 … for field hockey 1.2…"

56.    There has long been clinical and neurological studies indicating that multiple head injuries or concussions can cause severe cognitive problems such as depression and early-onset

dementia.

57.    There has long been published peer review studies documenting that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injuries.

58.    There can be no doubt that prior to September 23, 2011, the NCAA, as well as the Patriot League, and their participating members including American University and their agents, servants, and employees were aware of the seriousness and dangers associated with concussions and post-concussive syndrome in all athletic sports, including field hockey.

## THE DUTIES ASSUMED BY DEFENDANTS

59.    The NCAA holds itself out as the supervisory force over conduct in intercollegiate events and practices throughout the United States.  According to its own website, the NCAA was founded "*to protect* young people from the dangerous and exploitive athletic practices of the time."

60.    The NCAA's founding purpose to protect student-athletes has been repeated often. In1909 at the annual convention of member institutions, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport.  Athletic sports must be selected with strict regard to the safety of those practicing them.  It must be remembered that the sport is not the end.  It is incidental to another end far more important.  We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.

61.    College athletics at NCAA member institutions, such as AU, are tightly regulated by the NCAA Constitution, Operating Bylaws and Administrative Bylaws, which compromise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including but not limited to player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

62.    The NCAA also promulgates sport-specific standards through its Playing-Rules Committees.

63.    According to the NCAA Constitution,

The purposes of this Association are:

a.   To initiate, stimulate and improve intercollegiate athletics programs for student athletes …;

b.   To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association…

NCAA Const., Art. 1, § 1.2(a)(b).

64.    Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

**2.2 The Principle of Student-Athlete Well-Being**
Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05)

\*\*\*

**2.2.3 Health and Safety.**  It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes.  (Adopted: 1/10/95)

65.    The NCAA Constitution also provides that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations…"  Thereby, the NCAA has both promised and acknowledged that it has a duty to protect the health and safety of student-athletes.

66.    The NCAA also maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly recognized by the NCAA as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment for student-athletes

through research, education, collaboration and policy development."

67.     As expressed in the Handbook and on the NCAA's own website, the NCAA utilizes injury surveillance data to examine, explore, understand, and work to prevent sports injuries.

68.     The NCAA even requires student-athletes to sign HIPAA authorizations for the consent of their medical records, in part to presumably examine, explore, understand, and work to prevent sports injuries.  Jennifer Bradley, in fact, signed such an authorization on August 11, 2009 which stated,

> The information provides NCAA committees, athletics conferences and individual schools and NCAA-approved researchers with injury, relevant illness and participation information that does not identify individual student-athletes or schools.  The data provide the Association and other groups with an information resource upon which to base and evaluate the effectiveness of health and safety rules and policy, and to study other sports medicine questions.

69.     Despite all of these public displays of responsibility and oversight, the NCAA has chosen to ignore the stringent oversight and protection of its student-athletes and instead focused its resources on its own economic development and public perception.

70.     In 2005 Preston Plevretes was rendered permanently disabled after he suffered a second-impact syndrome at La Salle University.  Dr. Michael W. Collins, Ph.D. opined "[t]he lack of institutional involvement in assuring appropriate care of their student athletes and also not having any written protocols for appropriate management of injury is a reckless and gross deviation from the standard of care."

71.     In 2010, during the NCAA Concussion Working Group, Joni Comstock, the NCAA's Senior Vice President of Championships, recorded in the minutes that "[t]here was continued agreement that the membership was looking to the national office for guidance…"

72.     SEC Commissioner Mike Slive also confirmed the NCAA's shortcomings in

stating:

> There is much work to be done, and while the Conference has a role to play, prevention and treatment of concussion injuries is a national concern that needs and deserves a coordinated national effort. For this reason, the Presidents and Chancellors will make a formal request that the NCAA take the lead in organizing and spearheading a national research effort and examining possible revisions to playing rules in football *and other sports*.

