# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
JENNIFER BRADLEY,                )
)
          Plaintiff,         )
)
      v.               )      Civil Action No. 16-346 (RBW)
)
NATIONAL COLLEGIATE ATHLETIC   )
ASSOCIATION, et al.,          )
)
         Defendants.    )
_____)

## MEMORANDUM OPINION

The plaintiff, a former student-athlete at American University (the "University"), brings this civil action against the defendants, the United States of America (the "Government"), the National Collegiate Athletic Association (the "NCAA"), the Patriot League, the University, the Maryland Sports Medicine Center (the "Medicine Center"), David L. Higgins, M.D. P.C. (the "Higgins Practice"), and David L. Higgins, M.D. ("Dr. Higgins"), alleging various causes of action stemming from the defendants' alleged failure to provide her with proper medical care after she allegedly sustained a head injury during a field hockey game in September 2011. See Notice of Removal of a Civil Action ("Removal Notice"), Exhibit ("Ex.") 5 (Amended Complaint ("Am. Compl.")) ¶¶ 98–136. Six motions are currently pending before the Court: (1) Defendant [ ] Patriot League's Preliminary Motion to Dismiss ("Patriot League's Dismiss Mot."), ECF No. 9; (2) Defendant [ ] Patriot League's Request for Hearing on Its Preliminary Motion to Dismiss ("Patriot's League's Hearing Request"), ECF No. 10; (3) defendant [ ] American University's Preliminary Motion to Dismiss ("University's Mot."), ECF No. 11; (4) Defendant [ ] National Collegiate Athletic Association's Motion to Dismiss the Amended

Complaint ("NCAA's Mot."), ECF No. 17; (5) the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Gov't's Mot."), ECF No. 26; and (6) Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss, ECF No. 31. Upon careful consideration of the parties' submissions,[1] the Court concludes for the reasons that follow that it must deny the Government's motion to dismiss or, in the alternative, its motion for summary judgment, deny in part and grant in part both the NCAA's and the University's motions to dismiss, grant the Patriot League's motion to dismiss, deny the Patriot League's hearing request as moot, and grant the three medical provider defendants' partial motion to dismiss.

## I.       BACKGROUND

Much of the relevant factual background has been previously set forth by the Court in an earlier Order. See Removal Notice, Ex. 1 (Order dated December 10, 2015 ("Order")), Part I.B. In brief,

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant [ ] Patriot League's Preliminary Motion to Dismiss ("Patriot League's Mem."); (2) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] Patriot League's Motion to Dismiss ("Pl.'s Patriot League Opp'n"); (3) the Reply Memorandum of Defendant [ ] Patriot League to Plaintiff's Opposition to Defendant's Preliminary Motion to Dismiss ("Patriot League's Reply"); (4) the Memorandum of Points and Authorities in Support of [ ] American University's Preliminary Motion to Dismiss ("Am. Univ. Mem."); (5) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] American University's Preliminary Motion to Dismiss ("Pl.'s Am. Univ. Opp'n"); (6) the Memorandum of Points and Authorities in Support of [ ] National Collegiate Athletic Association's Motion to Dismiss ("NCAA's Mem."); (7) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] NCAA's Motion to Dismiss ("Pl.'s NCAA Opp'n"); (8) the Reply Memorandum of Points and Authorities in Support of [ ] National Collegiate Athletic Association's Motion to Dismiss ("NCAA's Reply"); (9) the Memorandum of Points and Authorities in Support of Federal Defendant's Motion to Dismiss, or, Alternatively, Motion for Summary Judgment ("Gov't's Mem."); (10) the Plaintiff's Memorandum of Points and Authorities in Response to Defendant USA's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Pl.'s Gov't Opp'n"); (11) the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Gov't's Reply"); (12) the Memorandum of Points and Authorities in Support of Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss ("Medical Defs.' Mem."); and (13) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant Higgins' Partial Motion to Dismiss ("Pl.'s Medical Defs. Opp'n").

> [i]n 2011, the plaintiff was a junior-year student athlete at [the] University here in Washington, D.C. She played field hockey for the [U]niversity, and in September of that year, the plaintiff asserts that she 'was hit in the head during a field hockey game between [the] University and Richmond University[.]' Subsequent to that hit, she allegedly began experiencing symptoms of a concussion, but continued participating in field hockey practices and games as she was [not] advised to sit out [practices and games] while her symptoms persisted. According to the plaintiff, this failure has caused her a variety of harms, including monetary damages.

Id. (internal citations and footnote omitted). "On March 19, 2012, [the plaintiff] presented to MedStar National Rehabilitation with her chief complaint being of a concussion, . . . [and] on April 30, 2012, her diagnosis was confirmed." Id., Ex. 5 (Am. Compl.) ¶¶ 119–20.

Between August and October 2014, the plaintiff "filed several actions in the Superior Court of the District of Columbia ("Superior Court"), which were consolidated against the [NCAA],[2] the Patriot League,[3] [the] University, the [ ] Medicine Center, David L. Higgins, M.D., P.C., David L. Higgins, M.D., and Aaron Williams, D.O." Id., Ex. 1 (Order) at 1. In March 2015, the Government, pursuant to the Westfall Act, 28 U.S.C. § 2679 (2012), substituted itself for Dr. Williams as a defendant and removed the consolidated case to this Court. See id., Ex. 1 (Order) at 1–2. Thereafter, in December 2015, this Court dismissed the plaintiff's claims against the Government because the "the plaintiff concede[d] that she [was] still pursuing her administrative remedies," id., Ex. 1 (Order) at 11 (internal citation and quotation marks omitted), which precluded her at that time from bringing suit against the Government. This Court also concluded that it "no longer ha[d] jurisdiction over [the] matter following the dismissal of the [Government]" and remanded the case to the Superior Court. Id., Ex. 1 (Order) at 11–12.

---

[2] "The NCAA is a voluntary, unincorporated association of more than 1,300 colleges, universities, conferences, affiliated associations[,] and other educational institutions with its principal office in Indianapolis, Indiana." NCAA's Mem. at 4.

[3] "The Patriot League, a nonprofit establishment, is a Division I collegiate athletic conference which consists of ten (10) member institutions based in the Northeastern United States." Patriot League Mem. at 3.

After the case was remanded to the Superior Court, the plaintiff moved both to amend her Complaint and to remove the case back to this Court, a motion the Superior Court granted only with respect to the plaintiff's request to amend her Complaint. See id., Ex. 3 (Order dated Feb. 19, 2016) at 1. On February 23, 2016, the plaintiff amended her Complaint, and on the following day, removed this case back to this Court. See id. at 4. Shortly thereafter, the defendants filed their motions to dismiss the plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court now addresses.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests whether the complaint properly "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a) requires only that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "detailed factual allegations" are not required, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," id. Rather, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint alleging "facts [which] are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

"In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts

alleged.'" <u>Hettinga v. United States</u>, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)).  However, conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief."  <u>Iqbal</u>, 556 U.S. at 679.

### III.    ANALYSIS

### A.    The Plaintiff's Claims Against the Government

As an initial matter, the Government contends that Counts IV and VIII of the plaintiff's Amended Complaint, which assert claims of negligent infliction of emotional distress and medical malpractice against the Government, "should be dismissed with prejudice" because "the [p]laintiff's claim[s are] time-barred by the [Federal Tort Claims Act ('FTCA')]'s two-year statute of limitations[,]" and because "under the borrowed servant doctrine, any alleged tort committed by Dr. Williams, attaches to the borrower (<u>i.e.</u>, special employer), the Medical Practice of David L. Higgins . . . and not to the general master (<u>i.e.</u>, general employer), the [Government]."  Gov't Mem. at 1–2.  The Court will address each of these arguments in turn.

### 1.  The Federal Tort Claims Act's Two-Year Statute of Limitations

The Government argues that the plaintiff's claims against it are time-barred because she failed to "file her claim with the appropriate agency" within two years after the "[p]laintiff's claim accrued . . . [in] March 2012 when she was diagnosed with [post-concussive syndrome]," as the FTCA mandates.  Gov't Mem. at 10–11.  In response, the plaintiff contends that the statute of limitations was equitably tolled and "did not begin to run until November 7, 2013, at the earliest," when "counsel for [d]efendant Higgins contacted [the p]laintiff's counsel and first indicated that Dr. Williams was a military fellow at the time he rendered treatment."  Pl.'s Gov't

Opp'n at 11.

"Under the doctrine of sovereign immunity, the United States is immune from suit unless Congress has expressly waived the defense of sovereign immunity by statute." Carter-El v. D.C. Dep't of Corr., 893 F. Supp. 2d 243, 246 (D.D.C. 2012) (Walton, J.) (citing United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.")). "Absent a waiver, sovereign immunity shields the Federal Government . . . from suit." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994). "The FTCA is an example of Congress' waiver of sovereign immunity. Under the FTCA, the United States consents to suit in federal district court for certain, but not all, tort claims." Carter-El, 893 F. Supp. 2d at 246.

"The date the plaintiff's administrative claim was received is important because a party asserting jurisdiction under the FTCA must satisfy administrative exhaustion requirements by 'present[ing] the claim to the appropriate federal agency.'" Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 87 (D.D.C. 2011) (Walton, J.) (quoting 28 U.S.C. § 2675(a) (2006)). "In fact, the United States Code makes clear that a 'tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues,' id. (citing 28 U.S.C. § 2401(b)), and the associated regulations explain that a claim is deemed presented when it is received by the agency," id. (citing 28 C.F.R. §§ 14.2(a), 14.2(b)(1) (2005)). "Under the FTCA, a claim accrues 'by the time a plaintiff has discovered both h[er] injury and its cause.'" Id. at 87–88 (quoting Sexton v. United States, 832 F.2d 629, 633 (D.C. Cir. 1987)); see also United States v. Kubrick, 444 U.S. 111, 123 (1979) ("A plaintiff . . . armed with the facts about the harm done to h[er], can protect [herself] by seeking advice in the medical and legal community. To excuse h[er] from promptly doing so by postponing the

accrual of h[er] claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.").

Moreover, "[t]he time limits in the FTCA are just time limits, nothing more. Even though they govern litigation against the Government, a court can toll them on equitable grounds." United States v. Kwai Fun Wong, __ U.S. __, __, 135 S. Ct. 1625, 1633 (2015). However, such relief applies "only sparingly" and generally is not available to a plaintiff who has "failed to exercise due diligence in preserving [her] legal rights" or has demonstrated only "a garden variety of excusable neglect." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990); see also Holland v. Florida, 560 U.S. 631, 649 (2010) (noting that a "[plaintiff] is 'entitled to equitable tolling' only if [she] shows '(1) that [she] has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way' and prevented timely filing" (internal citation omitted)). In this Circuit, courts can permit "equitable tolling, but 'only in extraordinary and carefully circumscribed circumstances,'" Norman v. United States, 467 F.3d 773, 776 (D.C. Cir. 2006) (quoting Smith-Haynie v. District of Columbia, 155 F.3d 575, 580 (D.C. Cir. 1998)), such as where 'despite all due diligence [a plaintiff] is unable to obtain vital information bearing on the existence of her claim,'" id. (quoting Smith-Haynie, 155 F.3d at 579) (alteration in original). "At a minimum, due diligence requires reasonable efforts to learn the employment status of the defendant." Id. "Further, due diligence is a fact-specific judgment in each case as to what the court expects a reasonable plaintiff to do in uncovering the elements of [her] claim." United States v. Intrados/Intern. Mgmt. Grp., 265 F. Supp. 2d 1, 11 (D.D.C. 2002) (citation omitted).

