## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNIFER BRADLEY,         ) | |
|          ) | |
|     Plaintiff,    ) | |
|          ) | |
|    v.       ) | Civil Action No. 16-346 (RBW) |
|          ) | |
| NATIONAL COLLEGIATE ATHLETIC   ) | |
| ASSOCIATION, et al.,    ) | |
|          ) | |
|     Defendants.   ) | |
|          ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Jennifer Bradley, brings this civil action against the defendants, American

University (the "University"), the Maryland Sports Medicine Center (the "Medicine Center"),

David L. Higgins, M.D. P.C. (the "Higgins Practice"), and David L. Higgins, M.D. ("Dr.

Higgins") (collectively, the "University defendants"), the National Collegiate Athletic

Association (the "NCAA"), and the United States of America (the "Government"),

asserting common law claims of negligence against the NCAA and the University, negligent

infliction of emotional distress against the Government, and medical malpractice against the

University defendants and the Government.  <u>See</u> Notice of Removal of a Civil Action ("Removal

Notice"), Exhibit ("Ex.") 5 (Amended Complaint ("Am. Compl.")) ¶¶ 137–46, 157–73, 195–

205.  Currently pending before the Court are (1) Defendant National Collegiate Athletic

Association's Motion for Summary Judgment Regarding Negligence ("NCAA's Mot." or the

"NCAA's motion for summary judgment"); (2) Defendant United States of America's Motion

for Summary Judgment ("Gov't's Mot." or the "Government's motion for summary judgment");

(3) Defendants American University, Maryland Sports Medicine Center, David L. Higgins,

M.D., and David L. Higgins, M.D., P.C.'s Motion for Summary Judgment ("Univ. Defs.' Summ.
J. Mot." or the "University defendants' motion for summary judgment"); (4) the Plaintiff's
Opposition to Defendant USA's Motion for Summary Judgment and Cross-Motion for Summary
Judgment Pertaining to Affirmative Defenses ("Pl.'s Gov't Mot." or the "plaintiff's motion for
summary judgment as to the Government"); (5) the Plaintiff's Opposition to Defendant NCAA's
Motion for Summary Judgment and Cross-Motion for Summary Judgment Pertaining to
Defendant NCAA's Affirmative Defenses ("Pl.'s NCAA Mot." or the "plaintiff's motion for
summary judgment as to the NCAA"); (6) the Plaintiff's Opposition to Defendant[s] American
University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins,
M.D., P.C.'s Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment
("Pl.'s Univ. Defs. Mot." or the "plaintiff's motion for partial summary judgment as to the
University defendants"); and (7) Motion of Defendants Maryland Sports Medicine Center, David
L. Higgins, M.D., and David L. Higgins, M.D., P.C., and American University to Modify
Scheduling Order and Supplement Defendants' Expert Designation ("Univ. Defs.' Mot. to
Modify" or the "University defendants' motion to modify the scheduling order").  Upon careful
consideration of the parties' submissions,[1] the Court concludes for the following reasons that it

---

[1]  In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) the Memorandum of Points and Authorities in Support of Defendant National Collegiate Athletic
Association's Motion for Summary Judgment Regarding Negligence ("NCAA's Mem."); (2) Defendant United
States of America's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Gov't's
Mem."); (3) the Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment
("Univ. Defs.' Mem."); (4) the Plaintiff's Memorandum of Points and Authorities in Response to Defendant USA's
Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment Pertaining to
Affirmative Defenses ("Pl.'s Gov't Mem."); (5) the Plaintiff's Reply to Defendant USA's Statement of Undisputed
Facts ("Pl.'s Gov't Facts"); (6) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant
NCAA's Motion for Summary Judgment and in Support of Her Motion for Summary Judgment Pertaining to
Defendant NCAA's Affirmative Defenses ("Pl.'s NCAA Mem."); (7) the Plaintiff's Reply to Defendant NCAA's
Statement of Undisputed Material Facts ("Pl.'s NCAA Facts"); (8) the Plaintiff's Memorandum of Points and
Authorities in Response to Defendant American University, Maryland Sports Medicine Center, David L. Higgins,
M.D., and David L. Higgins, M.D., P.C.'s Motion for Summary Judgment ("Pl.'s Univ. Defs. Mem."); (9) the
Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Univ. Defs. Facts"); (10) Defendant United
(continued . . .)

must grant both the NCAA's and the University defendants' motions for summary judgment,

deny as moot the plaintiff's motion for summary judgment as to the NCAA and the plaintiff's

motion for partial summary judgment as to the University defendants, deny the Government's

motion for summary judgment, grant in part and deny in part the plaintiff's motion for summary

judgment as to the Government, and deny as moot the University defendants' motion to modify

the scheduling order.[2]

## I.    BACKGROUND

The following facts are undisputed, except where otherwise noted by the Court.  During

the relevant time period, the plaintiff "was a [twenty]-year[-]old college student in her junior

year at [the] University and a member of the [U]niversity's field hockey team."  Pl.'s Gov't Facts

¶ 54.  On July 25, 2011, prior to the 2011 field hockey season, the plaintiff signed the

Acknowledgement of Risk form, which states the following:

---

(. . . continued)
States of America's Reply in Further Support of Its Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Gov't Opp'n"); (11) Defendant NCAA's Reply Memorandum in Support of Its Motion for Summary Judgment Regarding Negligence and Opposition to Plaintiff's Cross-Motion for Summary Judgment Pertaining to Defendant NCAA's Affirmative Defenses ("NCAA's Opp'n); (12) Defendants American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D. P.C.'s Reply to Plaintiff's Opposition to Motion for Summary Judgment and Cross Motion for Summary Judgment ("Univ. Defs.' Opp'n"); (13) the Plaintiff's Reply Brief to Defendant USA's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Gov't Reply"); (14) the Plaintiff's Reply Brief to Defendant NCAA's Response to Plaintiff's Motion for Summary Judgment ("Pl.'s NCAA Reply"); (15) the Plaintiff's Opposition to Defendants Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D., P.C., and American University's Motion to Modify Scheduling Order and Supplement Defendants' Expert Designations ("Pl.'s Univ. Defs. Opp'n"); (16) the Plaintiff's Reply Brief to Defendants American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D.[], P.C.'s Response to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Univ. Defs. Reply"); (17) the Plaintiff's Reply Memorandum of Points & Authorities to Defendants American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D.[], P.C.'s Response to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Univ. Defs. Reply Mem."); and (18) Defendants American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D. P.C.'s Reply to Plaintiff's Opposition to Motion to Modify Scheduling Order ("Univ. Defs.' Reply").

[2] Because the Court is granting the University defendants' motion for summary judgment and entering judgment in their favor as to all of the plaintiff's claims against them in this case, the Court need not address the University defendants' motion to modify the scheduling order and therefore will deny the motion as moot.

My signature below indicates that I am aware of the risks of injury inherent in athletic activities and that such risks may include death, paralysis, and other serious permanent bodily injury. I am willing to assume responsibility for any and all such risks of injury while participating in intercollegiate athletics at the University.

I (including my parents, legal guardians, and legal representatives) hereby agree to indemnify, defend[,] and hold harmless the University and its employees, officers, [and] agents from any claims, demands, or suites for damages which may arise from my participation in the University's Intercollegiate Athletic Program, or from any treatment, medical, or otherwise provided to me by the University's Sports Medicine staff. Further, I absolve, indemnify, defend[,] and hold harmless American University from any breach of these presentations.

I understand my obligations as set forth in this document[] and agree to meet these obligations as a condition of my participation.

Univ. Defs.' Opp'n, Ex. 1 (2011–2012 Acknowledgement of Risk) at 15111.

"On September 23, 2011, [the] [p]laintiff allegedly suffered a concussion resulting from a collision during . . . a field hockey game . . . , as a member of [the] [University's] . . . field hockey team." Pl.'s NCAA Facts ¶ 12; see also NCAA's Mot., Ex. A (Deposition of Jennifer Bradley ("Bradley Dep.")) 41:13–16. As a result of the plaintiff's purported concussion-like symptoms, the University's field hockey team's trainer, Jenna Earls, scheduled "an appointment for [the] [p]laintiff to be evaluated by the team physician," Pl.'s Univ. Defs. Facts ¶ 9; see also NCAA's Mot., Ex. A (Bradley Dep.) 62:11–15, and on October 5, 2011, "Dr. Aaron Williams[,] the assistant [ ] University team physician and Uniformed Services University Sports Medicine Fellow, examined the [p]laintiff in the [ ] University['s] training room," Pl.'s Gov't Facts ¶ 71; see also NCAA's Mot., Ex. A (Bradley Dep.) 63:18–64:6. According to Earls, she "verbally told [Dr. Williams] [that the plaintiff experienced] a hit to the head[.]" Gov't Mot., Ex. 13 (Deposition of Jenna Earls ("Earls Dep.")) 121:22–25. Based upon his examination, Dr. Williams, who "did not believe these symptoms were consistent with a concussion because of

the lack of a mechanism,"[3] nevertheless "held the [p]laintiff out of play [for two days]," and

instead "diagnosed the [p]laintiff as having ethmoid sinusitis."  Pl.'s Gov't Facts ¶ 74; see also

Gov't's Mot., Ex. 8 (Deposition of Aaron Williams ("Williams Dep.")) 136:10–14.  "Over the

following months, [the] [p]laintiff continued to participate in field hockey practices and games,

sitting out intermittently."  Pl.'s NCAA Facts ¶ 33; see also NCAA's Mot., Ex. A (Bradley Dep.)

