**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JENNIFER BRADLEY,

               Plaintiff,

*v.*

NCAA, *et al.*,

               Defendants.

Case No.  1:16-cv-00346-RBW

## <u>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

***COMES NOW*** Plaintiff by and through undersigned counsel, and respectfully submits to this Honorable Court her Proposed Findings of Fact and Conclusions of Law:

1.      This case came before this Honorable Court for a bench trial on September 9, 2021 and lasted four days.

2.      Plaintiff Jennifer Bradley was represented at trial by Barry J. Nace, Esq. (now deceased) and Matthew A. Nace, Esq. of the law firm Paulson & Nace, PLLC.

3.      Defendant United States of America was represented by Christopher Hair, Esq., Jennifer Colsia, Esq., and John Lopez, Esq, for the United States Attorney's Office for the District of Columbia.

4.      Defendant United States of America intervened in this matter on behalf of Aaron Williams, D.O., who was a federal employee at the time of the alleged negligence and was certified under a Westfall Certification to have been operating within the scope of his employment during the treatment in question.

5.      The operative complaint sought one count of medical malpractice and one count of negligent inflection of emotional distress against the United States Government.

# Table of Contents

**Brief Summary of Case** ....................................................................................**4**

**Applicable Law**..............................................................................................**5**

I. The Law on Medical Malpractice Claims in the District of Columbia .............................5

II. The Law on Negligent Infliction of Emotional Distress in the District of Columbia.......7

III. The Applicable Contract Law in the District of Columbia.............................................10

    a. Third Party Beneficiaries Must Be Specifically Identified to
       Receive Benefits of a Contract ..................................................................11

    b. Ambiguities of Contracts are to be Construed Against the Party
       Seeking to Enforce. ..................................................................................12

    c. The Law On Waiver Applicability In The District Of Columbia............................13

IV. The Law On Contributory Negligence In The District Of Columbia............................14

V. The Law Of Joint and Several Liability In The District Of Columbia ............................15

**Proposed Findings of Fact**.............................................................................**16**

I. Factual Testimony and Evidence.....................................................................................16

II. Evidence of Damages....................................................................................................25

III. Expert Testimony To Support Plaintiff's Claim .............................................................33

    a. Robert Cantu, M.D. on Standard of Care, Breach, Causation, and Damages.............33

    b. William Vollmer, M.D. Testimony on Standard of Care, Causation, and Damages..42

    c. Testimony of Defense Expert Witness Katherine Margo, M.D.................................45

    d. Joseph Crouse, Ph.D. on Damages ............................................................47

IV. Testimony on Dr. Williams' "Employment" Status At American University ...............51

**Proposed Conclusions Of Law Based Upon The Evidence** ................................................**60**

    I. Defendant U.S.A. Is Liable For The Medical Malpractice of Dr. Williams........60

    II. The Waiver Does Not Apply To The Defendant U.S.A. ....................................62

III.    No Contributory Negligence Has Been Established...........................................67

IV.    There Is No Evidence That Another Concussion Occurred Or That If One Did There Was Any Causative Affect To Disturb A Complete Recovery For Plaintiff...........................................................................68

V.    Defendant U.S.A. Is Liable For 100% Of The Damages....................................70

**Conclusion** ...........................................................................................**70**

# BRIEF SUMMARY OF CASE

This is a medical malpractice action pertaining to the medical care rendered by Aaron Williams, D.O. to Jennifer Bradley. Dr. Williams was acting as a Federal Employee at the time of the incident, and, therefore, the United States of America has intervened on his behalf to stand in his place as the Defendant pursuant to the Federal Tort Claims Act.

The allegations are straight forward: Dr. Williams failed to timely and appropriately diagnose Ms. Bradley with a concussion. Moreover, because he didn't appreciate that Ms. Bradley had sustained a concussion, he violated the national standard of care by failing to pull her out of all American University field hockey team activities. The failure to recognize, diagnose, and treat Ms. Bradley's concussion proximately caused her to develop a moderate traumatic brain injury.

Plaintiff presented expert witness testimony from an eminently qualified expert witness to demonstrate that Dr. Williams failed to adhere to the standard of care and that such failures were the direct and proximate cause of Ms. Bradley's permanent traumatic brain injury and the damages thereof. Plaintiff also presented consistent testimony from Plaintiff's treating physician. No credible expert medical evidence was elicited by Defendant to dispute Plaintiff's claim of medical malpractice. Plaintiff also presented uncontested evidence from a vocational rehabilitation expert and economist to quantify the amount of future economic damages. This testimony was not contradicted or contested by any witness for Defendant. Finally, Plaintiff presented testimony on the non-economic damages that Ms. Bradley suffered as a result of Dr. Williams' negligence and continues to suffer therefrom.

Defendant's only true defense is the assertion that Ms. Bradley waived her cause of action; however, Defendant failed to establish that these Defendants are in privity such that they can rely upon any such waiver.

The preponderance of the evidence in this matter clearly established that the Defendant was negligent and caused severe and permanent damages to the Plaintiff for which the United States of America is liable.

## APPLICABLE LAW

### I. THE LAW ON MEDICAL MALPRACTICE CLAIMS IN THE DISTRICT OF COLUMBIA.

It has long been settled in this jurisdiction that "in a medical malpractice negligence action the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries." *Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C. 1997). "If the applicable standard of care is breached, the person to whom the duty is owed may recover for damages proximately caused by the negligence, including damages for physical injury, monetary loss, and ancillary or 'parasitic' damages for related mental distress (sometimes referred to as 'pain and suffering')." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011). "In cases involving doctors, therefore, a plaintiff must present expert testimony that the doctor breached the national standard of care and must prove that this breach was reasonably likely to cause an objective person, and in fact did cause the plaintiff, to suffer serious emotional distress." *Id.* at 817.

According to the District of Columbia Court of Appeals, "[t]he causal relationship between breach and injury is established through expert testimony 'based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries.'" *Perkins v. Hansen*, 79 A.3d 342, 344 (D.C. 2013). The *Perkins* case went on to state that it "is well established that a physician's experience may provide a reliable basis for his or her expert opinion." *Id.* at 345.

Medical malpractice is, thus, a claim that has its roots in tort law. While a traditional tort claim requires a plaintiff to bear the burden of proof by the preponderance of the evidence in establishing a duty, breach thereof, causation, and damages, a claim for medical malpractice requires a plaintiff to carry the same burden on the same issues; however, the "duty" is defined by the "standard of care." The "standard of care" is a legal term defined as "what a reasonably competent physician would do in the same or similar circumstances."

The "standard of care" must be established by expert witness testimony and must reflect a national standard of care, and not simply what one witness would do in the same or similar circumstances. Establishment of the "national" standard of care is done through the presentation of opinions based upon the expert's education, training, experience, and knowledge of the continuing evolution of the field of inquiry through training, seminars, continuing medical education, and medical literature in the field. (*See Nwaneri v. Sandidge*, 931 A.2d 466, 473 (D.C. 2007) stating that "the expert failed to even attempt to link his national standard of care testimony to 'any certification process, current literature, conference, or discussion with other knowledgeable professionals,' any which would have been legally sufficient to establish a basis for his discussion of the national standard of care. Without a basis for his testimony, or any supplemental support for that matter, we concluded in *Strickland* that the expert's testimony amounted to nothing more than his own personal opinion.")

Once a plaintiff has established what the national standard of care is, he or she must then demonstrate that the healthcare provider failed to act in conformity with said standard. Again, such testimony must be established through expert witnesses unless the breach of the standard of care was so obvious that skilled witnesses in the field are not required. If a plaintiff has carried his or her burden in establishing what the national standard of care is and how the healthcare provider

deviated from it, it is established that the healthcare provider is liable, and the plaintiff need then demonstrate what the healthcare provider is liable for to the plaintiff.

The question of causation is a relative concept in tort law that requires two questions to be answered by the fact finder: 1) was the negligent conduct *a* cause of damages (actual causation); and 2) were the damages reasonably foreseeable outcomes from the negligent conduct (proximate causation). *Psychiatric Institute of Washington v. Allen*, 509 A.2d 619, 623 – 24 (D.C. 1986). There can be more than one proximate cause of damages. A plaintiff need only prove that the alleged negligence was **a** proximate cause. *King v. Pagliaro Bros. Stone Co.*, 703 A.2d 1232, 1234 (D.C. 19977)

Finally, upon carrying his or her burden of proof to establish what the national standard of care is, what the healthcare provider's deviations of the standard of care was/were, and what the deviation(s) were a proximate cause to, the plaintiff must establish the amount of money that such damages would fairly and reasonably be required to make the plaintiff whole again. *Bell v. Westinghouse Electric Corp.*, 507 A.2d 548, 555 (D.C. 1986) ("The purpose of tort damages is to make the injured party whole again.")

## II. <u>THE LAW ON NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS IN THE DISTRICT OF COLUMBIA</u>

The District of Columbia Court of Appeals thoroughly details the tort of negligent infliction of emotional distress in the matter of *Hedgepath v. Whitman Walker Clinic*, 22 A3d. 789 (D.C. 2011). There, plaintiff Hedgepath brought suit under a theory of negligent infliction of emotional distress after the defendant incorrectly informed him that he was HIV positive. *Id.* at 792. Initially, the Superior Court granted summary judgment stating the plaintiff failed to satisfy the "zone of physical danger test." *Id.* The D.C. Court of Appeals affirmed the Superior Court's decision but granted a petition for rehearing *en banc* to decide whether the test should be applied to preclude

appellant's claim that his doctor's negligent misdiagnosis caused him serious emotional injury. *Hedgepeth v. Whitman Walker Clinic*, 990 A.2d 455 (D.C. 2010).

The Court of Appeals ruled that "appellant's claims should not be barred simply because he was not put at risk of physical injury." *Hedgepath*, 22 A.3d at 792. The court adopted a rule "supplementing" the zone of physical danger test:

> We hold that a duty to avoid negligent infliction of serious emotional distress will be recognized only where the defendant has an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and serious emotional distress is especially likely to be caused by the defendant's negligence.

*Id.* at 792. This opinion, important for its holding, also details the expansion of the negligent infliction of emotional distress tort over the years explaining its origin and evolution beginning with a general overview of a negligence claim's elements, specifically duty and foreseeability. The Court states, "if the injury that befell the plaintiff was 'reasonably foreseeable' to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury; if the injury was not 'reasonably foreseeable,' then there was no duty." *Id.* at 793.

In determining foreseeability, the court explained that the "relationship between the plaintiff and the defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty." *Id.* at 794. The D.C. Court of Appeals wrote that, generally in negligence tort cases, the "foreseeability of harm test" is used to assist courts in determining whether a duty existed. This test was utilized in part "based on the recognition that duty must be limited to avoid liability for unreasonably remote consequences…" *Id.*

The Court's opinion in *Hedgepath* detailed the evolution of an emotional distress claim initially requiring "physical impact," to then requiring a claimant satisfy a "zone of physical

danger" test, to finally declaring that while a claimant may be in the zone of physical danger, injury must be serious and verifiable, but they "need not experience a physical manifestation of the mental injury." *Id.* at 796-97, *Jones v. Howard Univ., Inc*., 589 A.2d 419, 424 (D.C. 1991).

In *Hedgepath*, the Court of Appeals continued this movement away from requiring strict tests and towards one more akin with traditional notions of duty. The easing of limitations on emotional distress claims would permit claimants to pursue claims for negligent infliction of emotional distress even when not present in the "zone of danger" on a case-by-case basis:

> The question is not whether the "zone of physical danger" rule should be jettisoned and replaced with the proposed "relationship" or "undertaking" rule in every case. Rather, the issue presented in this appeal is whether — in addition to permitting recovery based on the "zone of physical danger" rule — the law should allow courts to conclude that a defendant has assumed a duty to avoid inflicting emotional distress in certain cases where the underlying ***relationship or undertaking is such that it is not only foreseeable, but especially likely, that the defendant's negligence will cause serious emotional distress to the plaintiff***. For the reasons discuss, we agree with appellant, and adopt a supplemental rule, as defined in this opinion.

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 800 (D.C. 2011) (emphasis added). The Court

> agree[d] with the draft Third Restatement['s] . . . observation that no special rule (such as the zone of physical danger test) is necessary to guard against the risk of imposing a duty that might be unlimited or unreasonable when emotional harm is especially likely to be caused as a direct result of negligent performance of a duty to avoid such harm owed to a specific person. Such a duty can, but need not, arise from a contractual arrangement between the parties. ***The key point is that the requirement of a special relationship between the parties or undertaking by the defendant to the plaintiff limits the scope of the defendant's potential liability to identifiable persons, rendering the "physical danger" requirement unnecessary to achieve that purpose.***

*Id.* at 802 (emphasis added). The Court concluded its analysis of the law and held that

> a plaintiff may recover for negligent infliction of emotional distress if the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and

(3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Id.* at 810-11. *See also Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 984 (D.C. 2014).

## III. <u>THE APPLICABLE CONTRACT LAW IN THE DISTRICT OF COLUMBIA</u>[1]

In determining if a party is an agent or an independent contractor of another the Court will "generally look to the actual relationship between the parties as well as any written contract between them in analyzing an employers' right to control." *Beegle v. Restaurant Mgmt.*, 679 A.480, 486 (D.C. 1996).

In *Holmes v. Brethren Mut. Ins. Co.,* 868 A.2d 155, 158 (D.C. 2005), the D.C. Court of Appeals analyzed how a contract between an entity and a third party applies to an independent contractor of that entity. In reliance upon *Fisher v. Tyler*, 284 Md. 100 (Md. 1978), the Court indicated that

> 'here a leading commentator on the subject (on whom the court relied in *Fisher*) instructs us that 'the key inquiry regarding whether an automobile will fall within the hired automobiles provision for the policy is whether the insured exercised dominion, control or the right to direct the use of the vehicle.'… ('The right to control of equipment is generally regarded as the critical distinction between the 'hired automobile' and the 'non owned automobile' for insurance contract purposes")… Relatedly, courts have held that 'automobiles which are owned and being used by… independent contractors hired by the insured will not constitute hired automobiles… because, under most circumstances, the… independent contractor exercises independent control over the vehicle, not the insured.'

*Holmes*, 868 A.2d at 158.