73.     Additionally, upon information and belief, one year prior to the incident in question pertaining to Jennifer Bradley's concussion related injuries while playing field hockey at AU, a teammate on the AU field hockey team suffered multiple concussions that required her to quit the team.

74.     In 2001, American University became a full member in the Patriot League.

75.     According to its own website, the Patriot League "was founded on the principles of admitting athletes who are academically representative of their class, [and] is in its third decade of academic and athletic achievement. Participation in athletics at Patriot League institutions is viewed as an important component of a well-rounded education."

76.     According to the Patriot League's own Policies and Procedures, "The Patriot League promotes opportunities for students to compete in Division I intercollegiate athletics programs within a context that holds paramount the high academic standards and integrity of member institutions, and the academic and personal growth of student-athletes."

77.     The Patriot League's Policies and Procedures also mandates that, "this document addresses compliance procedures, and, as such is to be used in conjunction with the National Collegiate Athletic Association (NCAA) Manual, which states specifically the rules that govern intercollegiate athletics. Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Manuals." Thereby, the Patriot League

has assumed the same duties and responsibilities as the NCAA has both promised and acknowledged pertaining to the protection of the health and safety of student-athletes.

78.     The Patriot League's Policies and Procedures are silent as to any Concussion Prevention/Management policies.

79.     The Patriot League's Policies and Procedures do, however, establish a "Policy Committee" that "shall, on request of the Council, act on behalf of the Presidents and shall study and make recommendations on the implementation of policy.  The Policy Committee shall monitor on a continuous basis the policies and programs in the League to assure that they are consistent with the spirit and intent of the League Code."

80.     Despite having a Policy Committee, it does not appear that any Policies were ever formulated for the management of concussions/brain injuries to student-athletes.   As such, in accordance with its incorporation of the NCAA's manuals, the Patriot League has adopted the Plan as set forth in 2010 by the NCAA.

81.     Sean Dash was at all times relevant to this action the head athletic trainer at AU.

82.     Steven Jennings was at all times relevant to this action the head field hockey coach at AU.

83.     Jenna Earls was at all times relevant to this action the head field hockey athletic trainer at AU.

84.     David Higgins, M.D. was at all times relevant to this action the head physician at AU.

85.     Aaron Williams, D.O. was at all times relevant to this action the field hockey team physician at AU.

86.     Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams were

responsible for the safety of the student-athletes at AU participating on the field hockey team.

87.     Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams either were or should have been aware of dangers associated with concussions and with continued play of concussed athletes.

88.     Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams were or should have been in charge of implementing and enforcing a concussion management plan at AU.

89.     Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams failed to implement and enforce a proper concussion management plan at AU and instead focused their efforts on establishing a "win at all costs" environment at AU.

90.     While Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams built an impressive record for AU's Field Hockey program, they did so at the expense of the health and well-being of the participating student-athletes, including Jennifer Bradley.

## THE HISTORY OF JENNIFER BRADLEY

91.     In 2008, Jennifer Bradley began her collegiate life at AU on scholarship.

92.     On August 11, 2009, Jennifer was presented and executed a HIPAA authorization as identified above as well as an authorization by AU to appropriate her likeness and accomplishments to the financial benefit of AU.  Said authorization authorized AU in pertinent part to:

> disseminate information and images pertaining to my athletic participation & eligibility, athletic accomplishments and honors, academic accomplishments & honors, and any other pertinent student-athlete related information …

> I hereby authorize American University, its agents, and its authorized licensees to make copies of, use, sell and distribute any photographic images of me which were

taken in connection with my participation in the athletics programs of, or otherwise in connection with my status as a student-athlete at, American University. I agree that all right, title and interest in and to all such photographic images and any reproductions or derivative work thereof shall be the exclusive property of American University. I further consent to the use of my name and biographical material in connection with such photographic images. I agree that American University does not owe me any compensation for the acts that I have consented to in this agreement.