Furthermore, "[b]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred."

Bregman v. Perles, 747 F.3d 873, 875 (D.C. Cir. 2014). And, "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996). In other words, "a defendant is entitled to succeed on a Rule 12(b)(6) motion to dismiss brought on statute[] of limitations grounds only if the facts that give rise to this affirmative defense are clear on the face of the plaintiff's complaint." Lattisaw v. District of Columbia, 118 F. Supp. 3d 142, 153 (D.D.C. 2015) (citing Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)); accord Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 130 F. Supp. 3d 236, 254 (D.D.C. 2015).

There is no dispute that the plaintiff did not "present[ ] [her claim] in writing to the appropriate Federal agency within two years after [her] claim accrue[d]," 28 U.S.C. § 2401(b), which was in March 2012, at the latest, when she was diagnosed with post-concussive syndrome, see Gov't's Mem. at 10. Therefore, because the plaintiff did not provide written notice of her claim until December 15, 2014, see Pl.'s Gov't Opp'n, Exhibit ("Ex.") 3 (Affidavit of Service), the FTCA's two-year statute of limitations period seemingly bars the plaintiff's tort claims against the Government.[4] However, the Court cannot find from the face of the Complaint that the plaintiff failed to exercise reasonable due diligence to learn Dr. Williams' employment status, and because the plaintiff has shown that extraordinary circumstances prevented her from filing her claims against the government before she did, this Court finds that equitable tolling of

---

[4] In her opposition to the Government's motion, the plaintiff argues that the applicable statute of limitations period for a negligence action in the District of Columbia is "a three (3) year statute of limitations . . . as opposed to the two year statute [of limitations] established under the FTCA," Pl.'s Gov't Opp'n at 14, and that she timely filed her tort claims within the three-year period. However, as the Circuit has noted, "the FTCA's statute of limitations would have no bite [if p]laintiffs injured in the District of Columbia or in any other jurisdiction where the statute of limitations is longer than two years could evade the FTCA statute by filing within the period prescribe by the state statute." Norman, 467 F.3d at 776. Accordingly, the plaintiff's argument urging the Court to apply the three-year statute of limitations for negligence claims in the District of Columbia has no merit here.

the FTCA's two-year statute of limitations period is warranted.

As noted above, the plaintiff contends that the FCTA's two-year statute of limitations should be equitably tolled until approximately November 7, 2013, when she learned from defendant Higgins' counsel that Dr. Williams was employed as a military fellow when he provided medical treatment to her at the University. See Pl.'s Gov't Opp'n at 11. The plaintiff contends that she "exercise[d] reasonable diligence in pursuing this matter by first sending a notice of representation letter to [the] University with a request to have both parties meet and discuss the matter." Pl.'s Gov't Opp'n at 12; see also id., Ex. 9. She also "went out and retained experts in a highly complicated medical malpractice action, and underwent the timely and complex notice provisions required in the District of Columbia to pursue a medical malpractice claim." Pl.'s Gov't Opp'n at 12–13. Specific to Dr. Williams' employment status, the plaintiff states that she "had absolutely no knowledge that Dr. Williams was a Federal Employee, nor any rational basis to believe that when she went and sought treatment from her team doctor at the [ ] University that she was actually being treated by [a Government employee]." Id. at 13. In addition, the plaintiff notes that "out of an abundance of caution in order to act with all due diligence, [she] served the Department of Defense and the Department of Health and Human Services with a Form 95 on December 15, 2014," to provide written notice of her claims, id. at 2, despite the uncertainty as to whether the Government would provide Dr. Williams with the Westfall certification, see id., Ex. 5 (Dr. Williams Petition for Certification), Ex. G (Letter from counsel for Dr. Williams sent to Litigation Division of the United States Army Legal Services Agency dated December 19, 2014) at 1 (noting that Dr. Williams and the Government had prior discussions regarding whether Dr. Williams was acting within the scope of his employment as a federal employee while treating the plaintiff). Therefore, the Court finds that the plaintiff acted

with reasonable due diligence "in preserving [her] legal rights," Irwin, 498 U.S. at 96, in regards to filing a lawsuit against the Government.

In arguing that the plaintiff did not exercise reasonable due diligence, the Government cites as support for its position Norman v. United States, 467 F.3d 773 (D.C. Cir. 2006), M.J. ex rel. Jarvis v. Georgetown Univ. Med. Ctr., 962 F. Supp. 2d 3 (D.D.C. 2013), aff'd as modified, 2014 WL 1378274 (D.C. Cir. Mar. 25, 2014), and Espinosa v. United States, No. 09-2399 (RMU), 2011 WL 710170, at *1 (D.D.C. Feb. 22, 2011), where the courts in each case declined to equitably toll the FTCA's two-year statute of limitations because the plaintiffs failed to act with reasonable due diligence. The Court finds, however, the facts in those cases distinguishable from the facts in this case. In Norman, the plaintiff, who sustained injuries in an automobile accident after being struck by the driver of a rental car who was a federal employee acting within the scope of his employment, 467 F.3d at 773–74, argued that "he exercised due diligence because immediately following the accident he filed a worker's compensation claim with his employer and a liability claim with USAA," id. at 776, the driver's personal "insurance provider," id. at 774. Although the plaintiff failed to present this documentation to the district court, the Circuit, in reviewing the documentation, noted that "[n]either the worker's compensation claim nor the liability claim indicate[d that the plaintiff] or his attorney made any efforts prior to the expiration of the FTCA's two-year statute of limitations-much less reasonably diligent efforts-to discover [the driver's] employer." Id. at 776.

Similarly, in M.J. ex rel. Jarvis, the plaintiff, fourteen years after the birth of her son, brought a medical malpractice claim on behalf of her son, alleging that he suffered from physical and mental disabilities attributable to the timing and method of his delivery. 962 F. Supp. 2d at 4–5. The district court rejected the plaintiff's argument that the statute of limitations should be

equitably tolled because the plaintiff failed to identify any efforts she had taken to learn of the doctor's employer.  See id. at 9.  And, in Espinosa, the plaintiff, who suffered spinal injuries in a car accident after being struck by "an active duty Army solider operating a government-owned van on official Army business," 2011 WL 710170, at *1, also argued that "the FTCA statute of limitations should be [equitably] tolled because he filed his complaint prior to the expiration of [the] District of Columbia's personal injury statute of limitations, having not yet received the Westfall certification," id. at *2.  The district court, however, noted that, "[o]ther than retaining counsel in the months after the accident, the plaintiff made no effort to discover [the driver's] employment status or to file suit within the two-year limitations period," in addition to failing to "allege[] or present[] any evidence of fraudulent concealment on the part of the agency that might provide a basis for equitable tolling."  Id. at *3.

As the Court noted earlier, the plaintiff in this case exercised reasonable due diligence in pursuing her legal rights.  She attempted to discuss and potentially resolve this matter with the University, retained medical experts, conducted research through the efforts of her attorneys, and complied with timely jurisdictional requirements in pursuing certain claims.  She also reasonably believed that Dr. Williams was an employee of the University, as he worked at the University as a medical trainer for the field hockey team.  See Pl.'s Gov't Opp'n at 11.  Thus, unlike the plaintiffs in the cases cited by the Government, it cannot be said that the plaintiff here failed to employ reasonable efforts to identify Dr. Williams' employer.

Moreover, the Court finds that extraordinary circumstances require equitable tolling of the FTCA's two-year statute of limitations.  As the plaintiff notes, the contract between defendant Higgins and the Government, which governs the employment terms for Dr. Williams as a trainee and member of "a fellowship program under the supervision of defendant Higgins,"

Pl.'s Gov't Opp'n at 1, prohibits individuals "being treated by the trainees [from] be[ing] made aware of [the] relationship" between defendant Higgins and the Government, thereby "deliberate[ly] conceal[ing] [a] material fact[] related to the involvement of the [Government]." Pl.'s Gov't Opp'n at 10; see also Gov't's Mot., Ex. 2 (Memorandum of Understanding Between the Medical Practice of David L. Higgins, M.D. and the National Capital Consortium (the "Agreement")) ¶ 12 ("Neither party will use the name of the other party in any of its publicity or advertising media. The existence and scope of the program, however, may be known to [the] trainees."). The plaintiff contends that neither this contract or any other

> proof or evidence of Dr. Williams' employment . . . was ever provided to [the p]laintiff or [her] counsel until Dr. Williams filed a Praecipe in the underlying Superior Court Action in March of 2015[,] in which he attached a copy of his Petition for Judicial Findings and Certification of Scope of Officer or Employment in Case 1:15-MC-00283 in this Court.

Pl.'s Gov't Opp'n at 11–12. Therefore, despite the plaintiff's exercise of due diligence, she would have been "unable to obtain [the] vital information," Norman, 467 F.3d at 776, about Dr. Williams' employment status because that information was concealed and not made available until Dr. Williams legally sought to force the Government to provide him with a Westfall certification. And, until the Government provided the Westfall certification, it had taken the position that Dr. Williams was not acting within the scope of his federal employment, but rather as an employee of the Medicine Center hired by the University, the same belief the plaintiff reasonably held. Accordingly, because the Court cannot find that the plaintiff failed to exercise due diligence in pursuing her legal rights, and as a result of extraordinary circumstances that existed in this case, the Court finds it appropriate to equitably toll the FCTA's two-year statute of limitations until November 7, 2013, when the plaintiff learned that Dr. Williams was a military fellow. Therefore, because the plaintiff filed her administrative claim within two years after

learning of Dr. Williams' status as a military fellow, the Court must reject the Government's

position that the plaintiff's claims against it are time-barred.[5]

## 2. Borrowed Servant Doctrine

The Government also argues that the "[p]laintiff's claims against [it] fail under the

borrowed servant doctrine" because "at all times relevant to the litigation, [Dr.] Williams 'was an

agent, servant, and/or employee of . . . [the] University, Higgins, Higgins, P.C. and [the

Medicine] Center,'" Gov't's Mem. at 15 (quoting Removal Notice, Ex. 5 (Am. Compl.) ¶ 13),

and because "the Higgins Practice had the 'power to control and direct' [Dr.] Williams in the

performance of his work," id. The plaintiff contends that issue preclusion estops the

Government from asserting the borrowed servant doctrine because

> the issue over whether or not [the Government] was liable for the actions of Dr.
> Williams was actually litigated, [and] determined by a valid final judgment on the
> merits when the Court issued its previous[] ruling after a full and fair opportunity
> to litigate the matter where the issue of [the Government's] liability for Dr.
> Williams was essential.

Pl.'s Gov't Opp'n at 21. In response, the Government asserts that the "state law defining an

individual's scope of employment (for purposes of Westfall certification) is separate and distinct

from the control inquiry and the ultimate issue of employer liability (for purposes of borrowed

servant)." Gov't's Reply at 10. Accordingly, the Court must decide (1) whether, after litigating

the Westfall certification issues, the Government's determination that it must be substituted as a

defendant for Dr. Williams for Westfall certification purposes bars the Government from

denying liability for Dr. Williams' alleged negligent conduct based on issue preclusion, and if

---

[5] The Government also contends that the plaintiff did not exercise reasonable due diligence because she did not serve her administrative claim on the appropriate federal agency, as her affidavit establishing service of her claim lists the wrong address for the Department of Defense. Gov't's Mot. at 4. Despite the plaintiff's mistake, the appropriate agency received the plaintiff's administrative claim in March 2015, see Gov't's Mot. at 4, which was within the two-year statute of limitations as a result of the Court's equitable tolling of the limitations period. Thus, the Court finds that this argument lacks merit.

not, (2) whether Dr. Williams is a borrowed servant of the Higgins Practice, which the Government argues should be solely liable for Dr. Williams' alleged negligent conduct.