86:21–87:6.  On February 3, 2012, the plaintiff was treated by Dr. Puneet Singh, who concluded

that the plaintiff "may have sustained some form of an acceleration/deceleration head injury

while playing field hockey that is causing her to have symptoms [consistent with] a post-

concussive syndrome."  Pl.'s Gov't Facts ¶ 91 (internal citations omitted); see also Gov't's Mot.,

Ex. 22 (Medical Record from Dr. Puneet Singh, D.O. (Feb. 3, 2012)) at 10068.

> Between August and October 2014, the plaintiff "filed several actions in the Superior Court of the District of Columbia ("Superior Court"), which were consolidated against the [NCAA], the Patriot League, [the] University, the [ ] Medicine Center, [the Higgins Practice], [Dr. Higgins], and Aaron Williams[] [ ]." In March 2015, the Government, pursuant to the Westfall Act, substituted itself for Dr. Williams as a defendant and removed the consolidated case to this Court. Thereafter, in December 2015, this Court dismissed the plaintiff's claims against the Government because the "the plaintiff concede[d] that she [was] still pursuing her administrative remedies," which precluded her at that time from bringing suit against the Government.  This Court also concluded that it "no longer ha[d] jurisdiction over [the] matter following the dismissal of the [Government]" and remanded the case to the Superior Court.
>
> After the case was remanded to the Superior Court, the plaintiff moved both to amend her Complaint and to remove the case back to this Court, a motion the Superior Court granted only with respect to the plaintiff's request to amend her Complaint.  On February 23, 2016, the plaintiff amended her Complaint, and on the following day, removed this case back to this Court.

Bradley v. Nat'l Collegiate Athletic Ass'n (Bradley I), 249 F. Supp. 3d 149, 157 (D.D.C. 2017)

(Walton, J.) (internal citations omitted) (first, second, third, eighth, ninth, tenth, eleventh, and

---

[3] A "mechanism," according to Dr. Williams, is "the direct or indirect force to the head" that causes a concussion. See Gov't's Mot., Ex. 8 (Deposition of Aaron Williams) 86:3–11, 109:2–5.

twelfth alterations in original).[4]  In the Amended Complaint, the plaintiff alleges (1) a negligence

claim against the NCAA ("Count I"), see Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 137–46; (2) a

gross negligence claim against the NCAA ("Count II"), see id., Ex. 5 (Am. Compl.) ¶¶ 147–56;

(3) a negligence claim against the Patriot League and the University ("Count III"), see id., Ex. 5

(Am. Compl.) ¶¶ 157–68; (4) a negligent infliction of emotional distress claim against all

defendants ("Count IV"), see id., Ex. 5 (Am. Compl.) ¶¶ 169–73; (5) a fraudulent

misrepresentation claim against the NCAA ("Count V"), see id., Ex. 5 (Am. Compl.) ¶¶ 174–82;

(6) a breach of contract claim against the NCAA ("Count VI"), see id., Ex. 5 (Am. Compl.)

¶¶ 183–88; (7) a breach of contract claim against the Patriot League and the University ("Count

VII"), see id., Ex. 5 (Am. Compl.) ¶¶ 189–94; and (8) a medical malpractice claim against all

defendants ("Count VIII"), see id., Ex. 5 (Am. Compl.) ¶¶ 195–205.

Thereafter, the defendants filed motions to dismiss the plaintiff's Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).  On April 12, 2017, the Court "den[ied] the

Government's motion to dismiss or, in the alternative, its motion for summary judgment,

den[ied] in part and grant[ed] in part both the NCAA's and the University's motions to dismiss,

grant[ed] the Patriot League's motion to dismiss, . . . and grant[ed] the [Medicine Center's, the

Higgins Practice's, and Dr. Higgins' joint] partial motion to dismiss," Bradley I, 249 F. Supp. 3d

at 156, and accordingly dismissed Count II and Counts V through VIII in their entirety, Count III

as to the Patriot League, Count IV as to all defendants with the exception of the Government,

---

[4] The Federal Employees Liability Reform and Tort Compensation Act of 1988 is commonly referred to as the "Westfall Act," e.g., Kelley v. Fed. Bureau of Investigation, 67 F. Supp. 3d 240, 275 (D.D.C. 2014), pursuant to which "Dr. Williams received a certification from the [ ] [Government] that he was acting within the scope of his employment as an employee of the [ ] [Government] at the time of the . . . [allegations] in the [c]omplaint[,]" Removal Notice, Ex. 1 (Order (Dec. 10, 2015) "Order")) at 1 (fifth, sixth, and seventh alterations in original).  "This certification statutorily substituted the [ ] [Government] for Dr. Williams as a defendant." Id., Ex. 1 (Order) at 1–2.

and Count VIII as to the NCAA and the Patriot League.[5]  The following causes of action are

therefore still pending before the Court: (1) Count I—the negligence claim against the NCAA;

(2) Count III—the negligence claim against the University; (3) Count IV—the negligent

infliction of emotional distress claim against the Government; and (4) Count VIII—the medical

malpractice claim against the University defendants and the Government.

 After the close of discovery, the parties filed their cross-motions for summary judgment,

see generally NCAA's Mot.; Gov't's Mot.; Univ. Defs.' Summ. J. Mot.; Pl.'s Gov't Mot.; Pl.'s

NCAA Mot.; Pl.'s Univ. Defs. Mot., and on January 23, 2020, the University defendants filed

their motion to modify the scheduling order, requesting to supplement their respective expert

designations, see Univ. Defs.' Mot. to Modify at 1.  These motions are the subjects of this

Memorandum Opinion.

## II. STANDARD OF REVIEW

 The Court may grant a Rule 56 motion for summary judgment only if "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under

the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d

689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in h[er] favor." Anderson, 477 U.S. at

255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

---

[5] As a result of the Court's opinion in Bradley I, the Patriot League is no longer a defendant in this case.

summary judgment[.]"  Id.  The movant has the burden of demonstrating the absence of a

genuine issue of material fact and that the non-moving party "fail[ed] to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving

party "must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson,

477 U.S. at 248.  "The mere existence of a scintilla of evidence in support of the [non-moving

party's] position . . . [is] insufficient" to withstand a motion for summary judgment; rather,

"there must be [some] evidence on which the jury could reasonably find for the [non-movant]."

Id. at 252.

### III.    ANALYSIS

**A.    The Plaintiff's Claims Against the Government**

**1.  The Government's Motion for Summary Judgment**

Counts IV and VIII of the plaintiff's Amended Complaint assert claims of negligent

infliction of emotional distress and medical malpractice against the Government, respectively.

See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73, 195–205.  The Government argues that

"[b]ecause Dr. Williams was the borrowed servant of the Higgins Practice, vicarious liability

arising from Dr. Williams'[s] alleged negligent diagnosis of [the] [p]laintiff, if any, falls squarely

on Dr. Higgins and the Higgins Practice," and therefore summary judgment should be entered in

its favor.  Gov't Mem. at 13.[6]  The Government also argues, in the alternative, that the

"[p]laintiff's contributory negligence bars her recovery for alleged medical malpractice" because

"she failed to provide [Dr.] Williams . . . with information that would have resulted in Dr.

Williams reaching the medical conclusion that [the] [p]laintiff likely sustained a concussion

while playing field hockey," id. at 17, 19 (capitalization removed), and that "there is no evidence

to support [the] plaintiff's claim for negligent infliction of emotional distress," id. at 23

(capitalization removed).  The Court will address the Government's arguments in turn.