In this matter, Dr. Williams was an instrumentality utilized by Dr. Higgins, an independent contractor for American University. Thus, the law in the District of Columbia recognizes that

---

[1] The Court has previously ruled on the overall applicability of the Waiver clause at issue here. Plaintiff has briefed the matter and sought reconsideration on the matter, both of which was denied. Plaintiff maintains her objections to the applicability of this clause in this case for the reasons previously addressed with the Court and desires to preserve on the record her continued objection to its applicability in all ways for the record and appellate purposes, should they be required.

independent contractors who are not controlled by the parties to the contract are not covered under a contract between two principals.

## A. THIRD PARTY BENEFICIARIES MUST BE SPECIFICALLY IDENTIFIED TO RECEIVE BENEFITS OF A CONTRACT.

As stated by the D.C. Court of Appeals, intended third-party beneficiaries must be identified in a release. *Woodfield v. Providence Hosp*. 779 A.2d 933 (D.C. 2001). The Court of Appeals interpreted *Woodfield* in indicating that "third party beneficiary status *requires* that the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Presley v. Commer. Moving & Rigging, Inc.* 25 A.3d 873, n. 14 (2011) (emphasis added). *Presely* also expressly states that "[a]n indirect interest in the performance of the undertakings is insufficient." *Id.* Likewise, Judge Facciola for this very Court interpreted *Woodfield* for the proposition that "third party beneficiary status existed when the release **specifically** named beneficiaries and when they directly benefited from performance." *United States ex rel. Miller v. Holzmann*, 2006 U.S. Dis. LEXIS 58266 (D.D.C. 2006) (emphasis added).

In asserting an affirmative defense of "waiver," "[a] third party may sue on a contract if the contracting parties intended the third party to benefit." *Aziken v. District of Columbia*, 70 A.3d 213 (D.C. 2013). Thus, if the parties did not intend the third party to benefit, then the third party has no standing to assert such an affirmative defense. When analyzing contract privity, "third party claims may be sustained where the [party] [was] 'the **direct and intended** beneficiar[y] of the contracted for services." *Scott v. Burgin*, 97 A.3d 564, 566 (D.C. 2014) (emphasis added). In this matter, the direct and intended beneficiary of the Acknowledgement of Risk form was American University, not Dr. Williams and not Defendant U.S.A.

## B. AMBIGUITIES OF CONTRACTS ARE TO BE CONSTRUED AGAINST THE PARTY SUING THEREON.

"Whether an instrument is ambiguous is a question of law. A contract is ambiguous only if it is 'reasonably susceptible of different constructions or interpretations." *Clyburn v. 1411 K St. Ltd. Partnership*, 628 A.2d 1015, 1017 (D.C. 1993). "An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning" *Nat'l Hous. P'ship v. Mun. Capital Appreciation Partners. I, L.P.*, 935 A.2d 300, 310 (D.C. 2007), and "the court determines that proper interpretation of the contract depends upon evidence outside the contract itself," *Dodek*, 537 A.2d at 1093, i.e., "where its interpretation depends upon the credibility of extrinsic evidence or upon a choice of reasonable inferences from such evidence." *Id*. at 1092, *Aziken v. District of Columbia*, 70 A.3d 213, 219 (D.C. 2013). "[T]he burden of establishing the terms of a contract rests upon the party suing thereon." *Nat'l Rifle Ass'n v. Ailes*, 428 A.2d 816, 821 (D.C. 1981) (internal quotation marks omitted). *Aziken*, 70 A.3d at 221.

*Aziken* further states:

> as a last resort in contract interpretation, this court sometimes applies the secondary rule of construction that 'any ambiguity as to the contract's meaning will be construed strongly against the drafter' from *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009); *see also District of Columbia v. C.J. Langenfelder & Son, Inc*., 558 A.2d 1155, 1164 (D.C. 1989) ("[I]f [the parties'] intention cannot be conclusively determined without resort to secondary rules of construction, then 'the ambiguities remaining in the contract will be construed strongly against the drafter.'").

70 A.3d at n.13.

## C. <u>THE LAW ON WAIVER APPLICABILITY IN THE DISTRICT OF COLUMBIA[2]</u>

While Courts may uphold clauses waiving negligence claims related to voluntary activities such as participating in a sporting event, waiving medical malpractice claims that follow injury sustained during a voluntary activity never has been, and never should be, considered appropriate. The District of Columbia Court of Appeals agreed in its opinion in *Hedgepeth v. Whitman Walker Clinic*:

> Such clauses may not be valid, however, in the context of transactions that affect the public interest. *See Wolf v. Ford*, 335 Md. 525, 644 A.2d 522, 525-26 (Md. 1994) (citing *Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92, 32 Cal. Rptr. 33, 383 P.2d 441, 445-46 (Cal. 1963) (holding that release of patient's claims for negligent and wrongful conduct in hospital's pre-admission form **was against public policy and not enforceable**).

22 A.3d 789, 802 (D.C. 2011) (emphasis added). This is not a different situation. A patient does not sign away all claims of medical malpractice just because a waiver of liability is signed prior to treatment. That is not accepted public policy and that is clearly not the law. The D.C. Medical Malpractice Act of 2006 was designed to "improve healthcare delivery and share best practices." The Act does not expressly permit waivers. If the drafters wished to include such exculpatory clauses to this specific act, they were knowledgeable and capable of doing so; however, they did not. It is undeniable that the rendering of healthcare is a public interest, therefore the clause here should not be considered valid for either Defendant.

---

[2] The Court has previously ruled on the overall applicability of the Waiver clause at issue here. Plaintiff has briefed the matter and sought reconsideration on the matter, which was denied. Plaintiff maintains her objections to the applicability of this cause in this case for the reasons previously addressed with the Court and desires to preserve on the record her continued objection to its applicability in all ways for the record and appellate purposes, should they be required.

## IV. **THE LAW ON CONTRIBUTORY NEGLIGENCE IN THE DISTRICT OF COLUMBIA**

Pursuant to the District of Columbia Court of Appeals, "the burden of proving contributory negligence" is upon a defendant. *May v. Washington, Virginia & Maryland Coach Co.* 197 A.2d 267, 268(1964) *see also Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997), *Lyons v. Barrazotto*, 667 A.2d 314, 321 (D.C. 1995) *See Singer v. Doyle,* 263 A.2d 436, 438 (1967). "In a civil case, the burden of proof required is a fair preponderance of the evidence. And this burden cannot be successfully carried by speculation." *Myrick v. National Sav. & Trust Co.*, 268 A.2d 526, 527 (D.C. Cir. 1970) (citing *Edwards v. Mazor Masterpieces, Inc.*, 111 U.S. App. D.C. 202, 295 F.2d 547 (1961); *Rule v. Bennett*, 219 A.2d 491, 494 (D.C. Cir. 1966)).

The Court of Appeals has also made it clear that as with any claim for negligence, a party asserting contributory negligence must establish that a party acted unreasonably *and* that such unreasonable conduct was a cause of the injuries:

> To establish contributory negligence, the party asserting the defense must prove by a preponderance of the evidence that the opposing party's negligence was a substantial factor in causing his or her injury, and that the injury or damage was either a direct result or a reasonably probable consequence of the negligent act or omission. "Contributory negligence is 'unreasonable conduct,' *i.e.*, "conduct 'which falls below the standard to which a plaintiff should conform for his [or her] own protection" and contributes to the plaintiff's injury.'"

*Durphy v. Kaiser Found. Health Plan of Mid-Atlantic States*, 698 A.2d 459, 465(1997)(internal citations omitted). In negligence cases, such as the case *sub judice*, prior acts of negligence cannot be utilized to establish "contributory negligence:"

> In medical malpractice cases . . . contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment." *Weeda v. District of Columbia*, 521 A.2d 1156, 1167 (D.C. 1987) (citations omitted). *However, where "the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment, contributory negligence is not a permissible defense*." *Id.* (citations omitted). Where that occurs, the doctor's negligent act is considered an intervening cause which does not bar the patient from recovering. *Id.*

*Durphy* at 698 A.2d 467(Emphasis added).

## V.    THE LAW OF JOINT AND SEVERAL LIABILITY IN THE DISTRICT OF COLUMBIA

There is a strong and recognized interest in determining the liability of District health care corporations for negligence attributable to them that occurs within the District of Columbia. *Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman,* 491 A.2d 502, 509-10 (D.C. 1985). Joint and several liability allows a plaintiff to sue for and recover the **full amount** of recoverable damages from **any defendant**. Restatement (Third) of Torts: Apportionment of Liability § 10 (2000). The practical effect of this doctrine is that the plaintiff can recover the entire amount of damages from any of the jointly and severally liable tortfeasors, regardless of a particular defendant's percentage share of fault. *Id.*

When two tortfeasors jointly contribute to harm to a plaintiff, both are potentially liable to the injured party for the entire harm. *National Health Laboratories, Inc. v. Ahmadi,* 596 A.2d 555 (D.C. 1991). Two persons whose concurrent negligence causes injury to a third are liable jointly and severally, and their liability will not be affected by the relative degree of negligence, or by the care required of each *Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982). There is simply no apportionment of damages allowed for within the District of Columbia; rather, joint tortfeasors have a separate and distinct right to redress against one another in the form of independent claims for contribution and indemnification. The finder of fact's duty in the case at issue, however, is to award an amount of damages that reflect those that a plaintiff is entitled to under the law without any bias or apportionment.

## PROPOSED FINDINGS OF FACT

**I.  FACTUAL TESTIMONY & EVIDENCE**

1.  While playing a field hockey game for American University, at the University of Richmond on September 23, 2011, Jennifer Bradley suffered a blow to the head. (Trial Transcript at 38:3 – 23)(The trial transcript will be cited herein simply as "Tr. at ___").

2.  The blow to the head occurred when Ms. Bradley was playing defense in a crouched position and an opposing player's shoulder struck her in the head. (Tr. at 38:14 – 18).

3.  Ms. Bradley dropped her stick to the ground and stood upright in a daze before she heard her coach yell at her to get back on defense. (Tr. at 38:19 – 39:15).

4.  Ms. Bradley then collected herself, noticed the player behind her, picked up her stick, and continued to play. (Tr. at 39:10 – 15).

5.  American University lost the game in question. (Tr. at 39:18 – 19).

6.  Initially after the game, Ms. Bradley did not appreciate the full extent of what had happened to her and was sullen by the team's loss. (Tr. at 41:2 – 10).

7.  Two days later, Ms. Bradley competed in another field hockey game for American University. During this game, Ms. Bradley noticed something being "off" with her performance. (Tr. at 41:11 – 17 & Exhibit 44).

8.  As the week went by, Ms. Bradley began to notice vision, cognitive, and physical irregularities. (Tr. at 42:16 – 43:5; 43:19 – 44:2) (Exhibit 1) (Exhibit 2 at 11004).

9.  Jenna Earls was the athletic trainer for the American University Field Hockey Team, and the trainer involved in Ms. Bradley's treatment. She testified for the defense in this matter. (Tr. at 405).

10. On October 1, 2011, Ms. Bradley expressed her symptoms to her team trainer, Jenna Earls, and her coach, Steve Jennings. Specifically, she informed them that she could not think and could not see correctly and that she did not know what to do and was scarred. She also told Ms. Earls that she couldn't understand the game. (Tr. at 44:19 – 45:5 & 45: 13 – 19).

11. Ms. Earls documented such conversation in the medical records wherein she stated:

Athlete approached me after game with her mother on 10/2 saying she has been having difficulty with her vision while playing, an increase in fatigue, and getting dizzy while playing. …When asked if she remembers getting hit in the head in a game she replied 'I mean, nothing worse than usual. I got hit in Richmond by some girl's shoulder but I get hit like that all the time, I didn't think it was anything significant…Today I am having Jennifer be seen by Dr. Williams, DO, our team physician…'

(Exhibit 3 at 10032 – 33).

12. On October 3, 2011, Ms. Bradley sent an email to Ms. Earls as well as to her coach wherein she documented the symptoms that were bothering her. Specifically, her email spelled out in detail her symptoms including "always extremely tired, cannot concentrate, long time to finish tasks or read," "sense of time seems off," "fast things seem like they are moving in snapshots," "[w]hen playing, I feel dizzy and unfocused," "feel like things are not real and easily forget things, hard for me to analyze," "answers/actions are delayed," "feel like I'm in a daze…dream like," and "[p]ressure in my head, not a headache, but have a constricting feeling in my forehead." (Exhibit 1, Exhibit 3 at 10033, and Tr. at 47:2 – 48:10). Ms. Earls testified that she did in fact receive this email and was aware of the complaints detailed in it. (Tr. at 428:14 – 16).

13. Ms. Earls testified that as a result of this email she placed a concussion on her "list of concerns." (Tr. at 428:17 – 22).

14. Concussion was at the top of her list. (Tr. at 429:7 – 8).

15.     In response to Ms. Bradley's complaints, Ms. Earls scheduled a doctor's appointment for Ms. Bradley with Aaron Williams, D.O. for October 5, 2011. (Tr. at 48:20 – 23 & Exhibit 3 at 10032- 33).

16.     Ms. Bradley remembers telling Ms. Earls about the collision that occurred at the Richmond gave. (Tr. at 53:1 – 4).

17.     On October 4, 2011, Ms. Earls conducted a SCAT2 test on Ms. Bradley. (Exhibit 2).

18.     Ms. Earls wrote the documentation on this SCAT2 test that stated, "Richmond, dizziness after getting shoulder to head. Whole week after felt fine, BC game when symptoms began." (Tr. at 432:18 – 23)(Exhibit 2). Ms. Earls believed this blow to the head to have been the mechanism of injury. (Tr. at 432:24 – 433:1).

19.     A SCATII test is a neuropsychological tool utilized to confirm a suspicion of a concussion. (Exhibit 2).

20.     Ms. Earls gave Ms. Bradley the SCATII test because she believed Ms. Bradley had a concussion. (Tr. at 428:20 – 429:12)

21.     Ms. Earls documented on the October 4, 2011 SCATII test, "Richmond Dizziness after getting shoulder to head. Whole week after felt fine. BC game when symptoms began again." (Exhibit 2).

22.     Ms. Bradley's SCATII test demonstrated symptoms that were scaled at over two times her baseline test. Her symptom score was a 17 compared to a baseline of 8. (Exhibit 2).

23.     It is of note that Ms. Bradley's baseline test was also an imperfect baseline test as she had been sick with mononucleosis for two weeks prior to the test being given. (Exhibit 17)

24.    This imperfect baseline test thus reflected higher symptoms than would be expected had she not been sick for those two weeks. (Tr. at 250:12 – 18).