93.     On August 10, 2010, Jennifer was required to sign a "2010-2011 Student-Athlete Concussion Statement." Included in that document was the following language:

> To minimize the risk of injury, I agree to obey all safety rules, to report fully any problems related to my physical condition to appropriate University personnel including medical personnel and coaches, to follow prescribed conditioning programs and to inspect my athletic equipment daily.

94.     On August 10, 2010, Jennifer also underwent a SCAT2 baseline test, which identified her total number of symptoms to be an 8 and her symptom severity score to be a 21.

95.     In 2011, prior to her junior year, Jennifer was required to sign a "2011-2012 Concussion Statement." The language was identical to that of the prior year Statement.

96.     On August 9, 2011, Jennifer dutifully signed yet another "Student-Athlete Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related Research Purposes." Again, said authorization indicated that the NCAA was attaining information for NCAA student-athletes "to evaluate the effectiveness of health and safety rules and policy, and to study other sports medicine questions."

97.     In September of 2011 as Jennifer was beginning her junior year at AU, she was a 20 year old female Academic All-American Field Hockey player. She had a cumulative GPA of a 3.47

98.     On or about September 23, 2011, Jennifer was hit in the head during a field hockey

game between American University and Richmond University.  Jennifer later recalled the hit to be no more extreme than other hits routinely suffered while playing field hockey.

99.  Subsequent to the game, Jennifer began to notice vision problems (seeing movement in snapshots), concentration problems, and early fatigue while playing a game against Boston College.

100.  On October 1, 2011, she informed Ms. Earls and Mr. Jennings about her symptoms and discussed the matter extensively.

101.  On October 2, 2011, Jennifer again played in a game with symptoms persistent.

102.  On October 3, 2011, Jennifer sent an email to the training staff spelling out in detail her symptoms in which she stated:

I think I might have been a little confusing with how I described the way I was feeling before.  I wrote out all my symptoms for you more clearly –

- always extremely tired – even after sleeping a good amount – sometimes I feel like I can't keep my eyes open and I always feel like I could fall asleep.
- Cannot concentrate for any amount of time – takes me a long time to finish tasks or read and have to take frequent breaks.  My sense of time seems off as well
- Fast things seem like they are moving in snapshots rather than a fluid motion and it's hard to focus my eyes on something
- When playing, I feel dizzy and unfocused – it's hard to concentrate on tactical things like the press
- Feel like things are not real and easily forget things.  Also hard for me to analyze something.  (When I am playing I'm not really sure if what I'm doing is "good" or not
- When I have to interact with someone, I feel like my answers/ actions are delayed
- When walking among people I feel like I'm in a daze – like maybe I'm not actually there ("dream like" feeling)
- Pressure in my head – not a headache, but have a constricting feeling in my forehead.

I've been having these symptoms for over a week and cannot pinpoint a cause.  I tried to sleep more, eat better and more, and to take more sugar in and none of this has improved the situation.

103.  On October 4, 2011, Ms. Earls gave Jennifer a SCAT2 test at 10:30 AM.  Her total

number of symptoms was 17 (over double her baseline test) and her symptom severity score was 45 (over double her baseline test).

104.    On October 5, 2011, Jennifer continued to complain to her trainers of these complaints, and she was given a second SCAT2 test at 6:00 AM.  Her total number of symptoms was 16 (double her baseline test) and her symptom severity score was 21.  Five hours later at 11:00AM, Jennifer was given a third SCAT2 test.  Her total number of symptoms was a 19 (over double her baseline test) and her symptom severity score was back to a 40 (approximately double her baseline test).

105.    On October 8, 2011, Jennifer played in a field hockey game at Holy Cross.

106.    On October 12, 2011, Jennifer continued to complain of dizziness and difficulty seeing upon onset of activity.

107.    On October 16, 2011, Jennifer sat out of her game and was told by Dr. Williams, "I don't know what's wrong with you."