### a. The Applicability of Issue Preclusion

There does not appear to be a case in this Circuit that has addressed the issue of whether the Government, which after substituting itself for an individual in a civil action after determining that the individual acted within the scope of his federal employment for Westfall certification purposes, is precluded from arguing that it is not liable for the individual's allegedly negligent actions under the borrowed servant doctrine. As support for its position that the Westfall certification question and the determination of liability for the allegedly negligent conduct are separate issues, the Government relies on Palmer v. Flaggman, 93 F.3d 196 (5th Cir. 1996), which addressed this issue. The Court finds the reasoning in Palmer instructive.

In Palmer, the Firth Circuit considered whether "a federal employee who acts as the 'borrowed servant' of a private employer may simultaneously act within the scope of his federal employment in such a way as to make him immune from suit under the Westfall Act." 93 F.3d at 197. In assessing this issue, the court noted that it had to determine whether, under Texas state law where the alleged negligence occurred, "the scope of employment inquiry is separable from the control inquiry and the ultimate issue of liability."[6] Id. at 201. However, the court recognized that "Texas state law on this issue [was] sparse" because

> [t]he Westfall Act creates a unique situation in which the parties have an interest
> in proving that an employee acted within the scope of his or her employment,
> without regard for the ultimate issue of the employer's liability [while] the model
> tort case [in Texas] answers the scope of employment issue only in the context of
> assigning liability.

---

[6] Under Texas state law, "an employee acts within the course and scope of his employment when his actions are: 1) within the general authority given to him by his employer; 2) in furtherance of the master's business; and 3) for the accomplishment of the object for which he is employed." Palmer, 93 F.3d at 199 (internal citation omitted).

Id.  And, the "Texas cases involving two 'employers' generally resolve only the issue of which employer had 'control' over the tortfeasor, and hence the liability through the 'borrowed servant' doctrine."  Id. at 201–02.  Thus, "Texas courts have not elaborated on whether the tortfeasor was also within the scope of the non-liable defendant's employment, or whether a tortfeasor is legally able to act simultaneously within the scope of employment of two defendants where only one is ultimately liable."  Id. at 202.  Nonetheless, in "reach[ing] the result [that it] believe[d] the Texas court would be most likely to reach," id.; see also id. at 202 ("Because Texas courts have not directly addressed this issue, we must decide it as we believe the Texas Supreme Court would have decided it, if confronted with the issue directly."), the court reasoned (1) that there was "no distinction between simultaneously 'serving' two masters, and acting within the 'scope of employment' of two employers[;]" id. at 204, (2) that "a particular action can serve more than one purpose, while still remaining within the scope of employment[;]" id. ("[A]n action may benefit the employee personally, but still fall within the course and scope of his employment, so long as the purpose of the action still benefits the master to an appreciable extent." (internal citation omitted)), and (3) that "[t]he borrowed servant inquiry seeme[d] to become relevant only after one determines whether an employee's actions are within the scope of his general employment[,]" id. (noting that "[e]ven if the borrowing master is liable for the acts of the servant, 'the general employer remains liable if the act fell within the scope of the employee's general employment'" (internal citation omitted)).  Therefore, the court concluded that "nothing in Texas law indicates that the stated test for scope of employment . . . also includes an additional element of control over the tortfeasor's actions.  Instead, [it found] that the element of control is relevant only to the separate issue of ultimate liability."  Id. at 205.

Applying these principles here, the Court notes that "District of Columbia [respondeat

superior] law, which applies in this case, follows the RESTATEMENT (SECOND) OF

AGENCY (1958) ("Restatement") in defining scope of employment."  Council on Am. Islamic

Relations v. Ballenger, 444 F.3d 659, 663 (D.C. Cir. 2006).  Under the Restatement:

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of
> the kind he is employed to perform; (b) it occurs substantially within the
> authorized time and space limits; [and] (c) it is actuated, at least in part, by a
> purpose to serve the master.  [However, c]onduct of a servant is not within the
> scope of employment if it is different in kind from that authorized, far beyond the
> authorized time or space limits, or too little actuated by a purpose to serve the
> master.

Restatement § 228.  Consequently, District of Columbia law does not include the additional

element of control over the tortfeasor's actions in determining the scope of employment.  In

addition, District of Columbia cases have separately considered the borrowed servant doctrine as

a defense to assigning liability for tortious conduct.  See Dellums v. Powell, 566 F.2d 216, 220

(D.C. Cir. 1977) (applying the borrowed servant doctrine as a defense to vicarious liability), cert.

denied, 438 U.S. 916 (1978); see also Estate of Carter v. District of Columbia, 903 F. Supp. 165,

167 (D.D.C. 1995) (discussing whether the borrowed servant doctrine transferred liability to the

District of Columbia for the actions of United States Park Police engaged in routine patrolling in

the District of Columbia).  Accordingly, the Court finds "that the element of control is relevant

only to the separate issue of ultimate liability," Palmer, 93 F.3d at 205, and thus, issue preclusion

does not apply in this case because the parties have only litigated Dr. Williams' scope of

employment for Westfall certification purposes.

### b.  Borrowed Servant Status and Liability

"Under the law of agency, 'a person who is generally the servant of one master [ ] can

become the borrowed servant of another.'"  Chang v. United States, Nos. 02-2010 (EGS),

02-2283 (EGS), 2007 WL 2007335, at *12 (D.D.C. July 10, 2007) (quoting Dellums, 566 F.2d at

220) (alteration in original). "In considering whether an employee's negligence should be imputed to a special employer, the critical determination is which employer possess the 'power of control.'" Dower v. Davis, No. 86-2658-OG, 1987 WL 12847, at *5 (D.D.C. July 28, 1987). The Restatement identifies the following factors as relevant to determining the issue of control:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement § 220(2).

Furthermore, "[i]f the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master." Dellums, 566 F.2d at 220. "However, '[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of service to the other.'" Chang, 2007 WL 2007335, at *12 (citing the Restatement § 226); see also Dellums, 566 F.2d at 221 ("[T]here is a presumption that an actor remains in his general employment so long as by the service rendered another, he is performing the business entrusted to him by the general employer." (citing the Restatement § 227, n.6, cmt. b)). And, if a servant acts within the scope of his employment for both masters, both may "be responsible for an act which is a breach of duty to one or both of them." Restatement § 226 cmt.

a.  Moreover, "[w]hether one party is the 'sole master to whom liability can attach . . . is usually a question of fact, generally to be decided by the jury.'"  Chang, 2007 WL 2007335, at *12 (quoting Dellums, 566 F.2d at 220).

Based on the record currently before the Court, it cannot be said that the facts here undisputably prove that the Higgins Practice is solely liable for Dr. Williams' allegedly negligent conduct.  The Government primarily relies upon the Agreement between the National Capital Consortium (the "Consortium") and the Higgins Practice to show that Dr. Williams, as a member of the Consortium, was under the control of the Higgins Practice, and therefore, a borrowed servant of the Higgins Practice.  See Gov't's Mem. at 15.  Specifically, the Government notes that the Agreement provides that Dr. Williams, "[w]hile training at the [Higgins] Practice, . . . [was] under the supervision of [Higgins Practice] officials for training purposes and [was] subject to, and [was] required to abide by, all practicable [Higgins] Practice rules and regulations."  Gov't's Mot., Ex. 2 (Agreement) ¶ 5.  Under the Agreement, Dr. Williams was "considered [a] provider[] or member[] of the [Higgins] Practice's workforce while performing duties pursuant to [the A]greement," id., Ex. 2 (Agreement) ¶ 10, and the Higgins Practice "reserved the right to refuse to accept or to bar [Dr. Williams] from training when it [was] determined that [his] further participation would not be in the [Higgins] Practice's best interest," id., Ex. 2 (Agreement) ¶ 9.  Additionally, the Agreement stated that because Dr. Williams, "while training at the Practice, [was] under the exclusive control and supervision of the [Higgins] Practice[,] . . . proceeds from [Dr. Williams'] professional bills [became] the [Higgins] Practice's exclusive property."  Id., Ex. 2 (Agreement) ¶ 11.  Based on these provisions, the Agreement suggests that Dr. Williams was a borrowed servant of the Higgins Practice, and therefore, the Higgins Practice would be liable for tortious conduct committed by Dr. Williams while working

under the control and supervision of the Higgins Practice.

However, the Agreement also provides that the Consortium "requires special clinical training in preparation for board certification of fellows . . . in sports medicine," id., Ex. 2 (Agreement) ¶ 3, and that "[i]t is in the best interest of the Consortium for trainees to use the facilities of the [Higgins] Practice to receive [this] clinical experience," id., Ex. 2 (Agreement) ¶ 4. Additionally, "the director of the Consortium's Family Medicine/Sports Medicine Fellowship Program" assisted in the "outlining [of the] specific goals and requirements for [the] clinical rotation" performed, including "the anticipated training, training and supervision standards to be employed, and any other issues required by the Family Medicine/Sports Medicine Fellowship Program Review Committee." Id., Ex. 2 (Agreement) ¶ 8. The Agreement also suggests that the Consortium prohibited the Higgins Practice from generating professional bills for services rendered by Dr. Williams "to patients who are beneficiaries of the Department of Defense/TriCare." Id., Ex. 2 (Agreement) ¶ 11. The Consortium further promised to "ensure compliance with all applicable [Higgins] Practice rules and instructions and those of its physicians," id., Ex. 2 (Agreement) ¶ 27, and it provided secondary liability coverage because, "while performing services pursuant to [the A]greement, Consortium trainees remain[ed] employees of the United States performing duties within the course and scope of their federal employment," id., Ex. 2 (Agreement) ¶ 32. Consequently, the record also suggests that the Consortium maintained some elements of control of Dr. Williams' clinical experience at the Higgins Practice and that Dr. Williams was acting within the scope of his duties for both the Higgins Practice and the Consortium. Therefore, because the current record does not clearly attach liability exclusively to the Higgins Practice, the Court must deny the Government's motion to dismiss, or alternatively for summary judgment with respect to the plaintiff's claims

against it based on the borrowed servant doctrine.[7]

### B. The Plaintiff's Claims Against the NCAA

### 1. The Negligence Claim

In Count I of her Amended Complaint, the plaintiff asserts a negligence claim against the NCAA, alleging that it "was careless and negligent by breaching the duties of care it assumed for the benefit of [the p]laintiff." Removal Notice, Ex. 5 (Am. Compl.) ¶ 142. To state a claim of negligence under District of Columbia law, the plaintiff must establish that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1098 (D.C. 1994). Defendant NCAA argues that

> [n]owhere in the Amended Complaint does [the p]laintiff plead that the NCAA did something or did not do something after the alleged injury with respect to her medical care, that the NCAA played any part in the medical decision made by the healthcare providers she consulted, or even that the NCAA was aware of her injury or that she was receiving medical care. Simply put, [the p]laintiff's [negligence] claim is about the medical care she received from other people, not the NCAA.

NCAA's Reply at 8. Thus, the NCAA contends that the "[p]laintiff has not pled sufficient facts to establish (even at the pleading stage) that [its] supposed negligence caused her injuries[,]" and therefore, the "[p]laintiff's negligence-based claims must be dismissed."[8] NCAA's Mem. at 15.