---

[6] The plaintiff argues that the Government's "Westfall certification precludes them from escaping liability in this matter." Pl.'s Gov't Mem. at 7 (capitalization removed).  However, the Court has already addressed this argument and concluded that the Government, after substituting itself for an individual in a civil action after determining that the individual acted within the scope of his federal employment for Westfall certification purposes, is not precluded from arguing that it is not liable for the individual's allegedly negligent actions under the borrowed servant doctrine. See Bradley I, 249 F. Supp. 3d at 163–65.  The plaintiff also claims that the Government "has waived any right to [the] defense it now seeks" because "[t]he Memorandum of Understanding [Between the Medical Practice of David L. Higgins, M.D. and the National Capital Consortium (the 'Memorandum of Understanding')] indicates that '[t]he [Higgins] Practice must provide documentary proof of the insurance coverage to the Consortium,'" Pl.'s Gov't Mem. at 5 (citing Gov't's Mot., Ex. 9 (Memorandum of Understanding Between The Medical Practice of David L. Higgins, M.D. and The National Capital Consortium) ¶ 31)), and that the Government "had a duty to review the policy and recognize what[,] if any[,] exposure it was putting on [Dr. Williams,]" but instead "waited over [two] years from the time it filed its Westfall Certification and nearly [eight] years from the date the [Memorandum of Understanding] was executed before attempting to tender the defense to the Higgins Practice," id.  According to the plaintiff, the Government, by "issu[ing] a Westfall Certification and interven[ing] on the behalf of Dr. Williams," "accept[ed] Dr. Higgins'[s] tender of the defense" and cannot now "attempt to tender the defense . . . back to Dr. Higgins."  Pl.'s Gov't Mem. at 5–6.  As an initial matter, the Court notes that the plaintiff does not specify the defense that she claims the Government is tendering to the Higgins Practice—i.e., the defense that she claims the Government is seeking to have the Higgins Practice defend on its behalf in this lawsuit in accordance with paragraph 31 of the Memorandum of Understanding.  Nevertheless, her argument is without merit.  As the Government correctly notes, its motion for summary judgment "is not attempting to tender the defense of this case to the Higgins Practice," but rather is "seek[ing] to shift vicarious liability to the Higgins Practice[] with the aim of terminating the [ ] Government as a party to this litigation and leaving the Higgins practice to rightfully defend Dr. Williams'[s] diagnosis on its own behalf."  Gov't Opp'n at 14 (emphasis removed).  In addition, the plaintiff's reliance on the Memorandum of Understanding—an agreement between the Consortium and the Higgins Practice—is misplaced.  The plaintiff is neither a party nor a third-party beneficiary to the Memorandum of Understanding and therefore cannot claim that the Government, because it did not act in accordance with the Memorandum of Understanding, has now waived a right that it was entitled to pursuant to the Memorandum of Understanding. Cf. Harris v. Med. Transp. Mgmt., Inc., 300 F. Supp. 3d 234, 252 (D.D.C. 2018) ("Under District of Columbia law, a third-party to a contract may sue to enforce the contract's provisions if the contracting parties intend[ed] the third party to benefit directly thereunder." (alteration in original) (internal quotation marks omitted)); Terrell v. District of Columbia, 703 F. Supp. 2d 17, 21 (D.D.C. 2010) (stating that "typically only parties to a contract may sue for its violation"); Hossain v. JMU Properties, LLC, 147 A.3d 816, 820 (D.C. 2016) ("A third party to a contract may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder." (internal quotation marks omitted)).

### a.      The Borrowed Servant Doctrine

Section 228 of the RESTATEMENT (SECOND) OF AGENCY (1958) ("Restatement"),

which has been adopted by the District of Columbia Court of Appeals, see Moseley v. Second

New St. Paul Baptist Church, 534 A.2d 346, 348 (D.C. 1987), states that

> [c]onduct of a servant is within the scope of employment if, but only if: (a) it is of
> the kind he is employed to perform; (b) it occurs substantially within the
> authorized time and space limits; [and] (c) it is actuated, at least in part, by a
> purpose to serve the master[,]

Restatement § 228.  However, "[a]s stated in Section 220, one is a servant only if, as to his

physical conduct in the performance of the service, he is subject to the control or to the right to

control of the master."   Id. § 228 cmt c.  Restatement § 220 identifies the following factors as

relevant to determining the issue of control:

> (a) the extent of control which, by the agreement, the master may exercise over
> the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or
> business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is
> usually done under the direction of the employer or by a specialist without
> supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and
> the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and
> servant; and
> (j) whether the principal is or is not in business.

Restatement § 220(2).  "Under the law of agency, 'a person who is generally the servant of one

master [ ] can become the 'borrowed' servant of another.'"   Chang v. United States, Civ. Action

Nos. 02-2010 (EGS), 02-2283 (EGS), 2007 WL 2007335, at *12 (D.D.C. July 10, 2007) (quoting

Dellums v. Powell, 566 F.2d 216, 220 (D.C. Cir. 1977)) (alteration in original).[7]  "If the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master."  Dellums, 566 F.2d at 220.

    As an initial matter, the Government argues that "[a]pplying [the] relevant factors provided in the Restatement," Dr. Higgins and the Higgins Practice bear "liability, if any, for Dr. Williams'[s] alleged negligent diagnosis."  Gov't Mem. at 15.  Specifically, the Government claims that (1) "Dr. Higgins exercised full supervisory authority, responsibility[,] and control of Dr. Williams'[s] provision of care to Higgins Practice patients," id.; (2) "this case pertains to the practice of medicine—unquestionably  a distinct occupation that can only be practiced by learned professionals who are subject to rigorous licensing and board certification requirements," and "[i]t is the type of occupation that requires clear and unquestionable delineations between who is the responsible master when a physician rotates among different clinical settings," id. at 15–16 (internal quotation marks omitted); (3) "this case pertains to the supervision of a physician receiving training in a medical subspecialty in which he was not yet certified to practice independently," and "[i]t is work that is usually done . . . by a specialist without supervision, but only after that specialist completes his or her training and is eligible to achieve certification—not before," id. at 16 (internal quotation marks omitted) (second alteration in original); and (4) "Dr. Higgins supplied the clinical setting in which Dr. Williams practiced medicine at American University and granted Dr. Williams the privilege of treating the Higgins Practice's patients," and "Dr. Williams could not, on his own as an active duty Army doctor, set up his own clinic at

---

[7] Where, as here, diversity of citizenship is the jurisdictional basis for a case being brought in federal court, "the substantive tort law of the District of Columbia controls."  Novak v. Capital Mgmt. & Dev. Corp., 452 F.3d 902, 907 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

American University to practice sports medicine," id.  However, the Government fails to cite to

any evidence in the record to support these assertions, see id. at 14–16.  Without such proof, the

Government's mere allegations are insufficient to meet its burden of establishing that it is

entitled to summary judgment.  See Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be

. . . genuinely disputed must support the assertion by[] [ ] citing to particular parts of materials in

the record[.]" (emphasis added)).  And, although the Government has included a statement of

undisputed material facts in accordance with Local Civil Rule 7(h), which includes some

citations to evidence in the record, the Government, by not citing to a single piece of evidence in

its memorandum in support of its motion for summary judgment, requests the Court to review

the entire record and determine which facts support the Government's claims.  However, "a party

seeking summary judgment always bears the initial responsibility of informing the [ ] [C]ourt of

the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact," Celotex Corp., 477 U.S. at 323

(internal quotation marks omitted), and Local Civil Rule 7(h) appropriately "places the burden

on the parties and their counsel, who are most familiar with the litigation and the record, to

crystallize for the [ ] [C]ourt the material facts and relevant portions of the record," Jackson v.

Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996).  Thus,

the Court does not bear the Government's burden and is not obligated to wade through the entire

record to identify material facts that the Government believes may exist to support its summary

judgment motion.  See Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (stating that the

Court "should not be obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact").

The Government also argues that it is entitled to summary judgment because "the borrowed servant doctrine shifts vicarious liability in this case to Dr. Higgins and the Higgins Practice." Gov't's Mem. at 16. The Court disagrees. The Court previously considered this same argument made by the Government in Bradley I and found that the Memorandum of Understanding Between the Medical Practice of David L. Higgins, M.D. and the National Capital Consortium (the "Memorandum of Understanding "), which "[t]he Government primarily relie[d] upon . . . to show that Dr. Williams, as a member of the Consortium, was under the control of the Higgins Practice, and therefore, a borrowed servant of the Higgins Practice," suggested not only "that Dr. Williams was a borrowed servant of the Higgins Practice, and therefore, the Higgins Practice would be liable for tortious conduct committed by Dr. Williams while working under the control and supervision of the Higgins Practice," but also that "the Consortium maintained some elements of control of Dr. Williams'[s] clinical experience at the Higgins Practice and that Dr. Williams was acting within the scope of his duties for both the Higgins Practice and the Consortium." 249 F. Supp. 3d at 166–67. Accordingly, the Court denied the Government's motion to dismiss, or alternatively for summary judgment, with respect to the plaintiff's claims against it based on the borrowed servant doctrine, concluding that "the current record does not clearly attach liability exclusively to the Higgins Practice." Id. at 167. However, the Court noted that "after the close of discovery and once the record is complete, the Government may of course renew its motion for summary judgment on the grounds that the borrowed servant doctrine shifts sole liability to the Higgins Practice." Id. at 167 n.7.

The Government now claims that "the six provisions of the [Memorandum of Understanding] that gave this Court pause in ruling on the United States' pre-discovery motion to dismiss or for summary judgment[] can now be evaluated with the benefit of full discovery and the Court's concerns are allayed," Gov't Opp'n at 12 (capitalization removed), and that "there is no genuine issue of fact [that Dr. Higgins] . . . controlled Dr. Williams in his practice of medicine at American University . . . in October 2011 when he treated [the] [p]laintiff[,]," Gov't Mem. at 14.  Specifically, the Government contends that "there is no question of fact" regarding "whether . . . Dr. Higgins and Dr. Williams believed [that] they had created the relation of master and servant while Dr. Williams was at American University."  Id. at 16 (internal quotation marks omitted).  The only admissible evidence that the Government cites in support of its claim is Dr. Higgins's deposition testimony in which he "describe[s] himself as 'the Boss' in relation to Dr. Williams," id. (citing Gov't Mot., Ex. 7 (Deposition of David Higgins, M.D.) 117:1–7), and Dr. Williams's deposition testimony that he "worked underneath" Dr. Higgins when he practiced medicine at the University, id. (citing Gov't Mot., Ex. 8 (Williams Dep.) 23:21), testimony that the plaintiff does not dispute, see Pl.'s Gov't Facts ¶ 39.[8]  However, such testimony does not address whether Dr. Higgins exclusively possessed the power of control over Dr. Williams.