25.    On October 5, 2011, Ms. Earls gave Ms. Bradley two additional SCATII tests. (Exhibit 17).

26.    The first October 5, 2011 test again demonstrated symptoms over two times her baseline at 16. (Exhibit 17).

27.    The second October 5, 2011 test also demonstrated symptoms over two times her baseline at 19. (Exhibit 17).

28.    On October 5, 2011, Ms. Bradley presented to her appointment with Dr. Williams. (Exhibit 3 at 10018).

29.    Ms. Earls testified that she would accompany the student athletes to their appointments with the doctors (Tr. at 412:9 – 12) and that she accompanied Ms. Bradley to the appointments with Dr. Williams. (Tr. at 412:25 – 4132).

30.    Ms. Earls testified that during the initial appointment Ms. Bradley indicated that she did not remember anything "out of the usual" when asked if she suffered a blow to the head, but admittedly Ms. Earls did not recall exactly what was said. (Tr. at 414:22 – 24). She also testified that before Ms. Bradley met with Dr. Williams she, Ms. Earls, informed Dr. Williams of her symptoms. (Tr. at 415:19 – 21). Ms. Earls also testified that she recalled "sharing [with Dr. Williams] that [Ms. Bradley] may have been hit by a girls' shoulder during a game." (Tr. at 416:6 – 8). Ms. Earls testified that she would have provided Dr. Williams with all of the SCAT2 test forms, including the one that noted the mechanism of injury and that the chart was available to him. (Tr. at 416:13 – 24). Dr. Williams also testified that he had access to the file. (Tr. at 481:7 – 10). Prior to the appointment, Ms. Earls met with Dr. Williams, provided to him all of the SCATII

tests that had been conducted on Ms. Bradley, and informed him of her complaints and that she did not recall a specific mechanism but did receive a shoulder to the head in the Richmond game. (Tr. at 433:16 – 18; 443:1 – 22).

31.    Ms. Earls testified that all of the complaints Ms. Bradley had voiced and were documented in the chart "had been transmitted to Dr. Williams," including the notes in the electronic file. (Tr. at 439:11 – 13 & Exhibit 3 at 10031 – 10032).

32.    Ms. Earls testified that before Ms. Bradley met with Dr. Williams, Ms. Earls informed Dr. Williams that there was an incident involving a shoulder to the head. (Tr. at 443:1 – 5).

33.    Upon examination from the Court, Ms. Earls further clarified that she did voice her concerns of a concussion to Dr. Williams. (Tr. at 449:12 – 18).

34.    Ms. Bradley had never met Dr. Williams before she saw him on October 5, 2011. (Tr. at 48:24 – 25).

35.    Ms. Bradley did not know anything about Dr. Williams' background, his association with the military and United States government, or anything about him at all prior to her first meeting with him on October 5, 2011. (Tr. at 49:1 – 10).

36.    While Dr. Williams initially denied receiving all of the SCAT2 tests, on cross-examination he testified that he simply "[does not] recall getting three of them," and he "was only focused on the one at 11 o'clock. Is that – because that was the one that was done at the time the day I saw her." (Tr. at 523:10 – 16).

37.    Ms. Bradley told Dr. Williams everything that she had documented into her email and everything that she had previously told Ms. Earls. (Tr. at 52:7 – 14 & 130:3 – 10).

38.     During this initial meeting, Ms. Earls was also present and speaking on behalf of Ms. Bradley to Dr. Williams. (Tr. at 52:13 – 16).

39.     Ms. Bradley remembers telling Dr. Williams that she thought "this thing happened in the Richmond game, and now all of this stuff is happening." (Tr. at 53:4 – 7).

40.     Despite the medical history provided and available to Dr. Williams, he definitively ruled out a concussion and documented in the medical record: "Do not believe concussion due to [no] mechanism." (Exhibit 3 at 10018). Dr. Williams also testified that the lack of mechanism "was significant" to his opinions simply because "every athlete [he's] seen with a concussion can narrow it down to a mechanism." (Tr. at 500:6 – 13).

41.     Dr. Williams did not place Ms. Bradley into a Concussion Management Protocol. (Exhibit 3).

42.     On October 8, 2011, Ms. Bradley played in another game. (Exhibit 44 at Tr. at 54:23 – 55:20 & 126:10 – 12).

43.     On October 12, 2011, she continued to complain to her trainers of her symptoms. (Exhibit 44; Exhibit 3; Tr. 56:18 – 57:2).

44.     Ms. Bradley was told that because she did not have a diagnosed concussion she must continue to play. (Tr. at 57:18 – 25).

45.     On October 15 and 16, 2011, Ms. Bradley sat out of her game. (Exhibit 44 and Tr. at 58:1 – 7 and 58:22 – 25).

46.     On October 16, 2011, Ms. Bradley was told by Dr. Williams, "I don't know what's wrong with you."  (Exhibit 44 and Tr. at 59:1 – 60:3).

47.     After Ms. Bradley informed her trainer, doctor, and coaching staff at American University about her symptoms, she wasn't "taken seriously," was told to "eat ice cream," and they "did not tell [her] to stop playing" or "stop practicing." (Tr. at 136:5 – 17).

48.     Ms. Bradley's mother then decided to take Ms. Bradley to Georgetown University's Emergency Department for a second opinion where a CT and MRI were read to be normal. She was discharged with a diagnosis of vertigo. (Exhibit 44; Tr. at 60:16 – 61:21).

49.     While the Georgetown medical record indicates, "Denied injury," Ms. Bradley testified that she told them what Dr. Williams diagnosed, i.e. no concussion. (Tr. at 100:24 – 101:1). She further testified that she "said my team doctor said no concussion so let's go from there." (Tr. at 134:2 – 4).

50.     Ms. Bradley was instructed to be reexamined after the Georgetown appointment, and she did so when referred to an ENT by American University. (Tr. at 104:14 – 20)(Exhibit 8/Defendant's Exhibit 12D).

51.     She specifically saw Dr. Morris who diagnosed her with vertigo. Dr. Morris also indicated that a viral illness was *possible*. (Exhibit 8/Defendant's Exhibit 12D).

52.     Ms. Bradley told Dr. Morris at that appointment that a concussion had been ruled out by Dr. Williams. (Tr. at 108:5 – 13).

53.     Ms. Bradley was still required to practice. (Tr. at 62:1 – 11 & 126:17 – 22)

54.     On October 22, 2011, Jennifer was cleared to play against Bucknell, but did not start. (Exhibit 44; Tr. at 62:14 – 24 & 126:23 – 25).

55.     On October 23, 2011, she played a game against Georgetown University.  (Exhibit 44; Tr. at 62:14 – 24 & 127:9 – 10).

56.     On October 24, 2011, her trainer contacted her by text message and recorded that Jennifer replied, "Hey, I feel okay…I still feel kind of weird after playing this weekend."

57.     On October 30, 2011, Jennifer again played in a game at Lafayette.  (Exhibit 44; Tr. at 62:14 – 24 & 127:11 – 12).

58.     Finally, on November 4, 2011, Jennifer played in the Patriot League Semifinals against Bucknell – a game in which Bucknell won and ended the season for American and Jennifer. (Exhibit 44; Tr. at 62:14 – 24 & 127:13 – 15).

59.     From the time she started experiencing the symptoms that she documented after the Richmond game until the end of the season on November 4, 2011, the symptoms never got better and in fact got worse. (Tr. at 62:25 – 63:12 & 440:3 – 9).

60.     Over Thanksgiving Break, Jennifer was still suffering from the symptoms that she explained to her trainer and saw her primary care doctor back home in Pennsylvania for the same complaints. (Tr. at 63:16 – 23)(Exhibit 13 at 7031).

61.     On January 9, 2012, Jennifer was referred to Puneet Singh, D.O. in Pennsylvania by her PCP. (Exhibit 13 at 7034 – 35).

62.     Dr. Singh stated that Jennifer presented with "chief complaint of Dizziness, Fatigue and Memory Loss." She then underwent three spinal taps and diagnostic testing that showed no leak and was diagnosed with post concussive syndrome. (Exhibit 13 at 7034 – 35 & Tr. at 65:1 – 21; Defendant's Exhibit 12F and 12G; Tr. at 117:21 – 118:10).

63.     On March 19, 2012, Jennifer presented to MedStar National Rehabilitation with her chief complaint being of a concussion, and the records indicate that she presented "for post concussive syndrome that was diagnosed by Dr. Puneet Singh."  (Exhibit 9 at 3000).

64.     That diagnosis was confirmed at NRH on April 30, 2012 and she was started on propranolol for preventative medication as well as Zoloft and given orders to see a neuropsychologist for testing.  (Exhibit 9 at 3003 – 3006).

65.     Jennifer also began receiving treatment at the Brain Wellness & Biofeedback Center of Washington on March 30, 2012. These records are all consistent with her complaints of post concussive syndrome. (Exhibit 10).

66.     In June of 2012, Jennifer saw Jon Bentz, PhD. who also diagnosed her with post-concussion syndrome. (Exhibit 12 in total, see also Exhibit 4 containing Dr. Bentz' neuropsychological examination records at 6094 – 98)

67.     Dr. Bentz then conducted a neuropsychological evaluation that documented neurological deficits. As a result of the testing, it was recommended that she not return to school, and she did not. (Exhibit 4 at 6094 – 98).

68.     She was also seen by Dr. Kellah, a neurologist at the University of Pennsylvania Presbyterian Medical Center. (Exhibit 13 and Exhibit 4 at 9010 – 9017).

69.     Dr. Kellah informed Jennifer that she was suffering from post-concussion syndrome. (Exhibit 15 and Exhibit 4 at 9010 – 9017).

70.     The impression formulated by Dr. Kellah was, "Ms. Bradley is a 22 y.o. s/p concussion 2 years ago with residual post-concussion deficits, though she's much improved.  There is mild residual depression being treated by her pcp. She's had an extensive prior neurologic workup and I don't see that it needs to be repeated at this time. I suggested that she see our neuropsych group with an interest in athletes for follow up testing and suggestions on cognitive rehab."  (Exhibit 15 at 9003).

71.     On December 16, 2013, she underwent a second neuropsychological examination that noted, among other things, she "demonstrated slightly slower processing speed and inefficient learning strategies with lower than expected semantic, meaningful organization of material [and that her] performance did not significantly improve since the previous evaluation conducted in May 2012." (Exhibit 4 at 9010 – 9017).

72.     Throughout most of this time, she was also being treated at Stephen G. Diamantoni & Associates in her hometown by Drs. Geidel and Vollmar. (Exhibit 20).

73.     Initially, Dr. Vollmer's treatment was for PCS; however, as of January 2, 2017, he began to identify her injury as a moderate traumatic brain injury. (Exhibit 20 at 110066.38 - .40; Tr. at 373:11 – 374:15; 386:15 – 387:8).

74.     Due to the permanency of the injury, this diagnosis was not a "new" diagnosis, but was a reclassification of the initial diagnosis that had to be made retrospectively after a year had elapsed and the severity of the injury had presented itself. (Tr. at 373:11 – 374:15 & 386:15 – 387:8).

75.     Today, she still suffers from the effects of Dr. Williams' failure to diagnose concussion and erroneous decision to rule out a concussion and failure to take appropriate steps to treat her. (Tr. at 388:4 – 7 & 241:8 – 22)

76.     Subsequent to the cessation of the 2011 Field Hockey Season, Ms Bradley attempted as best she could to continue to progress with her education at American University. (Tr. 66:1 – 14).

77.     In her second semester as a junior, she received straight F's that were ultimately reflected as "I" for "Incomplete" or "W" for "Withdrawal." (Tr. 69:10 – 14 and Exhibit 6).

78.     Ms. Bradley did not go back to school after remaining home attempting to recover for a year and a half. (Tr. at 73:17 – 18).

79.     When she did return to school, she was granted accommodations by the disability's office for more time on tests, spacing on days for due dates, and a note taker for classes she couldn't attend. (Tr. at 73: 24 – 74:8).

80.     Despite having an expected graduation date in 2013, she did not graduate until 2015. (Tr. at 74:14 – 20).

81.     Ms. Bradley has continued to have the diagnosis of a traumatic brain injury. (Tr. at 76:9 – 10).

82.     During the year and a half time period she was out of school from 2012 – 2014, Ms. Bradley volunteered in her community with Bhutanese refugees misplaced from Nepal. Tr. at 76:15 – 77:22).

83.     Ms. Bradley then got involved with a nonprofit organization that arranged for her to travel and conduct studies in Nepal. (Tr. at 81:18 – 24).

84.     The work that she conducted was under the guidance of Austin Lord. Mr. Lord was well aware of Ms. Bradley's head injuries and had her assist with archiving photos of the lands in the Himalyan Mountains that were destroyed after a massive earthquake in 2012. (Tr. at 82:12 – 83:18).

85.     When she travels to Nepal to work on this project, she is not paid but gets "a stipend to survive." (Tr. at 84:6 – 18).

86.     According to Ms. Bradley, the work life in Nepal is much more accommodating to her injury because the culture does not put as much demand on punctuality, which she is not

capable of maintaining due to her injury. She is allowed to take breaks and work at her own pace. (Tr. at 85:9 – 86:10).

87.     Ms. Bradley testified that she has "like a mental fog. It's exhaustion. It's like just waking up tired, like for a decade every day . . . Doesn't matter how much I rest or, because I'm going to be tired and I'm going to get worn out, and it never was like this before, ever." (Tr. at 86:18 – 24).

88.     Ms. Bradley testified that her eye sight has never gotten better, and her eyes don't track together. (Tr. at 87:1 – 10).

89.     Ms. Bradley is now required to take generic form of Adderall for her focusing problems as a result of her injuries and Lexapro because she "was diagnosed with depression and anxiety, post-head injury." (Tr. at 87:14 – 18 & 88:6 – 8). She was never treated for these ailments prior. (Tr. at 87:9 – 21).

90.     Ms. Bradley has attempted to gain other employment by way of seeking a post graduate degree but has not been accepted because she "can't process things as quickly. I can't, like even right now it's hard to think and to talk, and that doesn't really get accepted in these programs." (Tr. at 89:11 – 15).

91.     Ms. Bradley is able to work with Mr. Lords through the Cornell program because she has some control over her life and "because I'm hurt and everything is accepted as far as, like that's what she's dealing with. That's what she says. This is what it is, let her have a break, and it works out." (Tr. at 89:16 – 23).

92.     Ms. Bradley testified that she did not "ever know or agree that those waivers applied to Dr. Williams." (Tr. at 132:4 – 6).

93.     Ms. Bradley testified that she did not "ever know or agree that those waivers applied to the U.S. Government. (Tr. at 132:7 – 9).