108.    On October 22, 2011, Jennifer played in a game against Bucknell College.

109.    On October 23, 2011, Jennifer played in a game against Georgetown University.

110.    On October 24, 2011, Jennifer informed Ms. Earls that she "still feel kind of weird after playing this weekend."

111.    On October 30, 2011, Jennifer played in a game at Lafayette College.

112.    On November 4, 2011, Jennifer played in a game against Bucknell College for the Patriot League Semifinals.

113.    From September 23, 2011 through the November 4, 2011 Patriot League Semifinals, Jennifer participated in the vast majority of team practices and workouts without being advised to sit out while her symptoms persisted.

114.    From September 23, 2011 through the November 4, 2011, Jennifer continued to experience the same physical exertion and contact and head traumas as she had equated with the initial blow suffered during the September 23, 2011.

115.    From September 23, 2011 through the remainder of her junior year, upon information and belief, Jennifer's medical condition was discussed among Defendant AU's agents, servants, and/or employees including but not limited to Mssrs. Dash and Jennings as well as Ms. Earls and Drs. Higgins and Williams.

116.    Over Thanksgiving Break, Jennifer was still suffering from the symptoms that she explained to her trainer and saw her primary care doctor for the same complaints.

117.    On January 9, 2012, Jennifer was referred to Puneet Singh, D.O. in Pennsylvania by her PCP.  Dr. Singh stated that Jennifer presented with "chief complaint of Dizziness, Fatigue and Memory Loss."

118.    Jennifer then underwent three spinal taps that showed no leak and was diagnosed with post concussive syndrome.

119.    On March 19, 2012, Jennifer presented to MedStar National Rehabilitation with her chief complaint being of a concussion, and the records indicate that she presented "for post concussive syndrome that was diagnosed by Dr. Puneet Singh."

120.    On April 30, 2012, her diagnosis was confirmed at NRH and she was started on propranolol for preventative medication as well as Zoloft and given orders to see a neuropsychologist for testing.

121.    Jennifer also began receiving treatment at the Brain Wellness & Biofeedback Center of Washington on March 30, 2012.

122.    Eventually, Jennifer did not finish out the school year due to the injuries she had

suffered.

123.    In June of 2012, Jennifer began treatment with Jon Bentz, PH.D. who diagnosed her with:

| Axis I: | Cognitive disorder NOS, post concussion syndrome |
| Axis II: | No diagnosis |
| Axis III: | Suspected cerebral concussion (9/25/2012)[sic 2011] |
| Axis IV: | Educational problems |
| Axis V: | 51-60 moderate symptoms. |

124.    Dr. Bentz then conducted a neuropsychological evaluation.   As a result of the testing, it was recommended that she not return to school at that time; and she did not.

125.    In June of 2012, Jennifer began treating with physicians at Stephen G. Diamantoni & Associates including William Vollmer, M.D. and Zachary Geidel, M.D.

126.    On August 22, 2012, Jennifer began treatment at LG Health Campus – PRC for outpatient rehabilitation services.

127.    In January of 2013, Dr. Vollmar wrote to Defendant AU's administration seeking a "retroactive medical withdrawal" from her classes in the spring semester of 2012 due to the fact that she had received failing grades because she was unable to finish the school year because of her post concussion syndrome "that has been significant."

128.    In April of 2013, Dr. Vollmar wrote a letter directly to Coach Jennings in which he stated that "she should not have to concentrate many hours on managing the team that she could be placing on rest and continuing her education…as her physician, I am saying that she cannot be the manager of the field hockey team, because I believe this will continue to risk her academic advancement."

129.    Upon information and belief, this letter was required due to the fact that Defendant AU and its administration, including Mr. Jennings, were requiring that Jennifer be the manager of

the field hockey team in order to maintain her scholarship.

130.   On October 25, 2013, Jennifer was seen by Sami L. Kellah, M.D., a neurologist at the University of Pennsylvania Presbyterian Medical Center.  Dr. Kellah informed Jennifer that she was still suffering from post-concussion syndrome and has residual post-concussion deficits and depression.

131.   In 2013, Jennifer resumed her studies at AU.   However, due to her mental deficiencies and injuries, she could only take two classes a semester.