"The District of Columbia Court of Appeals 'has defined proximate causation as that

---

[7] The Court finds the Government's motion for summary judgment premature given that discovery has not yet occurred in this case. However, after the close of discovery and once the record is complete, the Government may of course renew its motion for summary judgment on the grounds that the borrowed servant doctrine shifts sole liability to the Higgins Practice.

[8] In a footnote in its motion to dismiss, the NCAA noted that it "disagrees that [the p]laintiff has identified a legally cognizable duty that the NCAA breached" because "the law is clear that athletic associations do not have a legal duty to prevent foreseeable risks." NCAA's Mem. at 14 n.11. However, the NCAA appears to predicate its argument solely on the causation element of a negligence claim, see generally NCAA's Reply (failing to address the plaintiff's argument that the NCAA concedes that the plaintiff has successfully pleaded the duty, breach, and damages elements), and therefore, the Court, at this time, will consider only whether the NCAA's alleged negligence was a proximate cause of the plaintiff's alleged injuries.

cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.'" Smith v. Hope Village, Inc., 481 F. Supp. 2d 172, 199–200 (D.D.C. 2007) (Walton, J.) (quoting District of Columbia v. Zukerberg, 880 A.2d 276, 281 (D.C. 2005)). "[A]n actor whose conduct is a substantial factor in bringing about [the] harm shall be liable in negligence . . . for[, inter alia,] harm foreseeably attributable to his or her conduct." Id. at 200 (quoting White v. United States, 780 F.2d 97, 106 (D.C. Cir. 1986) (alterations in original)). The plaintiff may demonstrate proximate cause by "either direct or circumstantial evidence," Zukerberg, 880 A.2d at 281, and "'[i]n most cases, the existence of proximate cause is a question of fact for the jury,' and 'only if it is absolutely clear that the [defendant's] negligence could not have been a proximate cause [of the harm asserted by the plaintiff] is it a question of law,'" Smith, 481 F. Supp. 2d at 185 (first quoting McNeal v. Hi-Lo Powered Scaffolding, Inc. 836 F.2d 637, 644 (D.C. Cir. 1988); then quoting Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (alterations in original)).

Here, the plaintiff has pleaded facts sufficient to establish a claim of negligence against the NCAA. In her Amended Complaint, the plaintiff asserts that "[d]efendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including [her,] . . . [and] a duty to protect student-athletes from brain injuries." Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 138–39. The plaintiff then alleges that "[d]efendant NCAA failed in its duties" by, among other things, failing to

> ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms[,] and risks of concussions, second-impact syndrome, and post-concussive syndrome; implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms; implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans; provide appropriate guidance to its member institutions on concussion management; [and] safeguard[] its

student-athletes from preventable concussion and post-concussion injuries.

Id., Ex. 5 (Am. Compl.) ¶ 142(b), (g), (h), (i), (k), (m).  And the plaintiff also contends that the NCAA's alleged negligent acts or omissions proximately caused her to suffer economic and non-economic damages such as various "past [and future] medical bills, . . . and loss of future economic opportunity," id., Ex. 5 (Am. Compl.) ¶ 145, as well as "deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation[,] and disfigurement," id., Ex. 5 (Am. Compl.) ¶ 146.  Because "it is [not] absolutely clear that the [defendant's] negligence could not have been a proximate cause" of the harm asserted by the plaintiff," Smith, 481 F. Supp. 2d at 185 (second alteration in original), and because the plaintiff has pleaded facts sufficient to demonstrate causation to withstand a motion to dismiss, the Court must deny the NCAA's motion to dismiss with respect to the plaintiff's negligence claim against it.

### 2. The Gross Negligence Claim

Count II of the plaintiff's Amended Complaint asserts a gross negligence claim against the NCAA.  See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 147–56.  The NCAA contends that the plaintiff's gross negligence claim against it is "duplicative of [the p]laintiff's negligence claim and should be dismissed as redundant."  NCAA's Mem. at 15.

"In the District of Columbia, 'courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons.'"  Search v. Uber Techs., Inc., 128 F. Supp. 3d 222, 237 (D.D.C. 2015) (quoting Hernandez v. District of Columbia, 845 F. Supp. 2d 112, 116 (D.D.C. 2012)).  Where, as here, the "plaintiff has already alleged a negligence claim[,] . . . the Court defers to the general rule in the District of Columbia against recognizing degrees of

negligence and will dismiss as duplicative plaintiff's claim for gross negligence . . . as a separate basis of liability.'" Id. (citation omitted) (alterations in original).

The "[p]laintiff maintains her contention that [d]efendant NCAA's conduct in this matter rose to the level of gross negligence for which punitive damages may be recoverable[, and that s]uch damages are not recoverable under a mere standard of negligence." Pl.'s NCAA Opp'n at 32. However, the plaintiff's Amended "Complaint includes multiple counts of negligence against [the NCAA], and [the plaintiff] does not identify any relevant statutory claim or defense requiring a showing of gross negligence." Search, 128 F. Supp. 3d at 237; see also Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 147–56 (alleging only the elements of a gross negligence claim without any reference to any statutory claim or defense). Instead, the plaintiff asserts a claim of gross negligence only for the purposes of recovering punitive damages.[9] But, "neither 'gross negligence' nor 'punitive damages' is a stand-alone cause of action in the District of Columbia." Search, 128 F. Supp. 3d at 237–38. Accordingly, the Court must dismiss the plaintiff's gross negligence claim against defendant NCAA.

### 3. The Negligent Infliction of Emotional Distress Claim

The plaintiff in Count IV of her Amended Complaint alleges that she "has and continues to suffer from severe emotional distress" resulting from the NCAA's alleged negligence.

---

[9] The Court also notes that "[i]n the District of Columbia, punitive damages are generally available only in actions arising from intentional torts." Doe v. De Amigos, LLC, 987 F. Supp. 2d 12, 17 (D.D.C. 2013) (citing Calvetti v. Antcliff, 346 F. Supp. 2d 92, 108 (D.D.C. 2004)). And, "[t]he District of Columbia does not allow recovery for punitive damages for a showing of mere negligence." Id. (citing Harvey v. Mohammed, 841 F. Supp. 2d 164, 180–81 (D.D.C. 2012), aff'd in part as modified and rev'd in part, 798 F.3d 1042 (D.C. Cir. 2015)). "Rather, punitive damages are reserved for only those tortious acts that are 'replete with malice.'" Harvey, 841 F. Supp. 2d at 181 (quoting Zanville v. Garza, 561 A.2d 1000, 1002 (D.C. 1989)); see also Wash. Med. Ctr., Inc. v. Holle, 573 A.2d 1269, 1284 (D.C. 1990) ("Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." (internal quotation marks and citation omitted)). Therefore, to the extent the plaintiff's Amended Complaint can be construed as a request for punitive damages, the plaintiff has not made a showing sufficient to establish that the NCAA committed an intentional tort against her that was "replete with malice." Zanville, 561 A.2d at 1002.

Removal Notice, Ex. 5 (Am. Compl.) ¶ 171.  Similar to its argument in opposition to the

plaintiff's gross negligence claim, the NCAA contends that the "[p]laintiff's negligent infliction

of emotional distress [claim] is subsumed by her negligence claim and thereby seeks duplicative

damages."  NCAA's Mem. at 16.

"To establish a prima facie case of negligent infliction of emotional distress, [a plaintiff]

must show that she was in the zone of physical danger created by [the defendant's] conduct and

was caused by [the defendant's] negligence to fear for her own well-being."  Hollis v. Rosa

Mexicano D.C., LLC, 582 F. Supp. 2d 22, 27 (D.D.C. 2008) (quoting Jane W. v. Pres. & Dirs. of

Georgetown Coll., 863 A.2d 821, 826 (D.C. 2004) (alterations in original)).  Alternatively,

"when a plaintiff [is] not within the zone of danger but where there is a 'special relationship'

between the parties," a plaintiff may state of a claim of negligent infliction of emotional distress

> if the plaintiff can show that (1) the defendant has a relationship with the plaintiff,
> or has undertaken an obligation to the plaintiff, of a nature that necessarily
> implicates the plaintiff's emotional well-being, (2) there is an especially likely
> risk that the defendant's negligence would cause serious emotional distress to the
> plaintiff, and (3) negligent actions or omissions of the defendant in breach of that
> obligation have, in fact, caused serious emotional distress to the plaintiff.

Lesesne v. District of Columbia, 146 F. Supp. 3d 190, 195 (D.D.C. 2015) (citing Hedgepeth v.

Whitman Walker Clinic, 22 A.3d 789, 810–11 (D.C. 2011)).

Here, the plaintiff has not pleaded facts sufficient to establish a claim of negligent

infliction of emotional distress against the NCAA.  In her Amended Complaint, the plaintiff

merely summarizes the same allegations upon which she seeks to establish claims of negligence

and gross negligence, and recites, in a conclusory fashion, the elements that set forth a claim for

negligent infliction of emotional distress.  Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73.

Additionally, the plaintiff has not proffered any facts that demonstrate that the NCAA's alleged

negligence, rather than her underlying physical injury, caused her serious emotional distress.  See

id., Ex. 5 (Am. Compl.) ¶¶ 172–73 (asserting the same injuries in Count I (negligence) and Count II (gross negligence) against the NCAA). Consequently, the plaintiff has not pleaded facts sufficient to plausibly state a claim of negligent infliction of emotional distress against the NCAA, and therefore, the Court grants the NCAA's motion to dismiss Count IV against it.

### 4. The Fraudulent Misrepresentation Claim

The plaintiff alleges in Count V of her Amended Complaint that the NCAA made false representations to her by stating "that it undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports . . . [and] to protect student-athletes from brain injuries." Removal Notice, Ex. 5 (Am. Compl.) ¶ 175. The NCAA contends that the plaintiff fails to plead the requisite elements of a common law fraud claim, including failing to identify "what statements [it] made to [the p]laintiff, when the statements were made, how any such statements were false, that [it] knew the statements were false, or how [the p]laintiff relied on those statements to her detriment." NCAA's Mem. at 12.

"The essential elements of common law fraud are: (1) a false representation (2) in reference to [a] material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." Va. Acad. of Clinical Psychologists v. Grp. Hosp. & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005) (citation omitted). In addition to the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, fraud claims are subject to the heightened pleading requirement of Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this heightened standard, "'the pleader [must] . . . state the time, place[,] and content of the false misrepresentations, the fact misrepresented . . . [,] what was retained or given up as a

consequence of the fraud,'" and "identify individuals allegedly involved in the fraud." United States ex rel. Williams v. Martin–Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citations omitted); see also Stevens v. InPhonic, Inc., 662 F. Supp. 2d 105, 114 (D.D.C. 2009) (Walton, J.) ("The complaint must . . . provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud in order to meet this enhanced pleading standard." (internal citation and quotation marks omitted)).