---

[8] Although the Government also cites to the declarations of Dr. Jerri Curtis, see Gov't Opp'n at 6, and Colonel Anthony Beutler, see id. at 13, in support of its claim that Dr. Higgins and the Higgins Practice exercised exclusive control over Dr. Williams, as the plaintiff correctly notes, the Government did not include the names of Dr. Curtis or Colonel Beutler in its initial disclosures, see Pl.'s Gov't Reply, Ex. 1 (Defendant United States' Initial Disclosures) 1.  And, because the Government relies on information obtained from these individuals in support of its defense, it was required to disclose their names to the plaintiff during discovery.  See Fed. R. Civ. Pro. 26(a)(1)(A)(i) ("[A] party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]").  As a result of this non-disclosure, the plaintiff requests that the Court "strike the [employee under the power and control of another] affirmative defense" pleaded by the Government from the record.  Pl.'s Gov't Mem. at 27.  To the extent that the plaintiff seeks to prevent the Government from relying on such evidence as support for its summary judgment motion, and without any evidence that these individuals were

(continued . . .)

The Government also relies on the Memorandum of Understanding as support for its position that it "states exactly who will control Dr. Williams when he is at the [Higgins] Practice," Gov't's Opp'n at 10 (citing Gov't's Mot., Ex. 9 (Memorandum of Understanding Between The Medical Practice of David L. Higgins, M.D. and The National Capital Consortium ("Memorandum of Understanding")) ¶ 5 ("While training at the [Higgins] Practice, trainees will be under the supervision of [Higgins] Practice officials for training purposes and will be subject to, and be required to abide by, all applicable [Higgins] Practice rules and regulations.")), and that "[n]othing in the [Memorandum of Understanding] allows a Consortium or other Army or Department of Defense doctor to supervise or control Dr. William in the actual treatment and care of patients at the clinical placement facility," id. at 13 (emphasis omitted).  However, the Government ignores the provision in the Memorandum of Understanding stating that "while performing services pursuant to [the Memorandum of Understanding], Consortium trainees remain[ed] employees of the United States performing duties within the course and scope of their federal employment," Gov't's Mot., Ex. 9 (Memorandum of Understanding) ¶ 32, and the Government even concedes that "[d]iscovery has shown that Dr. Williams was at all relevant times a military graduate medical student and that the Consortium retained responsibility for ensuring that he successfully completed the sports medicine fellowships program's required clinical training and other academic accreditation requirements," Gov't's Opp'n at 13 (emphasis removed).  Despite this revelation, the Government fails to acknowledge that "'[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of service to the other,'" Chang, 2007 WL 2007335, at *12

---

(. . . continued)
ultimately disclosed to the plaintiff before discovery closed, the Government cannot rely on information obtained from either Dr. Curtis or Colonel Beutler as a basis for being awarded summary judgment.

(alternation in original) (citing the Restatement § 226); <u>see also</u> <u>Dellums</u>, 566 F.2d at 221

("[T]here is a presumption that an actor remains in his general employment so long as by the

service rendered another, he is performing the business entrusted to him by the general

employer." (citing the Restatement § 227 cmt. b)), and that if a servant acts within the scope of

his employment for both masters, both may "be responsible for an act which is a breach of duty

to one or both of them[,]" Restatement § 226 cmt. a.  And, because there is evidence in the

record suggesting that "the Consortium maintained some elements of control of Dr. Williams'[s]

clinical experience at the Higgins Practice and that Dr. Williams was acting within the scope of

his duties for both the Higgins Practice and the Consortium," <u>Bradley I</u>, 249 F. Supp. 3d at 166–

67; <u>see also</u> Gov't Mem., Ex. 9 (Memorandum of Understanding) ¶ 8 (stating that "the director

of the Consortium's Family Medicine/Sports Medicine Fellowship Program" assisted in the

"outlining [of the] specific goals and requirements for [the] clinical rotation" performed,

including "the anticipated training, training and supervision standards to be employed, and any

other issues required by the Family Medicine/Sports Medicine Fellowship Program Review

Committee"); <u>id.</u>, Ex. 9 (Memorandum of Understanding) ¶ 11 (suggesting that the Consortium

prohibited the Higgins Practice from generating professional bills for services rendered by Dr.

Williams "to patients who are beneficiaries of the Department of Defense/TriCare"); <u>id.</u>, Ex. 9

(Memorandum of Understanding) ¶ 27 (stating that the Consortium promised to "ensure

compliance with all applicable [Higgins] Practice rules and instructions and those of its

physicians"); <u>id.</u>, Ex. 9 (Memorandum of Understanding) ¶ 32 (stating that the Consortium

provided secondary liability coverage because, "while performing services pursuant to [the

Memorandum of Understanding], Consortium trainees remain[ed] employees of the United

States performing duties within the course and scope of their federal employment"), "it cannot be

said that the facts here undisputably prove that the Higgins Practice is solely liable for Dr. Williams'[s] allegedly negligent conduct," <u>Bradley I</u>, 249 F. Supp. 3d at 166.[9]  Therefore, because "[w]hether one party is the 'sole master to whom liability can attach . . . is usually a question of fact, generally to be decided by the jury,'" <u>Chang</u>, 2007 WL 2007335, at *12 (quoting <u>Dellums</u>, 566 F.2d at 220), the Court must deny the Government's motion for summary judgment with respect to the plaintiff's claims against it based on the borrowed servant doctrine.

### b.     Contributory Negligence

"In a medical malpractice action, there are three elements [that] a plaintiff must show to establish a prima facie case: '(1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between <u>that deviation</u> and the plaintiff's injury.'" <u>Burke v. Scaggs</u>, 867 A.2d 213, 217 (D.C. 2005) (quoting <u>Talley v. Varma</u>, 689 A.2d 547, 552 (D.C. 1997)).  However, a defendant may assert a defense of contributory negligence, which "may operate as a complete bar to liability." <u>Dennis v. Jones</u>, 928 A.2d 672, 676 (D.C. 2007).  To succeed, the defendant "must establish by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care, and that this failure was a substantial factor in causing the alleged damage or injury." <u>Massengale v. Pitts</u>, 737 A.2d 1029, 1031 (D.C. 1999) (internal citations omitted); <u>Stager v. Schneider</u>, 494 A.2d 1307, 1311 (D.C. 1985) (stating that "[c]ontributory negligence is the failure to act with the prudence demanded of an ordinary

---

[9] The Government argues that <u>Harris-DeVaughn v. United States</u>, 241 F. Supp. 3d 186 (D.D.C. 2017), a case in which another member of this Court held that a doctor who was employed by the United States Navy was acting as a borrowed servant and therefore the United States was entitled to summary judgment, "is essentially on 'all-fours' with the present case."  Gov't's Opp'n at 7.  However, <u>Harris-DeVaughn</u> is distinguishable from this case because, according to that court, the facts were undisputed in <u>Harris-DeVaughn</u>, <u>see</u> 241 F. Supp. 3d at 188 (stating that "there is no dispute about how [the doctor's] work was managed when he was caring for the [plaintiffs'] daughter, or for that matter about the terms of the agreement between the [Consortium] and Children's National Medical Center"), unlike the circumstances in this case where the parties dispute who controlled Dr. Williams when he allegedly misdiagnosed the plaintiff.  Therefore, the holding in <u>Harris-DeVaughn</u> is not directly analogous to the case at hand and has no bearing on the Court's analysis.

reasonable person under like circumstances," or in other words, "[t]he plaintiff is required to conform to the same objective standard of conduct, that of the reasonable person of ordinary prudence under like circumstances").

"In medical malpractice cases . . . contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment." Weeda v. District of Columbia, 521 A.2d 1156, 1167 (D.C. 1987) (Terry, J., dissenting) (citations omitted).  However, where "the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment, contributory negligence is not a permissible defense[,]" and "the physician's negligent act constitutes an intervening force, and the patient is therefore not barred from recovery." Id.  Moreover, "a physician's superior knowledge and expertise makes contributory negligence a difficult defense to prove in medical-malpractice cases: '[B]ecause of the doctor's ability to understand and interpret medical matters, the doctor generally owes a greater duty to his patient than the patient owes to himself.'" Burton v. United States, 668 F. Supp. 2d 86, 107 (D.D.C. 2009) (quoting Morrison v. MacNamara, 407 A.2d 555, 568 (D.C. 1979)).