94.     Ms. Bradley testified that she did not "ever know or agree that the waivers applied to medical treatment that [she] would receive off of the filed." (Tr. at 132:10 – 12).

95.     Ms. Bradley testified that she was "required to sign the documents" and if she did not she "wouldn't be on the team anymore" and as a scholarship athlete if she "didn't sign the documents, [she] would [ ] lose [her] scholarship." (Tr. at 132:20 – 133:3).

96.     Ms. Bradley was in fact a full scholarship athlete during the 2011 field hockey season. (Tr. at 133:4 – 16).

## II.     **EVIDENCE OF DAMAGES**

97.     Thomas Bradley, Plaintiff's father, testified in this matter. (Tr. at 139).

98.     Mr. Bradley is a retired Naval Service Member who worked for six years on a nuclear submarine and subsequently in various nuclear power plants. (Tr. at 137:21 – 138:1).

99.     Mr. Bradley observed Jennifer throughout her life including during her sports career. (Tr. at 139:9 – 24).

100.    Mr. Bradley testified that prior to this incident she was a "[v]ery good [student], never any issues, 4.0 at least." (Tr. at 140:8 – 14).

101.    Mr. Bradley testified that prior to this incident she was a "very good daughter," "was always top of the class." (Tr. at 140:17 – 22).

102.    Mr. Bradley testified that as he followed her sports career, she never had any major injury until the concussion at issue in this matter. (Tr. at 141:17 – 22).

103.    Mr. Bradley testified that during that season he watched her "physically falling apart," and "just physically shaken." (Tr. at 142:1 – 4).

104.   Mr. Bradley testified that after the October 5ᵗʰ game, he and his wife took Plaintiff to see Dr. Williams. (Tr. at 142:24 – 143:7).

105.   Mr. Bradley testified that after that visit they went back to the tailgate and were informed by other parents of the field hockey players to take her to Georgetown University. (Tr. at 143:15 – 21).

106.   At that time, Mr. Bradley testified that Plaintiff "couldn't even stand up on the side – I mean she had to crouch down." (Tr. at 143:24 – 25).

107.   Mr. Bradley testified that the symptoms that he observed in Plaintiff did not improve throughout the field hockey season and "she always complained of – the biggest one I remember is seeing like snapshots. Like when her eyes would pan, it would be like digital snapshots. And she always said that, that she had that, and also blurred and double vision at times." He also testified that to the best of his knowledge these same issues remain today. (Tr. at 145:7 – 23).

108.   When asked about the changes he has observed in Plaintiff since the incident he testified as follows: "she has huge problems sleeping . . . she'll lose track of time. Next thing you know she'll be doing something all night, before she realizes it's daytime, and then she's sleeping until three, three o'clock in the afternoon. . . . she can't really maintain a household. . . . I mean, [her] house was a mess [just a few weeks before trial]. I mean, it really was. It was not just messy, I mean, it was filthy. It was filthy. And we helped her clean it up, more of my wife and I. We helped her clean it all up and everything. And I had made plans two weeks later to fly out there and driver with her back here to get ready for the trial. And in two weeks time I walked in that room, I was – in that house, I was devastated. Two weeks, it was, it was horrifying. It was, I mean, again, I mean, not messy, filthy. Two weeks worth of dishes. You know, I don't know if the cat

box was ever changed, and it stunk." (Tr. at 146:2 – 24). Mr. Bradley testified that while she wasn't always the neatest person, she was never "to the degree that I see now." (Tr. at 147:5 – 7).

109.    Mr. Bradley also testified that he has seen specific differences in the Plaintiff since the incident: "The tiredness, the dizziness, the headaches, the constant headaches, the vision issues. So that's pretty much – oh, the jaw. Her jaw used to lock up, and she had issues with that. . . ." (Tr. at 149:2 – 11).

110.    Mr. Bradley also testified to the delicacy in which communications must be held with Plaintiff as a result of the incident in question: "it's a very touchy, everything, everything's touchy anymore. She's not the same person. You can't, you can't talk to her reasonably about it. We try, you know, if I want to get in a fight or get in an argument about it, yeah. But all we tried to do is be caring and help her clean it. And maybe in my mind I was thinking if it gets cleaned, she'll have some pride in it and keep it that way. But two weeks later I show up and it's just as bad as it was." (Tr. at 167:14 – 25).

111.    Lori Bradley, Plaintiff's mother, testified in this matter. (Tr. at 170)(Lori Bradley will be referred to as "Lori" in order to avoid confusion in the record with Plaintiff referred to as "Ms. Bradley")

112.    Lori is a high school graduate with two years of college education at Camden County College. (Tr. at 170:18 – 22).

113.    Lori spent many years as a stay at home mother, but has been working in an ophthalmologist's office for the past 18 years. (Tr. at 170:23 – 171:4).

114.    Lori testified that Plaintiff was a "very sweet young lady," "very intelligent," "very diligent with her schoolwork," "always tried her best," "extremely disciplined," "very artistic," and "just an all around really wonderful young lady." (Tr. at 171:18 – 172:1).

115.     Lori was familiar with Plaintiff's medical history and testified that there was one time when Plaintiff was about 8 years old that she was evaluated for a concussion, but was never diagnosed with one prior to this incident. (Tr. at 173:6 – 18).

116.     Lori testified that she did not attend the Richmond game but she spoke to Plaintiff that night and was informed that she had been hit in the head. (Tr. at 175:2 – 7).

117.     Lori testified that over the next week Plaintiff informed her that she was noticing "focus problems" and "extreme exhaustion." (Tr. at 175:13 – 176: 10).

118.     Lori testified that she believed she was with Plaintiff on October 1st after the Lehigh game when Plaintiff spoke to Jenna Earls. Lori testified that Plaintiff informed Ms. Earls of her complaints. (Tr. at 177:1 – 21).

119.     Lori testified that on October 8, she had a phone call with Plaintiff who was crying and feeling horrible. (Tr. at 180:2 – 11).

120.     Lori testified that after the October 16th game, she left the team tailgate with her husband and Plaintiff to go and see Dr. Williams. (Tr. at 181:9 – 21).

121.     Lori testified that Dr. Williams was in the room with Plaintiff for about three minutes, and when he left, Plaintiff informed her that she was told to drink coffee and see a neurologist. (Tr. at 182:3 – 7).

122.     Upon hearing the mention of a neurologist, Lori testified that her and her husband made the decision to get Plaintiff to a hospital. (Tr. at 182:11 – 22).

123.     Lori then started to help Plaintiff arrange for medical care. (Tr. at 183:22 – 184:8).

124.     Lori testified that Plaintiff was "exhausted" "unable to really follow conversations," "she would lose track of [ ] conversations," "bright lights hurt her head," "[s]he

had lots of headaches," and "[s]he just was weak, and she was not her herself." (Tr. at 184:11 – 17).

125.    Lori testified that those issues did not go away over the next year, and even still persist today. (Tr. at 184:12 – 185:1)

126.    Lori also testified that after they were given the diagnosis of post-concussive syndrome, she went through great lengths to try to arrange for health care coverage for Plaintiff in the D.C. area because she was not receiving help from American University and Dr. Williams was not signing off on the treatment. (Tr. at 186:9 – 188:6).

127.    Lori also testified extensively on the damages that she has observed in Plaintiff since the incident: "I don't think that she's capable of what a 30-year-old should be doing as far as life skills. The basic going through the motions of a day, I think are hard for her. I think that she doesn't process things correctly. I think she forgets constantly. She forgets appointments. She has trouble sleeping. . . . she suffered from severe sleeping problems. I think that she has great anxiety. She has depression. She constantly has headaches. She has problems focusing. She has a problem going into a store like Costco. She's unable to do that because of the overhead lighting, they affect her. She never feels well. She has moments that she can gather. She can string it together a little bit, but it doesn't stay for any length of time." (Tr. at 188:3 – 18). And she testified that all those issues are still present today and worse. (Tr. at 188:19 – 20). She testified that the anxiety is "off the charts. . . . she goes into isolation. She is so depressed that she just wants to cut off from everyone. I've seen her try to pm a task that, that you or I would not even think about, and it becomes a huge undertaking just to, I mean, I'm sorry to say this, but just to back a cake. Baking a cake has thrown her into just – it's like this unsurmountable task. She knows she wants to do it. It is not about Jennifer not wanting to do something. It's she's unable to do something. She doesn't

have the stamina. She doesn't have the focusing. She has a lot of problems with remember the timeline of we need to do this at three o'clock. Yeah at three o'clock. You can say it over and over, it does not mean that tomorrow at three o'clock Jennifer will be ready and able to do something." (Tr. at 189:22 – 190:12). Lori also testified that Plaintiff no longer has any social life. (Tr. at 190:20 – 191:5).

128.    Lori further testified that in the past before this incident Plaintiff did not have any regular complaints of depression, headaches, or dizziness. (Tr. at 191:6 – 20).

## III.    EXPERT TESTIMONY TO SUPPORT PLAINTIFF'S CLAIM

### A. ROBERT CANTU, M.D. ON STANDARD OF CARE, BREACH, CAUSATION, AND DAMAGES.

129.    Robert Cantu, M.D. testified on behalf of the Plaintiff as an expert witness in the field of neurosurgery with respect to concussion, standard of care with respect to treatment of concussions, and damages that can flow from failure to diagnose and treat concussions. (Tr. at 204).

130.    Dr. Cantu was accepted as an expert witness without objection. (Tr. at 216).

131.    Dr. Cantu graduated from the University of California at Berkely before obtaining his masters and medical degree from the University of California, San Francisco in 1962 and 1963 respectively. (Tr. at 205:16 – 20).

132.    Dr. Cantu conducted his internship at Columbian Presbyterian Hospital in New York in 1964 and completed a residence at Mass General in neurosurgery in 1968. (Tr. at 205:21 – 24).

133.    Thereafter, Dr. Cantu became a senior staff member at Mass General had has been on staff at hospitals in the greater Boston area and other places since. (Tr. at 205:24 – 206:1).

134.     Dr. Cantu was board certified in neurosurgery in 1970 and has remained certified since. (Tr. at 206:2 – 7).

135.     Dr. Cantu has practiced in the field of neurosurgery for 41 years with a special interest in the concussions, and he has even bunning a concussion center that bears his own name. (Tr. at 206:15 – 21).

136.     His center and his work have been focused in the field of athletic head and spine injuries, their prevention and their treatment; he has published over 500 articles about traumatic brain and spinal cord injuries and athletic injuries to that part of the body. (Tr. at 206:15 – 21).

137.     He currently serves as the senior advisor to the National Football League's head, neck and spine committees, a member of the Mackey-White Health and fitness Committee before the National Football League Players Association, and he holds academic appointments at Boston University as a clinical professor of neurosurgery and neurology and is the co-founder of the CTE Center at Boston University. (Tr. at 206:15 – 207:7).

138.     As a member of the executive committee of the CTE Center he sits on consensus committees that meet every other week for two-hour session whereby they have clinical presentations of the histories and individuals that have donated their brains. (Tr. at 207:22 – 208:3).

139.     Dr. Cantu has served as the President of the American College of Sports Medicine and been on the board of trustees. (Tr. at 208:6 – 15).

140.     Dr. Cantu has been a peer reviewer for the American College of Sports Medicine and other journals as well. (Tr. at 208:17 – 24).

141.     Dr. Cantu is and has been a fellow for the American College of Surgeons, the American Association of Neurological Surgeons, the American College of International Surgeons, and The American College of Sports Medicine. (Tr. at 209:4 – 8).

142.    Dr. Cantu has been in the field of concussions since the early 1970's when he started as a team physician for a high school. In that capacity he made decisions about return to play for players who suffered concussions. (Tr. at 209:23 – 210:2.)

143.    At that time, it became known that there were no standards for return to play and he assisted in the drafting and writing of the first return to play standards that were published in 1986. (Tr. at 210:1 – 4).

144.    Since that time, he has been involved in concussion meetings and lectures and writings in the field of not only return to play status but also concussions, post-concussion syndrome, and chronic traumatic encephalatrophy. (Tr. at 210:5 – 10).

145.    Dr. Cantu has treated thousands of athletes in these fields. (Tr. at 210:15 – 16).

146.    Not only has Dr. Cantu been acknowledged as one of the physicians who "wrote the book" on concussion management but he has stayed up to date and active with the advancement and literature in the field. (Tr. at 210:17 – 211:9).

147.    Dr. Cantu not only consults with many committees for the NFL but also for Boston College and a number of different schools in the New England area. (Tr. at 211:12 – 24).

148.    Dr. Cantu has spent the major focus of his career, research, and publications on treating and examining and ascertaining what it is that causes concussions and the effect of concussions in athletes. (Tr. at 212:5 – 12).

149.    Dr. Cantu has testified that he is familiar with the standards of care that are necessary in order to properly treat college athletes, high school athletes and professional athletes who have suffered injuries that might be concussions, has lectured in that field, and he has published in that filed. (Tr. at 212:13 – 22).

150.     Dr. Cantu has been a member of the concussion and sport group which meets internationally periodically and puts out consensus statements on concussions every year that they meet. (Tr. at 213:15 – 21).

151.     The International Concussion and Sprots Group's Consensus Statements are considered to be the most cited concussion resource. (Tr. at 213:15 – 21).

152.     Dr. Cantu is familiar with the standards of care in treatment of student athletes who are injured while playing in games and suffered head injures; he has been a part of setting those standards; he is familiar with what happens to such athletes when the standards have not been met; he is familiar with the necessity and how to diagnose a concussion and what you have to have in order to make such a diagnosis; and he is familiar with the damages that can occur if the standards are not met. (Tr. at 214:2 – 25).

153.     Dr. Cantu is familiar with post-traumatic concussion syndrome ("PCS"). (Tr. at 215:1 – 3).

154.     Dr. Cantu is familiar with how long symptoms of PCS can last. (Tr. at 214:6 – 15).

155.     Dr. Cantu testified that a concussion is "a type of traumatic brain injury in which there is violent shaking of the brain, usually due to a blow delivered to the head, but not always. It can simply be the head being snapped from a blow to your back or a blow to your chest, which would snap your head forward. So it's basically violent shaking of the brain inside the head. It sets off a neuro-metabolic cascade acutely, and it also can structurally cause tearing of nerve fibers and nerve cells themselves." (Tr. at 216:3 – 11).

156.     Dr. Cantu testified that PCS is "persistent post-concussion symptoms. Most of us in the field use a one month window. And when concussion symptoms persist beyond one month,

then we call it post-concussion syndrome or persistent post-concussion symptoms." (Tr. at 215:6 – 10).