132.   Jennifer continues to undergo treatment for her post-concussion syndrome and residual post-concussion deficits and depression and will continue to incur such economic damages for the foreseeable future, including but not limited pharmacological management, life care planning, future medical treatment, and other forms of economic damages.

133.   Jennifer has incurred and will continue to incur damages to her health and well-being including but not limited to nutritional damages as, upon information and belief, the injuries alleged have caused her to unintentionally lose significant weight.

134.   Jennifer has incurred and will continue to incur for the foreseeable future damages to her earning capacity.

135.   Jennifer has also incurred and continues to incur damages to her educational development.

136.   Jennifer also suffered and will continue for the foreseeable future to suffer non-economic damages including but not limited to deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

## COUNT I
### (Negligence)
### Bradley vs. NCAA

137.    Plaintiff incorporates by referenced hereinafter all preceding paragraphs.

138.    Defendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley.

139.    Defendant NCAA further undertook and assumed a duty to protect student-athletes from brain injuries.  This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public.   Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

140.    Defendant NCAA either did not have the requisite knowledge and/or ability to undertake such a duty or failed through its actions and omissions in its undertaking of its duty.

141.    Defendant NCAA acted negligently in its position as the regulatory body for college teams, including Defendant AU's field hockey team, and Plaintiff Jennifer Bradley. Defendant NCAA knew or should have known that its actions and/or inactions, in light of concussive and sub-concussive injuries made known to it, would cause harm to Plaintiff Jennifer Bradley.

142.    Defendant NCAA was careless and negligent by breaching the duties of care it assumed for the benefit of Plaintiff Jennifer Bradley.  Specifically, Defendant NCAA failed in its duties in the following ways:

    a.   Failing to enforce the NCAA Constitution, By-laws and the Handbook;
    b.   Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;
    c.   Failing to enforce the Plan;
    d.   Failing to provide Plaintiff and her teammates with a safe environment;

e. Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;

f. Failing to maintain institutional control over Defendant AU, the coaches, athletic trainers, and the athletic director;

g. Failing to implement appropriate safety procedures and policies regarding concussion prevention;

h. Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;

i. Failing to implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans;

j. Failing to implement appropriate requirements over its member institutions in their hiring and training of appropriate medical personnel;

k. Failing to provide appropriate guidance to its member institutions on concussion management;

l. Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;

m. Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries; and

n. Being otherwise negligent.

143.    Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and informed consent.

144.    Plaintiff Jennifer Bradley relied upon Defendant NCAA to uphold its duties to her as a student-athlete.  Plaintiff Jennifer Bradley relied on Defendant NCAA's superior knowledge and expertise, as well as its representations that it was looking out for her health and safety.

145.    As a direct and proximate result of Defendant NCAA's negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

146.    As a direct and proximate result of Defendant NCAA's negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental

anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

**COUNT II**
**(Gross Negligence)**
**Bradley vs. NCAA**

147.   Plaintiff incorporates by reference hereinafter all preceding paragraphs.

148.   Defendant NCAA recklessly endangered Plaintiff Jennifer Bradley.

149.   Defendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley.

150.   Defendant NCAA further undertook and assumed a duty to protect student-athletes from brain injuries.  This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public.   Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

151.   Defendant NCAA knowingly, recklessly, and wantonly failed to undertake its duties through its actions and omissions.  Specifically, Defendant NCAA failed in its duties in the following ways:

    a.   Failing to enforce the NCAA Constitution, By-laws and the Handbook;
    b.   Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;
    c.   Failing to enforce the Plan;
    d.   Failing to provide Plaintiff and her teammates with a safe environment;
    e.   Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;

    f.   Failing to maintain institutional control over Defendant AU, the coaches, athletic trainers, and the athletic director;

    g.   Failing to implement appropriate safety procedures and policies regarding concussion prevention;

    h.   Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;

    i.   Failing to implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans;

    j.   Failing to implement appropriate requirements over its member institutions in their hiring and training of appropriate medical personnel;

    k.   Failing to provide appropriate guidance to its member institutions on concussion management;

    l.   Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;

    m.  Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries; and

    n.   Being otherwise negligent.