Here, the plaintiff has failed to allege facts sufficient to state a claim of fraudulent misrepresentation against the NCAA to survive a motion to dismiss. The plaintiff claims that the "NCAA has both promised and acknowledged that it has a duty to protect the health and safety of student-athletes" because the NCAA's Constitution states that the NCAA "shall assist [member] institution[s] in [their] efforts to achieve full compliance with all rules and regulations," Removal Notice, Ex. 5 (Am. Compl.) ¶ 65, and because "the NCAA utilizes injury surveillance data to examine, explore, understand, and work to prevent sports injuries," id., Ex. 5 (Am. Compl.) ¶ 67. Additionally, the plaintiff asserts that the NCAA's representations to protect the health and safety of student-athletes were false. See id., Ex. 5 (Am. Compl.) ¶ 176. However, the plaintiff recognizes that the NCAA, through its Constitution, expressly notes that each member institution maintains sole responsibility "to protect the health of, and provide a safe environment for, each of its participating student athletes." Id., Ex. 5 (Am. Compl.) ¶ 64 (quoting Article 2.2 of the NCAA's Constitution). Even accepting the plaintiff's allegation of fraudulent misrepresentation as true, as the Court must at this stage of the proceedings, she has not alleged any facts that demonstrate how the NCAA's representations are allegedly false, were "made with knowledge of its falsity [or] with the intent to deceive." Va. Acad. of Clinical Psychologists, 878 A.2d at 1233. Instead, what the plaintiff has done is simply assert a

threadbare recital of the elements of a fraudulent misrepresentation claim. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 174–82. Such bare, conclusory allegations satisfy neither the Rule 8 pleading standards as explained under Iqbal, nor the heightened pleadings requirements of Rule 9(b). The plaintiff's fraudulent misrepresentation claim against the NCAA must, therefore, be dismissed.

### 5. The Breach of Contract Claim

Count VI of the plaintiff's Amended Complaint alleges that the NCAA and the plaintiff

> entered into a contract whereby the NCAA agreed to undertake and assume a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including [the plaintiff]; and agreed to undertake and assume a duty to protect student-athletes from brain injuries. In return, [the p]laintiff [ ] agreed to abide by all rules and regulations promulgated by [d]efendant NCAA through its Constitution, Bylaws, and numerous authorizations required to participate in field hockey.

Removal Notice, Ex. 5 (Am. Compl.) ¶ 184. According to the plaintiff, "[d]efendant NCAA breached [this] contract in failing to protect the physical and mental well-being of [the p]laintiff and in failing to protect [her] from brain injuries." Id., Ex. 5 (Am. Compl.) ¶ 186.

"In the case of a claim for breach of contract, the complaint must allege four necessary elements in order to effect fair notice: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." Ihebereme v. Capital One, N.A., 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (internal quotation marks omitted). The NCAA argues that dismissal of the plaintiff's breach of contract claim against it is warranted because the plaintiff has not "identif[ied] an actual contract between her and the NCAA, much less a contract in which the NCAA agreed to be responsible for injuries [the p]laintiff could suffer while playing field hockey." NCAA's Mem. at 13. The Court agrees.

In her Amended Complaint, the plaintiff cites the following formal agreements as establishing a valid contract for the basis of her breach of contract claim: (1) Health Insurance Portability and Accountability Act ("HIPAA") authorization forms for the NCAA and the University; (2) Student-Athlete Concussion Statements for 2010–2011 and for 2011–2012 on behalf of the University; and (3) a Student-Athlete Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related Research Purposes for the NCAA. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 68, 92–93, 96; see also Pl.'s NCAA Opp'n at 26–27. However, only two of these formal agreements are between the plaintiff and the NCAA, and those agreements are only a request to access the plaintiff's medical records. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 68, 96. Consequently, the plaintiff has neither identified a valid, enforceable contract wherein the NCAA agreed to protect the physical and mental well-being of students-athletes, including the plaintiff, nor the specific terms of any contract regarding the NCAA's alleged duty or obligation to provide medical treatment to the plaintiff that the NCAA breached. See Regan v. Spicer HB, LLC, 134 F. Supp. 3d 21, 30 (D.D.C. 2015) (dismissing part of the plaintiff's breach of contract claims because the plaintiff "failed to identify an obligation or duty arising out of the [contract] that was breached by [the d]efendants"); see also In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009, 808 F. Supp. 2d 154, 159 (D.D.C. 2011) (Walton, J.) ("It is particularly important to note that 'one cannot breach a contract without breaching a particular obligation created under the contract.'" (quoting Iheberere, 730 F. Supp. 2d at 47)).

Alternatively, if the Court concludes "that a formal contract was not entered into between the parties," the plaintiff asserts "that she has adequately pled facts to support a claim of quasi-contract" or an implied-in-fact contract. Pl.'s NCAA Opp'n at 29. Specifically, the

plaintiff contends that she "expect[ed] to receive consideration from [d]efendant NCAA for granting it the ability to appropriate her likeness and providing access to her personal identifiable and privileged medical information in the form of compliance and enforcement of the applicable rules and safeguards imposed by the NCAA." Id. at 30. But, as the NCAA notes, see NCAA's Reply at 6, the plaintiff has not pleaded any facts to establish a quasi-contract or an implied-in-fact contract, and the plaintiff may not now seek to do so or further amend her complaint through an opposition brief. See Thomas v. Sotera Def. Sols., Inc., 40 F. Supp. 3d 181, 185 (D.D.C. 2014) (noting that "a complaint may not be amended by the briefs in opposition to a motion to dismiss" (internal citation and quotation marks omitted)).[10] Accordingly, because the plaintiff has failed to plead facts sufficient to establish a valid contract between her and the NCAA regarding the NCAA's alleged duty or obligation to provide her medical treatment, the Court must grant the NCAA's motion to dismiss the plaintiff's breach of contract claim against it.

### 6. The Medical Malpractice Claim

The plaintiff predicates Count VIII of her Amended Complaint on a medical malpractice claim against the NCAA. In the District of Columbia, a "healthcare provider" is

> an individual or entity licensed or otherwise authorized under District law to provide healthcare service, including a hospital, nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, renal dialysis facility, ambulatory surgical center, pharmacy, physician or health care practitioner's office, long-term care facility, behavior health residential treatment facility, health clinic, birth center, clinical laboratory, health center, physician, physician assistant, nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, certified nurse midwife, psychologist, certified social worker, registered dietitian or nutrition professional, physical or occupational therapist, pharmacist, or other individual health care practitioner.

---

[10] In her oppositions to both defendants Patriot League's and the University's motions to dismiss, the plaintiff makes the same argument that she has pleaded facts to show the existence of a quasi-contract, and if the Court deems otherwise, she requests leave of the Court to further amend her Complaint. Because the arguments and facts are essentially identical, it is unnecessary for the Court to separately address this argument in regards to each motion, as the Court's ruling here is also applicable to the other defendants' motions.

D.C. Code § 16-2801(2) (2012).  Defendant NCAA contends that dismissal of the plaintiff's

medical malpractice claim against it is warranted because the "[p]laintiff does not allege that the

NCAA is a healthcare provider licensed in the District of Columbia . . . , and the NCAA neither

falls within any of the twenty-seven examples enumerated in the statute, nor can it be considered

an 'other individual health care practitioner' under any reasonable interpretation of the term."

NCAA's Mem. at 9.  The Court agrees.

The Court notes that the plaintiff has not alleged or pleaded facts that demonstrate that

the NCAA is "an entity licensed or otherwise authorized under District law to provide healthcare

service[s]."  D.C. Code § 16-2801(2).  Nonetheless, in her attempt to show that "[d]efendant

NCAA undertook a duty to act as a healthcare provider," Pl.'s NCAA Opp'n at 18, the plaintiff

relies on the Sports Medicine Handbook[11] created by the NCAA Committee on Competitive

Safeguards and Medical Aspects of Sports, which provides "guidelines for sports medicine care

and [the] protection of student athletes' health and safety . . . [and which she contends] may

constitute some evidence of the legal standard of care," id. at 17 (citing NCAA Mot., Ex. B

(2011–2012 NCAA Sports Medicine Handbook (the "Sports Medicine Handbook")) at 2).  And,

the plaintiff argues that the NCAA's enforcement of the Sports Medicine Handbook and its

underlying policies and guidelines constitutes the "practice of medicine."  Id. at 18 (comparing

the NCAA's action with respect to this Handbook to "Georgetown University and George

Washington University[, which both] craft and enforce policies and procedures to be utilized

within their hospitals").  However, the Sports Medicine Handbook expressly states:

---

[11] "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted).  Therefore, because the plaintiff incorporates the Sports Medicine Handbook into her Amended Complaint, see Removal Notice, Ex. 5 (Am. Compl.) ¶ 42, the Court will consider the Sports Medicine Handbook in its analysis.

> This handbook consists of guidelines for each institution to consider in developing sports medicine policies appropriate for its intercollegiate athletics program. . . . These recommendations are not intended to establish a legal standard of care that must be strictly adhered to by member institutions. . . . [Additionally,] [t]hese general guidelines are not intended to supersede the exercise of medical judgment in specific situations by a member institution's sports medicine staff. In all instances, determination of the appropriate care and treatment of student-athletes must be based on the clinical judgment of the institution's team physician or athletic health care team that is consistent with sound principles of sports medicine care.

NCAA Mot., Ex. B (Sports Medicine Handbook) at 2. Therefore, the NCAA, through the Sports Medicine Handbook and its policies, only provides guidance for the consideration of its member institutions and does not establish a standard of care, instead deferring to the member institutions the responsibility of developing sports medicine policies for he care and treatment of their student-athletes.

Alternatively, the plaintiff contends that the "NCAA is vicariously liable for the actions and inactions of [the University] and its agents, servants, and/or employees that failed to fall in line with policies and procedures as [they] pertain to a concussion management plan." Pl.'s NCAA Opp'n at 22. As support for this position, the plaintiff argues that "the NCAA Constitution and the policies and procedures developed by [the] NCAA created a right to control and direct the healthcare providers treating [her] in creating and enforcing an appropriate concussion management plan." Id. at 21. However, the "NCAA Bylaws state '[i]t is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating athletes.'" Id. (alteration in original). And, even if the NCAA could "suspend[] or terminate[] or . . . otherwise discipline[]" the University if it "fail[ed] to meet the conditions and obligations of membership or fail[ed] to adhere to the purposes and policies of the [NCAA]," id., the NCAA could not likewise punish the healthcare providers employed by the University who treated the plaintiff. Furthermore, the Sports Medicine Handbook only provided

guidance for its member institutions' consideration and did not grant the NCAA the right to control or direct the healthcare providers who treated the plaintiff at the University.  See generally NCAA Mot., Ex. B (Sports Medicine Handbook) at 2.  Consequently, the plaintiff has failed to proffer facts sufficient to plausibly state a claim of entitlement to relief either through direct or vicarious liability against the NCAA.  Accordingly, the Court must dismiss the plaintiff's medical malpractice claim against the NCAA.

### C.    The Plaintiff's Claims Against the Patriot League

#### 1.  The Negligence Claim

Count III of the plaintiff's Amended Complaint alleges that the Patriot League was "careless and negligent by breaching the duties of care [it] assumed for the benefit of [the p]laintiff."  Removal Notice, Ex. 5 (Am. Compl.) ¶ 164.  Specifically, the plaintiff asserts that the Patriot League failed to "provide and oversee a management system for [the treatment of the] concussion" that she suffered.  Pl.'s Patriot League Opp'n at 15; see also Removal Notice, Ex. 5 (Am. Compl.) ¶ 164(a)–(p) (alleging that the defendants failed to implement policies and procedures to treat, care, and manage student-athletes who sustain concussions).  And, the plaintiff argues that the Patriot League is vicariously liable under the doctrine of respondeat superior because it "had a right to control and direct [the University] and the healthcare providers treating [the plaintiff]."  Pl.'s Patriot League's Opp'n at 18; see also Removal Notice, Ex. 5 (Am. Compl.) ¶ 165.

As noted earlier, a claim of negligence under District of Columbia law requires the plaintiff to establish that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of [the] duty proximately caused damage to the plaintiff." Haynesworth, 645 A.2d at 1098.  The Patriot League contends that the plaintiff's negligence

claim against it must be dismissed as a matter of law because "there is no legal basis upon which to find a 'duty' on behalf of the Patriot League in this case [and t]here is no 'special relationship' between [t]he Patriot League and [the p]laintiff that would result in [the] establishment of a duty or justify the imposition of a duty."  Patriot League's Mem. at 17.