 Here, the Government argues that "the [p]laintiff knowingly failed to provide Dr. Williams with a complete medical history," including "any details regarding a blow to the head or other head injury," and the failure to do so was unreasonable, "contributed to her injury[,] and should be deemed to be the proximate cause of the injury." Gov't's Mem. at 19, 22.  In support of its argument, the Government claims that "[t]he deposition transcripts and medical records demonstrate that the [p]laintiff did not tell Dr. Williams that she was struck in the head during [a] [hockey] game." Id. at 19.  Specifically, the Government asserts that while the plaintiff had a conversation "with an American University team trainer, Jenna Earls, regarding a hit in the head,

[ ] she does not allege that Dr. Williams knew of this conversation or its content[.]" Gov't's

Opp'n at 19.  Contrary to the Government's assertion, however, the Government's own evidence

submitted in support of its motion for summary judgment suggests that Dr. Williams knew that

the plaintiff had been hit in the head, see Gov't's Mot., Ex. 13 (Earls Dep.) 121:22–25

(testimony of Jenna Earls that she "verbally told [Dr. Williams] [that] there was a hit to the

head"), and the Government fails to address this testimony in its submissions to the Court, see

Gov't's Mem. at 17–23; Gov't's Opp'n 15–24.  Therefore, because the record contains a genuine

issue of material fact regarding whether Dr. Williams knew that the plaintiff had sustained a

blow to her head when he met with her on October 5, 2011, the Court must deny the

Government's motion for summary judgment on the issue of contributory negligence.

### c.      Negligent Infliction of Emotional Distress

"To establish a prima facie case of negligent infliction of emotional distress, [a plaintiff]

must show that she was in the zone of physical danger created by [the defendant's] conduct and

was caused by [the defendant's] negligence to fear for her own well-being."  Hollis v. Rosa

Mexicano DC, LLC, 582 F. Supp. 2d 22, 27 (D.D.C. 2008) (quoting Jane W. v. Pres. & Dirs. of

Georgetown Coll., 863 A.2d 821, 826 (D.C. 2004) (alterations in original)).  Alternatively,

"when a plaintiff [is] not within the zone of danger but where there is a 'special relationship'

between the parties," a plaintiff may state of a claim of negligent infliction of emotional distress

> if the plaintiff can show that (1) the defendant has a relationship with the plaintiff,
> or has undertaken an obligation to the plaintiff, of a nature that necessarily
> implicates the plaintiff's emotional well-being, (2) there is an especially likely
> risk that the defendant's negligence would cause serious emotional distress to the
> plaintiff, and (3) negligent actions or omissions of the defendant in breach of that
> obligation have, in fact, caused serious emotional distress to the plaintiff.

Lesesne v. District of Columbia, 146 F. Supp. 3d 190, 195 (D.D.C. 2015) (citing Hedgepeth v.

Whitman Walker Clinic, 22 A.3d 789, 810–11 (D.C. 2011)).  "The purpose of the relationship

must involve care for [the plaintiff's] emotional well-being[.]" Id. at 196.  And, "[i]f the object

of the relationship is not such care, but is rather 'to obtain a financial, commercial or legal

objective,' emotional well-being is not necessarily implicated." Id. (internal citation omitted)

"In other words, even if the purpose of a relationship is to achieve an objective for the benefit of

a client, if that objective does not necessarily implicate the client's emotional wellbeing—even if

it has an effect on it—the relationship is not 'special' for purposes of [negligent infliction of

emotional distress]." Id.

Here, the Government argues that it is entitled to summary judgment as to the plaintiff's

negligent infliction of emotion distress claim because "there is no evidence . . . that Dr. Williams

had a relationship with [the] [p]laintiff beyond that of doctor and patient[.]" Gov't Mem. at

23–24.[10]  Again, however, the Government's own submission in support of its reply undermines

its position.  As the Government acknowledges, "the plaintiff, as an athlete of the University's

field hockey team, had a relationship with Dr. Williams[,] who served as part of the University's

field hockey team's medical staff," id. at 24, and pursuant to that relationship, Dr. Williams was

aware that the plaintiff was experiencing "extreme fatigue, lack of concentration, dizziness, [and]

[inability] to focus," Gov't Opp'n, Ex. 1 (Department of Athletics, Physician's Exam Report)

at 10018.  This evidence reflects that Dr. Williams's doctor-patient relationship with the plaintiff

"involve[d] the care of not just physical illness or conditions, but also of the mental and

emotional distress that can result from physical ailments and, indeed, can trigger, aggravate and

impede the treatment and alleviation of illness and symptoms," Hedgepeth, 22 A.3d at 812–13;

---

[10] Although the Government also in a cursory fashion states that "[t]he plaintiff's conclusory allegations do not
demonstrate that . . . their alleged negligence would likely cause serious emotional distress, or that their alleged
negligence actually caused her serious emotional distress," Gov't Mem. at 23, the Government does not otherwise
expound on this argument in its submissions to the Court, but instead focuses entirely on the issue of whether there
was a special relationship between Dr. Williams and the plaintiff.  Therefore, the Court will not address these
perfunctory claims.

see also id. at 813 ("Because care for the body and the emotions are so interlinked, and patients often are dependent on their physicians' exercise of due care, they therefore are susceptible to suffer emotionally as well as physically as a result of their physicians' negligence."), and therefore, the Court concludes that Dr. Williams "ha[d] a relationship with the plaintiff . . . of a nature that necessarily implicate[d] the plaintiff's emotional well-being," Lesesne, 146 F. Supp. 3d at 195. Accordingly, the Court will deny the Government's motion for summary judgment as to the plaintiff's negligent infliction of emotion distress claim. Cf. Tolu v. Ayodeji, 945 A.2d 596, 601 (D.C. 2008) ("[T]he question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." (alteration in original) (quoting District of Columbia v. Shannon, 696 A.2d 1359, 1365 (D.C. 1997)).

## 2. The Plaintiff's Motion for Summary Judgment as to the Government

The plaintiff contends that she is entitled to summary judgment as to two of the Government's affirmative defenses: (1) assumption of the risk, and (2) contributory negligence. The Court will address the plaintiff's arguments in turn.

First, the plaintiff contends that she is entitled to summary judgment because the Government has "failed to present any evidence to establish [that the] plaintiff assumed the risk of negligent healthcare." Pl.'s Gov't Mem. at 27 (capitalization removed). Although the Government does not state in its reply that it is "no longer pursing this [ ] affirmative defense," Wye Oak Tech., Inc. v. Republic of Iraq, Civ. Action No. 10-1182 (RCL), 2018 WL 5983385, at *14 (D.D.C. Nov. 14, 2018), because the Government has "not presented any evidence regarding this affirmative defense in [its] [reply] to [the] [plaintiff's] motion for summary judgment[,] [t]his means that [the] [Government] [ ] [is] inherently unable to raise a genuine issue of material

fact on this issue," id. at *13.  Therefore, the Court will grant the plaintiff's motion for summary judgment as to the Government's affirmative defense of assumption of the risk.

Second, the plaintiff claims that summary judgment should be entered in her favor as to the affirmative defense of contributory negligence because, "assuming arguendo that [the] [plaintiff] did in fact breach a duty" by not informing Dr. Williams that she was hit in the head, the Government has "failed to provide any evidence to indicate that any potential negligence on the part of [the] plaintiff was a proximate cause of her damages."  Pl.'s Gov't Mem. at 36 (capitalization removed).  However, as the Government notes, Dr. Robert Cantu, the plaintiff's proffered expert, testified that "had [the injury] been recognized and properly managed, [ ] most likely [the plaintiff] would have [recovered] [ ] within ten to [fourteen] days."  Gov't's Opp'n, Ex. 10 (Deposition of Dr. Robert Cantu, M.D.) 52:3–5.  And, because, "[i]n most cases, the existence of proximate cause is a question of fact for the jury," McNeal, 836 F.2d at 644 (internal quotation marks and citation omitted), and "[o]nly in exceptional cases will questions of [ ] contributory negligence[] and proximate cause pass from the realm of fact to one of law," Majeska v. District of Columbia, 812 A.2d 948, 950 (D.C. 2002), the Court concludes that the question of whether the plaintiff was contributorily negligent, such that her negligence caused her injuries, is more appropriately reserved for a jury.  Therefore, the Court will deny the plaintiff's motion for summary judgment as to the affirmative defense of contributory negligence in regards to the Government.

**B.     The Plaintiff's Claims Against the University Defendants**

**1.   The University Defendants' Motion for Summary Judgment**

Count III of the Amended Complaint asserts that the University was "negligent by breaching the duties of care [it] assumed for the benefit of [the p]laintiff," Removal Notice, Ex. 5 (Am. Compl.) ¶ 164, and Count VIII of the plaintiff's Amended Complaint asserts a medical

malpractice claim against the University defendants, see id., Ex. 5 (Am. Compl.) ¶¶ 195–204.

The University defendants argue that they are entitled to summary judgment as to all of the

claims against them because, by signing the "Acknowledgement of Risk" form prior to the 2011

field hockey season, the plaintiff "agreed to hold [the University] [d]efendants harmless for any

claims arising from her participation in field hockey."  Univ. Defs.' Mem. at 17.[11]  In response,

the plaintiff argues that the Acknowledgement of Risk form should "not be enforced because it

was adhesionary[,]" Pl.'s Univ. Defs. Mem. at 33 (capitalization removed), and the plaintiff also

disputes the validity of "the exculpatory clause contained in the 'Acknowledgement of Risk'

form . . . as it pertains to a regulated public interest and is against public policy," id. at 25

(capitalizations removed).[12]  The Court will address each of the plaintiff's arguments in turn.