157. Dr. Cantu testified that the majority of PCS symptoms "will not last beyond a year, but a small percent will last beyond a year and a small percent will actually be permanent." (Tr. at 215:13 – 15).

158. Dr. Cantu testified that neither an MRI or CT-Scan are ways to diagnose a concussion. (Tr. at 217:18 – 23).

159. Dr. Cantu testified that a SCAT2 test is "one of the tools that can be used for the acute, especially, assessment of a concussion. It involves a symptom checklist. It involves a number of cognitive tests. It involves the later forms of the SCAT, the SCAT 5 involves some balance testing. The SCAT2 doesn't. And the SCAT2 does not involve any testing of eye movements or eye tracking. So it's a tool that can be used to diagnose concussion." (Tr. at 219:18 – 25).

160. Dr. Cantu testified that the ideal time to make a diagnosis of concussion is "as soon as concussion symptoms are recognized or occur." (Tr. at 220:25 – 221:1).

161. Dr. Cantu also testified that it is not uncommon for symptoms to not present until the next day or several days after the insult. (Tr. at 221:1 – 5).

162. Dr. Cantu testified that the symptoms associated with concussions fall into various groupings: "There are cognitive symptoms and they're most commonly difficulty with memory, difficulty with concentration, difficulty with focus, doing cognitive tasks such as learning words or repeating digits correctly. . . . there are physical domain symptoms that are very common. The most common of them being headache, but also neck pain is not uncommon, sensitivity to light, sensitivity to noise, difficulty with dizziness. There are also vestibular ocular symptoms that may

occur with blurred vision or double vision or difficulty with balance. And there are also sleep symptoms that happen with concussion. . . . And then finally there are emotional symptoms that happen after a concussion, such as depression, anxiety, short fuse, impulsive type behavior or emotionality, inappropriate laughing or crying for events where it would not be appropriate." (Tr. at 221:9 – 222: 9).

163.     Dr. Cantu testified that you do not need to have a mechanism in order to be able to make a diagnosis of concussion. (Tr. at 222:13 – 17).

164.     Dr. Cantu testified that while it is true that you have to have an activity from which a concussion might occur and it is ideal to pinpoint one specific blow to make the diagnosis, it is very frequent that you cannot identify the specific blow, especially when symptoms are delayed." (Tr. at 222:13 – 223:7).

165.     When asked whether it was below the standard of care to rule out a concussion due to a lack of a known mechanism, Dr. Cantu testified that "you can never say if I can't identify the particular hit, this can't be a concussion. That's just not correct. And unfortunately, we're dealing with a very young doctor who's very inexperienced, still in training doing his fellowship year, who just didn't really understand the issues with concussions." (Tr. at 223:8 – 23).

166.     Dr. Cantu testified that the baseline SCAT2 test was not a perfect baseline and was a little high because she had been sick for three weeks prior. (Tr. at 225:11 – 20).

167.     When comparing the October 4th SCTAT2 test to the baseline, Dr. Cantu testified that October 4th test documented the mechanism of injury and documented her symptoms to have raised from her baseline of 8 to an evaluation of 17, more than twice as many symptoms." (Tr. at 226:6 – 227:8).

168.     Dr. Cantu testified that in light of this SCAT2 test, "the standard of care would have required her to immediately be removed from practice and play. In other words, that's the – the SCAT2 that done on the fourth is consistent with a concussion and she should have been removed from practice and play, and she should have been, as she was, referred to a doctor." (Tr at 227:12 – 17).

169.     Dr. Cantu then testified that the standard of care required the doctor to then review and know the results of this October 4th SCAT2 test: "The doctor in his assessment of concussion certainly has to take a history and certainly has to go through the medical records that are relevant to the possibility of a concussion and certainly the most relevant would have been the SCAT that was done on the fourth and the SCAT that was done – the two SCATs on the fifth." (Tr. at 227:18 – 228:2).

170.     Dr. Cantu testified that the SCAT2 tests on the fifth were diagnostic of a concussion with increased symptoms from 16 to 19 and a symptom severity score that was quite high at 40. (Tr. at 228:6 – 14).

171.     Dr. Cantu then testified that in light of her vocalized complaints and the documented records and SCAT2 results, "within a reasonable degree of medical certainty" "her diagnosis should [have been] concussion, and she should [have] been removed from practice and play" on the fifth. (Tr. at 228:18 – 229:3).

172.     Dr. Cantu also testified that she should not have returned "[u]ntil her concussion symptoms had either entirely cleared or you were convinced that whatever symptoms were left were not due to a concussion. Because her baseline was not zero in terms of symptoms, it may be that even when her concussion cleared she wouldn't' have zero symptoms, but she certainly

shouldn't have had the concentration issues, the vision issues, the fatigue issues, which were new to her." (Tr. at 229:5 – 11).

173. Dr. Cantu further testified that the standard of care required her to be diagnosed with a concussion and held out of play because, "there's not only sufficient symptoms to make the diagnosis and test results to make the diagnosis, but written right on the test the athletic trainer gave a mechanism for the concussion, the should to the head." (Tr. at 229:16 – 19).

174. Dr. Cantu also testified that the standard of care required that if the symptoms had persisted after Dr. Williams saw Ms. Bradley on the fifth he was required to actually make a professional referral and set up the meeting with a neurologist as opposed to just suggesting to her that she see one. (Tr. at 243:7 – 21).

175. On re-direct examination, Dr. Cantu further testified that if a concussion is suspected but the health care provider cannot confirm it because he or she does not have a mechanism for injury the patient "should be treated as if they have a concussion if you cannot rule out a concussion. If there's doubt in your mind, there's uncertainty, the proper thing to do is to treat it as a concussion." (Tr. at 270:20 – 271:4).

176. Dr. Cantu then testified that the fact that she was not diagnosed on October 5th by Dr. Williams and was allowed to continue to practice and play thereafter was "probably why her post-concussion syndrome has gone and have permanent symptoms." (Tr. at 229:25 – 230:1).

177. To clarify the record, Dr. Cantu went on and offered the following testimony within a reasonable degree of medical probability.

> I would say that most probably if she had been removed from practice and play on the fifth that she would have recovered completely or at least recovered back to what her baseline was on that SCAT, first SCAT test. Because she continued to practice and play and take more head trauma in the process, her post-concussion symptoms were aggravated, which is the expected situation if you can continue to

have somebody even physically exert, much less take head trauma with post-concussion syndrome, and converted it into something which now is permanent.

(Tr. at 230:2 – 18).

178.    Dr. Cantu testified that a review of her neuropsychological testing demonstrated "her tests were not good. They were even in the impaired range for somebody that was thought to have a very high IQ, which is where she was anticipated to be with regard to her cognitive accomplishments prior to the head injury," and that he believed that her future prognosis would be that she "would have cognitive fatigue." He also testified within a reasonable degree of medical probability that he "would agree with each of the two neuropsychologists that examined her that giving what her expected intellect was, that those scores, especially on processing speed and learning of new material, was impaired consistent with that, just as they indicated." (Tr. at 232:3 – 234:21).

179.    Dr. Cantu testified that her continued complaints are "post-concussion symptoms, and I do believe that they are due to the head injury and the failure to diagnose it and remove her from practice and play." (Tr. at 235:5 – 7).

180.    Dr. Cantu testified that she suffered "a brain injury that hasn't cleared in ten years and so it's probably, the symptoms are going to be permanent" and "more probably than not what she has now is what she's going to have for the rest of her life."  (Tr. at 236:12 – 14 & 241:8 – 22).

181.    Dr. Cantu also testified that the depression she suffers from were contributed "to by the fact that her life got changed around by this brain injury." (Tr. at 236:23 – 24).

182.    In summation, Dr. Cantu testified that if Dr. Williams had adhered to the standard of care, "more probably than not if he had seen her on – when he saw her on the fifth, if he had

recognized that as a concussion and pulled her out of play, that she would have completely recovered and her neuropsychological studies would have been normal." (Tr. at 238:23 – 239:2).

183.    In his re-direct testimony, Dr. Cantu addressed Defendant's assertion that the damage was done before Dr. Williams saw Ms. Bradley in stating, "The only relevance to me is that she was symptomatic at that particular point in time. And so to say what happened prior to Dr. Williams seeing the patient has absolutely nothing to do with what ultimately occurred." (Tr. at 271:13 – 24)

184.    Furthermore, on re-direct, Dr. Cantu made clear that her symptoms that she was voicing complimented the findings of the SCAT2 test, "[s]o it should have just cried out concussion until proven otherwise." (Tr. at 272:10 – 16).

185.    Just for further clarification, the Court inquired of Dr. Cantu what the standard of care required of Dr. Williams. In response, Dr. Cantu testified that "if you have an individual that's symptomatic from a concussion, that they must be removed from practice and play and probably have, if appropriate, accommodations cognitively as well for their scholastic activities. . . . If you cannot exclude a concussion, you're thinking it might be a concussion, you're just not certain, treat that individual as having a concussion. If you can definitely exclude the problems due to something else, some other musculoskeletal injury or whatever, then that's okay to return that individual to practice and play, but not if you haven't ruled out a concussion." (Tr. at 274:1 – 275:5).

### B.  WILLIAM VOLLMER, M.D. TESTIMONY ON STANDARD OF CARE, CAUSATION, AND DAMAGES

186.    William Vollmer, M.D.'s deposition testimony was read into the record by Plaintiff. (Tr. at 354).

187.    Dr. Vollmer testified that he is a board-certified physician in both family medicine and primary care sports medicine. (Tr. at 354:23 – 25).

188.    Dr. Vollmer testified that his practice is "about 70 percent sports med, 30 percent family medicine." (Tr. at 355:12 – 15).

189.    At the time of his testimony, Dr. Vollmer was affiliated with five schools for five sports, field hockey being one of them. (Tr. at 356:4 – 17).

190.    Dr. Vollmer treats patients with a concussion "sometimes [on] a daily occurrence." (Tr. at 356:18 – 24).

191.    Dr. Vollmer testified that "when people have symptoms beyond a year, I think we're dealing not with a concussion or a mild traumatic brain injury, but we're dealing more into the moderate traumatic brain injury realm since we're looking at more permanent deficits." (Tr. at 357:16 – 22).

192.    Dr. Vollmer testified that the history he received from Ms. Bradley was that "within two to three days she was starting to have headaches, dizziness, difficulty with concentration, generally not feeling well, loss of energy." (Tr. at 361:3 – 12).

193.    Dr. Vollmer testified that "[t]here is no specific time period" that is the "critical time period," but rather that health care providers "do things based on resolution of symptoms and able to progress into activity again without recurrence of symptoms." (Tr. at 361:19 – 362:2).

194.    Dr. Vollmer testified that by the time Ms. Bradley came to see him as his patient "they had come to the conclusion that she had had a concussion." (Tr. at 363:4 – 5).

195.    Dr. Vollmer testified that the "only reference that I have to short-term memory problems is the increase in the SCAT score over the time of the diagnosis at American University when the score went from seven to like 18 or something like that. That would suggest a cognitive deficit." (Tr. at 364:18 – 23).

196.    Dr. Vollmer testified that during his treatment of Ms. Bradley, with regard to her vision, "the inappropriate part here was the saccades was tracking rapid motion, which means the eyes were bouncing as they got to the extremes looking at laterally side to side . . . It's a finding, it's not a treatable event." (Tr. at 368:9 – 25).

197.    Dr. Vollmer testified that he recommended that American University should have provided her accommodations in addition to cessation of play in that she should take fewer credits, that she should remain on scholarship, but that she should not be conducting any work-study programs. (Tr. at 369:20 – 370:7).

198.    Dr. Vollmer testified that he was initially treating her under a diagnosis of "post-concussion syndrome," but later categorized her treatment as being for a "moderate traumatic brain injury." (Tr. at 370:10 – 18).

199.    Dr. Vollmer testified that in March of 2015 he determined it was appropriate to identify her as having a "traumatic brain injury" as opposed to "post-concussion syndrome." (Tr. at 373:16 – 374:8).

200.    Dr. Vollmer testified that as he continued to treat Ms. Bradley he diagnosed her with a new diagnosis of Attention Deficit Disorder (ADD) as a result of the brain injury. (Tr. at 378:13 – 20).

201.    Dr. Vollmer related Ms. Bradley's traumatic brain injury, ADD, depression, and eye focusing deficits to the treatment at American University. (Tr. at 379:14 – 380:2).

202.    Dr. Vollmer, like Dr. Cantu, testified that Dr. Williams was negligent by failing to diagnose a concussion at his first appointment with Ms. Bradley and for ruling out a concussion based on there being no mechanism because "you don't need to see the mechanism of injury to have the brain being tossed around in the head to get a concussion" and all of her reported

symptoms were diagnostic of a concussion. (Tr. at 380:13 – 382:11). He specifically testified that "this was a straight forward case of a concussion" and "any doctor seeing those symptoms should have diagnosed a concussion immediately." (Tr. at 383:9 – 16). He clarified on re-direct as well that "regardless of whether they knew the mechanism of injury or not, the standard of care still required concussion to be on the differential." (Tr. at 389:16 – 20).

203.    Dr. Vollmer also testified that Dr. Williams "should have" looked at the SCAT2 test that included Ms. Earls' notation of the mechanism of injury. (Tr. at 385:5 – 7).

204.    Dr. Vollmer testified that he diagnosed Ms. Bradley with a "moderate traumatic brain injury" "on the fact that she has continuing symptoms and deficits from a cognitive standpoint in focus and headaches that have lasted longer than a year. So I have no reason to believe that they are going to resolve. With that, I can make a diagnosis of moderate traumatic brain injury. Moderate traumatic brain injury defines concussion, concussion by definition resolves. She has not resolved." (Tr. at 386:17 – 387:2).

205.    Dr. Vollmer testified that "she has learned to live with [the deficits] better . . . but she will always have these deficits at this point in time." (Tr. at 387:2 – 388:3). He also testified that he "expects her to have deficits indefinitely. . . . which means permanent." (Tr. at 388:6 – 16).

206.    Even Dr. Williams testified that you cannot rule out a concussion solely based on a lack of mechanism. (Tr. at 460:24 – 467:7; 516:21 – 24)

### C. TESTIMONY OF DEFENSE EXPERT WITNESS KATHERINE MARGO, M.D.

207.    Dr. Margo testified on behalf of the Defendant as an expert witness in the field of family medicine solely on the standard of care. (Tr. at 565).