152.    Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and informed consent.

153.    Plaintiff Jennifer Bradley relied upon Defendant NCAA to uphold its duty to her as a student-athlete.

154.    As a direct and proximate result of Defendant NCAA's gross negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

155.    As a direct and proximate result of Defendant NCAA's gross negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

156.    Additionally, Plaintiff Jennifer Bradley seeks punitive damages to be determined

by a jury.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT III
### (Negligence)
### Bradley vs. The Patriot League and American University

157.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

158.    Defendants The Patriot League and American University, including their agents, servants, and employees (collectively hereinafter referred to as "School Defendants") undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating on their field hockey team, including Jennifer Bradley.

159.    School Defendants further undertook and assumed a duty to abide by the NCAA Constitution, Bylaws, Plan, and Handbook.

160.    School Defendants specifically undertook and assumed a duty to "taken reasonable precautions to minimize the risks of injury from athletics participation."

161.    School Defendants specifically undertook and assumed a duty to "protect the health of, and provide a safe environment for, each of its participating student-athletes."

162.    School Defendants further undertook and assumed a duty to protect student-athletes from brain injuries.

163.    School Defendants either did not have the requisite knowledge and/or ability to undertake such a duty or failed through their actions and/or inactions in their undertaking of their duties.

164.    School Defendants were careless and negligent by breaching the duties of care they assumed for the benefit of Plaintiff Jennifer Bradley.  Specifically, School Defendants failed in their duties in the following ways:

   a.  Failing to abide by the NCAA Constitution, By-laws and the Handbook;
   b.  Failing to ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms and risks of concussions, second-impact syndrome, and post-concussive syndrome;
   c.  Failing to have a Concussion Management Plan;
   d.  Failing to have an appropriate Concussion Management Plan;
   e.  Failing to enforce the Plan;
   f.  Failing to provide Plaintiff and her teammates with a safe environment;
   g.  Failing to protect and enhance the physical and educational well-being of Plaintiff and other student-athletes;
   h.  Failing to maintain institutional control over its coaches, athletic trainers, and athletic director;
   i.  Failing to implement appropriate safety procedures and policies regarding concussion prevention;
   j.  Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms;
   k.  Failing to hire and train appropriate medical personnel;
   l.  Failing to provide appropriate guidance to its coaches, athletic trainers, athletic director, and student-athletes on concussion recognition, prevention, and management;
   m.  Failing to provide its student-athletes with reasonable protection to their physical and mental well-being;
   n.  Failing to safeguarding its student-athletes from preventable concussion and post-concussion injuries;
   o.  Failing to appreciate and recognize the complaints voiced by Plaintiff Jennifer Bradley; and
   p.  Being otherwise negligent.

165.    Plaintiff also asserts the doctrines of *respondeat superior*, *res ipsa loquitur*, and informed consent.

166.    Plaintiff Jennifer Bradley relied upon School Defendants to uphold their duties to her as a student-athlete.   Plaintiff Jennifer Bradley relied on School Defendants' superior knowledge and expertise, as well as their representations that they were looking out for her health and safety.

167.    As a direct and proximate result of School Defendants' negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

168.    As a direct and proximate result of School Defendants' negligence, Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

*WHEREFORE*, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT IV
### (Negligent Infliction of Emotional Distress)
### Bradley vs. All Defendants

169.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

170.    All Defendants undertook a duty to protect the physical and mental well-being of Plaintiff Jennifer Bradley.

171.    As a result of the Defendants negligence and/or gross negligence stated *supra.*, Plaintiff Jennifer Bradley has and continues to suffer from severe emotional distress.