"[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care."  Presley v. Commercial Moving & Rigging, Inc., 25 A.3d 873, 888 (D.C. 2011) (alterations in original) (quoting Youssef v. 3636 Corp., 777 A.2d 787, 792 (D.C. 2001)).  "In general, courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the [plaintiff] in a negligence action and examine whether the risk to the [plaintiff] was 'reasonably foreseeable' to the defendant."  Hedgepeth, 22 A.3d at 793.  And, "[t]he relationship between the plaintiff and the defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty."  Id. at 794.  However, a "determination of whether a duty exits is the result of a variety of considerations and not solely the relationship between the parties."  Jefferson v. Collins, 905 F. Supp. 2d 269, 291 (D.D.C. 2012) (Walton, J.) (quoting Presley, 25 A.3d at 888).  "[T]he existence of a duty is also shaped by considerations of fairness and results ultimately from policy decisions made by the courts and the legislatures."  Id. (quoting Presley, 25 A.3d at 888).  "Whether there is a duty of care is a question of law."  Presley, 25 A.3d at 883 (citing Tolu v. Ayodeji, 945 A.2d 596, 601 (D.C. 2008)).

"[V]icarious liability is a legal concept that transfers an agent's liability to his or her principal, and includes the theory of [respondeat superior]."  Stevens v. Sodexo, Inc., 846 F. Supp. 2d 119, 129 (D.D.C 2012) (citing Convit v. Wilson, 980 A.2d 1104, 1114 (D.C. 2009)).  "Under that theory, the responsibility of an agent for his own legally careless action is imputed to

the principal." <u>Convit</u>, 980 A.2d at 1114. "[T]he decisive test is whether the [principal] has a right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done." <u>Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.</u>, 758 F.3d 378, 386 (D.C. Cir. 2014) (quoting <u>Schecter v. Merchs. Home Delivery, Inc.</u>, 892 A.2d 415, 423 (D.C. 2006)).

Here, the plaintiff has not pleaded facts sufficient to demonstrate that the Patriot League owed her a duty of care. In her Amended Complaint, the plaintiff states that the Patriot League "assumed the same duties and responsibilities as the NCAA has both promised and acknowledged pertaining to the protection of the health and safety of student-athletes" because the Patriot League's Policies and Procedures provides that "Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Materials." Removal Notice, Ex. 5 (Am. Compl.) ¶ 77; <u>see also</u> <u>id.</u> Ex. 5 (Am. Compl.) ¶ 80 (noting that because the Patriot League has not implemented a policy "for the management of concussions/brain injuries to student-athletes," the Patriot League incorporated the concussion management plan outlined by the NCAA). However, contrary to the plaintiff's position, such a broad requirement by the Patriot League does not suggest, nor has the plaintiff alleged any plausible facts that conceivably might suggest, that the Patriot League assumed an "affirmative duty to oversee that [ ] a [concussion management] plan was in fact implemented and being complied with by [the University]," Pl.'s Patriot League Opp'n at 14, or became an enforcement arm on the matter for the NCAA.

Moreover, and also contrary to the plaintiff's position, <u>see</u> <u>id.</u> at 13–14, the relationship between the plaintiff and the Patriot League is "closely related to [the C]ourt's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the [Patriot League's]

duty." Hedgepeth, 22 A.3d at 794. As the Patriot League notes, see Patriot League's Reply at 7,

its Policies and Procedures does not create a relationship between it and the plaintiff that gives

rise to a legal duty of care owed to the plaintiff. If anything, the manual creates a relationship

between the Patriot League and its respective member institutions, such as the University. In

fact, the Patriot League's Policies and Procedures[12] states:

> Member institutions are responsible for compliance by student-athletes and
> employees at their institutions. Students enrolled in a regular or associate
> member institution do not, by virtue of such enrollment, acquire membership in
> the [Patriot] League. The [Patriot] League has no direct jurisdiction over any
> student enrolled in a regular or associate member institution or any employees,
> and no individual students or employees have any membership rights in the
> [Patriot] League.

Patriot League's Mot., Ex. 1 (Constitutional Bylaws excerpted from the Patriot League Policies

& Procedures Manual) at 1. Thus, the record does not support the plaintiff's position that the

Patriot League had a relationship with the plaintiff that made the injuries she allegedly sustained

reasonably foreseeable, resulting in a legal duty of care that the Patriot League owed to the

plaintiff.

Moreover, the Patriot League cites various cases outside of this District, see Patriot

League Dismiss Mem. at 13–16,[13] as legal authority of "a consistent and understandable

reluctance on the part of courts to hold the governing bodies of sport associations liable for

negligence in the absence of direct involvement in decisions made with respect to the injured

athlete," id. at 16. Through these cases, the Patriot League contends, on public policy grounds,

that "[p]ermitting liability against a governing organization (or athletic conference) based upon

---

[12] Because the plaintiff incorporates the Patriot League's Policies and Procedures in her Amended Complaint, see
Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 76-80, the Court, as mentioned earlier regarding such documents, see supra
Part III.B.6 n.11, will consider the Patriot League's Policies and Procedures in its analysis.

[13] The Court finds it unnecessary to conduct an analysis of these cases because the Patriot League primarily cites
them for the proposition that an athletic conference owes no duty to student-athletes of its member institutions, and
independent of these cases, the Court finds that the Patriot League did not owe a duty of care to the plaintiff.

an athlete's mere participation in a sport places an unfair burden upon the governing

organizations, would make it difficult for the governing bodies to function, and would open the

door to a flood of litigation." Id. at 17. The Patriot League also argues that

> post-concussion treatment is [a] medical decision, involving individual
> considerations between the doctor and patient. Medical providers should not be
> second-guessed by bureaucrats in an athletic conference. Rather, medical
> decisions as to whether an athlete is physically cleared to play should be left
> within the sound discretion of trained health care providers, not organizations
> whose purpose is to provide referees, arrange for competitive fields / courts, and
> facilitate tournament and championship play.

Patriot League's Reply at 10–11. Because considerations of fairness and public policy play a

role in a court's analysis of foreseeability in determining duty, the Court agrees with the Patriot

League that such public policy considerations provide support for shielding athletic conferences

from litigation involving an injury to an athlete based on an athlete's participation in a sporting

event sanctioned by the athletic conference, without a showing that the athletic conference took

affirmative steps to establish a requisite duty of care.

Nonetheless, the plaintiff argues that the "Patriot League is vicariously liable for the

actions and inactions of [the University] that failed to fall in line with policies and procedures

that [the University] failed to uphold," Pl.'s Patriot League Opp'n at 19, because it "had a right

to control and direct [the University] and the healthcare providers treating [the plaintiff]," id. at

18. To support her position, the plaintiff cites the NCAA bylaws, the Sports Medicine

Handbook, and the Patriot League's Policies and Procedures, which provide the Patriot League

with the authority to terminate an institution's membership. Id. at 18–19. But, none of these

documents grant the Patriot League the right to control and direct the University in its day-to-day

operations, its hiring and firing decisions, or its responsibility for the performance of its

employees' duties. Simply, the plaintiff has not alleged plausible facts to allocate or transfer

liability to the Patriot League under the doctrine of <u>respondeat superior</u>.

Accordingly, because the plaintiff's bald assertions do not permit the Court to draw a reasonable inference that the Patriot League owed her a legal duty of care, the Court must grant the Patriot League's motion to dismiss the plaintiff's negligence claim against it.

### 2. The Negligent Infliction of Emotional Distress Claim

Count IV of the plaintiff's Amended Complaint also asserts a negligent infliction of emotional distress claim against the Patriot League.  Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73.  As the Court previously noted, <u>see</u> <u>supra</u> Part III.B.3, a plaintiff, who was not in the "zone of physical danger," may recover for a claim of negligent infliction of emotional distress if she can make a showing that

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

<u>Hedgepeth</u>, 22 A.3d at 810–11.  The Patriot League contends that it "neither undertook to protect against [the plaintiff's] emotional distress, nor is there any special relationship with [the p]laintiff that could create the duty necessary to form the basis for a negligent infliction of emotional distress claim."  Patriot League's Reply at 12.

The plaintiff argues in response that the Patriot League "undertook an obligation to the plaintiff to oversee and monitor [the University]'s compliance with both its own and the NCAA's policies and procedures, specifically the concussion management procedure" and that "the acceptance of this duty to oversee [the University's] compliance with the applicable policies and procedures . . . create[d] the 'special relationship' with the [p]laintiff."  Pl.'s Patriot League Opp'n at 20.  However, even accepting the plaintiff's allegation as true, as the Court must at the

motion to dismiss stage, the plaintiff has not established that "[t]he purpose of the relationship . . . involved care for [the plaintiff's] emotional well-being." Lesesne, 146 F. Supp. 3d at 196 ("If the object of the relationship is not such care, but is rather 'to obtain a financial, commercial or legal objective,' emotional well-being is not necessarily implicated. In other words, even if the purpose of a relationship is to achieve an objective for the benefit of a client, if that objective does not necessarily implicate the client's emotional wellbeing—even if it has an effect on it— the relationship is not 'special' for purposes of [negligent infliction of emotional distress]." (internal citations omitted)). And the plaintiff has not demonstrated that the Patriot League's alleged negligence, rather than the alleged physical injuries she sustained, caused serious emotional distress. See Pl.'s Patriot League Opp'n at 20 ("As vastly pled throughout the Complaint, multiple concussions and post-concussive syndrome has been vastly implicated with physical and emotional well-being."). Thus, similar to the circumstances regarding the NCAA, the plaintiff has not alleged facts sufficient to plausibly state a claim of negligent infliction of emotional distress against the Patriot League. Accordingly, because the plaintiff's conclusory allegations do not rise to the level necessary for the plaintiff to state a claim of entitlement to relief, the Court must dismiss the plaintiff's negligent infliction of emotional distress claim against the Patriot League.

### 3. The Breach of Contract Claim

The plaintiff predicates Count VII of her Amended Complaint against the Patriot League on a breach of contract theory. As noted above, to state "a claim for breach of contract, the complaint must allege four necessary elements in order to effect fair notice: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." Ihebereme, 730 F. Supp. 2d at 47 (internal quotation

marks and citation omitted). The Patriot League argues that the "[p]laintiff has failed to identify a governing contract which places [it] and [the p]laintiff in privity, and/or which gives rise to a duty or obligation by the Patriot League." Patriot League's Mem. at 23. The Court agrees.

The plaintiff relies on two contracts she entered into with the University: an August 11, 2009 HIPPA authorization and a 2010–2011 Student-Athlete Concussion Statement. See Pl.'s Patriot League Opp'n at 21–23. Pursuant to these contracts, the plaintiff argues that the Patriot League is a third party beneficiary. See id. at 22. "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (quoting Alpine Cty., Ca. v. United States, 417 F.3d 1366, 1368 (Fed. Cir. 2005)). However, the plaintiff has not alleged or proffered any facts that the Patriot League claims third party beneficiary status or that the plaintiff and the University, the actual parties to the two contracts, "had an express or implied intention to benefit directly [the Patriot League]." Parker v. John Moriarty & Assocs., __ F. Supp. 3d __, __, No. 15-1506 (CKK), 2016 WL 7235637, at *9 (D.D.C. Dec. 14, 2016) (citation and internal quotation marks omitted). Furthermore, as the Patriot League correctly notes, see Patriot League's Reply at 13, even if the Patriot League claimed third-party beneficiary status and the plaintiff and the University intended to benefit the Patriot League, the plaintiff would still be unable to pursue a breach of contract claim it because the Patriot League would be the party that maintains the right to enforce the contractual obligations against the plaintiff and the University, not vice versa. See Fort Lincoln Civic. Ass'n, 944 A.2d at 1064 (noting that "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty" (alteration in original) (citation omitted)). Therefore, because the plaintiff has failed to

identify a valid contract between her and the Patriot League to proceed with a breach of contract claim, the Court must grant the Patriot League's motion to dismiss the plaintiff's breach of contract claim against it.