As an initial matter, with respect to the plaintiff's argument that the Acknowledgement of

Risk form "was wholly adhesionary," id. at 33 (capitalization removed), the Court notes that

---

[11] The University defendants also argue that (1) summary judgment should be entered in favor of the University as to the plaintiff's negligence claim against it because the University owed no duty to the plaintiff, see Univ. Defs.' Mem. at 11; (2) summary judgment should be entered in favor of the University as to the plaintiff's medical malpractice claim against it because the University did not render any medical services to the plaintiff, see id. at 12; (3) the "[p]laintiff's claims are barred by her assumption of the risk," id. at 20; (4) the "[p]laintiff's . . . contributory negligence [ ] operates as an alternative bar to any recovery by the [p]laintiff in [this] case," id. at 23; (5) summary judgment should be entered in favor of the University defendants "due to lack of medical causation testimony," id. at 25 (capitalization removed); and (6) summary judgment should be entered in favor of the Medicine Center, the Higgins Practice, and Dr. Higgins because "there was no physician-patient relationship," id. at 37 (capitalization removed).  However, the Court need not address these arguments because the issue of waiver by the plaintiff is dispositive as to each of them.

[12] The plaintiff also argues that the Acknowledgement of Risk form should not be enforced because "there was never a meeting of the minds," Pl.'s Univ. Defs. Mem. at 33 (capitalization removed), and because the Acknowledgement of Risk forms signed by the plaintiff in the two years prior did not "address[] the future rendering of health care" and the exculpatory clause was "a new modification . . . that had never previously been seen and was in no way itemized out," id. at 36.  In support of her argument, the plaintiff submits in an affidavit that "[a]t no point in time . . . did I have any understanding that the form was signed to 'waive' my rights to pursue this lawsuit in any way." Pl.'s Univ. Defs. Mot., Ex. 12 (Affidavit of Jennifer Bradley) ¶ 8.  However, this argument is without merit.  As the University defendants correctly note, see Univ. Defs.' Opp'n at 18, "[i]t is, of course, the general rule that one who signs a contract has a duty to read it and [that she] is obligated according to its terms," and "[i]n the absence of fraud or its equivalent, one is obligated by his contract, though signed without knowledge of its terms."  Hart v. Vermont Inv. Ltd. P'ship, 667 A.2d 578, 582 (D.C. 1995) (citations omitted).  "It is not enough to avoid a contract that one party signed it believing it did not contain what was plainly expressed therein.  Id. (citation omitted).

"[e]ven though a contract is on a printed form and offered on a 'take it or leave it' basis, those

facts alone do not cause it to be an adhesion contract," but rather "[t]here must be a showing that

the parties were greatly disparate in bargaining power, that there was no opportunity for

negotiation and that the services could not be obtained elsewhere," Moore v. Waller, 930 A.2d

176, 182 (D.C. 2007).  Here, the plaintiff has failed to make such a showing.[13]  The plaintiff

"does not invite [the Court's] attention to any evidence that [s]he objected to the

["Acknowledgement of Risk" form] or attempted to bargain for different terms[,] [n]or has [s]he

shown that the contract involved a necessary service."  Id.  In any event, "[e]ven if a contract is

one of adhesion, it is enforceable unless it is deemed unconscionable upon judicial scrutiny."

Ass'n of Am. Med. Colls. v. Princeton Review, Inc., 332 F. Supp. 2d 11, 16 (D.D.C. 2004).

"Unconscionability has generally been recognized to include an absence of meaningful choice on

the part of one of the parties[, which is otherwise referred to as procedural unconscionability,]

together with contract terms which are unreasonably favorable to the other party[, which is

otherwise referred to as substantive unconscionability]."  Patterson v. Walker–Thomas Furniture

Co., 277 A.2d 111, 113 (D.C. 1971); see also Curtis v. Gordon, 980 A.2d 1238, 1244 (D.C.

2009).  "The party invoking unconscionability as a defense to enforcement of a contractual term

must prove both elements—lack of meaningful choice and terms unreasonably favorable to the

---

[13] In cases involving contract disputes, the courts in this Circuit apply the "significant relationship test," which is derived from the Restatement (Second) of Conflict of Laws § 188 (1971).  Ideal Electr. Sec. Co. v. Int'l Fidelity Ins. Co., 129 F.3d 143, 148 (D.C. Cir. 1997); Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. 'Rosvoorouzhenie', 172 F. Supp. 2d 79, 89 (D.D.C. 2001); Estrada v. Potomac Elec. Power Co., 488 A.2d 1359, 1361 (D.C. 1985).  Pursuant to Section 188, in the absence of an "effective choice of law by the parties, the contacts to be taken into account" include:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188 (internal citation omitted).  These factors, with the exception of the plaintiff's residence, all favor the application of District of Columbia law to disputes related to the Acknowledgement of Risk form.  Therefore, the Court concludes that District of Columbia law controls whether the Acknowledgement of Risk form is enforceable.

other party—except that, 'in an egregious situation, one or the other may suffice.'" <u>Kenyon Ltd.</u>
<u>P'ship v. 1372 Kenyon St. Nw. Tenants' Ass'n</u>, 979 A.2d 1176, 1186 (D.C. 2009) (quoting
<u>Urban Invs., Inc. v. Branham</u>, 464 A.2d 93, 99 (D.C. 1983)).  In fact, "unless a contract is shown
to be substantively unconscionable, it will not be rendered unenforceable because of procedural
unconscionability, except 'in an egregious situation,'" <u>Associated Estates LLC v. BankAtlantic</u>,
164 A.3d 932, 943 (D.C. 2017) (quoting <u>Urban Invs., Inc.</u>, 464 A.2d at 99), because, "[w]ithout
proof that the terms [of the contract] are unfair, the [C]ourt normally will be unable to ascertain
what detriment the weaker party suffered as a result of [an unconscionable] bargaining process,"
<u>Urban Invs., Inc.</u>, 464 A.2d at 100.  And, as noted by another member of this Court, "there do
not appear to be any reported [District of Columbia] cases finding such an 'egregious' scenario."
<u>Ruiz v. Millennium Square Residential Ass'n</u>, 156 F. Supp. 3d 176, 180 (D.D.C. 2016).  Here,
even if the plaintiff had shown that the Acknowledgement of Risk form was procedurally
unconscionable, which she has failed to do, the plaintiff has failed to make any argument, let
alone a showing—and the Court cannot find any evidence in the record to suggest that she has—
that the Acknowledgement of Risk form is substantively unconscionable or that this case
involves an egregious situation.  Accordingly, the Court concludes that the plaintiff has failed to
demonstrate that the Acknowledgement of Risk form was adhesionary and therefore
unenforceable.

The plaintiff nevertheless urges the Court to find the exculpatory clause in the
Acknowledgement of Risk form unenforceable because "rendering health care is a transaction
that affects the public interest."  Pl.'s Univ. Defs. Mem. at 25 (capitalization removed).  "A
fundamental requirement of any exculpatory provision is that it be clear and unambiguous."
<u>Moore</u>, 930 A.2d at 181.  Generally, "[e]xculpatory contract provisions are valid and enforceable

in the District of Columbia," <u>Ferenc v. World Child, Inc.</u>, 977 F. Supp. 56, 61 (D.D.C. 1997), "so

long as they do not purport to waive liability for gross negligence, fraud[,] or other willful

wrongful conduct," <u>Hedgepeth</u>, 22 A.3d at 802 n.18.  "Such clauses may not be valid, however,

in the context of transactions that affect the public interest."  <u>Id.</u>  However, as noted by another

member of this Court, "District of Columbia courts have not specifically addressed the validity

of [exculpatory] waivers for medical negligence when the waivers were signed prior to receiving

treatment."  <u>Jaffe v. Pallotta TeamWorks</u> (<u>Jaffe I</u>), 276 F. Supp. 2d 102, 109 (D.D.C. 2003),

<u>rev'd on other grounds</u>, 374 F.3d 1223 (D.C. Cir. 2004).[14]  In fact, on appeal, this Circuit

acknowledged that "[t]he District of Columbia has no recognizable policy, either way, on the

acceptability of prospective liability waivers for personal injury claims."  <u>Jaffe v. Pallotta</u>

<u>TeamWorks</u> (<u>Jaffe II</u>), 374 F.3d 1223, 1229 (D.C. Cir. 2004).