208.    Dr. Margo's qualifications were voir dire'ed by Plaintiff. (Tr. at 579 – 588:2). During the voir dire, Dr. Margo admitted that she has never lectured in the field of concussions,

she has never written on the field of concussions, she has no abstracts in the field of concussions, she has never treated a professional athlete or a collegiate athlete for concussions, she has never given a SCAT2 test, she has no specialty in neurology or neurosurgery, she has never been asked to diagnose a concussion, she may have seen 20 or 25 patients in over a twenty year career who had been diagnosed with a concussion before she saw them, and she has never previously given expert witness testimony regarding concussions.

209.    Dr. Margo testified that this whole case "is about she got hit in the head by a shoulder in a game." (Tr. at 617:4 – 14).

210.    Dr. Margo testified that she held an opinion that Ms. Bradley did suffer a concussion during the game: "I trust all the experts that have been taking care of her, so I think she probably did" (Tr. 643:15 – 18); "You can't get to a post-concussion syndrome before you've had a concussion," (Tr. at 643:19 – 21); "So all the doctors in January who were saying that she had a post-concussion syndrome were telling us that she had a concussion before that" (Tr. at 643:22 – 25); she agreed that she "would conclude it's more likely than not that she had a concussion before that [treatment] including in the fall of 2011" and that the most likely cause of that concussion was "[a] head injury." (Tr. at 644:15 – 25). Finally, the Court inquired if it was in fact her opinion that "Ms. Bradley did in fact have a concussion in [the] fall of 2011" and Dr. Margo answered "I think it's likely . . . I think that's the most likely." (Tr. at 660:5 – 12).

211.    Dr. Margo testified that a shoulder to the head would be a mechanism of injury and a reason to treat the patient as if she had a concussion. (Tr. at 650:1 – 16).

212.    Dr. Margo testified that the symptoms Ms. Bradley complained of and voiced in her email were all consistent with a concussion. (Tr. at 617:15 – 621:24).

213.     Dr. Margo testified that she has never administered a SCAT2 test or even seen one before she became involved in this case. (Tr. at 632:7 – 15).

214.     Dr. Margo agreed with Dr. Cantu that the baseline SCAT2 demonstrated slightly elevated results for her suspected baseline because it was administered at a time that she had been sick. (Tr. at 634:1 – 7).

215.     Dr. Margo believed that Dr. Williams ruled out concussion, "[b]ecause he felt there was no mechanism of injury." (Tr. at 636:6 – 8)(*see also* Tr. at 637:15 – 23).

216.     Dr. Margo could not support her opinion with any literature that it was appropriate to rule out a concussion based solely on a lack of mechanism. (Tr. at 637:1 – 4).

### D.  JOSEPH CROUSE, PH.D. ON DAMAGES

217.     Joseph Crouse, Ph. D. testified on behalf of the Plaintiff as an expert witness in the fields of vocational rehabilitation and economics. (Tr. at 280).

218.     Dr. Crouse was admitted as an expert witness for these fields without objection. (Tr. at 286:15 – 287:10)

219.     Dr. Course received his Ph. D in economics from the University of Nevada at Reno as well as three master's degrees in rehabilitation counseling, strategic management, and human sciences, which is psychology. (Tr. at 281:13 – 22).

220.     Dr. Crouse is a certified public accountant and a certified rehab counselor with a Commission on Rehabilitation Counselor Certification. (Tr. at 282:9 – 23).

221.     As a rehabilitation counselor, Dr. Crouse works "with individuals with disabilities and [ ] analyz[es] their ability to work and earn money, look[s] at the jobs that they would be able to place into, what their employment levels would likely be over time, as well as their earnings." (Tr. at 283:12 – 16).

222.     Dr. Crouse is a member of the American Economic Association as well as the International Association of Rehabilitation Professionals. (Tr. at 283:20 – 22).

223.     He has published in his fields; he is a peer reviewer for the "Rehabilitation Professional" journal and is on the editorial board of the "Journal of Life Care Planning;" and he has been teaching economics at universities and colleges including Wilson College, the University of Nevada, Reno, and the University of Nevada, Las Vegas. (Tr. at 283:20 – 284:25).

224.     Dr. Crouse testified that his field and work in forensic vocational rehabilitation includes "looking at the limitations that they have now and seeing what is the path that they're most likely to be on in terms of earnings and work life expectancy." (Tr. at 285:13 – 21).

225.     Dr. Crouse testified that in his field of economics he "is taking a look at supply and demand, in this case supply and demand of labor. So I'm looking at the labor market in trying to quantify exactly what an individual with cognitive functional limitations would be able to do over their work life expectancy in terms of earnings and employment levels. So economics is really the quantification of the vocational opinions, so I kind of wear both hats simultaneously." (Tr. at 286:1 – 9).

226.     Dr. Crouse reviewed the medical records of Ms. Bradley, the educational records of Ms. Bradley and conducted an interview and examination of Ms. Bradley. (Tr. at 288:21 – 289:21; Exhibit 26).

227.     Dr. Crouse formulated an opinion within a reasonable degree of professional certainty that "Ms. Bradley would have reduced annual earnings and reduced work life expectancy as a result of her cognitive functional limitations, and that would translate into an overall loss of earning capacity of $1,037,047 to $1,210,108." (Tr. at 289:22 – 290:14).

228.	Dr. Crouse testified that he utilized documents and materials that are relied upon in his field to formulate his opinions including the U.S. Census Bureau's American Community Survey ("ACS"), and the Disabilities Statistics Rehabilitation Research and Training Center for Economic Research on Employment Policies for Persons with Disabilities. (Tr. at 290:21 – 292:4).

229.	Dr. Crouse also testified that he utilized standardized tests that are utilized and relied upon in the field of vocational rehabilitation to formulate his opinions including the COPS, the Beta-4, and the WRAT. (Tr. at 292:4 – 293:3).

230.	Dr. Crouse also reviewed Dr. Cantu's report to understand his opinion "regarding prognosis and causation." (Tr. at 293:4 – 12).

231.	Dr. Crouse testified that the process in which he formulated his opinion is the proper process and methodology generally used in his field and it allowed him to formulate his opinions "within a reasonable degree of professional certainty." (Tr. at 293:13 – 21).

232.	Dr. Crouse testified that this methodology allowed him to formulate an opinion that Ms. Bradley is defined as an individual "that has a non-severe cognitive disability based on her cognitive functional impairments. And then [he] also determined that it would be reasonable to look at two levels of education attainment, both Bachelor's degree and then Bachelor's degree or higher, which would encompass the possibility of her receiving a Master's or a Doctoral degree. And then in terms of the economics [he] tried to quantify how much she would have annually earn[ed] and how long she's likely to work by using American Community Survey data." (Tr. at 294:1 – 12).

233.	Dr. Crouse indicated that he utilized a "total offset" approach to reduce his calculations to present value and that such an approach is a reasonable approach in the field for numerous reasons including "[s]ome states actually require it . . .if you look at the historical data

you see the growth rate in compensation is approximately equal to the risk free rates that a person could receive on a lump sum award. . . . peer reviewed literature in recent years has supported it more and more." (Tr. at 295:4 – 24).

234. His interview of Ms. Bradley demonstrated that "the functional limitations she reported to [him] were consistent with the neuropsychological reports, the medical reports and Dr. Cantu's disclosure that [he] reviewed." (Tr. at 297:18 – 23).

235. Dr. Crouse also indicated that his opinion was partly formed by a comparison of her relatively low test scoring in comparison to her relatively high SAT scoring, which he reviewed. (Tr. at 298:12 – 20 & Exhibit 26). Specifically, on re-direct examination, he cited to her SAT percentile rankings that noted she was in the 94th percentile in writing, the 82nd percentile in verbal, and the 80th percentile in math, and an overall 89th percentile. (Exhibit 26 at page 2 and Tr. at 346:1 – 5).

236. Dr. Crouse than utilized all of the data and test results to formulate the opinion that "her limitations and memory concentration, organization, multitasking, information processing, all of those functional limitations would impede her future ability to attain, retain a position, and it would likely also necessitate that she retire sooner or that her job transitions would be harder from job to job." (Tr. at 300:12 – 23).

237. Dr. Crouse then utilized the data and information that he previously identified to tabulate both her pre-injury average earnings as a female with a Bachelor's degree and no disability and then her post-injury scenario as a female with a Bachelor's degree and a nonsevere cognitive disability. (Tr. at 301:3 – 13). His next step was to determine both her pre-injury and post-injury work life expectancy. (Tr. at 301:22 – 302:4).

238.     Dr. Crouse then complied two sets of tables that are admitted as Plaintiff's Exhibits 54A and 54B. (Tr. at 302:8 – 303:6).

239.     In order to utilize those tables, Dr. Crouse explained that each year presents a different evaluation for the probability that the Plaintiff will be alive and the probability that she will be employed. (Tr. at 303:13 – 304:15).

240.     As a result, the Court can view Dr. Crouse's tables at Plaintiff's Exhibits 54A and B and can add the adjusted earnings for both a pre-injury and post-injury in each respective column and then subtract those totals from each other to find the future loss. In doing this, Mr. Crouse's calculations and expert opinion tabulate that "post-injury my opinion is that over the lifetime, Ms. Bradley is able to earn $1,250,0333, but the pre-injury she would have been able to earn $2,287,080, so subtracting post-injury from pre-injury you then arrive at the loss of [$1,037,047]." (Tr. at 306:6 – 14). The same calculations on Exhibit 54B can be made with if the fact finder is to believe that she would have been able to attain a higher degree above a Bachelor's degree and that total future loss equaled $1,210,108. (Tr. at 306:15 – 18).

## IV.     TESTIMONY ON DR. WILLIAMS' "EMPLOYMENT" STATUS AT AMERICAN UNIVERSITY

241.     Dr. Williams expressly testified that he was "not a member of the medical staff at AU." Tr. at 547:2 – 4).

242.     Dr. Williams expressly testified that he "never saw or heard anything about a waiver that [Ms. Bradley] might have signed." (Tr. at 547:5 – 7).

243.     Dr. Williams testified that he was not an employee of American University (Tr. at 543:3 – 5); he did not have a key to the facility (Tr. at 543:6 – 7); he was employed solely by the Army during his entire time at American University (Tr. at 543:8 – 10); he was not employed by

Dr. Higgins (Tr. at 543:11 – 12); and everything he did was under the auspicious and direction of the Department of Family Medicine at the Uniform Services School (Tr. at 543:13 – 16).

244.    Dr. Williams completed an application to be a member of the primary care sports medicine fellowship offered by the Consortium. (Tr. at 466:20 – 467:16).

245.    Col. Kevin DeWeber "supervised" Dr. Williams and "was the one that was directly over [Dr. Williams in this fellowship program]. (Tr. at 468:6 – 12).

246.    During the fellowship, Dr. Williams testified that he remained on active duty and was paid by the Army. (Tr. at 468:13 – 16).

247.    Dr. Williams had no control over where he worked during his fellowship. (Tr. at 469:2 – 14).

248.    Dr. Williams testified that he managed colds, flu, rashes, dermatological type issues and concussions by himself. (Tr. at 471:7 – 10).

249.    Dr. Williams testified that at American University he "took care of the medicine athletes, [Dr. Higgins] took care of the orthopedic athletes." (Tr. at 472:20 – 23).

250.    Dr. Williams testified that the patients he managed did not require him to report to Dr. Higgins because "[a]s an orthopedic surgeon that was outside his scope to talk about colds, rashes. As a board certified family physician that was in my scope of practice to treat those." (Tr at 474:16 – 22). He also never "back briefed" Dr. Higgins on patients he treated that were not for orthopedic injuries. (Tr. at 474:23 – 24).

251.    Dr. Williams testified that Dr. DeWeber instructed him on his "duties at American University." (Tr. at 477:2 – 4).

252.    Dr. Williams testified that he neither had access to nor was even aware that there existed digital files at American University. (Tr. at 481:17 – 25; 542:25 – 543:2).

253. Dr. Williams never discussed the number of athletes he was treating for concussion with Dr. Higgins. (Tr. at 482:8 – 11).

254. Dr. Williams never discussed his treatment of Jennifer Bradley with Dr. Higgins "because this was a medicine issue not an orthopedic issue." (Tr. at 491:14 – 17).

255. Dr. Williams testified in accordance with his prior affidavit that "since being commissioned in the United States Army I have been employed exclusively by the Department of Defense of the government of the United States;" "I have never been employed by Dr. David M. Higgins, David M. Higgins, MD CP, or American University;" and "At all times during my participation in the National Capital Consortium fellowship, I only received compensation from the Department of Defense of the government of the United States." (Tr. at 556:3 – 21).

256. On re-direct by his own counsel, Dr. Williams testified that when "he saw someone [at American University]" he was "not sure if anyone [oversaw him] for medical treatment. I'm not sure anyone did. I was a board certified family medicine physician treating primary care issues there at American University." (Tr. at 553:19 – 25). He even expressly testified that he "did [not] work for another doctor at American University." (Tr. at 554:1 -3).

257. When questioned directly by the Court on whether he had to consult with Dr. Higgins, Dr. Williams stated "No, I did not. Dr. Higgins is an orthopedic surgeon. He deals with orthopedic issues. The athletes I saw were under medicine, primary care medicine, so coughs, colds, mono, rashes. Dr. Higgins, those kinds of issues were outside his scope of, within mine." (Tr. at 563:21 – 564:8) Furthermore, Dr. Williams testified in response to the Court's question that "in reference to the primary care that you were providing you were acting independently of Dr. Higgins," that such a statement was "Correct." (Tr. at 564:14 – 17).

258. Mr. DeWeber testified on behalf of the Defendant. (Tr. at 661).

259.     In September of 2011, Mr. DeWeber was the program director for the National Capital Consortium Sports Medicine Fellowship ("Fellowship"). (Tr. at 665:10 – 13).

260.     According to Mr. DeWeber in order to be in the Fellowship one would have to be "active duty in Army, Navy, Airforce to be eligible. And you had to be board certified in any one of the five specialties." (Tr. at 669:16 – 19). Selection of the Fellows is made by the selection board, Graduate Medical Education Selection Board. (Tr. at 670:15 – 17). The Fellows spent only 28 – 30% of their time at the Universities they were assigned to. (Tr. at 671:15 – 16).