172.    As a direct and proximate result of the Defendants' negligence and/or gross negligence as stated *supra.*, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past

psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

173.   As a direct and proximate result of Defendants' negligence and/or gross negligence as stated *supra*., Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

### COUNT V
### (Fraudulent Misrepresentation)
### Bradley vs. NCAA

174.   Plaintiff incorporates by reference hereinafter all preceding paragraphs.

175.   Defendant NCAA represented to Plaintiff Jennifer Bradley and the public at large that it undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley; and that it undertook and assumed a duty to protect student-athletes from brain injuries.

176.   These representations were false.

177.   These representations were material to Plaintiff Jennifer Bradley and the public at large, in so far as she reasonable believed that those with superior knowledge were regulating, monitoring, and ensuring that she and all other collegiate athletes were participating in an institution of heightened skill and talent, of which the safety of the participates was an impotence

to the governing body.

178.    Defendant NCAA, by and through its agents, servants, and employees' actions and/or inactions demonstrated that these representations were not being upheld and were no more than falsities utilized to placate to the public at large in order to increase public perception and monetary success.

179.    Defendant NCAA by and through its agents, servants, and employees' actions and/or inactions made these false misrepresentations with the intent to deceive the public at large, including Plaintiff Jennifer Bradley.

180.    Plaintiff Jennifer Bradley relied upon these misrepresentations and undertook continued participation in the NCAA's intercollegiate athletic program at Defendant AU.

181.    As a direct and proximate result of Defendant NCAA's fraudulent misrepresentations, Plaintiff Jennifer Bradley has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past neuropsychological bills; future neuropsychological bills; and loss of future economic opportunity.

182.    As a direct and proximate result of Defendant NCAA's fraudulent misrepresentations,   Plaintiff Jennifer Bradley has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of her mental status, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and

proper.

## COUNT VI
### (Breach of Contract)
### Bradley vs. NCAA

183.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

184.    Plaintiff and Defendant NCAA entered into a contract whereby the NCAA agreed to undertake and assume a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Jennifer Bradley; and agreed to undertake and assume a duty to protect student-athletes from brain injuries.  In return, Plaintiff Jennifer Bradley agreed to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, and numerous authorizations required to participate in field hockey.

185.    Plaintiff Jennifer Bradley adhered to and abided by all provisions of the contract.

186.    Defendant NCAA breached the contract in failing to protect the physical and mental well-being of Plaintiff and in failing to protect Plaintiff from brain injuries.

187.    Defendant NCAA profited from Plaintiff's unwavering commitment to this contract.

188.    Plaintiff Jennifer Bradley, however, was severely and permanently injured from Defendant NCAA's breaches of the contract.

***WHEREFORE***, Plaintiff Jennifer Bradley demands judgment against Defendant in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT VII
### (Breach of Contract)
**Bradley vs. The Patriot League and American University**

189.    Plaintiff incorporates by reference hereinafter all preceding paragraphs.

190.    Plaintiff and School Defendants entered into a contract whereby the School Defendants agreed to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, Concussion Management Plans, and numerous authorizations required to participate in field hockey including the appropriation of Plaintiff's likeness and achievements. Plaintiff agreed in exchange for such promises by the Defendants to be granted financial aid, a scholarship, and to participate in intercollegiate sports.

191.    Plaintiff Jennifer Bradley adhered to and abided by all provisions of the contract.

192.    School Defendants breached the contract in failing to abide by all rules and regulations promulgated by Defendant NCAA through its Constitution, Bylaws, Concussion Management Plans, and numerous authorizations required to participate in field hockey including the appropriation of Plaintiff's likeness and achievements.

193.    School Defendants profited from Plaintiff's unwavering commitment to this contract.

194.    Plaintiff Jennifer Bradley, however, was severely and permanently injured from Defendant NCAA's breaches of the contract.

***WHEREFORE***, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

## COUNT VIII
### (Medical Malpractice)
### Bradley vs. All Defendants

195.    Defendants The NCAA, The Patriot League, AU, Maryland Sports Medicine Center, David L. Higgins, M.D., P.C., David L. Higgins, and the United States of America, as well as through their agents, servants and employees, real or ostensible, (collectively referred to as "Defendants") owed a duty of care to the Plaintiff to act in the same or similar circumstances as a reasonably competent healthcare provider in the same or similar circumstances.