### 4. The Medical Malpractice Claim

As noted above, Count VIII of the plaintiff's Amended Complaint asserts a medical malpractice claim against defendant Patriot League. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 195–96. Akin to the position of the NCAA, the Patriot League argues that the plaintiff's medical malpractice claim against it must be dismissed as a matter of law because it "is not a 'healthcare provider' under District of Columbia law." Patriot League's Mem. at 25. The Court agrees.

The plaintiff cannot plausibly state a claim of medical malpractice against the Patriot League because she has not alleged or proffered any facts demonstrating that the Patriot League is an "entity licensed or otherwise authorized under District law to provide healthcare service[s]." D.C. Code § 16-2028(2). In her attempt to salvage her medical malpractice claim, the plaintiff argues that the Patriot League "is vicariously liable for the conduct of the healthcare providers who treated [the p]laintiff at [the University]" because it was "aware of the implementation of the [NCAA's] concussion management plan and had a duty to oversee that the [concussion management plan] was being adhered to by [the University] and the healthcare providers treating [her]." Pl.'s Patriot League's Opp'n at 24. However, as the Court previously concluded, see supra Part III.C.1, the plaintiff has not alleged any plausible facts demonstrating that the Patriot League had a right to control the day-to-day operations of the athletic operations at the University and its employees, or even had a right to control the medical treatment the plaintiff received, see Interstate Fire & Cas. Co., 758 F.3d at 386 (D.C. Cir. 2014). Therefore,

the plaintiff has not pleaded facts sufficient to allocate or transfer liability to the Patriot League

under the doctrine of respondeat superior. Accordingly, because the plaintiff has not

demonstrated that the Patriot League is an authorized healthcare provider under District of

Columbia law or that the Patriot League is vicariously liable for the plaintiff's alleged injuries,

the Court must dismiss the plaintiff's medical malpractice claim against defendant Patriot

League.[14]

### D. The Plaintiff's Claims Against the University

#### 1. The Negligence Claim

Count III of the Amended Complaint asserts that the University was "negligent by

breaching the duties of care [it] assumed for the benefit of [the p]laintiff." Removal Notice, Ex.

5 (Am. Compl.) ¶ 164. The University contends that the plaintiff's negligence claim against it

must be dismissed because the plaintiff "cannot establish a requisite duty" to support her claim.

Am. Univ. Mem. at 5.[15]

The University primarily relies on case law from other districts in its effort to

demonstrate that it, as an academic institution, does not owe any duty of care to the plaintiff, a

former student-athlete at the University. See Am. Univ. Mem. at 5–13. However, the

University's reliance on these cases is to no avail because the facts in those cases are

distinguishable from the facts in this case. Initially, the University cites various cases for the

---

[14] Through a separate motion, the Patriot League requests that the Court hold "a hearing on its Preliminary Motion to Dismiss." Patriot's League's Hearing Request at 1. However, because the Court has now ruled on the Patriot League's preliminary motion to dismiss, the Court will deny its hearing request as moot.

[15] The plaintiff also alleges that the University is vicariously liable for its employees' conduct based on the doctrine of respondeat superior, see Removal Notice, Ex. 5 (Am. Compl.) ¶ 165, and the University does not dispute this allegation, see Am. Univ. Mem. at 30 ("To be clear, [the] University is not asserting an absence of vicarious liability for the actions of its coach or trainers."). Thus, the Court will treat the University's motion to dismiss with respect to the plaintiff's negligence claim against it as a partial motion to dismiss.

proposition that "[c]ourts have been less inclined to find that institutes of higher education owe a

special duty to their students on account of their status as adults in society." Id. at 7.[16] But,

these cases do not involve either an injury to one of the institution's scholarship student-athletes

during the course of an intercollegiate game or an injury that occurred on the institution's

campus as is the case here. Thus, the Court does not find these cases instructive.

Additionally, the University cites various cases, one of which is from this District, as

support for its position that institutions of higher education do not owe a legal duty of care to

their student-athletes. See id. at 7–11. All of these cases were decided on motions for summary

judgment after discovery was conducted, three in which the courts did not apply an ordinary

negligence standard for injuries sustained in contact team sports, but elected to use a reckless or

intentional conduct standard of care, see Mercier v. Greenwich Acad., Inc., No. 3:13-CV-4

(JCH), 2013 WL 3874511, at *2 (D. Conn. July 25, 2013); Karas v. Strevell, 884 N.E.2d 122,

130 (Ill. 2008); Kahn v. E. Side Union High Sch. Dist., 31 Cal. 4th 990, 1011 (2003), which the

University encourages this Court to adopt, see Am. Univ. Mem. at 14. Additionally, all but one

of these cases involved initial injuries sustained during a school-sponsored sporting event, where

the courts dismissed the plaintiffs' negligence claims on the grounds that the plaintiffs assumed

the risks inherent in playing contact sports. See Breheny v. Catholic Univ. of Am., No.

---

[16] Bradshaw v. Rawlings, 612 F.2d 135, 143 (3d Cir. 1979) (finding that the college did not have "a duty of custodial care" to protect one of its student from a drinking-and-driving accident that occurred off campus); Coghlan v. Beta Theta Pi Fraternity, 133 Idaho 388, 400 (1999) (holding that "Idaho universities [do not] have the kind of special relationship creating a duty to aid or protect adult students from the risks associated with the students' own voluntary intoxication"); Univ. of Denver v. Whitlock, 744 P.2d 54, 61 (Colo. 1987) (concluding "that the student-university relationship is not a special relationship of the type giving rise to a duty of the University to take reasonable measures to protect the members of fraternities and sororities from risks of engaging in extra-curricular trampoline jumping"); Beach v. Univ. of Utah, 726 P.2d 413, 415–17 (Utah 1986) (finding no special relationship between the plaintiff and the University that gave rise to a duty to protect the plaintiff after she became voluntarily intoxicated); Nickel v. Stephens Coll., 480 S.W.3d 390, 401 (Mo. 2015) (declining to recognize "a duty [based on the student-university relationship] in connection with administrative decisions related to a student's enrollment status"); Doe v. Va. Wesleyan Coll., Nos. CL14-6942-01, CL14-6942-00, 2015 WL 10521466, at *12 (Va. Cir. Ct. June 20, 2015) (concluding that it could not find, "as a matter of law, that [the college] had a duty to warn or protect students against third-party criminal acts").

88-3328-OG, 1989 WL 1124134, at *1 (D.D.C. Nov. 22, 1989); see also Kelly v. McCarrick, 841 A.2d 869, 872 (Md. Ct. Spec. App. 2004); Hammond v. Bd. of Educ., 639 A.2d 223, 225 (Md. Ct. Spec. App. 1994). In this case, discovery has not commenced, and at the motion to dismiss stage, the Court is only tasked with testing the legal sufficiency of the allegations in the plaintiff's complaint, not the "plaintiff's likelihood of success on the merits." Ananiev v. Wells Fargo Bank, N.A., 968 F. Supp. 2d 123, 130 (D.D.C. 2013). Moreover, unlike the cases relied upon by the University where the plaintiffs were suing based on the injury initially sustained, the plaintiff here does not allege that

> [the University] was negligent in allowing [her] to suffer the initial concussion; the clear language of the [Amended] Complaint states that it was [the University's] failure to take certain precautions to protect and enhance [the p]laintiff's physical and educational well-being and to protect the health of, and provide a safe environment for [the p]laintiff in order to protect her from the additional and compounded effects suffered.

Pl.'s Am. Univ. Opp'n at 14. Therefore, the Court does not find these cases particularly instructive either.

As the Court noted above, see supra Part III.C.1, courts generally "rely on the concept of 'foreseeability' to determine whether [a] defendant owed a duty to [a plaintiff] in a negligence action and examine whether the risk to [a plaintiff] was 'reasonably foreseeable' to [a] defendant." Hedgepeth, 22 A.3d at 793. The plaintiff alleges that she reported on numerous occasions symptoms that she was experiencing after sustaining a head injury in one of her field hockey games. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 100–15. Given the plaintiff's relationship with the University as one of its student athletes, the Court agrees that it was reasonably foreseeable that

> [o]nce [the p]laintiff reported her concerns and symptoms to [the University] and its agents, servants, and employees, [it] owed a special duty to [her to] act reasonably to take precautions and to minimize the risk of injury[, . . .] to protect

and enhance her physical and educational well-being[,] and to protect the health of, and provide a safe environment for her.

Pl.'s Am. Univ. Opp'n at 18. Additionally, at this stage of the case, the Court finds that it was reasonably foreseeable that the University's alleged negligence regarding its duties to take precautions to minimize additional risks by prohibiting the plaintiff from further participation in field hockey activities would likely cause additional injuries. Accordingly, the Court concludes that the plaintiff has alleged facts sufficient to give rise to a duty of care to pursue her negligence claim against the University, and therefore, the Court must deny the University's motion to dismiss this claim.

### 2. The Negligent Infliction of Emotional Distress Claim

The plaintiff also asserts a negligent infliction of emotional distress claim against the University in Count IV of her Amended Complaint. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73. The University again "argues that no special relationship exists between the [p]laintiff and [the University] such that liability for the negligent infliction of emotional distress can exist." Am. Univ. Mem. at 16. With respect to this claim, the Court agrees.

The plaintiff predicates her negligent infliction of emotional distress claim against the University on the existence of a special relationship between her and the University because the University "undertook an obligation to the plaintiff to act in compliance with both its own and the NCAA and Patriot League's policies and procedures, specifically the concussion management procedure." Pl.'s Am. Univ. Opp'n at 23. Even accepting as true the existence of a special relationship due to the University's undertaking to protect its student-athletes from subsequent head injuries, particularly after a student-athlete complains of experiencing concussive symptoms, the plaintiff has not alleged facts sufficient to show that the University "ha[d] a relationship with [her], or ha[d] undertaken an obligation to [her], of a nature that

necessarily implicate[d] [her] emotional well-being." Hedgepeth, 22 A.3d at 810.  The plaintiff

contends solely that her special relationship with the University implicated her emotional

well-being because the University and its field hockey medical staff were purportedly aware of

the medical research and literature concerning the "failure to protect student-athletes from

[further head] injuries" and the likelihood that such failure would "cause serious emotional

distress."  Pl.'s Am. Univ. Opp'n at 23.  In her Amended Complaint, the plaintiff cites in support

of her position various published studies performed by other universities and NCAA personnel

on the impact resulting from suffering concussions, the increased risk resulting from subsequent

concussions, and the likelihood of latent brain injuries such as Alzheimer's disease, mild

cognitive impairment, and amyotrophic lateral sclerosis resulting from concussions.  See

Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58.  However, without identifying any studies or

research, the plaintiff alleges in conclusory fashion that "[t]here has long been clinical and

neurological studies that multiple head injuries or concussions can cause severe cognitive

problems such as depression."  Id., Ex. 5 (Am. Compl.) ¶ 56.  Nonetheless, even accepting as

true that the University was aware of such medical information, that knowledge did not create a

relationship between the plaintiff and the University that necessarily implicated the plaintiff's

emotional well-being.  And, although the Court recognizes that "care for the body and the

emotions are so interlinked  . . . [that patients] are susceptible to suffer emotionally as well as

physically," Hedgepeth, 22 A.3d at 813, the plaintiff has not demonstrated that "[t]he purpose of

the relationship" between her and the University "involved care for [her] emotional well-being,"

Lesesne, 146 F. Supp. 3d at 196.