  In the absence of such precedent, the plaintiff relies on <u>Tunkl v. Regents of Univ. of Cal.</u>,

where the California Supreme Court, in setting forth a six-factor test, held that "the hospital-

patient contract clearly falls within the category of agreements affecting the public interest." 383

P.2d 441, 447 (Cal. 1963).  However, "the circumstances facing the Court here are decidedly

different from [<u>Tunkl</u>]."  <u>Jaffe I</u>, 276 F. Supp. 2d at 109.  Unlike the plaintiff in <u>Tunkl</u>, the

plaintiff in this case (1) was "a young, apparently healthy, and vigorous adult when she signed

the [Acknowledgement of Risk] form"; (2) "did not sign the [Acknowledgement of Risk] form in

exchange for receiving medical care for an (existing) injury or illness[,]" but rather "she

executed the [Acknowledgement of Risk] to [participate in intercollegiate athletics], a

completely voluntary activity"; and (3) "had participated in [intercollegiate athletics the year

---

[14] The District of Columbia Circuit reversed the district court's decision on choice of law grounds, holding that Virginia law should have been applied rather than District of Columbia law.  <u>See Jaffe v. Pallotta TeamWorks</u>, 374 F.3d 1223, 1229 (D.C. Cir. 2004).

prior], so she can be presumed to know the nature of the event and the medical arrangements that would generally be provided." Id.  In fact, as the California Supreme Court recognized in Tunkl, "no public policy opposes private, voluntary transactions[, like the transaction in this case,] in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party[.]" Tunkl, 383 P.2d at 446.  Moreover, the District of Columbia Court of Appeals in Moore, 930 A.2d at 182, and Hedgepeth, 22 A.3d at 802 n.18, cited with approval Wolf v. Ford, where the Court of Appeals of Maryland "expressly decline[d] [ ] to adopt the six-factor test set forth in Tunkl," 644 A.2d 522, 527 (Md. 1994), and instead stated that it would "not invalidate a private contract on grounds of public policy unless the clause at issue is patently offensive," id. at 528.

Here, the exculpatory clause at issue, which is located in the second to last paragraph of the one-page Acknowledgement of Risk form, indicates that

> [the plaintiff] . . . agree[s] to indemnify, defend[,] and hold harmless the University and its employees, officers, [and] agents from any claims, demands, or suit[s] for damages which may arise from [her] participation in the University's Intercollegiate Athletic Program; o[r] from any treatment, medical, or otherwise provided to [her] by the University's Sports Medicine Staff,

Univ. Defs.' Opp'n, Ex. 1 (2011–2012 Acknowledgement of Risk) at 15111, and the text of this clause employs the same print size as the remainder of the provisions.  Thus, contrary to the plaintiff's claim that these terms "were not conspicuous, clear, and unambiguous," Pl.'s Univ. Defs. Mem. at 33 (capitalization removed), "[t]he [Acknowledgement of Risk] form was very clear on its face," Jaffe I, 276 F. Supp. 2d at 109.  Additionally, the language of the Acknowledgement of Risk form "is sufficiently broad and sweeping to encompass losses by negligence[,]" because although the exculpatory clause "does not specifically refer to negligence claims, it closely follows the language of other disclaimers upheld in previous decisions"—

language indicating that the plaintiff agreed "to indemnify and hold harmless" the University

defendants. Potomac Plaza Terraces, Inc. v. QSC Prods., Inc., 868 F. Supp. 346, 354 (D.D.C.

1994); see also Mero v. City Segway Tours of Wash. DC, LLC, 962 F. Supp. 2d 92, 99 (D.D.C.

2013) (stating that "courts applying District of Columbia law have upheld liability waivers . . .

that did not expressly foreclose causes of action[] arising from negligence").  By signing the

Acknowledgement of Risk form, the plaintiff waived her rights to sue the University defendants

for injuries caused by her participation in field hockey during the 2011 season, as well as injuries

resulting "from any treatment, medical[,] or otherwise provided to [her] by the University's

Sports Medicine Staff," Univ. Defs.' Opp'n, Ex. 1 (2011–2012 Acknowledgement of Risk) at

15111, which includes not only the University's alleged "breach[] [of] the duties of care they

assumed for the benefit of [the] [p]laintiff" but also the University defendants' alleged "fail[ure]

to meet the standard of care imposed upon them in the treatment of [the plaintiff]," Removal

Notice, Ex. 5 (Am. Compl.) ¶¶ 164, 196.[15]  And, although "[t]he District of Columbia might

---

[15] The plaintiff claims that the exculpatory clause "is not applicable to the conduct of Dr. Williams" because the exculpatory clause "is limited to 'damages which may arise . . . from any treatment . . . provided to [her] by the University Sports Medicine Staff," and Dr. Williams "was not considered a member of the staff." Pl.'s Univ. Defs. Mem. at 37.  According to the plaintiff, Sean Dash, the University's athletic trainer, stated that Dr. Williams "was[ not] an employee of the [U]niversity[,]" and that he "would[ not] consider [Dr. Williams] a member of [his] staff." Id. (citing Pl.'s Univ. Defs. Mot., Ex. 8 (Deposition of Sean Dash ("Dash Dep.")) 32:4–32:6); see also Pl.'s Univ. Defs. Reply at 14 (arguing that "the waiver does not apply to the conduct of Dr. Williams" because Dash "made it clear during his deposition [ ] that Dr. Williams is not and was not a member of the University's Sports Medicine Staff" when he stated that Dr. Williams "was[ not] an employee of the [U]niversity[,]" and that he "would[ not] consider [Dr. Williams] a member of [his] staff") (capitalization removed).  However, the plaintiff's reference to Dash's deposition testimony is incomplete and misleading, and upon review of Dash's deposition transcript, it is clear to the Court that Dash also testified to Dr. Williams being "a member of [the University's] sports medicine staff." Pl.'s Univ. Defs. Mot., Ex. 8 (Dash Dep.) 32:3–4 (testimony of Dash that "Dr. Williams was a member of our sports medicine staff").  Therefore, the Court concludes that Dr. Williams, as a member of the University's sports medicine staff, is covered under the exculpatory clause of the Acknowledgement of Risk form. The plaintiff also claims that the conduct of Steve Jennings, the University's field hockey team's head coach, and Dash is not covered under the exculpatory clause because neither "Jennings [n]or [] Dash . . . provide[d] treatment to [the plaintiff]." Pl.'s Univ. Defs. Mem. at 37.  The Court disagrees with this position as well because the exculpatory clause is not limited to only damages arising from treatment.  The plaintiff ignores the first phrase in the exculpatory clause stating that it applies to "damages [that] may arise from [the plaintiff's] participation in the University's Intercollegiate Athletic Program," Univ. Defs.' Opp'n, Ex. 1 (2011–2012 Acknowledgement of Risk) at 15111, which would apply to the plaintiff's challenged conduct of Dash and Jennings, i.e., their alleged "fail[ure]

(continued . . .)

recognize the exception for pre-injury medical liability waivers that California, Tennessee, and Michigan have adopted when the circumstances show less voluntariness and more superiority of bargaining power[,] [ ] those factors are not present here." Jaffe I, 276 F. Supp. 2d at 110.[16] Therefore, the Court agrees with the University defendants that "[b]ecause the Acknowledgement of Risk form signed by [the] [p]laintiff applies to injuries arising from inherent risks of the sport, such as concussions, as well as the subsequent treatment of such injuries, the[] [University] [d]efendants are entitled to summary judgment as a matter of law," Univ. Defs.' Mem. at 20, and "concludes that the District of Columbia would apply its normal rule enforcing waivers that are clear and unambiguous," Jaffe I, 276 F. Supp. 2d at 110. Because "[t]he [Acknowledgement of Risk] form signed by [the plaintiff] meets these criteria," the plaintiff's claims of negligence and medical malpractice claims against the University defendants are therefore barred.[17] See id. Accordingly, the Court must grant the University defendants' motion for summary judgment and enter judgment in their favor as to all of the plaintiff's claims against them in this case.[18]

---

(. . . continued)

to implement and enforce a proper concussion management plan at [the University,]" Removal Notice, Ex. 5 (Am. Compl.) ¶ 89. Therefore, the Court concludes that, contrary to the plaintiff's claim, Dr. Williams, Jennings, and Dash are all covered under the exculpatory clause, and therefore, any claim arising from their alleged negligent conduct is barred by the Acknowledgment of Rik form signed by the plaintiff.

[16] The plaintiff claims that "[t]he question at issue as pertains to the waiver is whether she voluntarily elected to get injured and receive substandard medical attention," and that she "had no bargaining power and no voluntariness when it came to receiving treatment by Dr. Williams and/or in receiving treatment below the standard of care." Pl.'s Univ. Defs. Mem. at 32. However, the plaintiff does not cite—and the Court is unable to find—legal authority to support her position.

[17] It is unclear to the Court whether the plaintiff's waiver of claims in the Acknowledgment of Risk form applies to her claims against the Government. However, because the Government has not raised this issue in its submissions to the Court, the Court need not address it at this time.

[18] With respect to the University defendants, the plaintiff argues that they "should be barred from raising [waiver as an] affirmative defense as they failed to disclose any such facts as requested during discovery." Pl.'s Univ. Defs. Mem. at 53 (capitalization removed); see also id. at 54 (capitalization removed) (claiming that the University "defendants were under a duty to provide the facts and evidence that support the basis of an affirmative defense").

(continued . . .)

**2.    The Plaintiff's Motion for Partial Summary Judgment as to the University Defendants**

The plaintiff argues that summary judgment should be granted against the University

defendants because (1) they "have failed to present any evidence to establish [that the] plaintiff

assumed the risk of negligent healthcare," Pl.'s Univ. Defs. Mem. at 56 (capitalization removed);

and (2) they "have failed to carry their burden of proof in establishing a prima facie case of

contributory negligence," id. at 62 (capitalization removed).  The Court need not address these

arguments because, as the Court has already concluded, see Part III.B.1, supra, the University

defendants are entitled to summary judgment as to all of the plaintiff's claims against them, and

because there are no remaining claims against the University defendants.  Therefore, the Court

will deny as moot the plaintiff's motion for partial summary judgment as to the University

defendants.