261.     The Memorandum of Understanding ("MOU") (Defendant's Exhibit 1) was entered into between the National Capital Consortium and David L. Higgins, M.D. (Tr. at 674:4 – 7). The Program Letter of Agreement ("PLA") (Defendant's Exhibit 2) gave Dr. Higgins the framework by which he was to teach and supervise Dr. Williams. (Tr. at 675:13 – 20). Neither contract was entered into with American University. (Tr. at 704:4 – 10)

262.     Dr. DeWeber's duties included "direct supervision of his clinical duties during sports medicine clinic, conducting didactic exercises such as lectures and case discussions in his presence, and coordinating the remainder of his schedule at places where he rotated." (Tr. at 688:18 – 22). Dr. DeWeber testified that he, in his military capacity, was available for supervision of Dr. Williams for Dr. William's treatment while at American University if Dr. Higgins was not available. (Tr. at 693:8 – 14). Dr. DeWeber also testified that Dr. Higgins was a faculty member of the fellowship itself. (Tr. at 697:20 – 22). Dr. DeWeber also testified that Mr. Dash and Dr. Higgins were his "eyes and ears about how the fellow was performing." (Tr. at 698:11 – 13).

263.     Dr. DeWeber testified that the MOU does not establish any relationship between the government and American University. (Tr. at 704:4 – 10). He was responsible in his government capacity to select the fellows. (Tr. at 704:20 – 705:1). He was responsible for assigning

the fellows to each particular fellowship. (Tr. at 705:5 – 7). Dr. Williams was required to follow the curriculum and the guidelines that the Consortium dictated. (Tr. at 705:16 – 19). Dr. Higgins did not have the ability to fire or terminate Dr. Williams and that such a power resided with the government. (Tr. at 705:23 – 706:7).

264.    Dr. DeWeber testified that "under the lines of supervision if Dr. Higgins was not making himself available to Dr. Williams for those treatments then [he] would have been the supervisor to take over the supervision of Dr. William's treatment of such patients." (Tr. at 708:8 – 13).

265.    The Fellowship was being overseen, run, and controlled by the United States Government and both Mr. Dash and Dr. Higgins were faculty members of it. (Tr at 708:22 – 709:9).

266.    David Higgins, M.D. testified on behalf of the Defendant. (Tr. at 747).

267.    Dr. Higgins testified that the fellows were working with him for the "nonoperative side of orthopedics." (Tr. at 756:1 – 4); he testified that under the MOU he was required to make facilities available to the fellows (Tr. at 759:1 – 10); he testified that despite the MOU indicated he was obligated to make the schedule for the fellows, "[w]homever the program chair is [makes the fellow's schedule]" (Tr. at 760:1); he testified that despite the MOU requirement that he provide the fellows with administrative privileges, that never occurred (Tr. at 761:2 – 8); and he testified that the program chair for the fellowship does "all of the onboarding" (Tr. at 762:5 – 12).

268.    With regard to the work done by Dr. Williams, Dr. Higgins testified that Dr. Williams saw "mainly the primary care, the nonoperative orthopedic and also medical side of athletes' illnesses and conditions." (Tr. at 767:2 – 9) and "he takes care of all the primary care side of, of the sports medicine." (Tr. at 767:22 – 25); he further testified that there was no limit to what

Dr. Williams was allowed to treat on his own and that he did not directly supervise Dr. Williams (Tr. at 773:6 – 13); Dr. Higgins also testified that the title of "supervising physician over Dr. Williams," was nothing more than a title as his understanding of what that meant was "I'm not sure how to put that into words. I mean, I'm for the places that I cover I'm his supervisory physician according to the agreement, but I'm not sure I could – I guess maybe the fact that I'm available for help if he needs it." (Tr. at 775:9 – 13); and Dr. Higgins did not even know if he was able to discipline Dr. Williams (Tr. at 776:1 – 8).

269.    Dr. Higgins testified that Mr. Dash did not oversee himself or Dr. Williams. (Tr. at 778:25 – 779:10).

270.    Dr. Higgins signed a contract with American University known as the Professional Service Agreement. (Defendant's Exhibit 14 & Tr. at 780:1 – 3).

271.    The Professional Service Agreement identified Dr. Higgins to be an independent contractor of American University (Defendant's Exhibit 14); it limited its authority solely to Dr. Higgins (*Id*.); it required Dr. Higgins to receive prior written consent from American University to assign any rights to another person (*Id*. and Tr. at 782:2 – 9); and Dr. Higgins never sought prior written consent from American University to have Dr. Williams act underneath him and enjoy the rights that he contracted for under the Professional Service Agreement. (Tr. at 72:10 – 18).

272.    Dr. Higgins had no document or contract that set forth limits of what Dr. Williams was allowed to do as his fellow. (Tr. at 782:22 – 783:5).

273.    Under the MOU (Defendant's Exhibit 1), Dr. Higgins agreed that the PLA included the "basic outline of the anticipated training, training and supervision standards to be employed, and any other issues required by the family medicine set slash sports medicine fellowship program review committee." (Tr. at 783:9 – 21).

274.     Under PLA, Dr. Higgins agreed that both himself and Dr. DeWeber held joint responsibility of the education and supervision of Dr. Williams (Tr. at 784:1 – 4); and that the PLA indicated that the fellowship was aimed solely at orthopedic issues and had "no mention of family medicine practice being part of the fellowship program." (Tr. at 785:1 – 7).

275.     Dr. Higgins admitted that he was not supervising Dr. Williams for anything related to family medicine. (Tr. at 785:8 – 12).

276.     Dr. Higgins testified and agreed that under the MOU Dr. William's duties that he was allowed to participate in were all related to the musculoskeletal system and injuries with the only exception being a phrase that stated he was to "participate in medical evaluations;" but Dr. Higgins even admitted that to the extent that Dr. Williams did participate in medical evaluations to diagnose concussions he would not supervise him. (Tr. at 785:21 – 788:1)

277.     Dr. Higgins also testified and admitted that while the MOU required him to provide professional liability insurance for Dr. Williams, he did not do that and was informed by his insurance carrier that it was not providing coverage to Dr. Higgins for the treatment rendered by Dr. Williams. (Tr. at 788:9 – 789:7).

278.     Dr. Higgins also testified that he agreed that he "had no oversight over Dr. Williams' treatment for any medical treatment that he may have rendered on his own while on site at American University." (Tr. at 789:8 – 12).

279.     Dr. Higgins testified that in 2011 he would not counterman Dr. Williams' medical decision on whether to rule in or out a concussion and he did not have any discussion with Dr. Williams about Ms. Bradley's potential diagnose of concussion. (Tr. at 790:16 – 23).

280.     Dr. Higgins also testified that he was acting as a professor for the Government's Fellowship program in having Dr. Williams act as his fellow. (Tr. at 791:4 – 14).

281.    Sean Dash was/is the head athletic trainer at American University and testified on behalf of the Defendant. (Tr. at 717).

282.    Mr. Dash was not able to define who the medical staff at American University was. When asked by the Court "are there any physicians who are actually on the staff at AU," Mr. Dash's response was "I have to have somebody clarify staff." (Tr. at 721:23 – 722:1). When asked by Plaintiff's counsel, again he was not able to define the staff: "And as head athletic trainer, you oversaw the AU sports medicine staff, correct? A. You would have to define staff." (Tr. at 736:2 – 4). He was then asked how he defined "staff" and he testified: "I define staff as my, those individuals that are beneath me in the flow chart. So my staff athletic trainers, I don't, I certainly work with our physicians, but I don't oversee our physicians." (Tr. at 736:5 – 11). Mr. Dash was then questioned on his prior testimony and admitted that his prior deposition testimony was that Dr. Williams was not a member of the staff. (Tr. at 736:23 – 738:5). Mr. Dash then offered two different definitions for what the medical staff consisted of: "I'm trying to explain my answer. I think I contradicted myself a little in the deposition or was unclear. I think it's a semantic – we're talking about – when we're talking about staff *I view my staff as the staff athletic trainers because they're paid by American University. And those individuals I supervised*. That's when people ask me who my staff are that's who I refer to as my staff. The larger sports medicine staff also includes our physicians." (Tr. at 738:7 – 15). Mr. Dash also testified that he "[didn't] ever recall ever referring to Dr. Williams as part of our staff." (Tr. at 740:3 – 4). He also did not recall ever referring to Dr. Williams as a member of the staff to anyone in 2011. (Tr. at 7405 – 9). On re-direct, Mr. Dash again established that he held two different definitions of the "staff:" "I think I'm creating the issue when I use staff in two forms." (Tr. at 746:23 – 24).

283.    Mr. Dash testified that he did not supervise Dr. Williams. (Tr. at 740:10 – 12).

284.	Mr. Dash testified that in order to play field hockey and receive her scholarship, Ms. Bradley was obligated to sign the Acknowledgement of Risk form. (Tr. at 742:11 – 16).

285.	Mr. Dash testified that Dr. Williams did not have access to the electronic medical records, did not have a key to the office, and that he had no ability to terminate Dr. Williams' fellowship. (Tr. at 743:20 – 24 & 745:20 – 23).

286.	Mr. Dash frequently referred to "we" to distinguish a demarcation between himself and the athletic trainers verses the physicians. *See* Tr. at 726:16 – 727:9 in which he indicated that the referral process consisted of the physicians requested of him and the trainers a referral and then "we" "would find somebody that would see the patient . . . we would work with that individual's insurance."

287.	Mr. Dash demonstrated a refusal to utilize the word "waiver" and thus an inherit bias to describe the form to the student-athletes as what it actually is: "And then we would have them complete the necessary waivers for that meet – I hate to say waivers. The necessary forms." (Tr. at 731:11 – 15).

288.	Ms. Earls testified that Sean Dash was her employer who was just above her and Dr. Higgins was above Mr. Dash "as he would sign our licensure" but Dr. Williams did not supervise her at all. (Tr. at 410:22 – 411:3).

289.	Ms. Earls could not set an appointment for Ms. Bradley to see Dr. Williams on October 3rd or 4th because Dr. Williams' schedule controlled when he would see the student-athletes. (Tr. at 433:19 – 434:2).

# PROPOSED CONCLUSIONS OF LAW BASED UPON THE EVIDENCE

## I. DEFENDANT U.S.A. IS LIABLE FOR THE MEDICAL MALPRACTICE OF DR. WILLIAMS.

The standard of care required that Dr. Williams should have diagnosed a concussion on October 4, 2011 and that he placed Ms. Bradley into a concussion protocol until she was asymptomatic. Dr. Williams failed to adhere to the standard of care, thereby breaching it. As a result of his breach of standard of care, Ms. Bradley's concussion symptoms were allowed to progress into a permanent moderate traumatic brain injury from which she still suffers from today and will suffer from for the rest of her life.

Dr. Cantu was by far the most qualified and credible health care provider to testify it in this matter. Dr. Cantu "wrote the book" on concussion diagnosis and management in the sports context. His testimony is unchallenged. All health care providers who testified in this matter, including Dr. Williams, agreed that a lack of mechanism was not a sufficient basis to rule out a concussion. Dr. Cantu and Dr. Vollmar testified that Dr. Williams was obligated under the standard of care to have reviewed all of the SCAT2 tests and to have been aware of the notation by Ms. Earls that Ms. Bradley suffered a blow to the head. Dr. Cantu testified that even without acknowledgement of the notation of Ms. Earls on the SCAT2 test, the complaints voiced by Ms. Bradley and the results of the SCAT2 test that Dr. Williams did claim to have reviewed required a diagnosis of a concussion on October 4 and that she should have been placed in a concussion management protocol and withheld from athletic activity until asymptomatic. The notation of Ms. Earls only made the diagnosis that much more apparent and required. Likewise, Ms. Earls testimony that she handed him all of the tests and that he was informed of the blow make it even more clear.

Dr. Cantu and Dr. Vollmar both testified within a reasonable degree of medical certainty that as a direct and proximate result of Dr. Williams' negligence Ms. Bradley now has a permanent

moderate traumatic brain injury that presents with the deficiencies documented in her multiple neuropsychological test results.

Dr. Crouse has quantified the future economic damages of Ms. Bradley to be between $1,037,047 and $1,210,108. No other expert witness was proffered to contest such testimony, and Defendant's cross-examination did not in any way challenge Dr. Crouse's opinions as counsel attempted to utilize mathematical calculations that are not properly utilized in the field of forensic economics.

The non-economic damages in this matter are severe and significant. Mr. and Mrs. Bradley testified to the constant struggle Plaintiff endured during the immediate time surrounding the incident as well as the continued and progressive issues that she suffered and suffers with up to the present day. Drs. Cantu and Vollmar testified that her mental issues are permanent and will continue. The Court also heard directly from Ms. Bradley on how her life has been affected. More importantly, the Court was able to observe Ms. Bradley during this trial. The Court has the evidence to support the notion that prior to this incident Ms. Bradley was an Academic All-American Division I Student Athlete with aspirations to enter into a career in international relations, that she had applied for and been admitted into a special program offered by American University to study abroad during her junior year Spring Break, that she was smart, studious, diligent, responsible, and motivated. Yet at trial, this is anything but who Ms. Bradley demonstrated herself to be today. The Court was able to observe that while Ms. Bradley is not an invalid, her brain injury is demonstrated through her now reserved nature; her retarded analytic and processing skills that required delayed responses to questioning and confusion over the questions asks; a clear exhaustion sitting in the courtroom even when not on the stand; and a general demeanor that in no way resembles the young woman that she was 10 years ago when this

incident occurred. All of these issues are the exact deficits that were detailed in the neuropsychological reports and acknowledged to exist by Drs. Cantu and Vollmar.

Ms. Bradley has a permanent **brain injury**. Not all brain injuries manifest in a manner that leaves one comatose, confined to a bed or wheelchair, or visually or audibly appreciable. The preponderance of the evidence is clear that Ms. Bradley's brain injury has affected her executive functions, and while one may not be able to simply look at her and determine that she is impaired, the medical evidence is clear that she is in fact severely impaired. That impairment has been proven by a preponderance of the evidence to have been a result of negligent actions of Dr. Williams. This is a brain injury that has caused damages in every avenue of Ms. Bradley's life and should be compensated justly and accordingly.

## II.     THE WAIVER DOES NOT APPLY TO THE DEFENDANT U.S.A.

For the Court to rule that the waiver applies to the Government, it was the burden of the Government to establish that Dr. Williams was a member of the Sports Medicine Staff and to establish that under the first clause of the waiver that Dr. Williams and/or the Government contracted with American University to be employees, officers, and/or agents of American University and that such care and treatment qualifies as damages which arose from Plaintiff's participation in the University's Intercollegiate Athletic Program. Defendant's witness, Sean Dash, proffered testimony that legally requires the Court to construe the language of the waiver against Defendant, and no such contracts exist. Simply put, there has been no evidence put forward by the Government to carry *its* burden of proof that the waiver clause was applicable to either Dr. Williams or the Government.