196.    Defendants, their agents, servants, and employees, associated with Plaintiff's care and treatment failed to meet the standard of care imposed upon them in the treatment of her beginning on or about September 23, 2011 and continuing thereafter.

197.    Each of the Defendants, their agents, servants and employees owed a duty Plaintiff to provide care and treatment consistent with the appropriate standard of care.

198.    Additionally, Defendant AU assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, by acting as a participating member of the NCAA and Patriot League and by providing healthcare and healthcare providers to its student-athletes.

199.    Additionally, Defendant NCAA assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, and to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Plaintiff.

200.    Additionally, Defendant NCAA further undertook and assumed a duty to protect student-athletes from brain injuries.  This duty has been repeated by the NCAA on numerous occasions, including to Plaintiff Jennifer Bradley, Congress and the members of the public. Defendant NCAA reaffirmed its duty to protect Plaintiff Jennifer Bradley and student-athletes from head injuries when it undertook a duty to implement concussion guidelines in 2010.

201.   Additionally, Defendant The Patriot League undertook and assumed a duty to provide the appropriate standard of care to its student-athletes, including Plaintiff, and to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including Plaintiff in stating, among other things, that "Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Manuals."

202.   Defendants United States of America, Higgins, Higgins, P.C. and Maryland Sports Medicine Center their agents, servants, and employees were required to adhere to the standard of care as healthcare professionals caring for Plaintiff.

203.   All Defendants, their agents, servants, and employees each had a duty to provide and uphold the standard of care in treating Plaintiff.

204.   Defendants, their agents, servants, and employees, did not employ the requisite degree of skill and care required of them, as was their duty, while Plaintiff was in their care. Defendants thereby breached their duties of care owed to Plaintiff including, but not limited to, the following:

   a.   Failure to appreciate the injuries complained of by Plaintiff after suffering the initial blow to her head on or about September 23, 2010;
   b.   Failure to timely and appropriately diagnose Plaintiff with a concussion;
   c.   Failure to timely and appropriately treat and manage Plaintiff's concussion;
   d.   Failing to implement appropriate safety procedures and policies regarding concussion prevention, including implementing such procedures and policies for Plaintiff;
   e.   Failing to implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms including Plaintiff;
   f.   Failing to hire and train appropriate medical personnel;
   g.   The Defendants were otherwise negligent;
   h.   Plaintiff also relies on *res ipsa loquitur, respondeat superior,* and lack of informed consent.

205.   As a direct and proximate result of the aforesaid negligence of all of the Defendants their agents, servants, and employees,  Plaintiff sustained serious and disabling damage to her body

and nervous and cognitive system, including but not limited to post-concussive syndrome, prolonged residual post-concussion syndrome deficits and depression, and related injuries and damages; she has in the past and will in the future incur medical, healthcare, and other expenses; she has in the past suffered and will in the future continue to suffer loss of earnings and impairment of earning capacity; she has suffered and will continue to suffer pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement, all of which is permanent.

**WHEREFORE**, Plaintiff Jennifer Bradley demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one million dollars ($1,000,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

Dated: February 23, 2016

Respectfully submitted,

PAULSON & NACE, PLLC

/s/Matthew A. Nace, Esq.
Matthew A. Nace, Bar No. 1011968
1615 New Hampshire Ave., NW
Washington, DC 20009
202-463-1999 – Telephone
202-223-6824 – Facsimile
man@paulsonandnace.com
*Counsel for Plaintiff*

## Jury Demand

Plaintiff, by and through the undersigned counsel and pursuant to Rule 38 of the District of Columbia Rules of Civil Procedure, hereby demands trial by jury of all issues in this matter.

/s/Matthew A. Nace, Esq.
Matthew A. Nace