Furthermore, the plaintiff has not alleged facts sufficient to demonstrate that the

University's alleged negligence in breaching an undertaking owed to the plaintiff "would cause

[her] serious emotional distress," <u>Hedgepeth</u>, 22 A.3d at 811, rather than emotional distress caused solely by the alleged concussion or subsequent injuries she purportedly sustained, <u>see</u> Pl.'s Am. Univ. Opp'n at 23 ("[M]ultiple concussions and post-concussive syndrome has been vastly implicated with physical and emotional well-being."). As the <u>Hedgepeth</u> Court clarified, "it must be especially likely that there would be serious emotional distress, <u>i.e.</u>, a deeply emotional response, . . . in the event that the underlying obligation is breached." 22 A.3d at 813 (internal quotation marks and citations omitted). Here, the plaintiff has alleged only that sustaining multiple head injuries can potentially lead to depression or other brain injuries, but not that serious emotional distress would result from the University's purported negligent breach of its undertaking. <u>See</u> Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58 (failing to allege that the University's negligent performance of its undertaking caused the plaintiff emotional distress).

In sum, bald assertions and conclusory allegations that a viable intentional infliction of emotional distress claim exists do not satisfy the pleading requirements required by <u>Iqbal</u>. Accordingly, because the plaintiff has failed to allege plausible facts sufficient to establish that the University had a "special relationship" with her that implicated her emotional well-being, the Court must dismiss the plaintiff's negligent infliction of emotional distress claim against the University.

### 3. The Breach of Contract Claim

The plaintiff also asserts a breach of contract claim against the University in Count VII of her Amended Complaint, <u>see</u> Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 189–94, and like the other defendants already discussed, the University argues that dismissal of this claim is justified because the plaintiff has not identified the existence of a valid contract that it breached as the basis for proceeding with her breach of contract claim, <u>see</u> Am. Univ. Mem. at 17–18. The

Court agrees.

As previously discussed, see supra Part III.C.3, the plaintiff cites two contracts that form the basis of her breach of contract claim against the University: (1) an August 11, 2009 HIPAA authorization, which permitted the "University, its agents, and its authorized licensees to make copies of, use, sell, and distribute any photographic images of [the plaintiff] which were taken in connection with [her] participation in the athletics programs of, or otherwise in connection with [her] status as a student-athlete at, [the] University"; and (2) a "2010–2011 Student-Athlete Concussion Statement, wherein the plaintiff "agree[d] to obey all safety rules [and] report fully any problems related to [her] physical condition to appropriate University personnel including medical personnel and coaches." Pl.'s Am. Univ. Opp'n at 24. However, the plaintiff fails to identify any provisions in either of these contracts that include an obligation or duty owed by the University "to abide by all rules and regulations promulgated by [d]efendant NCAA." Removal Notice, Ex. 5 (Am. Compl.) ¶ 190. Therefore, because the plaintiff has not identified a valid contract creating such an obligation owed by the University as she alleges in her Amended Complaint, see In re Fort Totten, 808 F. Supp. 2d at 159 (noting that "one cannot breach a contract without breaching a particular obligation created under the contract" (internal citation and quotation marks omitted)), the Court must dismiss her breach of contract claim against the University.

### 4. The Medical Malpractice Claim

Count VIII of the plaintiff's Amended Complaint also asserts a medical malpractice claim against the University. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 195–204. The University argues that dismissal of the plaintiff's medical malpractice claim is warranted because the University, its field hockey coach, or athletic trainers are not "healthcare providers" within the meaning of District of Columbia Code section 16-2801(2). See Am. Univ. Mem. at 23.

Based on what is asserted in the plaintiff's Amended Complaint, she has alleged facts sufficient to demonstrate that the University and its athletic and medical staff provided healthcare services that qualify them as healthcare providers in the District to withstand a motion to dismiss.  There does not appear to be a case in this jurisdiction that has addressed whether a university, coach, or athletic trainer qualify as a "healthcare provider" under District of Columbia law, as the Court has been unable to identify one.  However, the clear language of District of Columbia Code section 16-2801(2) provides an extensive list of individuals and entities that qualify as healthcare providers in the District.  And, although a university, coach, or athletic trainer are not expressly listed in the statute, see id., the list of a healthcare providers identified in this provision is not exhaustive, as the definition explicitly includes the phrase "or other individual health care practitioner," id.

The University argues that the term "healthcare provider" should be given only its ordinary meaning, and therefore a university, coach, or athletic trainer does not qualify.  See Am. Univ. Mem. at 24–27.  To support its positions, the University relies on cases both from and from outside of this District.  See id.  However, the Court does not find these cases to be particularly instructive in its determination at this stage of the litigation.  Primarily, the two cases from this District, Coleman v. Wash. Hosp. Ctr. Corp., 734 F. Supp. 2d 58, 62 (D.D.C. 2010) and Smith v. Corr. Corp. of Am., Inc., 674 F. Supp. 2d 201, 209 (D.D.C. 2009), addressed the applicability of section 16-2801(2) to radiologists and a private prison that contracted with third party vendors to provide medical services to District of Columbia inmates, but did not address the question of who qualifies as an "other individual health care practitioner" under District law.  The other cases cited by the University from courts outside of this District, did not examine state laws containing language analogous to the language at issue here (i.e., the "or other individual

health care practitioner" clauses). See Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't. of Health & Human Servs., 455 F.3d 500 (5th Cir. 2006) (addressing whether athletic trainers that provided therapy services incident to physician services could seek reimbursement of the services provided under Medicare Part B); see also Miles Labs., Inc. Cutter Labs. Div. v. Doe, 556 A.2d 1107, 740–41 (Md. 1989) (determining that Red Cross was not a "health care provider" as defined by Maryland state law that provided an exhaustive definition of "health care provider"); Grp. Health Ass'n v. Blumenthal, 453 A.2d 1198, 1203 (Md. 1983) (finding that, even though a health maintenance organization is not a healthcare provider as defined under Maryland law, it could nonetheless be liable for the negligent acts of its employees who are healthcare providers under Maryland law); Morris v. Adm'rs of Tulane Educ. Fund, 891 So.2d 57, 61 (La. Ct. App. 2004) (holding that the record was devoid of facts sufficient to determine whether Tulane University or its athletic trainers qualified as healthcare providers under Louisiana law that broadly defines "healthcare provider" without any related catchall phrase).

Moreover, the plaintiff has alleged that the University "provid[ed] healthcare and healthcare providers to its student-athletes." Removal Notice, Ex. 5 (Am. Compl.) ¶ 198. The plaintiff has also alleged that the University field hockey team's athletic trainers and physicians gave her "SCAT2 tests" to assess her concussion-related symptoms. Id., Ex. 5 (Am. Compl.) ¶¶ 103–04. Such medical tests and assessments could reasonably qualify as medical services. Thus, the Court is compelled to afford the plaintiff the opportunity to conduct discovery to determine whether the University and its field hockey athletic and medical staff qualify as healthcare providers. Accordingly, the Court will deny without prejudice the University's motion to dismiss the plaintiff's medical malpractice claim against it.

### E. The Plaintiff's Claims Against the Medicine Center

The Medicine Center, Dr. Higgins, and the Higgins Practice (collectively, the "Medical Defendants") also move to dismiss Count IV of the plaintiff's Amended Complaint, which asserts a claim of negligent infliction of emotional distress against them.  See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73.  In particular, the Medical Defendants contend that the plaintiff's conclusory allegations do not demonstrate that they had a relationship with the plaintiff that implicated her emotional well-being, that their alleged negligence would likely cause serious emotional distress, or that their alleged negligence actually caused her serious emotional distress.  See Medical Defs.' Mem. at 4–8.

The Court agrees that the plaintiff has not pleaded facts sufficient to establish that the Medical Defendants owed her the requisite legal duty of care to state a claim of negligent infliction of emotional distress against the Medical Defendants.  Again, to establish the requisite duty, the plaintiff must allege facts that demonstrate "(1) a relationship or undertaking to the plaintiff that necessarily implicates the plaintiff's emotional well-being, and (2) the special likelihood that the defendant's negligence in the course of performing obligations pursuant to such relationship or undertaking will result in emotional distress."  Hedgepeth, 22 A.3d at 815. In her Amended Complaint, the plaintiff asserts that the medical defendants "undertook a duty to protect [her] physical and mental well-being."  Removal Notice, Ex. 5 (Am. Compl.) ¶ 170. Although the plaintiff, as an athlete of the University's field hockey team, had a relationship with the Medical Defendants who served as part of the University's field hockey team's medical staff, it cannot be said that this relationship, without more, necessarily implicated the plaintiff's emotional well-being.  See Hedgepeth, 22 A.3d at 792 ("A duty to avoid negligent infliction of serious emotional distress will be recognized only where the defendant has an obligation to care

for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff.").

Nonetheless, the plaintiff argues that the Medical Defendants had "knowledge and understanding of the effects of concussions and the manner in which student-athletes suffering from concussions were to be observed, monitored, and treated," including the likelihood of experiencing emotional distress. Pl.'s Medical Defs.' Opp'n at 7. But, the Medical Defendants' awareness of medical research surrounding concussions and the impact concussions may have on an individual, taking the plaintiff's allegation as true, does not heighten the Medical Defendants' relationship with the plaintiff whereby a "special likelihood of [their] negligence . . . [would] result in emotional distress" as contemplated in Hedgepeth. 22 A.3d at 815. Otherwise, any medical staff attending to an athletic team "would be expected, as a matter of reasonable care, to take precautions to avoid causing serious emotional distress, just as the care a doctor would take to use sterile instruments in order to prevent a serious infection during the course of an operation." See id. at 813. Additionally, the plaintiff does not allege that the Medical Defendants' purported negligent performance of their undertaking caused her serious emotional distress; instead, as the Court noted earlier, she relies upon medical research that suggests that multiple head injuries may potentially lead to depression or other brain diseases or injuries. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58. Because, the plaintiff has not alleged facts sufficient to establish the requisite duty needed to proceed with her negligent infliction of emotional distress claim against the Medical Defendants, the Court must dismiss Count IV of the plaintiff's Amended Complaint against these defendants.

## IV.    CONCLUSION

For all of the foregoing reasons, the Government's motion to dismiss, or in the alternative, for summary judgment is denied. The NCAA's motion to dismiss is granted with

respect to the plaintiff's claims of gross negligence, negligent infliction of emotional distress, fraudulent misrepresentation, breach of contract, and medical malpractice, which are dismissed with prejudice, but denied in all other respects. The Patriot League's motion to dismiss is granted, and its request for a hearing is denied as moot. The University's motion to dismiss is granted with respect to the plaintiff's claims of negligent infliction of emotional distress and breach of contract, which are dismissed with prejudice, but denied in all other respects. Finally, the Medical Defendants' partial motion to dismiss is granted.

**SO ORDERED** on this 12th day of April, 2017.[17]

REGGIE B. WALTON
United States District Judge

---

[17] An Order consistent with this Memorandum Opinion is issued simultaneously with this opinion.