**C.    The Plaintiff's Claim Against the NCAA**

**1.    The NCAA's Motion for Summary Judgment**

Count I of the plaintiff's Amended Complaint alleges a claim of negligence against the

NCAA.  See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 137–46.  The NCAA argues that this claim

"fails as a matter of law" because it "owes [the] [p]laintiff no legal duty of care," NCAA's Mem.

at 9 (capitalization removed), and because it "did not proximately cause [the] [p]laintiff's

injuries," id. at 16 (capitalization removed).

As noted earlier, to establish a claim of negligence in the District of Columbia, a plaintiff

must prove "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3)

---

(. . . continued)
However, this argument is nonsensical because, as the University defendants correctly note, during discovery, the plaintiff was provided a copy of the Acknowledgement of Risk form, see Univ. Defs.' Opp'n, Ex. 1 (2011–2012 Acknowledgement of Risk) at 15111, upon which the University defendants rely in support of their argument that they are entitled to summary judgment and which the Court has properly considered in granting the University defendants' motion for summary judgment.

injury to the plaintiff that was proximately caused by the breach." <u>Hedgepeth</u>, 22 A.3d at 793.
The District of Columbia Court of Appeals "has defined proximate causation as that cause
which, in natural and continual sequence, unbroken by any efficient intervening cause, produces
the injury[,] and without which the result would not have occurred." <u>District of Columbia v.
Zukerberg</u>, 880 A.2d 276, 281 (D.C. 2005) (internal quotation marks and citation omitted).
"[U]nder [the] proximate cause analysis, an actor whose conduct is a substantial factor in
bringing about harm shall be liable in negligence . . . for [, <u>inter alia</u>,] harm foreseeably
attributable to his[,] [ ] her[, or its] conduct." <u>White v. United States</u>, 780 F.2d 97, 106 (D.C.
Cir. 1986) (internal quotation marks, ellipses, and footnote omitted). "An intervening negligent
or criminal act breaks the chain of causation if it is not reasonably foreseeable . . . [and] there is
no proximate causation when the sequence of events leading to an injury is highly extraordinary
in retrospect." <u>McKethean v. Wash. Metro. Area Transit Auth.</u>, 588 A.2d 708, 716 (D.C. 1991)
(internal quotation marks and citations omitted). The plaintiff may demonstrate proximate cause
by "either direct or circumstantial evidence." <u>Zukerberg</u>, 880 A.2d at 281 (citation omitted). "In
most cases, the existence of proximate cause is a question of fact for the jury," <u>McNeal</u>, 836 F.2d
at 644 (internal quotation marks and citation omitted), and "only if it is absolutely clear that the
[defendant's] negligence could not have been a proximate cause [of the harm asserted by the
plaintiff] is it a question of law," <u>Boodoo v. Cary</u>, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (internal
quotation marks and citation omitted). "The question becomes one of law . . . when the evidence
[that would be] adduced at trial will not support a rational finding of proximate cause." <u>Sanders
v. Wright</u>, 642 A.2d 847, 849 (D.C. 1994) (internal quotation marks and citation omitted).

Here, because the plaintiff does not address the NCAA's argument that it did not
proximately cause her injuries, <u>see generally</u> Pl.'s NCAA Mem., the Court, therefore, assuming

without deciding that the plaintiff has established a duty of care owed by the NCAA, treats the

NCAA's argument as conceded and concludes that the NCAA was not the proximate cause of

the plaintiff's injuries.  See Rote v. Comm. on Judicial Conduct & Disability of Judicial

Conference of United States, Civ. Action No. 19-01299 (RC), 2019 WL 5797615, at *4 (D.D.C.

Nov. 6, 2019) (treating argument that the plaintiff failed to address as conceded); Holassie v.

District of Columbia, Civ. Action No. 16-2053 (TSC), 2019 WL 5189005, at *4 n.2 (D.D.C. Oct.

15, 2019) (stating that because the plaintiff "opposes summary judgment only on the Title VII,

[the District of Columbia Human Rights Act], and [the District of Columbia Whistleblower

Protection Act] claims, and does not address his unlawful invasion of privacy claim[,] [ ] the

court treats the [defendant's] argument as to the invasion of privacy claim as conceded");

Akhmetshin v. Browder, 407 F. Supp. 3d 11, 20 (D.D.C. 2019) ("Because [the plaintiff] did not

respond to that argument in his opposition brief, the Court deems it as conceded." (citation

omitted)); Hogan v. Hayden, 406 F. Supp. 3d 32, 42 (D.D.C. 2019) ("Because [the plaintiff] fails

to address the [defendant's] age discrimination (Count II) and retaliation (Count III) claims in

her opposition to summary judgment, the court treats both as conceded and will grant summary

judgment to the [defendant] on these claims."); Wimbish v. District of Columbia, 381 F. Supp.

3d 22, 35 n.9 (D.D.C. 2019) ("In its reply brief, the [defendant] does not address this

argument . . . ; therefore, the [defendant] has conceded the argument by not responding to it.");

Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)

(Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded."), aff'd, 98 F. App'x 8

(D.C. Cir. 2004).  But see Winston & Strawn, LLP v. McLean, 843 F.3d 503, 507 (D.C. Cir.

2016) (reversing district court ruling that treated a summary judgment motion as conceded when the non-moving party failed to file any opposition at all).  Although, in the Amended Complaint, the plaintiff alleges that "[a]s a direct and proximate result of [the] NCAA's negligence," she has suffered economic and non-economic damages such as various "past [and future] medical bills, . . . and loss of future economic opportunity," Removal Notice, Ex. 5 (Am. Compl.) ¶ 145, as well as "deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation[,] and disfigurement," id., Ex. 5 (Am. Compl.) ¶ 146, the plaintiff "is not entitled to rely on the[se] [conclusory] allegations in h[er] Complaint to create a genuine issue of material fact at the summary judgment stage," Hajjar–Nejad v. George Wash. Univ., 37 F. Supp. 3d 90, 128 (D.D.C. 2014); see also Pub. Citizen Health Research Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) (stating that "conclusory allegations unsupported by factual data will not create a triable issue of fact" (internal quotation marks and citations omitted)).  In fact, there is nothing of a factual nature in the record to support the plaintiff's conclusory allegation that the NCAA did anything that was the proximate cause of her injuries.  Therefore, the Court must grant the NCAA's summary judgment motion as to the plaintiff's negligence claim against it.[19]

### 2. The Plaintiff's Motion for Summary Judgment as to the NCAA

The plaintiff argues that summary judgment should be granted against the NCAA because (1) the NCAA "failed to present any evidence to establish [that the] plaintiff assumed the risk of negligent healthcare," Pl.'s NCAA Mem. at 21 (capitalization removed); and (2) the

---

[19] In her motion for summary judgment, the plaintiff argues that "the Court should strike the following affirmative defenses [raised by the NCAA] from the record[s]: . . . [1] Affirmative Defense 4: Contact Sports Exception to the Ordinary Standard of Care[;] [2] Affirmative Defense 5: Failure to Mitigate Damages[;] [3] Affirmative Defense 6: Statute of Limitations[;] [and] [4] Affirmative Defense 7: Estoppel and Waiver" because the NCAA "fail[ed] to indicate in any way that [these] affirmative defense[s] [were] being pursued." Pl.'s NCAA Mem. at 20–21. However, because the Court concludes that the NCAA is entitled to summary judgment as to Count I of the Amended Complaint, the Court need not address these arguments.

NCAA has "failed to carry [its] burden of proof in establishing a prima facie case of contributory negligence," id. at 29 (capitalization removed).[20]  The Court need not address these arguments because, as the Court has already concluded, see Part III.C.1, supra, the NCAA is entitled to summary judgment as to the plaintiff's claim of negligence, and because there are no remaining claims against the NCAA.  Therefore, the Court will deny as moot the plaintiff's motion for summary judgment as to the NCAA.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court concludes that the Government's motion for summary judgment is denied and the plaintiff's motion for summary judgment as to the Government is granted in part and denied in part.  The Court further concludes that the University defendants' motion for summary judgment is granted, their motion to modify the scheduling order is denied as moot, and the plaintiff's motion for partial summary judgment as to the University defendants is denied as moot.  Finally, the Court concludes that the NCAA's motion for summary judgment is granted and the plaintiff's motion for summary judgment as to the NCAA is denied as moot.

**SO ORDERED** this 29th day of May, 2020.[21]

REGGIE B. WALTON
United States District Judge

---

[20] The Court notes that, although it ordered the plaintiff to refile her motion for summary judgment because she "fail[ed] to differentiate her arguments against each of the defendants, and instead repeatedly refer[ed] to all six [d]efendants as a single collective[] and generalize[d] her claims that [the] [d]efendants have presented insufficient evidence concerning their affirmative defen[ses]," Order at 4 (Sept. 24, 2019), ECF No. 112, the plaintiff has filed almost verbatim motions for summary judgment as to each defendant.  The Court demands that the orders it issues be complied with by counsel.  Counsel is therefore advised that non-compliance with any orders that the Court issues in the future will not be tolerated and that monetary sanctions will be imposed for future non-compliance.

[21] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.