For the waiver to be applicable, the Court must look to the express terms of the contract. The contract at issue here, the Acknowledgement of Risk form, only applies to members of the

sports medicine staff. Thus, the "waiver" at issue in this matter is specific that it only applies to "the University's Sports Medicine Staff."

The Acknowledgement of Risk form does not define who the "University's Sports Medicine Staff" is. Plaintiff's Exhibit 5 is the American University Student-Athlete Handbook. This document does not define who the "University's Sports Medicine Staff" is. In fact, no document defines this term of the contract. No corporate representative of American University was called to speak to the contract. The only witness proffered by Defendant was Sean Dash. When asked at trial, Mr. Dash did not dispute that his prior deposition testimony indicated that he testified that Dr. Williams was *not* a member of the Sports Medicine Staff. Instead, Mr. Dash indicated that he was confused on how to define the term and that he held two different definitions in his mind as to whom was considered a member of the Sports Medicine Staff. Mr. Dash's testimony alone makes it clear that there exists an ambiguous contract with an undefined term that holds two different meanings. Mr. Dash also repeatedly testified that he never referred to Dr. Williams as a member of the staff. However, page 46 of the Handbook states that "The Sports Medicine Department at American University works in conjunction with the Team Physicians to provide medical care to all student-athletes participating in the intercollegiate athletic program." A plain reading of this statement makes clear that by working in "conjunction" with the "Team Physicians" the University's Sports Medicine Department does NOT consist of the team physicians.

In this matter, Dr. Higgins was an independent contractor of American University pursuant to the terms of his contract. The testimony was additionally clear that American University did not demonstrate any control over Dr. Higgins. Dr. Higgins' contract between himself and American University was specific to Dr. Higgins alone and required any assignment of rights to be preauthorized in writing by American University. Dr. Higgins never sought nor received pre-

approval from American University to utilize Dr. Williams and government employees to provide health care to the student athletes. Dr. Higgins did not insure Dr. Williams under his insurance policy. Dr. Higgins and the United States of American each jointly held responsibility and control of Dr. Williams. Dr. Higgins' control over Dr. Williams, however, was limited to the scope of services identified in the Memorandum of Understanding and Program Letter of Agreement, which limited his authority to utilize Dr. Williams as a Fellow to "assist the Fellow Preceptor in the clinic with the care of patients with *orthopedic problems*… with the surgical management of selected cases as designated by [Dr. Higgins]… [and to] assist [Dr. Higgins] in athlete rehabilitation." (Defendant's Exhibit 2 at p. 1). All parties agree that concussion management is not an "orthopedic" condition. American University exercised absolutely no control over Dr. Williams. In fact, it was demonstrated by Dr. Higgins' own testimony that Dr. Higgins did not even exercise any control over Dr. Williams when it came to treating student-athletes who voiced complaints of concussion-like symptoms. When treating Ms. Bradley, Dr. Williams was not acting under the supervision of either American University or Dr. Higgins; he was acting under his own accord under his duties as a military physician enrolled in the Consortium's Fellowship Program. He was outside the control of both Dr. Higgins and American University in ALL respects.

Thus, Dr. Williams was not acting as an agent, servant, employee, or even and independent contractor of American University. At best, Dr. Higgins, as an independent contract, inappropriately and in violation of his contract with American University, allowed Dr. Williams to have access to student-athletes for treatment that Dr. Williams was not authorized to undertake under the MOU, the PLA, and Dr. Higgins' contract with American University. American University exercised absolutely no control over Dr. Williams' medical treatment to any student-athletes, including Ms. Bradley, and Dr. Higgins exercised absolutely no control over Dr.

Williams' medical treatment to any student-athletes for non-orthopedic treatment, including Ms. Bradley. Furthermore, there is no contract in existence between American University and either the government or Dr. Williams to define Dr. Williams as any agent or even an independent contractor of American University. There was simply no legal relationship between the two. As faculty members of the Consortium, the Court should recognize that both Dr. Higgins and Mr. Dash were only allowing Dr. Williams to treat Ms. Bradley in their capacity as faculty members for the Consortium, not on behalf of American University. At best, Dr. Williams was offering care to Ms. Bradley as an outside referral under the guidelines set up by the American University Student-Athlete Handbook. (Plaintiff's Exhibit 5).

The "waiver" does not specify that either the United States of America or Dr. Williams were intended third party beneficiaries. It is agreed that the United States of America is not and was not a member of the American University Sports Medicine Staff. Plaintiff testified unequivocally that she did not intend expressly or by implication to allow Dr. Williams or the United States of America to benefit from this document. Ms. Bradley testified that at the time of the execution of this document she did not even know who Dr. Williams was or that he or the United States government would even be providing health care to her. Likewise, Dr. Williams testified that he had no knowledge that this document ever existed prior to this lawsuit. The United States also called Dr. deWeber who testified that he, as the Program Director of the Consortium, did not have any knowledge of this "waiver."

The United States of America bore the burden of establishing the terms of the contract; specifically, it was required to establish who was a member of "the University's Sports Medicine Staff." Defendant attempted to do this solely through the testimony of Mr. Dash. It is of note that Defendant did not call any corporate representative of American University to speak to the

relationship status of Drs. Higgins and Williams to American University and to define who was a member of the Sports Medicine Staff. The only witness that Defendant called was Mr. Dash, who was a lay witness and never indicated or testified that he was speaking on behalf of American University to define the terms of the American University Acknowledgement of Risk form. Mr. Dash, however, gave two different definitions as to who was a member of the Staff. Mr. Dash even testified that he was in fact confused over the question and was not sure how to answer it. There cannot be any more clear-cut case of what an "ambiguous" term is as when the drafting party of the contract is unclear of how to define the term.

Ms. Bradley, on the other hand, was clear that she did not at any point in time believe that any waiver was being applied to negligent conduct on the part of Dr. Williams or the United States of America. Given the clear ambiguity, the Court should construe the contract strongly against the drafter and party asserting the contract and determine that Dr. Williams was not a member of the Staff – as Mr. Dash originally testified during his deposition – or in the alternative that Dr. Williams and Defendant United States of America were not afforded the benefits of the document.

By asserting "waiver" as an affirmative defense, it was the Government's burden to establish that Dr. Williams was a member of the sports medicine staff at trial. Mr. Dash's testimony was completely destructive to any chance that the Defendant had to rely upon waiver as a defense. Furthermore, the clause at issue at best only indemnifies, defends, and holds harmless "the University and its employees, officers, [and] agents."

The clear weight of the evidence fails to establish that Defendant USA and Dr. Williams was/were an employee, officer, and or agent of the University. The government did not contract with American University to have its employees act as employees, officers, and/or agents of

American University. The Court should not find that Defendant USA should benefit from this document.

### III.     NO CONTRIBUTORY NEGLIGENCE HAS BEEN ESTABLISHED

Defendants have offered absolutely no evidence of negligence on the part of Ms. Bradley to indicate she failed to act as a reasonably competent person under the same or similar circumstances. Partaking in a contact sport, in which she was injured and seeking treatment for feeling unwell on multiple occasions in fact shows the opposite – that Ms. Bradley took the steps available to attempt to receive care when her symptoms developed. It was Defendant who negligently failed to properly diagnose and treat her concussion. There is no evidence that Plaintiff was negligent. To prove that Ms. Bradley was negligent, it was incumbent on Defendant to present testimony that Ms. Bradley failed to meet her duty and expert testimony that any such failure was a proximate cause of damages. Defendant, plain and simple, failed to do so.

Nothing that Ms. Bradley did prior to seeing Dr. Williams can be legally construed as contributory negligence under the case law. Thus, any claim that a delay in seeking treatment was contributory negligence is legally erroneous under *Durphy v. Kaiser Found. Health Plan of Mid-Atlantic States*, 698 A.2d 459, 467(1997). At best, Defendant attempts to claim that Ms. Bradley was contributorily negligent for failing to tell Dr. Williams that she suffered a blow to the head. Such an argument is defeated by Ms. Bradley's testimony that she believed that she or Ms. Earls did inform him; Ms. Earl's testimony that Dr. Williams *was in fact* informed of the blow to the head and was provided all of the SCAT2 tests; and the medical record itself that documents that Ms. Bradley expressed to the health care providers that she suffered a blow to the head. Furthermore, there is no claim that failing to report a specific blow to the head is negligent conduct by a Plaintiff. Dr. Cantu testified that it is frequent that athletes do not know the exact blow that

caused the concussion, and that is why a failure to identify a mechanism is not justification to rule out a concussion.

Finally, Defendants have not offered any causation testimony at all to establish that Ms. Bradley's alleged negligent conduct caused any damages.

## IV. THERE IS NO EVIDENCE THAT ANOTHER CONCUSSION OCCURRED OR THAT IF ONE DID THERE WAS ANY CAUSATIVE AFFECT TO DISTURB A COMPLETE RECOVERY FOR PLAINTIFF.

The Court requested the parties also address "whether there is any evidence in the record supporting the conclusion that the plaintiff sustained an additional concussion in 2013 and, if so, the impact, if any, an additional subsequent concussion should have on the damages for which the government may be liable."

Defendant cited to testimony of Dr. Vollmar that the medical record indicated that Ms. Bradley fell in 2013 doing her rehabilitation exercises for the concussion that she suffered in 2011. As an initially matter, Dr. Vollmar did not testify, and the record does not contain any reference, to a reasonable degree of medical certainty that Ms. Bradley suffered a concussion at time in 2013. In fact, all of the testimony cited to by Defendant merely indicated that Dr. Vollmar thought it was "possible" that she could have sustained a new concussion. "Possible" does not reach the level of probable and thus is not an admissible medical opinion. Defendant also cited to testimony at page 73 of Dr. Vollmar's testimony in which Defense counsel asked if "she had a moderate traumatic brain injury prior to April 2013, and then sustains a new concussion in April of 2013, *can* that new concussion make her condition worse." (Tr. at 803:13 – 17). Dr. Vollmar did indicate that it "can," however, no testimony was elicited that more likely than not within a reasonable degree of medical certainty in this case that such an incident did have any causative effects on Ms. Bradley or if it did, to what extent. In fact, the testimony recited was that Dr. Vollmar could not indicate that a

potential new concussion in April of 2013 had any discernable difference on Ms. Bradley's injuries.

Additionally, both Drs. Cantu and Vollmar testified that the injuries sustained by Ms. Bradley became permanent after they had failed to resolve within 1 year, or over a year prior to the April 2013 office notation. Dr. Vollmer testified that he diagnosed Ms. Bradley with a "moderate traumatic brain injury" "on the fact that she has continuing symptoms and deficits from a cognitive standpoint in focus and headaches that have lasted longer than a year. So I have no reason to believe that they are going to resolve. With that, I can make a diagnosis of moderate traumatic brain injury. Moderate traumatic brain injury defines concussion, concussion by definition resolves. She has not resolved." (Tr. at 386:17 – 387:2). Dr. Cantu expressly testified that "more probably than not if he had seen her on – when he saw her on the fifth, if he had recognized that as a concussion and pulled her out of play, that she would have completely recovered and her neuropsychological studies would have been normal." (Tr. at 238:23 – 239:2). Thus, all of the expert testimony provided within a reasonable degree of medical certainty established that all of her damages were permanent by one year, and no other testimony was provided to demonstrate that any potential incident in April of 2013 caused any additional damages.

If Defendant desired to establish a subsequent non-foreseeable intervening cause was responsible for the damages, they failed to provide any evidence to do so. Defendant could have presented expert opinion testimony on this point but did not. Suffice it to say, the record is devoid of any admissible opinion testimony regarding an imaginary second concussion or the effects thereof.

## V.     DEFENDANT U.S.A. IS LIABLE FOR 100% OF THE DAMAGES.

The Court has inquired if it is to apportion the damages awardable against the United States government in light of other parties. The simple and clear answer is that no such apportionment is allowed under the law of the District of Columbia. The District of Columbia follows the law of joint and several liability. Any one potential defendant is liable for 100% of the damages. That is the law and there is no dispute. Defendant USA would be free to seek contribution and indemnification from American University or Dr. Higgins and his practice after judgment is entered; however, at this stage of litigation, the finder of fact's duty is to award the full amount of damages that the evidence demonstrates to make the Plaintiff whole.

## CONCLUSION

The preponderance of the evidence in this matter demonstrates that Dr. Williams deviated from the standard of care and caused damages to Ms. Bradley in the form of a permanent moderate traumatic brain injury that affects her executive functions and other areas. The recoverable economic damages that this Court should award is $1,210,108 for future economic loss and a fair and justifiable amount of non-economic damages to make Ms. Bradley whole again from the permanent moderate traumatic brain injury that Dr. Williams' negligence caused.

In the alternative, if for some reason the Court does not believe that Dr. Williams committed medical malpractice, the preponderance of evidence still demonstrates that Dr. Williams had an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being was necessarily implicated by the nature of his undertaking to or relationship with Ms. Bradley, and serious emotional distress was especially likely to be caused by his negligence and was so caused.

The claims of medical malpractice and negligent infliction of emotional distress are two separate claims. Plaintiff is entitled to non-economic damages under both claims; however, she is not entitled to duplicative damages. If the Court is to make the finding that Defendant committed medical malpractice, it does not need to also find that Defendant committed negligent infliction of emotional distress in order to award non-economic damages.

Defendant has also failed to carry its burden of proof to establish its affirmative defenses of waiver and contributory negligence.

As a result, the Court should find in Plaintiff's favor and award $1,210,108 for future economic loss and a fair and justifiable amount of non-economic damages to make Ms. Bradley whole again from the permanent moderate traumatic brain injury that Dr. Williams' negligence caused from October 5, 2011 until her remaining days.

Respectfully submitted,

PAULSON & NACE, PLLC

_/s/ Matthew A. Nace_
Matthew A. Nace, Esq.
Bar No. 1011968
1025 Thomas Jefferson St. NW
Suite 810
Washington, DC 20007
man@paulsonandnace.com
Phone: 202-463-1999
Fax: 202-223-6824
_Counsel for Plaintiff_

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2022 I caused a true and exact copy of the

foregoing to be served via the Court's Electronic Filing System upon:

JESSICA B. COLSIA, GA Bar # 543222
Special Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2574
jessica.colsia@usdoj.gov
*Attorneys for the United States of America*


/s/ Matthew A. Nace
Matthew A. Nace, Esq.