# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:16–cv–00346–RBW</u>

| | |
|---|---|
| BRADLEY v. NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al | Date Filed: 02/24/2016 |
| Assigned to: Judge Reggie B. Walton | Date Terminated: 08/22/2022 |
| Demand: $10,000,000 | Jury Demand: Plaintiff |
| Case in other court:  Superior Court of the District of Columbia, 2014 CA 004932 B | Nature of Suit: 362 Personal Inj. Med. Malpractice |
| USCA for the DC Circuit, 22–05230 | Jurisdiction: Federal Question |
| Cause: 28:2671 Federal Tort Claims Act | |

**Plaintiff**

| | | |
|---|---|---|
| **JENNIFER BRADLEY** | represented by | **Barry J. Nace**<br>PAULSON & NACE, PLLC<br>1025 Thomas Jefferson Street NW<br>Ste 810<br>Washington, DC 20007<br>(202) 463–1999<br>Fax: (202) 223–6824<br>Email: bjn@paulsonandnace.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew Andrew Nace**<br>PAULSON & NACE, PLLC<br>1025 Thomas Jefferson Street, NW<br>Suite 810<br>Washington, DC 20007<br>(202) 463–1999<br>Fax: (202) 223–6824<br>Email: man@paulsonandnace.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**<br>*doing business as*<br>NCAA | represented by | **Danny C. Onorato**<br>SCHERTLER ONORATO MEAD & SEARS, LLP<br>555 13th Street, NW<br>Suite 500 West<br>Washington, DC 20004<br>202–628–4199<br>Fax: 202–628–4177<br>Email: donorato@schertlerlaw.com<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Francesca Morency**
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1152 15th Street NW
Washington, DC 20005
(202) 339–8427
Email: fmorency@orrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Alfonso Gonzalez**
DOJ–CIV
Civl Division
175 N St. NE
Ste 7th Floor
Washington DC, DC 20002
202–598–3888
Email: joseph.a.gonzalez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nexus U. Sea**
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017
212–547–5863
Email: nsea@omm.com
*TERMINATED: 05/30/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*

**William F. Stute**
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1152 15th Street NW
Washington, DC 20005
202–339–8400
Fax: 202–339–8500
Email: wstute@orrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Christian Word**
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004–1304
(202) 637–2200
Fax: (202) 637–2201
Email: christian.word@lw.com

*TERMINATED: 05/24/2017*

**Jennifer Butler Routh**
MCDERMOTT WILL & EMERY
McDermott Will & Emery
500 North Capitol St. NW
Washington, DC 20001
(202) 756–8165
Fax: (202) 756–8087
Email: jrouth@mwe.com
*TERMINATED: 09/06/2018*

**Kevin Andrew Chambers**
LATHAM & WATKINS LLP
555 11th Street N.W.
Suite 1000
Washington, DC 20004
(202) 637–2200
Email: kevin.chambers@lw.com
*TERMINATED: 05/24/2017*

**Margaret Hanley Warner**
MCDERMOTT WILL & EMERY LLP
McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756–8228
Fax: (202) 756–8087
Email: mwarner@mwe.com
*TERMINATED: 09/06/2018*

**Sarah M. Gragert**
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004–1304
(202) 637–2200
Fax: (202) 637–2201
Email: sarah.gragert@lw.com
*TERMINATED: 05/24/2017*

**Shermineh C Jones**
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 9th Street, N.W.
Suite 1000
Washington, DC 20004
202–274–2892
Email: shermineh.jones@troutman.com
*TERMINATED: 04/19/2019*

**William P. Schuman**

MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Suite 4000
Chicago, IL 60606–0029
312–372–2000
*TERMINATED: 09/06/2018*
*PRO HAC VICE*

**Defendant**

**PATRIOT LEAGUE**                 represented by  **Daniel C. Costello**
WHARTON, LEVIN, EHRMANTRAUT
& KLEIN, P.A.
P.O. Box 551
104 West Street
Annapolis, MD 21404
(410) 263–5900
Fax: (410) 280–2230
Email: DCC@WLEKN.COM
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle R. Mitchell**
WHARTON, LEVIN, EHRMANTRAUT
& KLEIN, P.A.
P.O. Box 551
104 West Street
Annapolis, MD 21404
(410) 263–5900
Fax: (410) 280–2230
Email: mrm@wlekn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMERICAN UNIVERSITY**                 represented by  **Christine Frazier Hein**
522 Fourth Street, SE
Washington, DC 20003
(410) 299–0781
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Murphy , III**
WALKER , MURPHY & NELSON, LLP
9210 Corporate Boulevard
Suite 320
Rockville, MD 20850
(301) 519–9150
Fax: (301) 519–9152
Email: jmurphy@walkermurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **MARYLAND SPORTS MEDICINE CENTER** | represented by | **H. Kenneth Armstrong** |

ARMSTRONG, DONOHUE, CEPPOS, VAUGHAN & RHOADES, CHARTERED
204 Monroe Street
Suite 101
Rockville, MD 20850
(301) 251–0440
Fax: (301) 279–5929
Email: hka@adclawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Collins Maynard**
ARMSTRONG, DONOHUE, CEPPOS, VAUGHAN & RHOADES, CHARTERED
204 Monroe Street
Suite 101
Rockville, MD 20850
(301) 251–0440
Email: rmaynard@adclawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Kathleen Fallon**
ARMSTRONG, DONOHUE, CEPPOS, VAUGHAN & RHOADES, CHARTERED
204 Monroe Street
Suite 101
Rockville, MD 20850
(301) 251–0440
Fax: (301) 279–5929
Email: mkf@adclawfirm.com
*TERMINATED: 05/31/2018*

**Defendant**

| | | |
|---|---|---|
| **DAVID L. HIGGINS** | represented by | **H. Kenneth Armstrong** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Collins Maynard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Kathleen Fallon**
(See above for address)

*TERMINATED: 05/31/2018*

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **Christopher Charles Hair**<br>U.S. ATTORNEY'S OFFICE FOR THE<br>DISTRICT OF COLUMBIA<br>555 Fourth Street, NW<br>Washington, DC 20530<br>(202) 252–2541<br>Fax: (202) 252–2599<br>Email: christopher.hair@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Jessica B. Colsia**
DOJ–USAO
Civil Division
555 4th Street. NW
Washington, DC 20530
(202) 252–2574
Email: jessica.colsia@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Derrick Wayne Grace**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2574
Fax: (202) 514–8780
Email: derrick.grace@usdoj.gov
*TERMINATED: 06/27/2017*

**Jeremy Allen Haugh**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2574
Fax: (202) 252–2599
Email: jeremy.haugh@usdoj.gov
*TERMINATED: 08/31/2020*

**John Haberland**
DOJ–CIV
Civil Division
555 4th Street NW
Suite 7.723
Washington, DC 20530
(202) 252–2574
Email: john.haberland@usdoj.gov

*ATTORNEY TO BE NOTICED*

**John Felix Lopez**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 4th Street, N.W.
Washington, DC 20530
703–943–0358
Email: john.f.lopez4.mil@mail.mil
*ATTORNEY TO BE NOTICED*

**Roberto Cesar Martens , Jr.**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2574
Fax: (202) 252–2599
Email: roberto.martens@usdoj.gov
*TERMINATED: 07/16/2019*

**Sean Patrick Mahard**
DOJ–USAO
555 4th St. NW
Ste 4408
Washington, DC 20530
(202) 252–2574
Email: sean.mahard@usdoj.gov
*TERMINATED: 06/11/2021*

**Shanna Laura Cronin**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–2574
Email: shanna.cronin@usdoj.gov
*TERMINATED: 05/08/2018*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/24/2016 | 1 | | NOTICE OF REMOVAL from Superior Court of the District of Columbia, case number 2014 CA 004932 B Filing fee $ 400, receipt number 0090–4424581 filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit Order, # 2 Exhibit Partial Consent Motion to Continue Status Conference, # 3 Exhibit Order, # 4 Exhibit Amended Complaint, # 5 Exhibit Filed Amended Complaint, # 6 Civil Cover Sheet)(Nace, Matthew) (Entered: 02/24/2016) |
| 02/24/2016 | 2 | | NOTICE *of Correct Civil Cover Sheet* by JENNIFER BRADLEY re 1 Notice of Removal, (Nace, Matthew) (Entered: 02/24/2016) |
| 02/24/2016 | | | Case Assigned to Judge Colleen Kollar–Kotelly. (md) (Entered: 02/25/2016) |

| 02/25/2016 | 3 | | NOTICE to Counsel re 1 Notice of Removal. (md) (Entered: 02/25/2016) |
|---|---|---|---|
| 02/25/2016 | 4 | | ORDER Establishing Procedures for Cases Assigned to Judge Colleen Kollar–Kotelly. Signed by Judge Colleen Kollar–Kotelly on February 25, 2016. (NS) (Entered: 02/25/2016) |
| 02/25/2016 | 5 | | REQUEST FOR SUMMONS TO ISSUE filed by JENNIFER BRADLEY.(Nace, Matthew) (Entered: 02/25/2016) |
| 02/25/2016 | 8 | | Case reassigned to Judge Reggie B. Walton as related to 15–cv–535 (RBW); Judge Colleen Kollar–Kotelly no longer assigned to the case. (ztnr) (Entered: 02/29/2016) |
| 02/26/2016 | 6 | | SUMMONS (1) Issued Electronically as to U.S. Attorney. (znmw) (Entered: 02/26/2016) |
| 02/29/2016 | 7 | | Receipt on 2/26/16 of ORIGINAL FILE, certified copy of transfer order and docket sheet from Superior Court. Superior Court Number 14ca4932. (Attachments: # 1 Superior Court Documents)(znmw) (Entered: 02/29/2016) |
| 03/04/2016 | 9 | | MOTION to Dismiss by PATRIOT LEAGUE (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit)(Mitchell, Michelle) (Entered: 03/04/2016) |
| 03/04/2016 | 10 | | MOTION for Hearing re 9 MOTION to Dismiss by PATRIOT LEAGUE (Mitchell, Michelle) (Entered: 03/04/2016) |
| 03/09/2016 | 11 | | MOTION to Dismiss by AMERICAN UNIVERSITY (Attachments: # 1 Exhibit)(Murphy, John) (Entered: 03/09/2016) |
| 03/11/2016 | 12 | | ANSWER to Complaint by DAVID L. HIGGINS, MARYLAND SPORTS MEDICINE CENTER.(Fallon, Mary) (Entered: 03/11/2016) |
| 03/15/2016 | 13 | | NOTICE of Appearance by J. Christian Word on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Word, J.) (Entered: 03/15/2016) |
| 03/15/2016 | 14 | | NOTICE of Appearance by Kevin Andrew Chambers on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Chambers, Kevin) (Entered: 03/15/2016) |
| 03/15/2016 | 15 | | NOTICE of Appearance by Sarah M. Gragert on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Gragert, Sarah) (Entered: 03/15/2016) |
| 03/15/2016 | 16 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Word, J.) (Entered: 03/15/2016) |
| 03/15/2016 | 17 | | MOTION to Dismiss the Amended Complaint by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Word, J.) (Entered: 03/15/2016) |
| 03/16/2016 | 18 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PATRIOT LEAGUE (Mitchell, Michelle) (Main Document 18 replaced on 3/17/2016) (ztd). (Entered: 03/16/2016) |

| 03/23/2016 | 19 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN UNIVERSITY (Murphy, John) (Entered: 03/23/2016) |
|---|---|---|
| 03/30/2016 | 20 | NOTICE of Appearance by Derrick Wayne Grace on behalf of UNITED STATES OF AMERICA (Grace, Derrick) (Entered: 03/30/2016) |
| 04/01/2016 | 21 | Memorandum in opposition to re 9 MOTION to Dismiss filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support)(Nace, Matthew) (Entered: 04/01/2016) |
| 04/01/2016 | 22 | Memorandum in opposition to re 17 MOTION to Dismiss *the Amended Complaint* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support)(Nace, Matthew) (Entered: 04/01/2016) |
| 04/01/2016 | 23 | Memorandum in opposition to re 11 MOTION to Dismiss filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support)(Nace, Matthew) (Entered: 04/01/2016) |
| 04/07/2016 | 24 | REPLY to opposition to motion re 9 MOTION to Dismiss filed by PATRIOT LEAGUE. (Mitchell, Michelle) (Entered: 04/07/2016) |
| 04/11/2016 | 25 | REPLY to opposition to motion re 17 MOTION to Dismiss *the Amended Complaint* filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Word, J.) (Entered: 04/11/2016) |
| 05/09/2016 | 26 | MOTION to Dismiss *or in the alternative, for Summary Judgment* by UNITED STATES OF AMERICA (Attachments: # 1 Statement of Facts, # 2 Exhibit, # 3 Exhibit)(Grace, Derrick). Added MOTION for Summary Judgment on 5/10/2016 (zd). Added MOTION for Summary Judgment on 5/10/2016 (jf). (Entered: 05/09/2016) |
| 05/11/2016 | 27 | NOTICE of Appearance by H. Kenneth Armstrong on behalf of DAVID L. HIGGINS, MARYLAND SPORTS MEDICINE CENTER (Armstrong, H.) (Entered: 05/11/2016) |
| 05/25/2016 | 28 | RESPONSE re 26 MOTION to Dismiss *or in the alternative, for Summary Judgment* MOTION for Summary Judgment filed by JENNIFER BRADLEY. (Attachments: # 1 Supplement, # 2 Memorandum in Support, # 3 Text of Proposed Order, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit)(Nace, Matthew) (Entered: 05/25/2016) |
| 06/03/2016 | 29 | MOTION for Extension of Time to File Response/Reply as to 26 MOTION to Dismiss *or in the alternative, for Summary Judgment* MOTION for Summary Judgment by UNITED STATES OF AMERICA (Grace, Derrick) (Entered: 06/03/2016) |
| 06/13/2016 | 30 | REPLY to opposition to motion re 26 MOTION to Dismiss *or in the alternative, for Summary Judgment* MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Grace, Derrick) (Entered: 06/13/2016) |
| 09/26/2016 | | ORDER denying as moot 29 Motion for Extension of Time to File Response/Reply. Upon consideration of the defendants' Motion to Enlarge Time to File Defendant's Reply in Support of its Motion to Dismiss, and light |

| | | |
|---|---|---|
| | | of the fact that the defendants filed their reply in support of its motion to dismiss on June 13, 2016, it is hereby ORDERED that the motion is DENIED AS MOOT. Signed by Judge Reggie B. Walton on September 26, 2016. (lcrbw2) (Entered: 09/26/2016) |
| 12/27/2016 | 31 | MOTION to Dismiss *Partial Motion to Dismiss* by DAVID L. HIGGINS, MARYLAND SPORTS MEDICINE CENTER (Attachments: # 1 Text of Proposed Order)(Fallon, Mary) (Entered: 12/27/2016) |
| 01/13/2017 | 32 | RESPONSE re 31 MOTION to Dismiss *Partial Motion to Dismiss* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Nace, Matthew) (Entered: 01/13/2017) |
| 02/22/2017 | | Set/Reset Hearings: Status Conference set for 3/7/2017 at 10:00 AM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 02/22/2017) |
| 03/07/2017 | | Minute Entry; for proceedings held before Judge Reggie B. Walton: Status Conference held on 3/7/2017. (Court Reporter Cathryn Jones) (hs) (Entered: 03/07/2017) |
| 03/09/2017 | 33 | NOTICE *Praecipe of Recusal* by JENNIFER BRADLEY (Nace, Matthew) (Entered: 03/09/2017) |
| 03/10/2017 | | MINUTE ORDER. In light of the plaintiff's representations in her Praecipe and the parties' consent for the undersigned to continue to preside over this matter, it is hereby ORDERED that the undersigned will proceed with presiding over this case and resolving the pending motions. Signed by Judge Reggie B. Walton on March 10, 2017. (lcrbw2) (Entered: 03/10/2017) |
| 03/31/2017 | 34 | ORDER. For the reasons to be set forth in the Memorandum Opinion to be issued by the Court within the next thirty days, absent extraordinary circumstances, the Court, in a final Order that will be issued contemporaneously with the forthcoming Memorandum Opinion, will (1) grant defendant Patriot League's motion to dismiss, (2) deny defendant Patriot League's request for hearing, (3) grant in part and deny in party defendant National Collegiate Athletic Association's motion to dismiss, (4) grant in part and deny in part American University's motion to dismiss, (5) deny the Government's motion to dismiss or, in the alternative, motion for summary judgment, and (6) grant defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s partial motion to dismiss. Accordingly, it is hereby ORDERED that Defendant [ ] Patriot League's Preliminary Motion to Dismiss, ECF No. 9, is GRANTED. It is further ORDERED that Defendant [ ] Patriot League's Request for Hearing on Its Preliminary Motion to Dismiss, ECF No. 10, is DENIED AS MOOT. It is further ORDERED that Defendant [ ] National Collegiate Athletic Association's Motion to Dismiss the Amended Complaint, ECF No. 17, is GRANTED IN PART AND DENIED IN PART. It is further ORDERED that [ ] American University's Preliminary Motion to Dismiss, ECF No. 11, is GRANTED IN PART AND DENIED IN PART. It is further ORDERED that the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 26, is DENIED. It is further ORDERED that Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss, ECF No. 31, is GRANTED. It is further ORDERED that this Order is not a final Order subject |

| | | | |
|---|---|---|---|
| | | | to appeal. Signed by Judge Reggie B. Walton on March 31, 2017. (lcrbw2) (Entered: 03/31/2017) |
| 04/12/2017 | 35 | | ORDER. For the reasons stated in the Memorandum Opinion to be issued on this same day, it is hereby ORDERED that Defendant [ ] Patriot League's Preliminary Motion to Dismiss, ECF No. 9, is GRANTED. It is further ORDERED that Defendant [ ] Patriot League's Request for Hearing on Its Preliminary Motion to Dismiss, ECF No. 10, is DENIED AS MOOT. It is further ORDERED that Defendant [ ] National Collegiate Athletic Association's Motion to Dismiss the Amended Complaint, ECF No. 17, is GRANTED IN PART AND DENIED IN PART. Specifically, the motion is GRANTED as to the plaintiff's claims of gross negligence, negligent infliction of emotional distress, fraudulent misrepresentation, breach of contract, and medical malpractice, and DENIED as to the plaintiff's negligence claim. It is further ORDERED that [ ] American University's Preliminary Motion to Dismiss, ECF No. 11, is GRANTED IN PART AND DENIED IN PART. Specifically, this motion is GRANTED as to the plaintiff's negligent infliction of emotional distress and breach of contract claims, and DENIED as to the plaintiff's negligence and medical malpractice claims. It is further ORDERED that the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 26, is DENIED. It is further ORDERED that Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss, ECF No. 31, is GRANTED. It is further ORDERED that the remaining defendants shall file their Answer to the remaining claims of the plaintiff's Amended Complaint on or before May 3, 2017. Signed by Judge Reggie B. Walton on April 12, 2017. (lcrbw2) (Entered: 04/12/2017) |
| 04/12/2017 | 36 | | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on April 12, 2017. (lcrbw2) (Entered: 04/12/2017) |
| 04/13/2017 | | | Set/Reset Deadlines: Answer to the amended complaint due by 5/3/2017. (hs) (Entered: 04/13/2017) |
| 04/26/2017 | 37 | | ANSWER to Complaint with Jury Demand by AMERICAN UNIVERSITY.(Murphy, John) (Entered: 04/26/2017) |
| 05/03/2017 | 38 | | NOTICE of Appearance by Danny C. Onorato on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Onorato, Danny) (Main Document 38 replaced on 5/4/2017) (znmw). (Entered: 05/03/2017) |
| 05/03/2017 | 39 | | NOTICE of Appearance by Joseph Alfonso Gonzalez on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Gonzalez, Joseph) (Main Document 39 replaced on 5/4/2017) (znmw). (Entered: 05/03/2017) |
| 05/03/2017 | 40 | | Consent MOTION for Extension of Time to File Answer *to the Amended Complaint* by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Word, J.) (Entered: 05/03/2017) |
| 05/03/2017 | | | MINUTE ORDER. Upon consideration of The National Collegiate Athletic Association's ("NCAA") Consent Motion for an Extension of Time to File an Answer to the Amended Complaint, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendant NCAA shall file its answer to the plaintiff's amended complaint on |

| | | | |
|---|---|---|---|
| | | | or before May 12, 2017. Signed by Judge Reggie B. Walton on May 3, 2017. (lcrbw2) (Entered: 05/03/2017) |
| 05/03/2017 | 41 | | Counter MOTION for Extension of Time to File Answer by UNITED STATES OF AMERICA (Grace, Derrick) (Entered: 05/03/2017) |
| 05/04/2017 | | | MINUTE ORDER. Upon consideration of the federal defendant's Motion to Enlarge Time to File Defendant's Answer to Plaintiff's Amended Complaint, and in light of the plaintiff's consent, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the federal defendant shall file its answer to the plaintiff's amended complaint on or before June 2, 2017. Signed by Judge Reggie B. Walton on May 4, 2017. (lcrbw2) (Entered: 05/04/2017) |
| 05/04/2017 | | | Set/Reset Deadlines: Answer to the Amended Complaint due by 6/2/2017. (hs) (Entered: 05/04/2017) |
| 05/12/2017 | 42 | | ANSWER to Complaint with Jury Demand *and Affirmative Defenses* by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION.(Word, J.) (Entered: 05/12/2017) |
| 05/24/2017 | 43 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. Attorney J. Christian Word; Kevin Andrew Chambers and Sarah M. Gragert terminated. (Word, J.) (Entered: 05/24/2017) |
| 05/26/2017 | 44 | | NOTICE of Appearance by Shermineh C. Jones on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Jones, Shermineh) (Entered: 05/26/2017) |
| 06/02/2017 | 45 | | ANSWER to Complaint by UNITED STATES OF AMERICA.(Grace, Derrick) (Entered: 06/02/2017) |
| 06/13/2017 | 46 | | GNERAL ORDER FOR CIVIL CASES BEFORE THE HONORABLE REGGIE B. WALTON. Signed by Judge Reggie B. Walton on June 13, 2017. (lcrbw2) (Entered: 06/13/2017) |
| 06/13/2017 | 47 | | ORDER SETTING INITIAL SCHEDULING CONFERENCE on July 18, 2017, at 11:30 a.m. See attachment for further details. Signed by Judge Reggie B. Walton on June 13, 2017. (lcrbw2) (Entered: 06/13/2017) |
| 06/13/2017 | | | Set/Reset Hearings: Scheduling Conference set for 7/18/2017 at 11:30 AM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 06/13/2017) |
| 06/27/2017 | 48 | | NOTICE OF SUBSTITUTION OF COUNSEL by Shanna Laura Cronin on behalf of UNITED STATES OF AMERICA Substituting for attorney Derrick Grace (Cronin, Shanna) (Entered: 06/27/2017) |
| 07/05/2017 | 49 | | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Jones, Shermineh) (Entered: 07/05/2017) |
| 07/18/2017 | | | Minute Entry; for proceedings held before Judge Reggie B. Walton: Scheduling Conference held on 7/18/2017. Scheduling Order to issue via chambers. Status Conference set for 8/20/2018 at 09:30 AM. Pretrial Conference set for 4/25/2019 at 02:00 PM. Jury Trial set for 6/10/2019 at 09:30 AM in Courtroom 16 in Courtroom 16 before Judge Reggie B. Walton. (Court Reporter Lisa Griffith) (hs) (Entered: 07/18/2017) |

| 07/18/2017 | 50 | | INITIAL SCHEDULING ORDER. See attached Order for details. Signed by Judge Reggie B. Walton on July 18, 2017. (lcrbw2) (Entered: 07/18/2017) |
|---|---|---|---|
| 07/19/2017 | | | Set/Reset Deadlines: Discovery due by 8/17/2018. Motion in Limine due by 3/22/2019. Plaintiff Rule 26(a)(1) due by 8/8/2017. Defendant Rule 26(a)(1) due by 8/8/2017. Plaintiff Rule 26(a)(2) due by 2/1/2018. Defendant Rule 26(a)(2) due by 2/1/2018. (hs) (Entered: 07/19/2017) |
| 08/04/2017 | 51 | | RULE 26a1 STATEMENT. (Fallon, Mary) (Entered: 08/04/2017) |
| 08/08/2017 | 52 | | RULE 26a1 STATEMENT. (Nace, Matthew) (Entered: 08/08/2017) |
| 08/08/2017 | 53 | | NOTICE of Change of Address by Matthew Andrew Nace (Nace, Matthew) (Entered: 08/08/2017) |
| 08/11/2017 | 54 | | NOTICE of Appearance by Barry J. Nace on behalf of JENNIFER BRADLEY (Nace, Barry) (Entered: 08/11/2017) |
| 09/07/2017 | 55 | | CERTIFICATE OF SERVICE by JENNIFER BRADLEY . (Nace, Matthew) (Entered: 09/07/2017) |
| 09/08/2017 | | | NOTICE OF ERROR re 55 Certificate of Service; emailed to man@paulsonandnace.com, cc'd 20 associated attorneys –– The PDF file you docketed contained errors: 1. Do not file Discovery (LcvR 5.2), 2. Do not file discovery or certificates of discovery unless ordered by the Court. (znmw, ) Modified to correct typo on 9/8/2017 (znmw). (Entered: 09/08/2017) |
| 01/08/2018 | 56 | | MOTION to Modify *the Scheduling Order* by JENNIFER BRADLEY (Nace, Matthew) (Entered: 01/08/2018) |
| 01/09/2018 | | | MINUTE ORDER granting 56 . Upon consideration of the Plaintiff's Consent Motion to Modify the Scheduling Order, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the Court's July 18, 2017 Initial Scheduling Order is MODIFIED as follows: (1) the proponent of any expert shall provide Rule 26(a)(2) disclosures on or before April 1, 2018; and (2) the opponent of any expert shall provide Rule 26(a)(2) disclosures on or before June 1, 2018. It is further ORDERED that all other aspects of the Court's July 18, 2017 Initial Scheduling Order REMAINS UNCHANGED. Signed by Judge Reggie B. Walton on January 9, 2018. (lcrbw2) (Entered: 01/09/2018) |
| 01/09/2018 | | | Set/Reset Deadlines: Plaintiff's Rule 26(a)(2) due by 4/1/2108. Defendant's Rule 26(a)(2) due by 6/1/2018. (hs) (Entered: 01/09/2018) |
| 03/29/2018 | 57 | | NOTICE of Appearance by William F. Stute on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Stute, William) (Entered: 03/29/2018) |
| 03/29/2018 | 58 | | NOTICE of Appearance by Jennifer Butler Routh on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Routh, Jennifer) (Entered: 03/29/2018) |
| 03/30/2018 | 59 | | CERTIFICATE OF SERVICE by JENNIFER BRADLEY *Re Rule 26(b)(4) and Discovery Docs*. (Nace, Matthew) (Entered: 03/30/2018) |
| 04/16/2018 | 60 | | NOTICE of Appearance by Margaret Hanley Warner on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Warner, |

| | | | |
|---|---|---|---|
| | | | Margaret) (Entered: 04/16/2018) |
| 05/08/2018 | 61 | | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy Allen Haugh on behalf of UNITED STATES OF AMERICA Substituting for attorney Shanna Cronin (Haugh, Jeremy) (Entered: 05/08/2018) |
| 05/23/2018 | 62 | | Consent MOTION for Extension of Time to *File Rule 26(a)(2) Disclosures* by UNITED STATES OF AMERICA (Haugh, Jeremy) (Entered: 05/23/2018) |
| 05/23/2018 | | | MINUTE ORDER granting 62 . Upon consideration of Defendant United States of America's Consent Motion for Enlargement of Time to File Federal Rule of Civil Procedure 26(a)(2) Disclosures, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendant United States shall file its complete Rule 26(a)(2) disclosures on or before June 15, 2018. Signed by Judge Reggie B. Walton on May 23, 2018. (lcrbw2) (Entered: 05/23/2018) |
| 05/24/2018 | | | Set/Reset Deadlines: Defendant's Rule 26(a)(2) due by 6/15/2018. (hs) (Entered: 05/24/2018) |
| 05/30/2018 | 63 | | Consent MOTION for Extension of Time to *File FRCP 26(a)(2) Disclosures* by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Stute, William) (Entered: 05/30/2018) |
| 05/31/2018 | | | MINUTE ORDER granting 63 . Upon consideration of the Consent Motion of the NCAA for Enlargement of Time to File Federal Rule of Civil Procedure 26(a)(2) Disclosures, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendant NCAA shall file its complete Rule 26(a)(2) disclosures on or before June 15, 2018. Signed by Judge Reggie B. Walton on May 31, 2018. (lcrbw2) (Entered: 05/31/2018) |
| 05/31/2018 | | | Set/Reset Deadlines: Defendant's Rule 26(a)(2) due by 6/15/2018. (hs) (Entered: 05/31/2018) |
| 05/31/2018 | 64 | | NOTICE OF SUBSTITUTION OF COUNSEL by Robert Collins Maynard on behalf of DAVID L. HIGGINS, MARYLAND SPORTS MEDICINE CENTER Substituting for attorney M. Kathleen Fallon (Maynard, Robert) (Entered: 05/31/2018) |
| 06/01/2018 | 65 | | CERTIFICATE OF SERVICE by AMERICAN UNIVERSITY . (Murphy, John) (Entered: 06/01/2018) |
| 06/04/2018 | | | NOTICE OF ERROR re 65 Certificate of Service; emailed to jmurphy@walkermurphy.com, cc'd 21 associated attorneys –– The PDF file you docketed contained errors: 1. Do not file Discovery (LcvR 5.2) (ztd, ) (Entered: 06/04/2018) |
| 06/28/2018 | 66 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William P. Schuman, :Firm– McDermott, Will & Emery LLP, :Address– 444 West Lake Street, Suite 4000. Phone No. – 312–372–2000. Filing fee $ 100, receipt number 0090–5561717. Fee Status: Fee Paid. by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Attachments: # 1 Declaration In Support of Motion for Pro Hac Vice Admission, # 2 Text of Proposed Order)(Warner, Margaret) (Entered: 06/28/2018) |
| 06/28/2018 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER granting 66 . Upon consideration of defendant National Collegiate Athletic Association's ("NCAA") motion for the pro hac vice admission of attorney William P. Schuman, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that William P. Schuman is admitted pro hac vice in this matter for the purpose of representing defendant NCAA. Signed by Judge Reggie B. Walton on June 28, 2018. (lcrbw2) (Entered: 06/28/2018) |
| 08/03/2018 | 67 | | Consent MOTION to Modify *Scheduling Order*, Consent MOTION for Scheduling Order by AMERICAN UNIVERSITY (Murphy, John) (Entered: 08/03/2018) |
| 08/06/2018 | | | MINUTE ORDER. Upon consideration of the parties' 67 Consent Motion to Modify Scheduling Order, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the Court's July 18, 2017 Initial Scheduling Order is MODIFIED as follows: (1) all discovery in this case shall close on December 21, 2018; and (2) if any defendant intends to file a summary judgment motion, such motion shall be filed on or before January 16, 2019; the plaintiff shall file her opposition to any such motion on or before February 1, 2019; and the defendant who filed the summary judgment motion shall file any reply on or before February 15, 2019. It is further ORDERED that all other aspects of the Court's July 18, 2017 Initial Scheduling Order REMAIN UNCHANGED. It is further ORDERED that the status conference currently scheduled for August 20, 2018, is CONTINUED to May 20, 2019, at 10:00 a.m. Signed by Judge Reggie B. Walton on August 6, 2018. (lcrbw3) (Entered: 08/06/2018) |
| 08/07/2018 | | | Set/Reset Deadlines: Discovery due by 12/21/2018. Summary Judgment motions due by 1/16/2019. Response to Motion for Summary Judgment due by 2/1/2019. Reply to Motion for Summary Judgment due by 2/15/2019. (hs) (Entered: 08/07/2018) |
| 08/07/2018 | | | Set/Reset Hearings: Status Conference reset for 5/20/2019 at 10:00 AM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 08/07/2018) |
| 09/06/2018 | 68 | | NOTICE of Change of Address by William F. Stute (Stute, William) (Entered: 09/06/2018) |
| 09/06/2018 | 69 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Nexus U. Sea, :Firm– Orrick, Herrington & Sutcliffe LLP, :Address– 51 West 52nd Street, New York, NY 10019. Phone No. – 212–506–3516. Fax No. – 212–506–5151 Filing fee $ 100, receipt number 0090–5674839. Fee Status: Fee Paid. by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Attachments: # 1 Declaration of Nexus Sea, # 2 Text of Proposed Order)(Stute, William) (Entered: 09/06/2018) |
| 09/06/2018 | 70 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. Attorney Margaret Hanley Warner; Jennifer Butler Routh and William P. Schuman terminated. (Warner, Margaret) (Entered: 09/06/2018) |
| 09/13/2018 | 71 | | STIPULATION *for Protective Order* by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Stute, William) (Entered: 09/13/2018) |
| 09/19/2018 | 72 | | |

| | | | |
|---|---|---|---|
| | | | STIPULATED PROTECTIVE ORDER. See attached for details. Signed by Judge Reggie B. Walton on September 18, 2018. (lcrbw3) (Entered: 09/19/2018) |
| 09/20/2018 | | | MINUTE ORDER. The Court having considered the defendant's 69 Motion for Admission Pro Hac Vice, and it appearing to the Court that the attorney referenced therein satisfies the requirements for pro hac vice admission under this Court's rules, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Nexus Sea, Orrick, Herrington & Sutcliffe LLP, 51 West 52nd Street, New York, NY, 10019, is ADMITTED to practice before the Court pro hac vice. Signed by Judge Reggie B. Walton on September 20, 2018. (lcrbw3) (Entered: 09/20/2018) |
| 11/21/2018 | 73 | | MOTION for Summary Judgment *Regarding Plaintiff's Release, Waiver, Assumption of the Risk And/Or Contributory Negligence* by AMERICAN UNIVERSITY (Murphy, John) (Entered: 11/21/2018) |
| 11/21/2018 | 74 | | MOTION to Strike 59 Certificate of Service *for Plaintiff's Expert Corey Andres* by AMERICAN UNIVERSITY (Murphy, John) (Entered: 11/21/2018) |
| 11/21/2018 | 75 | | MOTION for Summary Judgment *and To Exclude Plaintiff's Medical Causation Testimony* by AMERICAN UNIVERSITY (Murphy, John). Added MOTION in Limine on 11/21/2018 (ztd). (Entered: 11/21/2018) |
| 11/21/2018 | 76 | | MOTION in Limine *to Exclude Plaintiff's Experts's Testimony Regarding Athletic Trainer Dash* by AMERICAN UNIVERSITY (Murphy, John) (Entered: 11/21/2018) |
| 11/21/2018 | 77 | | MOTION for Summary Judgment *Regarding Duty and Medical Negligence* by AMERICAN UNIVERSITY (Murphy, John) (Entered: 11/21/2018) |
| 11/26/2018 | 78 | | NOTICE OF SUBSTITUTION OF COUNSEL by Roberto Cesar Martens, Jr on behalf of UNITED STATES OF AMERICA Substituting for attorney Jeremy Haugh (Martens, Roberto) (Entered: 11/26/2018) |
| 12/13/2018 | 79 | | MOTION for Extension of Time to *file opposition* by JENNIFER BRADLEY (Nace, Matthew) (Entered: 12/13/2018) |
| 12/17/2018 | | | MINUTE ORDER. Upon consideration of the plaintiff's 79 Motion to Establish Deadline for Oppositions, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that, on or before January 11, 2019, the plaintiff shall file her oppositions to (1) Defendants American University, Maryland Sports Medicine Center, [and] David L. Higgins, M.D., P.C.'s Motion for Summary Judgment Regarding Plaintiff's Release, Waiver, Assumption of the Risk and/or Contributory Negligence, ECF No. 73; (2) Defendant The American University's Motion to Strike Plaintiff's Expert Corey Andres, ECF No. 74; (3) Defendants American University, Maryland Sports Medicine Center,... and David L. Higgins, M.D.[,] P.C.'s Motion to Exclude Plaintiff's Medical Causation Testimony and for Summary Judgment, ECF No. 75; (4) Defendant The American University's Motion in Limine to Exclude Plaintiff's Experts' Testimony Regarding Athletic Trainer Dash, ECF No. 76; and (5) Defendant The American University's Motion for Summary Judgment Regarding Duty and Medical Negligence, ECF No. 77. Signed by Judge Reggie B. Walton on December 17, 2018. (lcrbw3) (Entered: 12/17/2018) |

| 12/17/2018 | | | Set/Reset Deadlines: Plaintiff's Responses due by 1/11/2019 (hs) (Entered: 12/17/2018) |
|---|---|---|---|
| 01/11/2019 | 80 | | RESPONSE re 74 MOTION to Strike 59 Certificate of Service *for Plaintiff's Expert Corey Andres Pl's Response to Def American University's Motion* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Text of Proposed Order)(Nace, Matthew) (Entered: 01/11/2019) |
| 01/11/2019 | 81 | | RESPONSE re 76 MOTION in Limine *to Exclude Plaintiff's Experts's Testimony Regarding Athletic Trainer Dash* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Text of Proposed Order)(Nace, Matthew) (Entered: 01/11/2019) |
| 01/11/2019 | 82 | | RESPONSE re 77 MOTION for Summary Judgment *Regarding Duty and Medical Negligence Pl's Response to Def American University' Motion* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Text of Proposed Order)(Nace, Matthew) (Entered: 01/11/2019) |
| 01/11/2019 | 83 | | RESPONSE re 73 MOTION for Summary Judgment *Regarding Plaintiff's Release, Waiver, Assumption of the Risk And/Or Contributory Negligence* filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Text of Proposed Order)(Nace, Matthew) (Entered: 01/11/2019) |
| 01/11/2019 | 84 | | RESPONSE re 75 MOTION for Summary Judgment *and To Exclude Plaintiff's Medical Causation Testimony*MOTION in Limine filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit)(Nace, Matthew) (Entered: 01/11/2019) |
| 01/16/2019 | 85 | | MOTION for Summary Judgment *and Request for Hearing by Defendant* by DAVID L. HIGGINS (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Maynard, Robert) (Entered: 01/16/2019) |
| 01/16/2019 | 86 | | MOTION for Summary Judgment *Motion for Summary Judgment Pertaining to Def's Affirmative Defenses* by JENNIFER BRADLEY (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Text of Proposed Order)(Nace, Matthew) (Entered: 01/16/2019) |
| 01/16/2019 | 87 | | MOTION for Summary Judgment *Regarding Negligence* by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Attachments: # 1 Index of |

| | | | |
|---|---|---|---|
| | | | Exhibits, # 2 Declaration of William F. Stute, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Text of Proposed Order)(Stute, William) (Entered: 01/16/2019) |
| 01/16/2019 | 88 | | MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support, # 3 Statement of Facts, # 4 Index of Exhibits, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 21, # 21 Exhibit 22, # 22 Exhibit 23, # 23 Exhibit 24, # 24 Exhibit 25, # 25 Exhibit 26)(Martens, Roberto) (Entered: 01/16/2019) |
| 01/31/2019 | 89 | | ENTERED IN ERROR. . . . . MOTION for Summary Judgment by JENNIFER BRADLEY (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Nace, Matthew) Modified on 1/31/2019 (ztd). (Entered: 01/31/2019) |
| 01/31/2019 | 90 | | RESPONSE re 87 MOTION for Summary Judgment *Regarding Negligence* filed by JENNIFER BRADLEY. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit)(Nace, Matthew) (Entered: 01/31/2019) |
| 01/31/2019 | 91 | | RESPONSE re 88 MOTION for Summary Judgment filed by JENNIFER BRADLEY. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit)(Nace, Matthew) (Entered: 01/31/2019) |
| 01/31/2019 | 92 | | RESPONSE re 85 MOTION for Summary Judgment *and Request for Hearing by Defendant* filed by JENNIFER BRADLEY. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Nace, Matthew) (Entered: 01/31/2019) |
| 01/31/2019 | | | NOTICE OF CORRECTED DOCKET ENTRY: re 89 MOTION for Summary Judgment was entered in error and counsel refiled said pleading as docket entry no. 92 . (ztd) (Entered: 01/31/2019) |
| 01/31/2019 | 93 | | RESPONSE re 86 MOTION for Summary Judgment *Motion for Summary Judgment Pertaining to Def's Affirmative Defenses Opposition* filed by AMERICAN UNIVERSITY. (Murphy, John) (Entered: 01/31/2019) |
| 02/01/2019 | 94 | | Memorandum in opposition to re 86 MOTION for Summary Judgment *Motion for Summary Judgment Pertaining to Def's Affirmative Defenses* filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Attachments: # 1 Statement of Facts Response to Plaintiff's Statement of Facts, # 2 Exhibit |

| | | | |
|---|---|---|---|
| | | | Index, # 3 Declaration of William F. Stute, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Text of Proposed Order)(Stute, William) (Entered: 02/01/2019) |
| 02/01/2019 | 95 | | Memorandum in opposition to re 86 MOTION for Summary Judgment *Motion for Summary Judgment Pertaining to Def's Affirmative Defenses* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Statement of Facts Response to Plaintiff's Statment of Undisputed Material Facts)(Martens, Roberto) (Entered: 02/01/2019) |
| 02/04/2019 | 96 | | REPLY to opposition to motion re 77 MOTION for Summary Judgment *Regarding Duty and Medical Negligence* filed by AMERICAN UNIVERSITY. (Murphy, John) (Entered: 02/04/2019) |
| 02/04/2019 | 97 | | REPLY to opposition to motion re 76 MOTION in Limine *to Exclude Plaintiff's Experts's Testimony Regarding Athletic Trainer Dash* filed by AMERICAN UNIVERSITY. (Murphy, John) (Entered: 02/04/2019) |
| 02/04/2019 | 98 | | REPLY to opposition to motion re 74 MOTION to Strike 59 Certificate of Service *for Plaintiff's Expert Corey Andres* filed by AMERICAN UNIVERSITY. (Murphy, John) (Entered: 02/04/2019) |
| 02/04/2019 | 99 | | REPLY to opposition to motion re 73 MOTION for Summary Judgment *Regarding Plaintiff's Release, Waiver, Assumption of the Risk And/Or Contributory Negligence* filed by AMERICAN UNIVERSITY, MARYLAND SPORTS MEDICINE CENTER, DAVID L. HIGGINS. (Murphy, John) Modified to add filers on 2/5/2019 (ztd). (Entered: 02/04/2019) |
| 02/04/2019 | 100 | | REPLY to opposition to motion re 75 MOTION for Summary Judgment *and To Exclude Plaintiff's Medical Causation Testimony*MOTION in Limine filed by AMERICAN UNIVERSITY, MARYLAND SPORTS MEDICINE CENTER, DAVID L. HIGGINS. (Murphy, John) Modified to add filers on 2/5/2019 (ztd). (Entered: 02/04/2019) |
| 02/15/2019 | 101 | | REPLY re 88 MOTION for Summary Judgment *PLAINTIFFS REPLY BRIEF TO DEFENDANT USAS RESPONSE TO* filed by JENNIFER BRADLEY. (Nace, Matthew) Modified event title on 2/19/2019 (znmw). (Entered: 02/15/2019) |
| 02/15/2019 | 102 | | REPLY to opposition to motion re 86 MOTION for Summary Judgment *Motion for Summary Judgment Pertaining to Def's Affirmative Defenses* filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit)(Nace, Matthew) (Entered: 02/15/2019) |
| 02/15/2019 | 103 | | REPLY to opposition to motion re 87 MOTION for Summary Judgment *Regarding Negligence* filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Attachments: # 1 Statement of Facts Continued, # 2 Exhibit Index, # 3 Declaration of William F. Stute, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Text of Proposed Order)(Stute, William) (Entered: 02/15/2019) |
| 02/15/2019 | 104 | | REPLY to opposition to motion re 88 MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Index of Exhibits)(Martens, Roberto) (Entered: 02/15/2019) |

| | | | |
|---|---|---|---|
| 02/18/2019 | | | MINUTE ORDER. It appearing unnecessary for the Court to hold a status conference in this case in light of the parties' pending motions for summary judgment, it is hereby ORDERED that the status conference currently scheduled for February 22, 2019, is VACATED. It is further ORDERED that all remaining deadlines set forth in the Court's initial scheduling Order entered on July 18, 2017, are VACATED pending further Order of the Court. Signed by Judge Reggie B. Walton on February 18, 2019. (lcrbw3) (Entered: 02/18/2019) |
| 02/27/2019 | | | MINUTE ORDER. It appearing necessary for the Court to address with the parties a schedule for further proceedings in this case, it is hereby ORDERED that the parties shall appear for a status conference on Friday, March 8, 2019, at 3:30 p.m. Signed by Judge Reggie B. Walton on February 27, 2019. (lcrbw3) (Entered: 02/27/2019) |
| 02/27/2019 | | | Set/Reset Hearings: Status Conference set for 3/8/2019 at 03:30 PM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 02/27/2019) |
| 03/05/2019 | 105 | | MOTION for Leave to File *Supplement Her Responses to Def' Statement of Material Facts Not in Dispute* by JENNIFER BRADLEY (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Text of Proposed Order)(Nace, Matthew) (Entered: 03/05/2019) |
| 03/08/2019 | | | Minute Entry; for proceedings held before Judge Reggie B. Walton: Status Conference held on 3/8/2019. The jury trial date of 6/10/2019 is VACATED for reasons stated on the record in open court. Status Conference set for 7/12/2019 at 10:00 AM in Courtroom 16 before Judge Reggie B. Walton. (Court Reporter Nancy Meyer) (hs) (Entered: 03/08/2019) |
| 04/02/2019 | 106 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that the Plaintiff's Motion for Leave to Supplement Her Responses to Defendants' Statement of Material Facts Not in Dispute, ECF No. 105, is GRANTED. It is further ORDERED that the trial date previously set for June 10, 2019, is VACATED. It is further ORDERED that all remaining deadlines set forth in this Court's initial scheduling Order entered on July 18, 2017, including the pretrial conference previously set for April 25, 2019, are VACATED. It is further ORDERED that the status conference previously set for May 20, 2019, is VACATED. It is further ORDERED that the parties shall appear for a status conference on Friday, July 12, 2019, at 10 a.m. Signed by Judge Reggie B. Walton on April 2, 2019. (lcrbw3) (Entered: 04/02/2019) |
| 04/03/2019 | | | Set/Reset Hearings: Status Conference set for 7/12/2019 at 10:00 AM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 04/03/2019) |
| 04/07/2019 | 107 | | ERRATA *re: Corrected Exhibits* by UNITED STATES OF AMERICA 88 MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Attachments: # 1 Corrected Index of Exhibits, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 18, # 5 Exhibit 21, # 6 Exhibit 22, # 7 Exhibit 23)(Martens, Roberto) (Entered: 04/07/2019) |
| 04/19/2019 | 108 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. Attorney Shermineh C. Jones terminated. (Jones, Shermineh) (Entered: 04/19/2019) |
| 05/30/2019 | 109 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE OF WITHDRAWAL OF APPEARANCE as to NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. Attorney Nexus U. Sea terminated. (Stute, William) (Entered: 05/30/2019) |
| 06/19/2019 | | | MINUTE ORDER. The Court requiring additional time to consider the parties' pending motions, it is hereby ORDERED that the status conference currently scheduled for July 12, 2019, is CONTINUED to October 15, 2019, at 11:00 a.m. Signed by Judge Reggie B. Walton on June 19, 2019. (lcrbw3) (Entered: 06/19/2019) |
| 06/19/2019 | | | Set/Reset Hearings: Status Conference reset for 10/15/2019 at 11:00 AM in Courtroom 16 before Judge Reggie B. Walton. (hs) (Entered: 06/19/2019) |
| 07/03/2019 | 110 | | NOTICE of Appearance by Francesca Morency on behalf of NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Morency, Francesca) (Entered: 07/03/2019) |
| 07/16/2019 | 111 | | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy Allen Haugh on behalf of UNITED STATES OF AMERICA Substituting for attorney Roberto Martens (Haugh, Jeremy) (Entered: 07/16/2019) |
| 09/24/2019 | 112 | | ORDER. See attached Order for details. Signed by Judge Reggie B. Walton on September 24, 2019. (lcrbw1) (Main Document 112 replaced on 9/26/2019) (zhs). (Entered: 09/24/2019) |
| 09/26/2019 | | | Set/Reset Deadlines/Hearings: Cross Motions due by 11/1/2019. Response to Cross Motions due by 1/3/2020. Reply to Cross Motions due by 2/3/2020. Summary Judgment motions due by 11/1/2019. Response to Motion for Summary Judgment due by 11/1/2019. Reply to Motion for Summary Judgment due by 1/3/2020. (zgdf) (Entered: 09/26/2019) |
| 09/26/2019 | | | Set/Reset Hearings: Status Conference set for 6/1/2020 at 11:00 AM in Courtroom 16 before Judge Reggie B. Walton. (zgdf) (Entered: 09/26/2019) |
| 10/31/2019 | 113 | | MOTION for Summary Judgment by AMERICAN UNIVERSITY, MARYLAND SPORTS MEDICINE CENTER, DAVID L. HIGGINS (Murphy, John) Modified to add filers on 11/5/2019 (znmw). (Entered: 10/31/2019) |
| 11/01/2019 | 114 | | RESPONSE re 88 MOTION for Summary Judgment *and Cross Motion for Summary Judgment* filed by JENNIFER BRADLEY. (Attachments: # 1 Statement of Facts In Op to Def, # 2 Statement of Facts For Plaintiff, # 3 Memorandum in Support, # 4 Appendix List of Exhibits, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Exhibit 20, # 25 Exhibit 21, # 26 Exhibit 22, # 27 Exhibit 23, # 28 Exhibit 24, # 29 Exhibit 25, # 30 Exhibit 26, # 31 Exhibit 27, # 32 Exhibit 28, # 33 Exhibit 29, # 34 Exhibit 30, # 35 Exhibit 31, # 36 Exhibit 32, # 37 Exhibit 33, # 38 Exhibit 34, # 39 Exhibit 35, # 40 Exhibit 36, # 41 Text of Proposed Order)(Nace, Matthew) (Entered: 11/01/2019) |
| 11/01/2019 | 115 | | RESPONSE re 87 MOTION for Summary Judgment *Regarding Negligence and Cross Motion for Summary Judgment* filed by JENNIFER BRADLEY. |

| | | | |
|---|---|---|---|
| | | | (Attachments: # 1 Statement of Facts In Op to Def, # 2 Statement of Facts For Plaintiff, # 3 Memorandum in Support, # 4 Appendix, # 5 Text of Proposed Order)(Nace, Matthew) (Entered: 11/01/2019) |
| 11/01/2019 | 116 | | SUPPLEMENTAL MEMORANDUM to re 115 Response to motion, filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Nace, Matthew) (Entered: 11/01/2019) |
| 11/01/2019 | 117 | | SUPPLEMENTAL MEMORANDUM to re 115 Response to motion, filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit)(Nace, Matthew) (Entered: 11/01/2019) |
| 11/01/2019 | 118 | | CROSS MOTION for Summary Judgment *Pertaining to USA's Affirmative Defenses* by JENNIFER BRADLEY (ztd); (See docket entry no. 114 to view document.) Modified on 11/5/2019 (znmw). (Entered: 11/04/2019) |
| 11/01/2019 | 119 | | CROSS MOTION for Summary Judgment *Pertaining to NCAA's Affirmative Defenses* by JENNIFER BRADLEY. (See Docket Entry 115 to view document). (znmw) (Entered: 11/05/2019) |
| 11/04/2019 | | | NOTICE OF ERROR re 114 Response to motion; emailed to man@paulsonandnace.com, cc'd 23 associated attorneys –– The PDF file you docketed contained errors: 1. Two–part docket entry, 2. In the future, please remember to file all parts of your document. The Court has entered the second portion of this document. (ztd, ) (Entered: 11/04/2019) |
| 12/02/2019 | 120 | | Consent MOTION for Leave to File *Brief in Excess of Page Limit*, MOTION for Leave to File Excess Pages by JENNIFER BRADLEY (Attachments: # 1 Text of Proposed Order)(Nace, Matthew) (Entered: 12/02/2019) |
| 12/02/2019 | | | MINUTE ORDER. The Court requiring additional information before resolving the 120 Plaintiff's Motion for Leave to File Brief in Excess of Page Limitations, it is hereby ORDERED that, on or before December 3, 2019, the plaintiff shall advise the Court as to the number of pages in excess of the page limitation that she is seeking leave to file. Signed by Judge Reggie B. Walton on December 2, 2019. (lcrbw1) (Entered: 12/02/2019) |
| 12/02/2019 | 121 | | NOTICE *of Page Limit Request* by JENNIFER BRADLEY re Order, (Nace, Matthew) (Entered: 12/02/2019) |
| 12/02/2019 | | | MINUTE ORDER. Upon consideration of the 120 Plaintiff's Motion for Leave to File Brief in Excess of Page Limitations, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the page limitation prescribed in Local Civil Rule 7(e) is WAIVED with respect to the plaintiff's forthcoming memorandum in opposition to the motion for summary judgment filed by American University, the Maryland Sports Medicine Center, David L. Higgins, M.D. P.C., and David L. Higgins, M.D., and in support of her cross–motion for summary judgment. It is further ORDERED that the plaintiff's memorandum in opposition to the defendants' motion for summary judgment and in support of her cross–motion for |

| | | | |
|---|---|---|---|
| | | | summary judgment shall not exceed seventy–one (71) pages. Signed by Judge Reggie B. Walton on December 2, 2019. (lcrbw1) (Entered: 12/02/2019) |
| 12/02/2019 | 122 | | REPLY to opposition to motion re 88 MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit Exhibits 1–10, # 2 Statement of Facts Response)(Haugh, Jeremy) (Entered: 12/02/2019) |
| 12/02/2019 | 123 | | RESPONSE re 118 MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Haugh, Jeremy) (Entered: 12/02/2019) |
| 12/02/2019 | 124 | | Memorandum in opposition to re 113 MOTION for Summary Judgment *& Cross−Motion For Summary Judgement* filed by JENNIFER BRADLEY. (Attachments: # 1 Appendix, # 2 Appendix, # 3 Appendix, # 4 Statement of Facts, # 5 Memorandum in Support & Opposition, # 6 Memorandum in Support & Opposition, # 7 Memorandum in Support & Opposition, # 8 Memorandum in Support & Opposition, # 9 Memorandum in Support & Opposition, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit)(Nace, Matthew) (Entered: 12/02/2019) |
| 12/02/2019 | 125 | | REPLY to opposition to motion re 87 MOTION for Summary Judgment *Regarding Negligence* filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Stute, William) (Entered: 12/02/2019) |
| 12/02/2019 | 126 | | Memorandum in opposition to re 119 MOTION for Summary Judgment filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Attachments: # 1 Response to Plaintiff's Statement of Undisputed Material Facts and NCAA's Statement of Additional Undisputed Material Facts, # 2 Index of Exhibits, # 3 Declaration of W. Stute, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Text of Proposed Order)(Stute, William) (Entered: 12/02/2019) |
| 12/02/2019 | 127 | | Cross MOTION for Partial Summary Judgment by JENNIFER BRADLEY (ztd); (See docket entry no. 124 to view.) Modified on 12/3/2019 (ztd). (Entered: 12/03/2019) |
| 01/02/2020 | 128 | | REPLY to opposition to motion re 113 MOTION for Partial Summary Judgment filed by AMERICAN UNIVERSITY. (Murphy, John) Modified linkage on 1/3/2020 (ztd). (Entered: 01/02/2020) |
| 01/02/2020 | 129 | | RESPONSE re 127 MOTION for Partial Summary Judgment filed by AMERICAN UNIVERSITY, DAVID L. HIGGINS, MARYLAND SPORTS MEDICINE CENTER. (ztd); (See docket entry no. 128 to view.) (Entered: 01/03/2020) |
| 01/03/2020 | 130 | | REPLY to opposition to motion re 118 MOTION for Summary Judgment filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 |

| | | | |
|---|---|---|---|
| | | | Exhibit, # 4 Exhibit)(Nace, Matthew) (Entered: 01/03/2020) |
| 01/03/2020 | 131 | | REPLY to opposition to motion re 119 MOTION for Summary Judgment filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit, # 2 Exhibit)(Nace, Matthew) (Entered: 01/03/2020) |
| 01/23/2020 | 132 | | MOTION to Modify *Scheduling Order and Supplement Defendants' Expert Designation* by DAVID L. HIGGINS (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Maynard, Robert) (Entered: 01/23/2020) |
| 01/31/2020 | 133 | | Memorandum in opposition to re 132 MOTION to Modify *Scheduling Order and Supplement Defendants' Expert Designation* filed by JENNIFER BRADLEY. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(Nace, Matthew) (Entered: 01/31/2020) |
| 01/31/2020 | 134 | | REPLY to opposition to motion re 127 MOTION for Partial Summary Judgment filed by JENNIFER BRADLEY. (Attachments: # 1 Table of Authorities, # 2 Exhibit List, # 3 Memorandum in Support, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4)(Nace, Matthew) (Entered: 01/31/2020) |
| 02/05/2020 | 135 | | REPLY to opposition to motion re 132 MOTION to Modify *Scheduling Order and Supplement Defendants' Expert Designation* filed by AMERICAN UNIVERSITY. (Murphy, John) (Entered: 02/05/2020) |
| 05/27/2020 | | | MINUTE ORDER. In light of Chief Judge Howell's May 26, 2020 Order, In re: Further Extension of Postponed Court Proceedings in Standing Order 20–9 and Limiting Court Operations in Exigent Circumstances Created by the COVID–19 Pandemic, Standing Order No. 20–29 (BAH), it is hereby ORDERED that the parties shall appear for the status conference currently scheduled for June 1, 2020, at 11:00 a.m., via teleconference by calling 1–877–873–8017 and entering the Court's access code (8583213) followed by the pound key (#). Signed by Judge Reggie B. Walton on May 27, 2020. (lcrbw1) (Entered: 05/27/2020) |
| 05/29/2020 | 136 | | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on May 29, 2020. (lcrbw1) (Entered: 05/29/2020) |
| 05/29/2020 | 137 | | ORDER. In accordance with the Memorandum Opinion issued on this same date, it is hereby ORDERED that 87 Defendant National Collegiate Athletic Association's Motion for Summary Judgment Regarding Negligence is GRANTED. It is further ORDERED that 88 Defendant United States of America's Motion for Summary Judgment is DENIED. It is further ORDERED that 113 Defendants American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D., P.C.'s Motion for Summary Judgment is GRANTED. It is further ORDERED that summary judgment is ENTERED for (1) the NCAA on Count I of the Amended Complaint; (2) the University on Count III of the Amended Complaint; and (3) the University defendants on Count VIII of the Amended Complaint. It is further ORDERED that the 118 Plaintiff's Opposition to Defendant USA's Motion for Summary Judgment and Cross–Motion for Summary Judgment Pertaining to Affirmative Defenses is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that it seeks summary judgment as to the Government's assumption of the risk affirmative defense. The motion is DENIED in all other respects. It is further ORDERED that the 119 Plaintiff's Opposition to Defendant NCAA's Motion |

| | | | |
|---|---|---|---|
| | | | for Summary Judgment and Cross–Motion for Summary Judgment Pertaining to Defendant NCAA's Affirmative Defenses is DENIED AS MOOT. It is further ORDERED that the 127 Plaintiff's Opposition to Defendant[s] American University, Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D., P.C.'s Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment is DENIED AS MOOT. It is further ORDERED that the <u>132</u> Motion of Defendants Maryland Sports Medicine Center, David L. Higgins, M.D., and David L. Higgins, M.D., P.C., and American University to Modify Scheduling Order and Supplement Defendants' Expert Designation is DENIED AS MOOT. Signed by Judge Reggie B. Walton on May 29, 2020. (lcrbw1) (Entered: 05/29/2020) |
| 06/02/2020 | <u>138</u> | | ORDER. In accordance with the oral rulings issued by the Court at the status conference held on June 1, 2020, it is hereby ORDERED that, on or before June 19, 2020, the defendant shall file its motion for leave to file its third motion for summary judgment and the plaintiff shall file her motion for reconsideration. It is further ORDERED that the parties shall appear before the Court for a status conference on September 17, 2020, at 9:30 a.m. Signed by Judge Reggie B. Walton on June 2, 2020. (lcrbw1) (Entered: 06/02/2020) |
| 06/03/2020 | | | Set/Reset Deadlines: Defendant's motion for leave to file its third motion for summary judgment and plaintiff's motion for reconsideration due by 6/19/2020. (hs) (Entered: 06/03/2020) |
| 06/19/2020 | <u>139</u> | | MOTION for Reconsideration re <u>136</u> Memorandum & Opinion, <u>137</u> Order on Motion for Summary Judgment,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, Order on Motion for Partial Summary Judgment,,,,,,,,, Order on Motion to Modify,,,,,,,, by JENNIFER BRADLEY (Attachments: # <u>1</u> Memorandum in Support Memo of Law, # <u>2</u> Text of Proposed Order Order)(Nace, Matthew) (Entered: 06/19/2020) |
| 06/19/2020 | <u>140</u> | | MOTION for Leave to File *Renewed Motion for Summary Judgment* by UNITED STATES OF AMERICA (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Statement of Facts, # <u>3</u> Exhibit)(Haugh, Jeremy) (Entered: 06/19/2020) |
| 08/17/2020 | | | MINUTE ORDER. Upon consideration of the <u>140</u> Defendant's Motion for Leave to File Renewed Motion for Summary Judgment, and for good cause shown, it is hereby ORDERED that this motion is GRANTED. It is further ORDERED that, on or before August 21, 2020, the United States of America shall file its renewed motion for summary judgment. It is further ORDERED that, on or before September 4, 2020, the plaintiff shall file her opposition to the United States' renewed motion for summary judgment. It is further ORDERED that, on or before September 11, 2020, the United States shall file a reply in support of its renewed motion. It is further ORDERED that, on or before August 28, 2020, the defendants shall file their oppositions to the plaintiff's motion for reconsideration. It is further ORDERED that, on or before September 4, 2020, the plaintiff shall file a reply in support of her motion. It is further ORDERED that the status conference currently scheduled for September 17, 2020, at 9:30 a.m. is CONVERTED to a motions hearing on the United States' renewed motion for summary judgment and the plaintiff's motion for reconsideration. Signed by Judge Reggie B. Walton on August 17, 2020. (lcrbw1) Modified on 8/17/2020 to reflect multiple defendants (lcrbw1). |

| | | | |
|---|---|---|---|
| | | | (Entered: 08/17/2020) |
| 08/17/2020 | | | Set/Reset Deadlines/Hearings: Renewed Summary Judgment motion due by 8/21/2020. Response to Motion for Summary Judgment due by 9/4/2020. Reply to Motion for Summary Judgment due by 9/11/2020. Response due by 8/28/2020 Reply due by 9/4/2020. Motion Hearing set for 9/17/2020 at 09:30 AM by Telephonic/VTC before Judge Reggie B. Walton. (hs) (Entered: 08/17/2020) |
| 08/21/2020 | 141 | | MOTION for Summary Judgment by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Haugh, Jeremy) (Entered: 08/21/2020) |
| 08/24/2020 | 142 | | Memorandum in opposition to re 139 MOTION for Reconsideration re 136 Memorandum & Opinion, 137 Order on Motion for Summary Judgment, Order on Motion for Partial Summary Judgment, Order on Motion to Modify, filed by AMERICAN UNIVERSITY. (Murphy, John) Modified docket event/text on 8/25/2020 (eg). (Entered: 08/24/2020) |
| 08/28/2020 | 143 | | Memorandum in opposition to re 139 MOTION for Reconsideration re 136 Memorandum & Opinion, 137 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, Order on Motion for Partial Summary Judgment,,,,,,,,, Order on Motion to Modify,,,,,,,, filed by NATIONAL COLLEGIATE ATHLETIC ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Stute, William) (Entered: 08/28/2020) |
| 08/31/2020 | 144 | | NOTICE OF SUBSTITUTION OF COUNSEL by Sean Patrick Mahard on behalf of UNITED STATES OF AMERICA Substituting for attorney Jeremy A. Haugh (Mahard, Sean) (Entered: 08/31/2020) |
| 09/04/2020 | 145 | | REPLY to opposition to motion re 139 MOTION for Reconsideration re 136 Memorandum & Opinion, 137 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, Order on Motion for Partial Summary Judgment,,,,,,,,, Order on Motion to Modify,,,,,,,, filed by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 09/04/2020) |
| 09/08/2020 | 146 | | MOTION for Extension of Time to File *Plaintiff's Consent Motion for Extension of Time* by JENNIFER BRADLEY (Attachments: # 1 Text of Proposed Order)(Nace, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | | | MINUTE ORDER. Upon consideration of the 146 Plaintiff's Consent Motion for Extension of Time, and for good cause shown, it is hereby ORDERED that this motion is GRANTED. It is further ORDERED that, on or before September 9, 2020, the plaintiff shall file her opposition to the United States' renewed motion for summary judgment. It is further ORDERED that, on or before September 15, 2020, the United States shall file a reply in support of its renewed motion. Signed by Judge Reggie B. Walton on September 8, 2020. (lcrbw1) (Entered: 09/08/2020) |
| 09/09/2020 | | | Set/Reset Deadlines: Government's Response in support of its motion due by 9/15/2020 (hs) (Entered: 09/09/2020) |
| 09/09/2020 | 147 | | Memorandum in opposition to re 140 MOTION for Leave to File *Renewed Motion for Summary Judgment* filed by JENNIFER BRADLEY. (Attachments: # 1 Supplement, # 2 Memorandum in Support, # 3 Text of |

| | | | |
|---|---|---|---|
| | | | Proposed Order, # <u>4</u> Exhibit, # <u>5</u> Exhibit)(Nace, Matthew) Modified docket event/text on 9/10/2020 (eg). (Entered: 09/09/2020) |
| 09/14/2020 | | | MINUTE ORDER. To minimize the risks associated with COVID−19, it is hereby ORDERED that the parties shall appear before the Court for the motions hearing currently scheduled for September 17, 2020, at 9:30 a.m., via teleconference by calling 1−877−873−8017 and entering the Court's access code (8583213) followed by the pound key (#). Signed by Judge Reggie B. Walton on September 14, 2020. (lcrbw1) (Entered: 09/14/2020) |
| 09/15/2020 | <u>148</u> | | REPLY to opposition to motion re <u>141</u> MOTION for Summary Judgment filed by UNITED STATES OF AMERICA. (Mahard, Sean) (Entered: 09/15/2020) |
| 09/17/2020 | | | Minute Entry; for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 9/17/2020 re <u>141</u> MOTION for Summary Judgment filed by UNITED STATES OF AMERICA, <u>139</u> MOTION for Reconsideration filed by JENNIFER BRADLEY. Written order to issue from Chambers. Motion Hearing continued for 9/24/2020 at 09:30 AM by Telephonic/VTC before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 09/17/2020) |
| 09/24/2020 | | | Minute Entry; for proceedings held before Judge Reggie B. Walton: Motion Hearing continued and held on 9/24/2020 re <u>140</u> MOTION for Leave to File Renewed Motion for Summary Judgment filed by UNITED STATES OF AMERICA. A written order will issue from Chambers. (Court Reporter Lisa Bankins) (hs) (Entered: 09/24/2020) |
| 02/16/2021 | <u>149</u> | | ORDER. In accordance with the attached Order, it is hereby ORDERED that the <u>139</u> Plaintiff's Motion for Reconsideration is DENIED. It is further ORDERED that the <u>141</u> Government's Renewed Motion for Summary Judgment is DENIED WITHOUT PREJUDICE. It is further ORDERED that, on March 19, 2021, at 12:00 p.m., the parties shall appear before the Court for a status conference via teleconference by calling 1−877−873−8017 and entering the Court's access code (8583213) followed by the pound key (#). Signed by Judge Reggie B. Walton on February 16, 2021. (lcrbw1) (Entered: 02/16/2021) |
| 02/17/2021 | | | Set/Reset Hearings: Status Conference set for 3/19/2021 at 12:00 PM by Telephonic/VTC before Judge Reggie B. Walton. (hs) (Entered: 02/17/2021) |
| 03/19/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 3/19/2021. Status Conference set for 4/30/2021 at 10:00 AM by Telephonic/VTC. Bench Trial set for 5/4/2021 at 10:00 AM in Courtroom 16 before Judge Reggie B. Walton. A written order will issue from Chambers. (Court Reporter Cathryn Jones) (hs) (Entered: 03/19/2021) |
| 03/19/2021 | <u>150</u> | | ORDER. In accordance with the attached Order, it is hereby ORDERED that (1) the government shall file its motion to amend its Answer on or before March 26, 2021; (2) the plaintiff shall file her opposition on or before April 9, 2021; and (3) the government shall file its reply in support of its motion on or before April 16, 2021. It is further ORDERED that, on May 4, 2021, at 10:00 a.m., the parties shall appear before the Court for a hearing on the government's motion to amend, via teleconference, by calling 1−877−873−8017 and entering the Court's access code (8583213) followed by the pound key (#). It is further ORDERED that, on April 30, 2021, at 10:00 |

| | | | |
|---|---|---|---|
| | | | a.m., the parties shall appear before the court for a status conference, via teleconference, by calling 1–877–873–8017 and entering the Court's access code (8583213) followed by the pound key (#). The parties shall be prepared to discuss filing dates for any forthcoming motions in limine. It is further ORDERED that the bench trial in this case shall commence on September 13, 2021, at 9:30 a.m. Signed by Judge Reggie B. Walton on March 19, 2021. (lcrbw1) (Entered: 03/19/2021) |
| 03/22/2021 | | | Set/Reset Deadlines: Motion due by 3/26/2021. Response due by 4/9/2021 Reply due by 4/16/2021. (hs) (Entered: 03/22/2021) |
| 03/26/2021 | 151 | | MOTION to Amend/Correct 45 Answer to Complaint by UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1: Answer, # 3 Exhibit 2: Amended Answer, # 4 Text of Proposed Order)(Mahard, Sean) (Entered: 03/26/2021) |
| 04/09/2021 | 152 | | Memorandum in opposition to re 151 MOTION to Amend/Correct 45 Answer to Complaint filed by JENNIFER BRADLEY. (Attachments: # 1 Memorandum in Support Memo of Law, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 4, # 5 Text of Proposed Order Proposed Order)(Nace, Matthew) (Entered: 04/09/2021) |
| 04/16/2021 | 153 | | Unopposed MOTION for Extension of Time to *file Defendant's Reply In Support of Its Motion to Amend Answer to Complaint* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Mahard, Sean) (Entered: 04/16/2021) |
| 04/16/2021 | | | MINUTE ORDER. Upon consideration of the 153 Defendant's Unopposed Motion for an Extension of Time to File Its Reply, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that, on or before April 19, 2021, the defendant shall file its reply in support of its motion to amend its answer. Signed by Judge Reggie B. Walton on April 16, 2021. (lcrbw1) (Entered: 04/16/2021) |
| 04/18/2021 | | | Set/Reset Deadlines: Reply due by 4/19/2021. (hs) (Entered: 04/18/2021) |
| 04/19/2021 | 154 | | REPLY to opposition to motion re 151 MOTION to Amend/Correct 45 Answer to Complaint filed by UNITED STATES OF AMERICA. (Mahard, Sean) (Entered: 04/19/2021) |
| 04/29/2021 | 155 | | NOTICE of Appearance by Christopher Charles Hair on behalf of UNITED STATES OF AMERICA (Hair, Christopher) (Entered: 04/29/2021) |
| 04/30/2021 | | | Minute Entry for telephone proceedings held before Judge Reggie B. Walton: Status Conference held on 4/30/2021. Any motions in Limine due by 5/28/2021. Responses due by 6/25/2021. Replies due by 7/9/2021. Bench Trial set for 9/9/2021 at 9:30 AM before Judge Reggie B. Walton. (Court Reporter: Cathryn Jones) (zgdf) (Entered: 04/30/2021) |
| 05/03/2021 | 156 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that (1) the parties shall file their motions in limine, in any, on or before May 28, 2021; (2) the parties shall file their oppositions to any motions in limine on or before June 25, 2021; and (3) the parties shall file their replies, in any, in support of their motions in limine on or before July 9, 2021. It is further ORDERED that the bench trial currently scheduled to commence on |

| | | | |
|---|---|---|---|
| | | | September 13, 2021, is RESCHEDULED for September 9, 2021, at 9:30 a.m. Signed by Judge Reggie B. Walton on May 3, 2021. (lcrbw1) (Entered: 05/03/2021) |
| 05/04/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 5/4/2021. Motion Hearing continued for 6/14/2021 at 10:00 AM by Telephonic/VTC before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 05/04/2021) |
| 05/06/2021 | 157 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that the government's 151 Defendant's Motion for Leave to Amend Its Answer is GRANTED. It is further ORDERED that, on or before May 10, 2021, the government shall file a clean copy of its Federal Defendant's Amended Answer to Plaintiff's Amended Complaint on the docket. It is further ORDERED that, on or before May 14, 2021, the plaintiff shall file a motion for further discovery addressing, inter alia, (1) what specific additional discovery is needed regarding whether the exculpatory clause in the Acknowledgement of Risk form applies to the government standing in the place of Dr. Williams because Dr. Williams was an agent of the University while employed by the Higgins' Practice; (2) the reasons for which an expert witness would be appropriate regarding whether the exculpatory clause applies to the government; and (3) the expected scope of an expert witness's testimony regarding whether the exculpatory clause applies to the government. It is further ORDERED that, on or before May 28, 2021, the government shall file its opposition, if any, to the plaintiff's forthcoming motion for further discovery. It is further ORDERED that, on June 14, 2021, at 10:00 a.m., the parties shall appear before the Court for a motion hearing, via teleconference, by calling 1–877–873–8017 and entering the Court's access code (8583213) followed by the pound key (#). Signed by Judge Reggie B. Walton on May 6, 2021. (lcrbw1) (Entered: 05/06/2021) |
| 05/06/2021 | | | Set/Reset Deadlines: Amended Pleadings due by 5/10/2021. Motions for further discovery due by 5/14/2021. Responses due by 5/28/2021 (hs) (Entered: 05/06/2021) |
| 05/10/2021 | 158 | | Amended ANSWER to Complaint by UNITED STATES OF AMERICA.(Mahard, Sean) (Entered: 05/10/2021) |
| 05/14/2021 | 159 | | MOTION for Relief by JENNIFER BRADLEY. (Nace, Matthew); Modified text and event on 5/26/2021 (ztth). (Entered: 05/14/2021) |
| 05/28/2021 | 160 | | Memorandum in opposition to re 159 MOTION Leave for Discovery filed by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Mahard, Sean) (Entered: 05/28/2021) |
| 06/11/2021 | 161 | | NOTICE OF SUBSTITUTION OF COUNSEL by Jessica B. Colsia on behalf of UNITED STATES OF AMERICA Substituting for attorney Sean Mahard (Colsia, Jessica) (Entered: 06/11/2021) |
| 06/14/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 6/14/2021 re: 159 MOTION for Relief filed by JENNIFER BRADLEY. For the reasons stated on the record, the Motion is denied in part, and granted in part; The Government shall produce documents and identity of witnesses by 7/12/2021; Any additional discovery shall be completed by 8/13/2021. (Court Reporter: Cathryn Jones.) (kt) Modified on 6/14/2021 to |

| | | | |
|---|---|---|---|
| | | | edit motion title to match what was filed by Plaintiff (kt). (Entered: 06/14/2021) |
| 06/23/2021 | 162 | | ORDER. See attached Order for details. Signed by Judge Reggie B. Walton on June 23, 2021. (lcrbw1) (Entered: 06/23/2021) |
| 08/20/2021 | 163 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on August 31, 2021, at 9:00 a.m., the parties shall appear before the Court for a pre–trial conference in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on August 20, 2021. (lcrbw1) (Entered: 08/20/2021) |
| 08/23/2021 | | | Set/Reset Hearings: Pretrial Conference set for 8/13/2021 at 09:00 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (hs) (Entered: 08/23/2021) |
| 08/24/2021 | 164 | | MOTION to Continue by JENNIFER BRADLEY. (Attachments: # 1 Text of Proposed Order)(Nace, Matthew) (Entered: 08/24/2021) |
| 08/25/2021 | | | MINUTE ORDER. Upon consideration of the 164 Plaintiff's Motion for Relief to Reschedule Pretrial Hearing, it is hereby ORDERED that this motion is DENIED WITHOUT PREJUDICE for counsel's failure to comply with Local Civil Rule 7(m) and the 46 General Order for Civil Cases Before the Honorable Reggie B. Walton, which states that "[a]ny motion or opposition that does not comply with Local Civil Rule 7, unless otherwise indicated below, will be sua sponte denied". Signed by Judge Reggie B. Walton on August 25, 2021. (lcrbw1) (Entered: 08/25/2021) |
| 08/25/2021 | 165 | | Second MOTION to Continue by JENNIFER BRADLEY. (Attachments: # 1 Text of Proposed Order)(Nace, Matthew) (Entered: 08/25/2021) |
| 08/25/2021 | | | MINUTE ORDER. Upon consideration of the 165 Plaintiff's Renewed Motion for Relief to Reschedule Pretrial Hearing, and for good cause shown, it is hereby ORDERED that the pre–trial conference currently scheduled for August 31, 2021, is CONTINUED to September 3, 2021, at 12:00 p.m., in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on August 25, 2021. (lcrbw1) (Entered: 08/25/2021) |
| 08/26/2021 | | | Set/Reset Hearings: Pretrial Conference reset for 9/3/2021 at 12:00 PM in Courtroom 16– In Person before Judge Reggie B. Walton. (hs) (Entered: 08/26/2021) |
| 08/27/2021 | 166 | | PRE–TRIAL SCHEDULING ORDER. See attached Order for details. Signed by Judge Reggie B. Walton on August 27, 2021. (lcrbw1) (Entered: 08/27/2021) (Main Document 166 replaced on 8/27/2021) (zhs). (Entered: 08/27/2021) |
| 08/27/2021 | 167 | | ENTERED IN ERROR.....TRIAL BRIEF *Joint Pretrial Statement* by JENNIFER BRADLEY. (Nace, Matthew) Modified on 8/30/2021 (zjf). (Entered: 08/27/2021) |
| 08/27/2021 | 168 | | Joint PRETRIAL STATEMENT by JENNIFER BRADLEY. (zjf) (Entered: 08/30/2021) |

| 08/30/2021 | | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 167 Trial Brief was entered in error and refiled by Clerk's Office under the correct category. (zjf) (Entered: 08/30/2021) |
|---|---|---|---|
| 09/01/2021 | 169 | | PRETRIAL STATEMENT by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 09/01/2021) |
| 09/03/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Final Pretrial Conference held on 9/3/2021. (Court Reporter Cathryn Jones) (hs) (Entered: 09/03/2021) |
| 09/04/2021 | 170 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that (1) on or before September 6, 2021, at 12:00 p.m., the plaintiff shall submit her objection to the government's cross–designations of the testimony of Dr. William Vollmer; and (2) on or before September 7, 2021, at 4:00 p.m., the government shall submit its response to the plaintiff's objection. It is further ORDERED that Dr. Aaron Williams and Dr. Kevin deWeber may present their testimony via videoconference. It is further ORDERED that Dr. Jerri Curtis is not permitted to present her testimony via videoconference, absent additional evidence of a compelling reason. It is further ORDERED that, in light of the government's representations that Jenna Earls is willing to testify remotely, the plaintiff is not permitted to introduce the designated portions of Ms. Earls' deposition, but rather Ms. Earls shall present her testimony via videoconference. Signed by Judge Reggie B. Walton on September 4, 2021. (lcrbw1) (Entered: 09/04/2021) |
| 09/04/2021 | 171 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that, as a treating physician of the plaintiff, Dr. William Vollmer is permitted to provide opinion testimony, subject to the requirements of the Federal Rules of Evidence. It is further ORDERED that, in the event that the government intended to argue that the plaintiff did not sufficiently disclose Dr. Vollmer's testimony under Federal Rule of Civil Procedure 26(a)(2)(C), the government may supplement its filing regarding its objection on or before September 7, 2021, at 4:00 p.m., providing additional information and legal authority to support its argument. It is further ORDERED that (1) the testimony of Dr. Kevin deWeber about the July 18, 2012 Program Letter of Agreement Between Military Primary Sports Care Medicine Fellowship and Dr. David Higgins, and (2) the testimony of Dr. Jerri Curtis about the November 2010 Memorandum of Understanding between the National Capitol Consortium and the Medical Practice of David L. Higgins, M.D., are relevant to the extent that these contracts are established to be ambiguous. Signed by Judge Reggie B. Walton on September 4, 2021. (lcrbw1) (Entered: 09/04/2021) |
| 09/06/2021 | 172 | | TRIAL BRIEF *Obj. to Counter Designations* by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 09/06/2021) |
| 09/07/2021 | 173 | | RESPONSE re 172 Trial Brief *(regarding Plaintiff's objections to Dr. Vollmar's counter–designations)* filed by UNITED STATES OF AMERICA. (Hair, Christopher) (Entered: 09/07/2021) |
| 09/07/2021 | 174 | | GENERAL ORDER GOVERNING TRIAL PROCEDURES BEFORE THE HONORABLE REGGIE B. WALTON. Signed by Judge Reggie B. Walton on September 7, 2021. (lcrbw1) (Entered: 09/07/2021) |
| 09/07/2021 | | | |

| | | | MINUTE ORDER. The Court requiring additional information before resolving the 172 Plaintiff's Objections to Defendant's Counter–Designations, it is hereby ORDERED that, on or before September 8, 2021, at 12:00 p.m., the parties shall submit to the Court a copy of the portions of Dr. Vollmar's deposition transcript to which the plaintiff objects. Signed by Judge Reggie B. Walton on September 7, 2021. (lcrbw1) (Entered: 09/07/2021) |
|---|---|---|---|
| 09/08/2021 | 175 | | NOTICE by UNITED STATES OF AMERICA re Order, (Attachments: # 1 Transcript Excerpts of William Vollmar, M.D.)(Hair, Christopher) (Entered: 09/08/2021) |
| 09/08/2021 | 176 | | NOTICE of Appearance by John Felix Lopez on behalf of UNITED STATES OF AMERICA (Lopez, John) (Entered: 09/08/2021) |
| 09/09/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Bench Trial Began on 9/9/2021. Witnesses: Jennifer Bradley/Thomas Bradley/Lori Bradley. Bench Trial continued for 9/10/2021 at 09:45 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 09/09/2021) |
| 09/10/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Bench Trial resumed on 9/10/2021. Witnesses: Dr. Robert Cantu/Joseph Crouse/Dr. William Vollmer. Bench Trial continued for 9/13/2021 at 09:30 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 09/10/2021) |
| 09/13/2021 | | | Minute Entry, for proceedings held before Judge Reggie B. Walton: Bench Trial resumed on 9/13/2021. Witnesses: Jenna Earls/Dr. Aaron William/Dr. Kathryn Margo. Bench Trial continued for 9/14/2021 at 09:30 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 09/13/2021) |
| 09/14/2021 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Bench Trial resumed and concluded on 9/14/2021. Witnesses: Dr. Kevin de Webber/Sean Dash/Dr. David Higgins. Plaintiff's Motion for a Directed Verdict; heard and denied. Oral Rulings set for 1/24/2022 at 10:00 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (hs) (Entered: 09/15/2021) |
| 09/15/2021 | 177 | | NOTICE *Praecipe* by JENNIFER BRADLEY (Attachments: # 1 Exhibit, # 2 Exhibit)(Nace, Matthew) (Entered: 09/15/2021) |
| 09/17/2021 | 178 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that the government's oral motion for judgment as a matter of law is DENIED. It is further ORDERED that the plaintiff's oral motion for partial judgment as a matter of law is DENIED. It is further ORDERED that, on or before September 21, 2021, the parties shall contact the court reporter to order a transcript of the bench trial. It is further ORDERED that, on or before December 17, 2021, the parties shall submit proposed findings of fact and conclusions of law, addressing, inter alia, (1) whether there is any evidence in the record supporting the conclusion that the plaintiff did not sustain a concussion in the fall of 2011; (2) if Dr. Williams was negligent in his treatment of the plaintiff, whether the government bears responsibility for the entirety of the plaintiff's damages, in light of the Court's ruling that American University is not subject to liability because of the Acknowledgement of Risk |

| | | | form signed by the plaintiff; (3) if Dr. Williams was negligent in his treatment of the plaintiff and the government does not bear responsibility for the entirety of the damages, the percentage of the damages for which the government is liable; and (4) whether there is any evidence in the record supporting the conclusion that the plaintiff sustained an additional concussion in 2013 and, if so, the impact, if any, an additional subsequent concussion should have on the damages for which the government may be liable. It is further ORDERED that, on January 24, 2022, at 10:00 a.m., the parties shall appear before the Court for a hearing at which the Court will issue its ruling. The parties shall appear before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001.. Signed by Judge Reggie B. Walton on September 17, 2021. (lcrbw1) (Entered: 09/17/2021) |
|---|---|---|---|
| 11/19/2021 | <u>179</u> | | TRANSCRIPT OF PROCEEDINGS before Judge Reggie B. Walton held on September 9, 2021; Page Numbers: 1 – 200. Court Reporter/Transcriber Cathryn Jones, Telephone number 202 354–3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u>

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 12/10/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022.(Jones, Cathryn) (Entered: 11/19/2021) |
| 11/19/2021 | <u>180</u> | | TRANSCRIPT OF PROCEEDINGS before Judge Reggie B. Walton held on September 10, 2021; Page Numbers: 201 – 401. Court Reporter/Transcriber Cathryn Jones, Telephone number 202 354–3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u>

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 day s, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers |

| | | | |
|---|---|---|---|
| | | | specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/10/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022.(Jones, Cathryn) (Entered: 11/19/2021) |
| 11/19/2021 | 181 | | TRANSCRIPT OF PROCEEDINGS before Judge Reggie B. Walton held on September 13, 2021; Page Numbers: 402 – 624. Court Reporter/Transcriber Cathryn Jones, Telephone number 202 354–3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 day s, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br><span style="color:red">**NOTICE RE REDACTION OF TRANSCRIPTS:**</span> The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/10/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022.(Jones, Cathryn) (Entered: 11/19/2021) |
| 11/19/2021 | 182 | | TRANSCRIPT OF PROCEEDINGS before Judge Reggie B. Walton held on September 14, 2021; Page Numbers: 625 – 815. Court Reporter/Transcriber Cathryn Jones, Telephone number 202 354–3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 day s, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br><span style="color:red">**NOTICE RE REDACTION OF TRANSCRIPTS:**</span> The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/10/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022.(Jones, Cathryn) (Entered: 11/19/2021) |
| 12/16/2021 | 183 | | Joint MOTION for Extension of Time to *File Findings of Fact and Conclusions of Law* by UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Text of Proposed Order)(Colsia, Jessica) (Entered: 12/16/2021) |

| | | | |
|---|---|---|---|
| 12/17/2021 | | | MINUTE ORDER. Upon consideration of the parties' 183 Joint Motion for an Extension of Time to File Proposed Findings of Fact and Conclusions of Law, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that, on or before January 7, 2022, the parties shall submit their proposed findings of fact and conclusions of law. It is further ORDERED that the hearing at which the Court will issue its ruling, which is currently scheduled for January 24, 2022, is CONTINUED to February 24, 2022, at 2:00 p.m. The parties shall appear before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on December 17, 2021. (lcrbw1) (Entered: 12/17/2021) |
| 12/20/2021 | | | Set/Reset Deadlines/Hearings: Proposed Findings of Fact due by 1/7/2022. Motion Hearing reset for 2/24/2022 at 02:00 PM by Telephonic/VTC before Judge Reggie B. Walton. (adh) (Entered: 12/20/2021) |
| 01/07/2022 | 184 | | Proposed Findings of Fact by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 01/07/2022) |
| 01/07/2022 | 185 | | Proposed Findings of Fact by UNITED STATES OF AMERICA. (Hair, Christopher) (Entered: 01/07/2022) |
| 02/08/2022 | 186 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on or before February 23, 2022, the plaintiff shall submit revised proposed conclusions of law, containing (1) citations to the record for each reference to trial testimony and (2) citations to and discussions of the legal authority that supports each proposed conclusion of law. It is further ORDERED that the hearing at which the Court will issue its ruling, which is currently scheduled for February 24, 2022, is CONTINUED to March 10, 2022, at 2:00 p.m. The parties shall appear before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on February 8, 2022. (lcrbw1) (Entered: 02/08/2022) |
| 02/10/2022 | | | Set/Reset Hearings: Motion Hearing reset for 3/10/2022 at 02:00 PM in Courtroom 16– In Person before Judge Reggie B. Walton. (adh, ) (Entered: 02/10/2022) |
| 02/24/2022 | 187 | | Proposed Findings of Fact by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 02/24/2022) |
| 02/25/2022 | 188 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on March 1, 2022, at 12:30 p.m., the parties shall appear before the Court for a status conference, via teleconference, by calling 1–877–873–8017 and entering the Court's access code (8583213) followed by the pound key (#). It is further ORDERED that the hearing at which the Court will issue its ruling, which is currently scheduled for March 10, 2022, is VACATED pending further order of the Court. Signed by Judge Reggie B. Walton on February 25, 2022. (lcrbw1) (Entered: 02/25/2022) |
| 02/27/2022 | 189 | | NOTICE of Appearance by John Haberland on behalf of UNITED STATES OF AMERICA (Haberland, John) (Entered: 02/27/2022) |
| 02/28/2022 | | | |

| | | | |
|---|---|---|---|
| | | | Set/Reset Hearings: Status Conference reset for 3/1/2022 at 12:30 PM by Telephonic/VTC before Judge Reggie B. Walton. (adh, ) (Entered: 02/28/2022) |
| 03/01/2022 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 3/1/2022. Order will issue via Chambers. (Court Reporter Cathryn Jones.) (adh, ) (Entered: 03/01/2022) |
| 03/01/2022 | 190 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on or before March 8, 2022, the plaintiff shall file revised proposed conclusions of law, containing citations to and discussions of the legal authority that supports each proposed conclusion of law. It is further ORDERED that, on April 22, 2022, at 9:30 a.m., the parties shall appear before the Court for a hearing at which the Court will issue its ruling. The parties shall appear before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. Signed by Judge Reggie B. Walton on March 1, 2022. (lcrbw1) (Entered: 03/01/2022) |
| 03/01/2022 | | | Set/Reset Deadlines/Hearings: Plaintiff's revised proposed conclusions of law due by 3/8/2022. Hearing set for 4/22/2022 at 09:30 AM in Courtroom 16– In Person before Judge Reggie B. Walton. (adh, ) (Entered: 03/01/2022) |
| 03/08/2022 | 191 | | Proposed Findings of Fact by JENNIFER BRADLEY. (Nace, Matthew) (Entered: 03/08/2022) |
| 04/15/2022 | | | MINUTE ORDER. Due to a change in the Court's schedule, it is hereby ORDERED that the hearing scheduled for April 22, 2022, at 9:30 a.m., is CONTINUED to that same day at 12:00 p.m. Signed by Judge Reggie B. Walton on April 15, 2022. (lcrbw1) (Entered: 04/15/2022) |
| 04/22/2022 | | | Minute Entry for proceedings held before Judge Reggie B. Walton: Hearing for Oral Ruling held on 4/22/2022. Written Order to follow. (Court Reporter: Cathryn Jones) (zcdw) (Entered: 04/25/2022) |
| 04/27/2022 | 192 | | SUPPLEMENTAL MEMORANDUM by JENNIFER BRADLEY. (Attachments: # 1 Exhibit)(Nace, Matthew) Modified event title on 4/27/2022 (znmw). (Entered: 04/27/2022) |
| 07/28/2022 | 193 | | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on July 28, 2022. (lcrbw1) (Entered: 07/28/2022) |
| 07/28/2022 | 194 | | ORDER. In accordance with the attached Order, it is hereby ORDERED that the Court finds in favor of the plaintiff on Count VIII of the plaintiff's Amended Complaint as to the defendant United States of America. It is further ORDERED that judgment is ENTERED for the plaintiff on Count VIII of her Amended Complaint in the amount of $1,745,194.65. It is further ORDERED that Count IV of the plaintiff's Amended Complaint is DISMISSED as to the defendant United States of America. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on July 28, 2022. (lcrbw1) (Entered: 07/28/2022) |
| 08/26/2022 | 195 | | NOTICE OF APPEAL TO DC CIRCUIT COURT by JENNIFER BRADLEY. Filing fee $ 505, receipt number ADCDC–9472261. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Supplement, # 2 Supplement, # 3 |

| | | | |
|---|---|---|---|
| | | | Supplement)(Nace, Matthew) (Entered: 08/26/2022) |
| 08/29/2022 | 196 | | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 195 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 08/29/2022) |
| 08/31/2022 | | | USCA Case Number 22–5230 for 195 Notice of Appeal to DC Circuit Court filed by JENNIFER BRADLEY. (ztth) (Entered: 09/02/2022) |
| 09/23/2022 | 197 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 194 Order,, 35 Order,,,,,, 193 Memorandum & Opinion, 36 Memorandum & Opinion by UNITED STATES OF AMERICA. Fee Status: No Fee Paid. Parties have been notified. (Haberland, John) (Entered: 09/23/2022) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JENNIFER BRADLEY,                            )
                                             )
            Plaintiff,                       )
                                             )
    v.                                       )        Civil Action No. 16-0346 (RBW)
                                             )
NATIONAL COLLEGIATE ATHLETIC                 )
ASSOCIATION, *et al.*,                       )
                                             )
            Defendant.                       )

## <u>DEFENDANT UNITED STATES OF AMERICA'S NOTICE OF APPEAL</u>

**Notice is hereby given** this 23rd day of September 2022, that pursuant to Fed. R. App. P.

3(c)(1) and 4(a), Defendant United States of America hereby appeals to the United States Court of

Appeals for the District of Columbia Circuit from Orders entered on March 31, 2017 (Docket

Entry No. 35) and April 12, 2017 (Docket No. 36), denying the United States' motion to dismiss,

and the Memorandum Opinion and Order of the District Court entered on July 28, 2022 (Docket

Nos. 193 & 194), finding the United States liable to Plaintiff for damages.

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK, D.C. Bar  #924092
Chief, Civil Division

_____*/s/*_____
JOHN B. HABERLAND, CT Bar # 426298
Special Assistant United States Attorney
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-2574
John.haberland@usdoj.gov

*Attorneys for the United States of America*

_____
                                    )
JENNIFER BRADLEY,                   )
                                    )
                 Plaintiff,         )
                                    )
        v.                          )        Civil Action No. 16-346 (RBW)
                                    )
NATIONAL COLLEGIATE ATHLETIC        )
ASSOCIATION, et al.,                )
                                    )
                 Defendants.        )
_____)

## ORDER

In accordance with the Memorandum Opinion issued on this same date, it is hereby

**ORDERED** that Defendant [ ] Patriot League's Preliminary Motion to Dismiss, ECF No.

9, is **GRANTED**. It is further

**ORDERED** that Defendant [ ] Patriot League's Request for Hearing on Its Preliminary

Motion to Dismiss, ECF No. 10, is **DENIED AS MOOT**. It is further

**ORDERED** that Defendant [ ] National Collegiate Athletic Association's Motion to

Dismiss the Amended Complaint, ECF No. 17, is **GRANTED IN PART AND DENIED IN

PART**. Specifically, the motion is **GRANTED** as to the plaintiff's claims of gross negligence,

negligent infliction of emotional distress, fraudulent misrepresentation, breach of contract, and

medical malpractice, and **DENIED** as to the plaintiff's negligence claim. It is further

**ORDERED** that [ ] American University's Preliminary Motion to Dismiss, ECF No. 11,

is **GRANTED IN PART AND DENIED IN PART**. Specifically, this motion is **GRANTED** as

to the plaintiff's negligent infliction of emotional distress and breach of contract claims, and

**DENIED** as to the plaintiff's negligence and medical malpractice claims. It is further

**ORDERED** that the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 26, is **DENIED**. It is further

**ORDERED** that Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss, ECF No. 31, is **GRANTED**. It is further

**ORDERED** that the remaining defendants shall file their Answer to the remaining claims of the plaintiff's Amended Complaint on or before May 3, 2017.

**SO ORDERED** on this 12th day of April, 2017.

REGGIE B. WALTON
United States District Judge

_____
                                                )
JENNIFER BRADLEY,                               )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )      Civil Action No. 16-346 (RBW)
                                                )
NATIONAL COLLEGIATE ATHLETIC                    )
ASSOCIATION, et al.,                            )
                                                )
            Defendants.                         )
_____)

## MEMORANDUM OPINION

The plaintiff, a former student-athlete at American University (the "University"), brings this civil action against the defendants, the United States of America (the "Government"), the National Collegiate Athletic Association (the "NCAA"), the Patriot League, the University, the Maryland Sports Medicine Center (the "Medicine Center"), David L. Higgins, M.D. P.C. (the "Higgins Practice"), and David L. Higgins, M.D. ("Dr. Higgins"), alleging various causes of action stemming from the defendants' alleged failure to provide her with proper medical care after she allegedly sustained a head injury during a field hockey game in September 2011. See Notice of Removal of a Civil Action ("Removal Notice"), Exhibit ("Ex.") 5 (Amended Complaint ("Am. Compl.")) ¶¶ 98–136. Six motions are currently pending before the Court: (1) Defendant [ ] Patriot League's Preliminary Motion to Dismiss ("Patriot League's Dismiss Mot."), ECF No. 9; (2) Defendant [ ] Patriot League's Request for Hearing on Its Preliminary Motion to Dismiss ("Patriot's League's Hearing Request"), ECF No. 10; (3) defendant [ ] American University's Preliminary Motion to Dismiss ("University's Mot."), ECF No. 11; (4) Defendant [ ] National Collegiate Athletic Association's Motion to Dismiss the Amended

Complaint ("NCAA's Mot."), ECF No. 17; (5) the Government's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Gov't's Mot."), ECF No. 26; and (6) Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss, ECF No. 31. Upon careful consideration of the parties' submissions,[1] the Court concludes for the reasons that follow that it must deny the Government's motion to dismiss or, in the alternative, its motion for summary judgment, deny in part and grant in part both the NCAA's and the University's motions to dismiss, grant the Patriot League's motion to dismiss, deny the Patriot League's hearing request as moot, and grant the three medical provider defendants' partial motion to dismiss.

## I.      BACKGROUND

Much of the relevant factual background has been previously set forth by the Court in an earlier Order. See Removal Notice, Ex. 1 (Order dated December 10, 2015 ("Order")), Part I.B. In brief,

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant [ ] Patriot League's Preliminary Motion to Dismiss ("Patriot League's Mem."); (2) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] Patriot League's Motion to Dismiss ("Pl.'s Patriot League Opp'n"); (3) the Reply Memorandum of Defendant [ ] Patriot League to Plaintiff's Opposition to Defendant's Preliminary Motion to Dismiss ("Patriot League's Reply"); (4) the Memorandum of Points and Authorities in Support of [ ] American University's Preliminary Motion to Dismiss ("Am. Univ. Mem."); (5) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] American University's Preliminary Motion to Dismiss ("Pl.'s Am. Univ. Opp'n"); (6) the Memorandum of Points and Authorities in Support of [ ] National Collegiate Athletic Association's Motion to Dismiss ("NCAA's Mem."); (7) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant [ ] NCAA's Motion to Dismiss ("Pl.'s NCAA Opp'n"); (8) the Reply Memorandum of Points and Authorities in Support of [ ] National Collegiate Athletic Association's Motion to Dismiss ("NCAA's Reply"); (9) the Memorandum of Points and Authorities in Support of Federal Defendant's Motion to Dismiss, or, Alternatively, Motion for Summary Judgment ("Gov't's Mem."); (10) the Plaintiff's Memorandum of Points and Authorities in Response to Defendant USA's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Pl.'s Gov't Opp'n"); (11) the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Gov't's Reply"); (12) the Memorandum of Points and Authorities in Support of Defendants Maryland Sports Medicine Center, David L. Higgins, M.D. and David L. Higgins, M.D. P.C.'s Partial Motion to Dismiss ("Medical Defs.' Mem."); and (13) the Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant Higgins' Partial Motion to Dismiss ("Pl.'s Medical Defs. Opp'n").

42

[i]n 2011, the plaintiff was a junior-year student athlete at [the] University here in Washington, D.C. She played field hockey for the [U]niversity, and in September of that year, the plaintiff asserts that she 'was hit in the head during a field hockey game between [the] University and Richmond University[.]' Subsequent to that hit, she allegedly began experiencing symptoms of a concussion, but continued participating in field hockey practices and games as she was [not] advised to sit out [practices and games] while her symptoms persisted. According to the plaintiff, this failure has caused her a variety of harms, including monetary damages.

Id. (internal citations and footnote omitted). "On March 19, 2012, [the plaintiff] presented to MedStar National Rehabilitation with her chief complaint being of a concussion, . . . [and] on April 30, 2012, her diagnosis was confirmed." Id., Ex. 5 (Am. Compl.) ¶¶ 119–20.

Between August and October 2014, the plaintiff "filed several actions in the Superior Court of the District of Columbia ("Superior Court"), which were consolidated against the [NCAA],[2] the Patriot League,[3] [the] University, the [ ] Medicine Center, David L. Higgins, M.D., P.C., David L. Higgins, M.D., and Aaron Williams, D.O." Id., Ex. 1 (Order) at 1. In March 2015, the Government, pursuant to the Westfall Act, 28 U.S.C. § 2679 (2012), substituted itself for Dr. Williams as a defendant and removed the consolidated case to this Court. See id., Ex. 1 (Order) at 1–2. Thereafter, in December 2015, this Court dismissed the plaintiff's claims against the Government because the "the plaintiff concede[d] that she [was] still pursuing her administrative remedies," id., Ex. 1 (Order) at 11 (internal citation and quotation marks omitted), which precluded her at that time from bringing suit against the Government. This Court also concluded that it "no longer ha[d] jurisdiction over [the] matter following the dismissal of the [Government]" and remanded the case to the Superior Court. Id., Ex. 1 (Order) at 11–12.

---

[2] "The NCAA is a voluntary, unincorporated association of more than 1,300 colleges, universities, conferences, affiliated associations[,] and other educational institutions with its principal office in Indianapolis, Indiana." NCAA's Mem. at 4.

[3] "The Patriot League, a nonprofit establishment, is a Division I collegiate athletic conference which consists of ten (10) member institutions based in the Northeastern United States." Patriot League Mem. at 3.

After the case was remanded to the Superior Court, the plaintiff moved both to amend her Complaint and to remove the case back to this Court, a motion the Superior Court granted only with respect to the plaintiff's request to amend her Complaint. See id., Ex. 3 (Order dated Feb. 19, 2016) at 1. On February 23, 2016, the plaintiff amended her Complaint, and on the following day, removed this case back to this Court. See id. at 4. Shortly thereafter, the defendants filed their motions to dismiss the plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court now addresses.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests whether the complaint properly "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a) requires only that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "detailed factual allegations" are not required, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," id. Rather, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint alleging "facts [which] are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

"In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts

4

alleged.'" Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). However, conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

## III.   ANALYSIS

### A.   The Plaintiff's Claims Against the Government

As an initial matter, the Government contends that Counts IV and VIII of the plaintiff's Amended Complaint, which assert claims of negligent infliction of emotional distress and medical malpractice against the Government, "should be dismissed with prejudice" because "the [p]laintiff's claim[s are] time-barred by the [Federal Tort Claims Act ('FTCA')]'s two-year statute of limitations[,]" and because "under the borrowed servant doctrine, any alleged tort committed by Dr. Williams, attaches to the borrower (i.e., special employer), the Medical Practice of David L. Higgins . . . and not to the general master (i.e., general employer), the [Government]." Gov't's Mem. at 1–2. The Court will address each of these arguments in turn.

### 1.  The Federal Tort Claims Act's Two-Year Statute of Limitations

The Government argues that the plaintiff's claims against it are time-barred because she failed to "file her claim with the appropriate agency" within two years after the "[p]laintiff's claim accrued . . . [in] March 2012 when she was diagnosed with [post-concussive syndrome]," as the FTCA mandates. Gov't's Mem. at 10–11. In response, the plaintiff contends that the statute of limitations was equitably tolled and "did not begin to run until November 7, 2013, at the earliest," when "counsel for [d]efendant Higgins contacted [the p]laintiff's counsel and first indicated that Dr. Williams was a military fellow at the time he rendered treatment." Pl.'s Gov't

Opp'n at 11.

"Under the doctrine of sovereign immunity, the United States is immune from suit unless Congress has expressly waived the defense of sovereign immunity by statute." Carter-El v. D.C. Dep't of Corr., 893 F. Supp. 2d 243, 246 (D.D.C. 2012) (Walton, J.) (citing United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.")). "Absent a waiver, sovereign immunity shields the Federal Government . . . from suit." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994). "The FTCA is an example of Congress' waiver of sovereign immunity. Under the FTCA, the United States consents to suit in federal district court for certain, but not all, tort claims." Carter-El, 893 F. Supp. 2d at 246.

"The date the plaintiff's administrative claim was received is important because a party asserting jurisdiction under the FTCA must satisfy administrative exhaustion requirements by 'present[ing] the claim to the appropriate federal agency.'" Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 87 (D.D.C. 2011) (Walton, J.) (quoting 28 U.S.C. § 2675(a) (2006)). "In fact, the United States Code makes clear that a 'tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues,' id. (citing 28 U.S.C. § 2401(b)), and the associated regulations explain that a claim is deemed presented when it is received by the agency," id. (citing 28 C.F.R. §§ 14.2(a), 14.2(b)(1) (2005)). "Under the FTCA, a claim accrues 'by the time a plaintiff has discovered both h[er] injury and its cause.'" Id. at 87–88 (quoting Sexton v. United States, 832 F.2d 629, 633 (D.C. Cir. 1987)); see also United States v. Kubrick, 444 U.S. 111, 123 (1979) ("A plaintiff . . . armed with the facts about the harm done to h[er], can protect [herself] by seeking advice in the medical and legal community. To excuse h[er] from promptly doing so by postponing the

6

accrual of h[er] claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.").

Moreover, "[t]he time limits in the FTCA are just time limits, nothing more. Even though they govern litigation against the Government, a court can toll them on equitable grounds." United States v. Kwai Fun Wong, __ U.S. __, __, 135 S. Ct. 1625, 1633 (2015). However, such relief applies "only sparingly" and generally is not available to a plaintiff who has "failed to exercise due diligence in preserving [her] legal rights" or has demonstrated only "a garden variety of excusable neglect." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990); see also Holland v. Florida, 560 U.S. 631, 649 (2010) (noting that a "[plaintiff] is 'entitled to equitable tolling' only if [she] shows '(1) that [she] has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way' and prevented timely filing" (internal citation omitted)). In this Circuit, courts can permit "equitable tolling, but 'only in extraordinary and carefully circumscribed circumstances,'" Norman v. United States, 467 F.3d 773, 776 (D.C. Cir. 2006) (quoting Smith-Haynie v. District of Columbia, 155 F.3d 575, 580 (D.C. Cir. 1998)), such as where 'despite all due diligence [a plaintiff] is unable to obtain vital information bearing on the existence of her claim,'" id. (quoting Smith-Haynie, 155 F.3d at 579) (alteration in original). "At a minimum, due diligence requires reasonable efforts to learn the employment status of the defendant." Id. "Further, due diligence is a fact-specific judgment in each case as to what the court expects a reasonable plaintiff to do in uncovering the elements of [her] claim." United States v. Intrados/Intern. Mgmt. Grp., 265 F. Supp. 2d 1, 11 (D.D.C. 2002) (citation omitted).

Furthermore, "[b]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred."

Bregman v. Perles, 747 F.3d 873, 875 (D.C. Cir. 2014).  And, "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  In other words, "a defendant is entitled to succeed on a Rule 12(b)(6) motion to dismiss brought on statute[] of limitations grounds only if the facts that give rise to this affirmative defense are clear on the face of the plaintiff's complaint."  Lattisaw v. District of Columbia, 118 F. Supp. 3d 142, 153 (D.D.C. 2015) (citing Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)); accord Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 130 F. Supp. 3d 236, 254 (D.D.C. 2015).

There is no dispute that the plaintiff did not "present[ ] [her claim] in writing to the appropriate Federal agency within two years after [her] claim accrue[d]," 28 U.S.C. § 2401(b), which was in March 2012, at the latest, when she was diagnosed with post-concussive syndrome, see Gov't's Mem. at 10.  Therefore, because the plaintiff did not provide written notice of her claim until December 15, 2014, see Pl.'s Gov't Opp'n, Exhibit ("Ex.") 3 (Affidavit of Service), the FTCA's two-year statute of limitations period seemingly bars the plaintiff's tort claims against the Government.[4]  However, the Court cannot find from the face of the Complaint that the plaintiff failed to exercise reasonable due diligence to learn Dr. Williams' employment status, and because the plaintiff has shown that extraordinary circumstances prevented her from filing her claims against the government before she did, this Court finds that equitable tolling of

---

[4] In her opposition to the Government's motion, the plaintiff argues that the applicable statute of limitations period for a negligence action in the District of Columbia is "a three (3) year statute of limitations . . . as opposed to the two year statute [of limitations] established under the FTCA," Pl.'s Gov't Opp'n at 14, and that she timely filed her tort claims within the three-year period.  However, as the Circuit has noted, "the FTCA's statute of limitations would have no bite [if p]laintiffs injured in the District of Columbia or in any other jurisdiction where the statute of limitations is longer than two years could evade the FTCA statute by filing within the period prescribe by the state statute."  Norman, 467 F.3d at 776.  Accordingly, the plaintiff's argument urging the Court to apply the three-year statute of limitations for negligence claims in the District of Columbia has no merit here.

the FTCA's two-year statute of limitations period is warranted.

As noted above, the plaintiff contends that the FCTA's two-year statute of limitations should be equitably tolled until approximately November 7, 2013, when she learned from defendant Higgins' counsel that Dr. Williams was employed as a military fellow when he provided medical treatment to her at the University. See Pl.'s Gov't Opp'n at 11. The plaintiff contends that she "exercise[d] reasonable diligence in pursuing this matter by first sending a notice of representation letter to [the] University with a request to have both parties meet and discuss the matter." Pl.'s Gov't Opp'n at 12; see also id., Ex. 9. She also "went out and retained experts in a highly complicated medical malpractice action, and underwent the timely and complex notice provisions required in the District of Columbia to pursue a medical malpractice claim." Pl.'s Gov't Opp'n at 12–13. Specific to Dr. Williams' employment status, the plaintiff states that she "had absolutely no knowledge that Dr. Williams was a Federal Employee, nor any rational basis to believe that when she went and sought treatment from her team doctor at the [ ] University that she was actually being treated by [a Government employee]." Id. at 13. In addition, the plaintiff notes that "out of an abundance of caution in order to act with all due diligence, [she] served the Department of Defense and the Department of Health and Human Services with a Form 95 on December 15, 2014," to provide written notice of her claims, id. at 2, despite the uncertainty as to whether the Government would provide Dr. Williams with the Westfall certification, see id., Ex. 5 (Dr. Williams Petition for Certification), Ex. G (Letter from counsel for Dr. Williams sent to Litigation Division of the United States Army Legal Services Agency dated December 19, 2014) at 1 (noting that Dr. Williams and the Government had prior discussions regarding whether Dr. Williams was acting within the scope of his employment as a federal employee while treating the plaintiff). Therefore, the Court finds that the plaintiff acted

9

with reasonable due diligence "in preserving [her] legal rights," Irwin, 498 U.S. at 96, in regards to filing a lawsuit against the Government.

In arguing that the plaintiff did not exercise reasonable due diligence, the Government cites as support for its position Norman v. United States, 467 F.3d 773 (D.C. Cir. 2006), M.J. ex rel. Jarvis v. Georgetown Univ. Med. Ctr., 962 F. Supp. 2d 3 (D.D.C. 2013), aff'd as modified, 2014 WL 1378274 (D.C. Cir. Mar. 25, 2014), and Espinosa v. United States, No. 09-2399 (RMU), 2011 WL 710170, at *1 (D.D.C. Feb. 22, 2011), where the courts in each case declined to equitably toll the FTCA's two-year statute of limitations because the plaintiffs failed to act with reasonable due diligence. The Court finds, however, the facts in those cases distinguishable from the facts in this case. In Norman, the plaintiff, who sustained injuries in an automobile accident after being struck by the driver of a rental car who was a federal employee acting within the scope of his employment, 467 F.3d at 773–74, argued that "he exercised due diligence because immediately following the accident he filed a worker's compensation claim with his employer and a liability claim with USAA," id. at 776, the driver's personal "insurance provider," id. at 774. Although the plaintiff failed to present this documentation to the district court, the Circuit, in reviewing the documentation, noted that "[n]either the worker's compensation claim nor the liability claim indicate[d that the plaintiff] or his attorney made any efforts prior to the expiration of the FTCA's two-year statute of limitations-much less reasonably diligent efforts-to discover [the driver's] employer." Id. at 776.

Similarly, in M.J. ex rel. Jarvis, the plaintiff, fourteen years after the birth of her son, brought a medical malpractice claim on behalf of her son, alleging that he suffered from physical and mental disabilities attributable to the timing and method of his delivery. 962 F. Supp. 2d at 4–5. The district court rejected the plaintiff's argument that the statute of limitations should be

10

equitably tolled because the plaintiff failed to identify any efforts she had taken to learn of the doctor's employer.  See id. at 9.  And, in Espinosa, the plaintiff, who suffered spinal injuries in a car accident after being struck by "an active duty Army solider operating a government-owned van on official Army business," 2011 WL 710170, at *1, also argued that "the FTCA statute of limitations should be [equitably] tolled because he filed his complaint prior to the expiration of [the] District of Columbia's personal injury statute of limitations, having not yet received the Westfall certification," id. at *2.  The district court, however, noted that, "[o]ther than retaining counsel in the months after the accident, the plaintiff made no effort to discover [the driver's] employment status or to file suit within the two-year limitations period," in addition to failing to "allege[] or present[] any evidence of fraudulent concealment on the part of the agency that might provide a basis for equitable tolling."  Id. at *3.

As the Court noted earlier, the plaintiff in this case exercised reasonable due diligence in pursuing her legal rights.  She attempted to discuss and potentially resolve this matter with the University, retained medical experts, conducted research through the efforts of her attorneys, and complied with timely jurisdictional requirements in pursuing certain claims.  She also reasonably believed that Dr. Williams was an employee of the University, as he worked at the University as a medical trainer for the field hockey team.  See Pl.'s Gov't Opp'n at 11.  Thus, unlike the plaintiffs in the cases cited by the Government, it cannot be said that the plaintiff here failed to employ reasonable efforts to identify Dr. Williams' employer.

Moreover, the Court finds that extraordinary circumstances require equitable tolling of the FTCA's two-year statute of limitations.  As the plaintiff notes, the contract between defendant Higgins and the Government, which governs the employment terms for Dr. Williams as a trainee and member of "a fellowship program under the supervision of defendant Higgins,"

11

Pl.'s Gov't Opp'n at 1, prohibits individuals "being treated by the trainees [from] be[ing] made aware of [the] relationship" between defendant Higgins and the Government, thereby "deliberate[ly] conceal[ing] [a] material fact[] related to the involvement of the [Government]." Pl.'s Gov't Opp'n at 10; <u>see also</u> Gov't's Mot., Ex. 2 (Memorandum of Understanding Between the Medical Practice of David L. Higgins, M.D. and the National Capital Consortium (the "Agreement")) ¶ 12 ("Neither party will use the name of the other party in any of its publicity or advertising media. The existence and scope of the program, however, may be known to [the] trainees."). The plaintiff contends that neither this contract or any other

> proof or evidence of Dr. Williams' employment . . . was ever provided to [the p]laintiff or [her] counsel until Dr. Williams filed a Praecipe in the underlying Superior Court Action in March of 2015[,] in which he attached a copy of his Petition for Judicial Findings and Certification of Scope of Officer or Employment in Case 1:15-MC-00283 in this Court.

Pl.'s Gov't Opp'n at 11–12. Therefore, despite the plaintiff's exercise of due diligence, she would have been "unable to obtain [the] vital information," <u>Norman</u>, 467 F.3d at 776, about Dr. Williams' employment status because that information was concealed and not made available until Dr. Williams legally sought to force the Government to provide him with a Westfall certification. And, until the Government provided the Westfall certification, it had taken the position that Dr. Williams was not acting within the scope of his federal employment, but rather as an employee of the Medicine Center hired by the University, the same belief the plaintiff reasonably held. Accordingly, because the Court cannot find that the plaintiff failed to exercise due diligence in pursuing her legal rights, and as a result of extraordinary circumstances that existed in this case, the Court finds it appropriate to equitably toll the FCTA's two-year statute of limitations until November 7, 2013, when the plaintiff learned that Dr. Williams was a military fellow. Therefore, because the plaintiff filed her administrative claim within two years after

12

learning of Dr. Williams' status as a military fellow, the Court must reject the Government's position that the plaintiff's claims against it are time-barred.[5]

### 2. Borrowed Servant Doctrine

The Government also argues that the "[p]laintiff's claims against [it] fail under the borrowed servant doctrine" because "at all times relevant to the litigation, [Dr.] Williams 'was an agent, servant, and/or employee of . . . [the] University, Higgins, Higgins, P.C. and [the Medicine] Center,'" Gov't's Mem. at 15 (quoting Removal Notice, Ex. 5 (Am. Compl.) ¶ 13), and because "the Higgins Practice had the 'power to control and direct' [Dr.] Williams in the performance of his work," id. The plaintiff contends that issue preclusion estops the Government from asserting the borrowed servant doctrine because

> the issue over whether or not [the Government] was liable for the actions of Dr. Williams was actually litigated, [and] determined by a valid final judgment on the merits when the Court issued its previous[] ruling after a full and fair opportunity to litigate the matter where the issue of [the Government's] liability for Dr. Williams was essential.

Pl.'s Gov't Opp'n at 21. In response, the Government asserts that the "state law defining an individual's scope of employment (for purposes of Westfall certification) is separate and distinct from the control inquiry and the ultimate issue of employer liability (for purposes of borrowed servant)." Gov't's Reply at 10. Accordingly, the Court must decide (1) whether, after litigating the Westfall certification issues, the Government's determination that it must be substituted as a defendant for Dr. Williams for Westfall certification purposes bars the Government from denying liability for Dr. Williams' alleged negligent conduct based on issue preclusion, and if

---

[5] The Government also contends that the plaintiff did not exercise reasonable due diligence because she did not serve her administrative claim on the appropriate federal agency, as her affidavit establishing service of her claim lists the wrong address for the Department of Defense. Gov't's Reply at 9. Despite the plaintiff's mistake, the appropriate agency received the plaintiff's administrative claim in March 2015, see Gov't's Mot. at 4, which was within the two-year statute of limitations as a result of the Court's equitable tolling of the limitations period. Thus, the Court finds that this argument lacks merit.

not, (2) whether Dr. Williams is a borrowed servant of the Higgins Practice, which the Government argues should be solely liable for Dr. Williams' alleged negligent conduct.

### a. The Applicability of Issue Preclusion

There does not appear to be a case in this Circuit that has addressed the issue of whether the Government, which after substituting itself for an individual in a civil action after determining that the individual acted within the scope of his federal employment for Westfall certification purposes, is precluded from arguing that it is not liable for the individual's allegedly negligent actions under the borrowed servant doctrine. As support for its position that the Westfall certification question and the determination of liability for the allegedly negligent conduct are separate issues, the Government relies on Palmer v. Flaggman, 93 F.3d 196 (5th Cir. 1996), which addressed this issue. The Court finds the reasoning in Palmer instructive.

In Palmer, the Firth Circuit considered whether "a federal employee who acts as the 'borrowed servant' of a private employer may simultaneously act within the scope of his federal employment in such a way as to make him immune from suit under the Westfall Act." 93 F.3d at 197. In assessing this issue, the court noted that it had to determine whether, under Texas state law where the alleged negligence occurred, "the scope of employment inquiry is separable from the control inquiry and the ultimate issue of liability."[6] Id. at 201. However, the court recognized that "Texas state law on this issue [was] sparse" because

> [t]he Westfall Act creates a unique situation in which the parties have an interest in proving that an employee acted within the scope of his or her employment, without regard for the ultimate issue of the employer's liability [while] the model tort case [in Texas] answers the scope of employment issue only in the context of assigning liability.

---

[6] Under Texas state law, "an employee acts within the course and scope of his employment when his actions are: 1) within the general authority given to him by his employer; 2) in furtherance of the master's business; and 3) for the accomplishment of the object for which he is employed." Palmer, 93 F.3d at 199 (internal citation omitted).

14

Id. And, the "Texas cases involving two 'employers' generally resolve only the issue of which employer had 'control' over the tortfeasor, and hence the liability through the 'borrowed servant' doctrine." Id. at 201–02. Thus, "Texas courts have not elaborated on whether the tortfeasor was also within the scope of the non-liable defendant's employment, or whether a tortfeasor is legally able to act simultaneously within the scope of employment of two defendants where only one is ultimately liable." Id. at 202. Nonetheless, in "reach[ing] the result [that it] believe[d] the Texas court would be most likely to reach," id.; see also id. at 202 ("Because Texas courts have not directly addressed this issue, we must decide it as we believe the Texas Supreme Court would have decided it, if confronted with the issue directly."), the court reasoned (1) that there was "no distinction between simultaneously 'serving' two masters, and acting within the 'scope of employment' of two employers[;]" id. at 204, (2) that "a particular action can serve more than one purpose, while still remaining within the scope of employment[;]" id. ("[A]n action may benefit the employee personally, but still fall within the course and scope of his employment, so long as the purpose of the action still benefits the master to an appreciable extent." (internal citation omitted)), and (3) that "[t]he borrowed servant inquiry seeme[d] to become relevant only after one determines whether an employee's actions are within the scope of his general employment[,]" id. (noting that "[e]ven if the borrowing master is liable for the acts of the servant, 'the general employer remains liable if the act fell within the scope of the employee's general employment'" (internal citation omitted)). Therefore, the court concluded that "nothing in Texas law indicates that the stated test for scope of employment . . . also includes an additional element of control over the tortfeasor's actions. Instead, [it found] that the element of control is relevant only to the separate issue of ultimate liability." Id. at 205.

Applying these principles here, the Court notes that "District of Columbia [respondeat

15

superior] law, which applies in this case, follows the RESTATEMENT (SECOND) OF

AGENCY (1958) ("Restatement") in defining scope of employment."  Council on Am. Islamic

Relations v. Ballenger, 444 F.3d 659, 663 (D.C. Cir. 2006).  Under the Restatement:

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.  [However, c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement § 228.  Consequently, District of Columbia law does not include the additional

element of control over the tortfeasor's actions in determining the scope of employment.  In

addition, District of Columbia cases have separately considered the borrowed servant doctrine as

a defense to assigning liability for tortious conduct.  See Dellums v. Powell, 566 F.2d 216, 220

(D.C. Cir. 1977) (applying the borrowed servant doctrine as a defense to vicarious liability), cert.

denied, 438 U.S. 916 (1978); see also Estate of Carter v. District of Columbia, 903 F. Supp. 165,

167 (D.D.C. 1995) (discussing whether the borrowed servant doctrine transferred liability to the

District of Columbia for the actions of United States Park Police engaged in routine patrolling in

the District of Columbia).  Accordingly, the Court finds "that the element of control is relevant

only to the separate issue of ultimate liability," Palmer, 93 F.3d at 205, and thus, issue preclusion

does not apply in this case because the parties have only litigated Dr. Williams' scope of

employment for Westfall certification purposes.

### b.  Borrowed Servant Status and Liability

"Under the law of agency, 'a person who is generally the servant of one master [ ] can

become the borrowed servant of another.'"  Chang v. United States, Nos. 02-2010 (EGS),

02-2283 (EGS), 2007 WL 2007335, at *12 (D.D.C. July 10, 2007) (quoting Dellums, 566 F.2d at

16

220) (alteration in original). "In considering whether an employee's negligence should be imputed to a special employer, the critical determination is which employer possess the 'power of control.'" Dower v. Davis, No. 86-2658-OG, 1987 WL 12847, at *5 (D.D.C. July 28, 1987). The Restatement identifies the following factors as relevant to determining the issue of control:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement § 220(2).

Furthermore, "[i]f the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master." Dellums, 566 F.2d at 220. "However, '[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of service to the other.'" Chang, 2007 WL 2007335, at *12 (citing the Restatement § 226); see also Dellums, 566 F.2d at 221 ("[T]here is a presumption that an actor remains in his general employment so long as by the service rendered another, he is performing the business entrusted to him by the general employer." (citing the Restatement § 227, n.6, cmt. b)). And, if a servant acts within the scope of his employment for both masters, both may "be responsible for an act which is a breach of duty to one or both of them." Restatement § 226 cmt.

17

a. Moreover, "[w]hether one party is the 'sole master to whom liability can attach . . . is usually a question of fact, generally to be decided by the jury.'" <u>Chang</u>, 2007 WL 2007335, at *12 (quoting <u>Dellums</u>, 566 F.2d at 220).

Based on the record currently before the Court, it cannot be said that the facts here undisputably prove that the Higgins Practice is solely liable for Dr. Williams' allegedly negligent conduct. The Government primarily relies upon the Agreement between the National Capital Consortium (the "Consortium") and the Higgins Practice to show that Dr. Williams, as a member of the Consortium, was under the control of the Higgins Practice, and therefore, a borrowed servant of the Higgins Practice. <u>See</u> Gov't's Mem. at 15. Specifically, the Government notes that the Agreement provides that Dr. Williams, "[w]hile training at the [Higgins] Practice, . . . [was] under the supervision of [Higgins Practice] officials for training purposes and [was] subject to, and [was] required to abide by, all practicable [Higgins] Practice rules and regulations." Gov't's Mot., Ex. 2 (Agreement) ¶ 5. Under the Agreement, Dr. Williams was "considered [a] provider[] or member[] of the [Higgins] Practice's workforce while performing duties pursuant to [the A]greement," <u>id.</u>, Ex. 2 (Agreement) ¶ 10, and the Higgins Practice "reserved the right to refuse to accept or to bar [Dr. Williams] from training when it [was] determined that [his] further participation would not be in the [Higgins] Practice's best interest," <u>id.</u>, Ex. 2 (Agreement) ¶ 9. Additionally, the Agreement stated that because Dr. Williams, "while training at the Practice, [was] under the exclusive control and supervision of the [Higgins] Practice[,] . . . proceeds from [Dr. Williams'] professional bills [became] the [Higgins] Practice's exclusive property." <u>Id.</u>, Ex. 2 (Agreement) ¶ 11. Based on these provisions, the Agreement suggests that Dr. Williams was a borrowed servant of the Higgins Practice, and therefore, the Higgins Practice would be liable for tortious conduct committed by Dr. Williams while working

under the control and supervision of the Higgins Practice.

However, the Agreement also provides that the Consortium "requires special clinical training in preparation for board certification of fellows . . . in sports medicine," id., Ex. 2 (Agreement) ¶ 3, and that "[i]t is in the best interest of the Consortium for trainees to use the facilities of the [Higgins] Practice to receive [this] clinical experience," id., Ex. 2 (Agreement) ¶ 4. Additionally, "the director of the Consortium's Family Medicine/Sports Medicine Fellowship Program" assisted in the "outlining [of the] specific goals and requirements for [the] clinical rotation" performed, including "the anticipated training, training and supervision standards to be employed, and any other issues required by the Family Medicine/Sports Medicine Fellowship Program Review Committee." Id., Ex. 2 (Agreement) ¶ 8. The Agreement also suggests that the Consortium prohibited the Higgins Practice from generating professional bills for services rendered by Dr. Williams "to patients who are beneficiaries of the Department of Defense/TriCare." Id., Ex. 2 (Agreement) ¶ 11. The Consortium further promised to "ensure compliance with all applicable [Higgins] Practice rules and instructions and those of its physicians," id., Ex. 2 (Agreement) ¶ 27, and it provided secondary liability coverage because, "while performing services pursuant to [the A]greement, Consortium trainees remain[ed] employees of the United States performing duties within the course and scope of their federal employment," id., Ex. 2 (Agreement) ¶ 32. Consequently, the record also suggests that the Consortium maintained some elements of control of Dr. Williams' clinical experience at the Higgins Practice and that Dr. Williams was acting within the scope of his duties for both the Higgins Practice and the Consortium. Therefore, because the current record does not clearly attach liability exclusively to the Higgins Practice, the Court must deny the Government's motion to dismiss, or alternatively for summary judgment with respect to the plaintiff's claims

19

against it based on the borrowed servant doctrine.[7]

## B. The Plaintiff's Claims Against the NCAA

### 1. The Negligence Claim

In Count I of her Amended Complaint, the plaintiff asserts a negligence claim against the NCAA, alleging that it "was careless and negligent by breaching the duties of care it assumed for the benefit of [the p]laintiff." Removal Notice, Ex. 5 (Am. Compl.) ¶ 142. To state a claim of negligence under District of Columbia law, the plaintiff must establish that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1098 (D.C. 1994). Defendant NCAA argues that

> [n]owhere in the Amended Complaint does [the p]laintiff plead that the NCAA did something or did not do something after the alleged injury with respect to her medical care, that the NCAA played any part in the medical decision made by the healthcare providers she consulted, or even that the NCAA was aware of her injury or that she was receiving medical care. Simply put, [the p]laintiff's [negligence] claim is about the medical care she received from other people, not the NCAA.

NCAA's Reply at 8. Thus, the NCAA contends that the "[p]laintiff has not pled sufficient facts to establish (even at the pleading stage) that [its] supposed negligence caused her injuries[,]" and therefore, the "[p]laintiff's negligence-based claims must be dismissed."[8] NCAA's Mem. at 15.

"The District of Columbia Court of Appeals 'has defined proximate causation as that

---

[7] The Court finds the Government's motion for summary judgment premature given that discovery has not yet occurred in this case. However, after the close of discovery and once the record is complete, the Government may of course renew its motion for summary judgment on the grounds that the borrowed servant doctrine shifts sole liability to the Higgins Practice.

[8] In a footnote in its motion to dismiss, the NCAA noted that it "disagrees that [the p]laintiff has identified a legally cognizable duty that the NCAA breached" because "the law is clear that athletic associations do not have a legal duty to prevent foreseeable risks." NCAA's Mem. at 14 n.11. However, the NCAA appears to predicate its argument solely on the causation element of a negligence claim, see generally NCAA's Reply (failing to address the plaintiff's argument that the NCAA concedes that the plaintiff has successfully pleaded the duty, breach, and damages elements), and therefore, the Court, at this time, will consider only whether the NCAA's alleged negligence was a proximate cause of the plaintiff's alleged injuries.

cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.'" Smith v. Hope Village, Inc., 481 F. Supp. 2d 172, 199–200 (D.D.C. 2007) (Walton, J.) (quoting District of Columbia v. Zukerberg, 880 A.2d 276, 281 (D.C. 2005)). "[A]n actor whose conduct is a substantial factor in bringing about [the] harm shall be liable in negligence . . . for[, inter alia,] harm foreseeably attributable to his or her conduct." Id. at 200 (quoting White v. United States, 780 F.2d 97, 106 (D.C. Cir. 1986) (alterations in original)). The plaintiff may demonstrate proximate cause by "either direct or circumstantial evidence," Zukerberg, 880 A.2d at 281, and "'[i]n most cases, the existence of proximate cause is a question of fact for the jury,' and 'only if it is absolutely clear that the [defendant's] negligence could not have been a proximate cause [of the harm asserted by the plaintiff] is it a question of law,'" Smith, 481 F. Supp. 2d at 185 (first quoting McNeal v. Hi-Lo Powered Scaffolding, Inc. 836 F.2d 637, 644 (D.C. Cir. 1988); then quoting Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (alterations in original)).

Here, the plaintiff has pleaded facts sufficient to establish a claim of negligence against the NCAA. In her Amended Complaint, the plaintiff asserts that "[d]efendant NCAA undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including [her,] . . . [and] a duty to protect student-athletes from brain injuries." Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 138–39. The plaintiff then alleges that "[d]efendant NCAA failed in its duties" by, among other things, failing to

> ensure that the coaches, athletic trainers and graduate assistants were educated about the signs, symptoms[,] and risks of concussions, second-impact syndrome, and post-concussive syndrome; implement appropriate safety procedures and policies regarding care, treatment, and monitoring of student-athletes suffering from concussions, concussion symptoms, and post-concussive symptoms; implement appropriate oversight over its member institutions in their implementation of Concussion Management Plans; provide appropriate guidance to its member institutions on concussion management; [and] safeguard[] its

student-athletes from preventable concussion and post-concussion injuries.

Id., Ex. 5 (Am. Compl.) ¶ 142(b), (g), (h), (i), (k), (m). And the plaintiff also contends that the NCAA's alleged negligent acts or omissions proximately caused her to suffer economic and non-economic damages such as various "past [and future] medical bills, . . . and loss of future economic opportunity," id., Ex. 5 (Am. Compl.) ¶ 145, as well as "deterioration of her mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation[,] and disfigurement," id., Ex. 5 (Am. Compl.) ¶ 146. Because "it is [not] absolutely clear that the [defendant's] negligence could not have been a proximate cause" of the harm asserted by the plaintiff," Smith, 481 F. Supp. 2d at 185 (second alteration in original), and because the plaintiff has pleaded facts sufficient to demonstrate causation to withstand a motion to dismiss, the Court must deny the NCAA's motion to dismiss with respect to the plaintiff's negligence claim against it.

### 2. The Gross Negligence Claim

Count II of the plaintiff's Amended Complaint asserts a gross negligence claim against the NCAA. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 147–56. The NCAA contends that the plaintiff's gross negligence claim against it is "duplicative of [the p]laintiff's negligence claim and should be dismissed as redundant." NCAA's Mem. at 15.

"In the District of Columbia, 'courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons.'" Search v. Uber Techs., Inc., 128 F. Supp. 3d 222, 237 (D.D.C. 2015) (quoting Hernandez v. District of Columbia, 845 F. Supp. 2d 112, 116 (D.D.C. 2012)). Where, as here, the "plaintiff has already alleged a negligence claim[,] . . . the Court defers to the general rule in the District of Columbia against recognizing degrees of

negligence and will dismiss as duplicative plaintiff's claim for gross negligence . . . as a separate basis of liability.'" Id. (citation omitted) (alterations in original).

The "[p]laintiff maintains her contention that [d]efendant NCAA's conduct in this matter rose to the level of gross negligence for which punitive damages may be recoverable[, and that s]uch damages are not recoverable under a mere standard of negligence." Pl.'s NCAA Opp'n at 32. However, the plaintiff's Amended "Complaint includes multiple counts of negligence against [the NCAA], and [the plaintiff] does not identify any relevant statutory claim or defense requiring a showing of gross negligence." Search, 128 F. Supp. 3d at 237; see also Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 147–56 (alleging only the elements of a gross negligence claim without any reference to any statutory claim or defense). Instead, the plaintiff asserts a claim of gross negligence only for the purposes of recovering punitive damages.[9] But, "neither 'gross negligence' nor 'punitive damages' is a stand-alone cause of action in the District of Columbia." Search, 128 F. Supp. 3d at 237–38. Accordingly, the Court must dismiss the plaintiff's gross negligence claim against defendant NCAA.

### 3. The Negligent Infliction of Emotional Distress Claim

The plaintiff in Count IV of her Amended Complaint alleges that she "has and continues to suffer from severe emotional distress" resulting from the NCAA's alleged negligence.

---

[9] The Court also notes that "[i]n the District of Columbia, punitive damages are generally available only in actions arising from intentional torts." Doe v. De Amigos, LLC, 987 F. Supp. 2d 12, 17 (D.D.C. 2013) (citing Calvetti v. Antcliff, 346 F. Supp. 2d 92, 108 (D.D.C. 2004)). And, "[t]he District of Columbia does not allow recovery for punitive damages for a showing of mere negligence." Id. (citing Harvey v. Mohammed, 841 F. Supp. 2d 164, 180–81 (D.D.C. 2012), aff'd in part as modified and rev'd in part, 798 F.3d 1042 (D.C. Cir. 2015)). "Rather, punitive damages are reserved for only those tortious acts that are 'replete with malice.'" Harvey, 841 F. Supp. 2d at 181 (quoting Zanville v. Garza, 561 A.2d 1000, 1002 (D.C. 1989)); see also Wash. Med. Ctr., Inc. v. Holle, 573 A.2d 1269, 1284 (D.C. 1990) ("Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." (internal quotation marks and citation omitted)). Therefore, to the extent the plaintiff's Amended Complaint can be construed as a request for punitive damages, the plaintiff has not made a showing sufficient to establish that the NCAA committed an intentional tort against her that was "replete with malice." Zanville, 561 A.2d at 1002.

Removal Notice, Ex. 5 (Am. Compl.) ¶ 171.  Similar to its argument in opposition to the

plaintiff's gross negligence claim, the NCAA contends that the "[p]laintiff's negligent infliction

of emotional distress [claim] is subsumed by her negligence claim and thereby seeks duplicative

damages."  NCAA's Mem. at 16.

"To establish a prima facie case of negligent infliction of emotional distress, [a plaintiff]

must show that she was in the zone of physical danger created by [the defendant's] conduct and

was caused by [the defendant's] negligence to fear for her own well-being."  Hollis v. Rosa

Mexicano D.C., LLC, 582 F. Supp. 2d 22, 27 (D.D.C. 2008) (quoting Jane W. v. Pres. & Dirs. of

Georgetown Coll., 863 A.2d 821, 826 (D.C. 2004) (alterations in original)).  Alternatively,

"when a plaintiff [is] not within the zone of danger but where there is a 'special relationship'

between the parties," a plaintiff may state of a claim of negligent infliction of emotional distress

> if the plaintiff can show that (1) the defendant has a relationship with the plaintiff,
> or has undertaken an obligation to the plaintiff, of a nature that necessarily
> implicates the plaintiff's emotional well-being, (2) there is an especially likely
> risk that the defendant's negligence would cause serious emotional distress to the
> plaintiff, and (3) negligent actions or omissions of the defendant in breach of that
> obligation have, in fact, caused serious emotional distress to the plaintiff.

Lesesne v. District of Columbia, 146 F. Supp. 3d 190, 195 (D.D.C. 2015) (citing Hedgepeth v.

Whitman Walker Clinic, 22 A.3d 789, 810–11 (D.C. 2011)).

Here, the plaintiff has not pleaded facts sufficient to establish a claim of negligent

infliction of emotional distress against the NCAA.  In her Amended Complaint, the plaintiff

merely summarizes the same allegations upon which she seeks to establish claims of negligence

and gross negligence, and recites, in a conclusory fashion, the elements that set forth a claim for

negligent infliction of emotional distress.  Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73.

Additionally, the plaintiff has not proffered any facts that demonstrate that the NCAA's alleged

negligence, rather than her underlying physical injury, caused her serious emotional distress.  See

24

id., Ex. 5 (Am. Compl.) ¶¶ 172–73 (asserting the same injuries in Count I (negligence) and Count II (gross negligence) against the NCAA). Consequently, the plaintiff has not pleaded facts sufficient to plausibly state a claim of negligent infliction of emotional distress against the NCAA, and therefore, the Court grants the NCAA's motion to dismiss Count IV against it.

### 4. The Fraudulent Misrepresentation Claim

The plaintiff alleges in Count V of her Amended Complaint that the NCAA made false representations to her by stating "that it undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports . . . [and] to protect student-athletes from brain injuries." Removal Notice, Ex. 5 (Am. Compl.) ¶ 175. The NCAA contends that the plaintiff fails to plead the requisite elements of a common law fraud claim, including failing to identify "what statements [it] made to [the p]laintiff, when the statements were made, how any such statements were false, that [it] knew the statements were false, or how [the p]laintiff relied on those statements to her detriment." NCAA's Mem. at 12.

"The essential elements of common law fraud are: (1) a false representation (2) in reference to [a] material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." Va. Acad. of Clinical Psychologists v. Grp. Hosp. & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005) (citation omitted). In addition to the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, fraud claims are subject to the heightened pleading requirement of Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this heightened standard, "'the pleader [must] . . . state the time, place[,] and content of the false misrepresentations, the fact misrepresented . . . [,] what was retained or given up as a

25

consequence of the fraud,'" and "identify individuals allegedly involved in the fraud." United States ex rel. Williams v. Martin–Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citations omitted); see also Stevens v. InPhonic, Inc., 662 F. Supp. 2d 105, 114 (D.D.C. 2009) (Walton, J.) ("The complaint must . . . provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud in order to meet this enhanced pleading standard." (internal citation and quotation marks omitted)).

Here, the plaintiff has failed to allege facts sufficient to state a claim of fraudulent misrepresentation against the NCAA to survive a motion to dismiss. The plaintiff claims that the "NCAA has both promised and acknowledged that it has a duty to protect the health and safety of student-athletes" because the NCAA's Constitution states that the NCAA "shall assist [member] institution[s] in [their] efforts to achieve full compliance with all rules and regulations," Removal Notice, Ex. 5 (Am. Compl.) ¶ 65, and because "the NCAA utilizes injury surveillance data to examine, explore, understand, and work to prevent sports injuries," id., Ex. 5 (Am. Compl.) ¶ 67. Additionally, the plaintiff asserts that the NCAA's representations to protect the health and safety of student-athletes were false. See id., Ex. 5 (Am. Compl.) ¶ 176. However, the plaintiff recognizes that the NCAA, through its Constitution, expressly notes that each member institution maintains sole responsibility "to protect the health of, and provide a safe environment for, each of its participating student athletes." Id., Ex. 5 (Am. Compl.) ¶ 64 (quoting Article 2.2 of the NCAA's Constitution). Even accepting the plaintiff's allegation of fraudulent misrepresentation as true, as the Court must at this stage of the proceedings, she has not alleged any facts that demonstrate how the NCAA's representations are allegedly false, were "made with knowledge of its falsity [or] with the intent to deceive." Va. Acad. of Clinical Psychologists, 878 A.2d at 1233. Instead, what the plaintiff has done is simply assert a

26

threadbare recital of the elements of a fraudulent misrepresentation claim. <u>See</u> Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 174–82. Such bare, conclusory allegations satisfy neither the Rule 8 pleading standards as explained under <u>Iqbal</u>, nor the heightened pleadings requirements of Rule 9(b). The plaintiff's fraudulent misrepresentation claim against the NCAA must, therefore, be dismissed.

### 5. The Breach of Contract Claim

Count VI of the plaintiff's Amended Complaint alleges that the NCAA and the plaintiff

> entered into a contract whereby the NCAA agreed to undertake and assume a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including [the plaintiff]; and agreed to undertake and assume a duty to protect student-athletes from brain injuries. In return, [the p]laintiff [ ] agreed to abide by all rules and regulations promulgated by [d]efendant NCAA through its Constitution, Bylaws, and numerous authorizations required to participate in field hockey.

Removal Notice, Ex. 5 (Am. Compl.) ¶ 184. According to the plaintiff, "[d]efendant NCAA breached [this] contract in failing to protect the physical and mental well-being of [the p]laintiff and in failing to protect [her] from brain injuries." <u>Id.</u>, Ex. 5 (Am. Compl.) ¶ 186.

"In the case of a claim for breach of contract, the complaint must allege four necessary elements in order to effect fair notice: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." <u>Ihebereme v. Capital One, N.A.</u>, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (internal quotation marks omitted). The NCAA argues that dismissal of the plaintiff's breach of contract claim against it is warranted because the plaintiff has not "identif[ied] an actual contract between her and the NCAA, much less a contract in which the NCAA agreed to be responsible for injuries [the p]laintiff could suffer while playing field hockey." NCAA's Mem. at 13. The Court agrees.

27

In her Amended Complaint, the plaintiff cites the following formal agreements as establishing a valid contract for the basis of her breach of contract claim: (1) Health Insurance Portability and Accountability Act ("HIPAA") authorization forms for the NCAA and the University; (2) Student-Athlete Concussion Statements for 2010–2011 and for 2011–2012 on behalf of the University; and (3) a Student-Athlete Authorization/Consent for Disclosure of Protected Health Information for NCAA-Related Research Purposes for the NCAA. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 68, 92–93, 96; see also Pl.'s NCAA Opp'n at 26–27. However, only two of these formal agreements are between the plaintiff and the NCAA, and those agreements are only a request to access the plaintiff's medical records. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 68, 96. Consequently, the plaintiff has neither identified a valid, enforceable contract wherein the NCAA agreed to protect the physical and mental well-being of students-athletes, including the plaintiff, nor the specific terms of any contract regarding the NCAA's alleged duty or obligation to provide medical treatment to the plaintiff that the NCAA breached. See Regan v. Spicer HB, LLC, 134 F. Supp. 3d 21, 30 (D.D.C. 2015) (dismissing part of the plaintiff's breach of contract claims because the plaintiff "failed to identify an obligation or duty arising out of the [contract] that was breached by [the d]efendants"); see also In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009, 808 F. Supp. 2d 154, 159 (D.D.C. 2011) (Walton, J.) ("It is particularly important to note that 'one cannot breach a contract without breaching a particular obligation created under the contract.'" (quoting Ihebereme, 730 F. Supp. 2d at 47)).

Alternatively, if the Court concludes "that a formal contract was not entered into between the parties," the plaintiff asserts "that she has adequately pled facts to support a claim of quasi-contract" or an implied-in-fact contract. Pl.'s NCAA Opp'n at 29. Specifically, the

28

plaintiff contends that she "expect[ed] to receive consideration from [d]efendant NCAA for granting it the ability to appropriate her likeness and providing access to her personal identifiable and privileged medical information in the form of compliance and enforcement of the applicable rules and safeguards imposed by the NCAA." Id. at 30. But, as the NCAA notes, see NCAA's Reply at 6, the plaintiff has not pleaded any facts to establish a quasi-contract or an implied-in-fact contract, and the plaintiff may not now seek to do so or further amend her complaint through an opposition brief. See Thomas v. Sotera Def. Sols., Inc., 40 F. Supp. 3d 181, 185 (D.D.C. 2014) (noting that "a complaint may not be amended by the briefs in opposition to a motion to dismiss" (internal citation and quotation marks omitted)).[10] Accordingly, because the plaintiff has failed to plead facts sufficient to establish a valid contract between her and the NCAA regarding the NCAA's alleged duty or obligation to provide her medical treatment, the Court must grant the NCAA's motion to dismiss the plaintiff's breach of contract claim against it.

### 6. The Medical Malpractice Claim

The plaintiff predicates Count VIII of her Amended Complaint on a medical malpractice claim against the NCAA. In the District of Columbia, a "healthcare provider" is

> an individual or entity licensed or otherwise authorized under District law to provide healthcare service, including a hospital, nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, renal dialysis facility, ambulatory surgical center, pharmacy, physician or health care practitioner's office, long-term care facility, behavior health residential treatment facility, health clinic, birth center, clinical laboratory, health center, physician, physician assistant, nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, certified nurse midwife, psychologist, certified social worker, registered dietitian or nutrition professional, physical or occupational therapist, pharmacist, or other individual health care practitioner.

---

[10] In her oppositions to both defendants Patriot League's and the University's motions to dismiss, the plaintiff makes the same argument that she has pleaded facts to show the existence of a quasi-contract, and if the Court deems otherwise, she requests leave of the Court to further amend her Complaint. Because the arguments and facts are essentially identical, it is unnecessary for the Court to separately address this argument in regards to each motion, as the Court's ruling here is also applicable to the other defendants' motions.

D.C. Code § 16-2801(2) (2012).  Defendant NCAA contends that dismissal of the plaintiff's

medical malpractice claim against it is warranted because the "[p]laintiff does not allege that the

NCAA is a healthcare provider licensed in the District of Columbia . . . , and the NCAA neither

falls within any of the twenty-seven examples enumerated in the statute, nor can it be considered

an 'other individual health care practitioner' under any reasonable interpretation of the term."

NCAA's Mem. at 9.  The Court agrees.

   The Court notes that the plaintiff has not alleged or pleaded facts that demonstrate that

the NCAA is "an entity licensed or otherwise authorized under District law to provide healthcare

service[s]."  D.C. Code § 16-2801(2).  Nonetheless, in her attempt to show that "[d]efendant

NCAA undertook a duty to act as a healthcare provider," Pl.'s NCAA Opp'n at 18, the plaintiff

relies on the Sports Medicine Handbook[11] created by the NCAA Committee on Competitive

Safeguards and Medical Aspects of Sports, which provides "guidelines for sports medicine care

and [the] protection of student athletes' health and safety . . . [and which she contends] may

constitute some evidence of the legal standard of care," id. at 17 (citing NCAA Mot., Ex. B

(2011–2012 NCAA Sports Medicine Handbook (the "Sports Medicine Handbook")) at 2).  And,

the plaintiff argues that the NCAA's enforcement of the Sports Medicine Handbook and its

underlying policies and guidelines constitutes the "practice of medicine."  Id. at 18 (comparing

the NCAA's action with respect to this Handbook to "Georgetown University and George

Washington University[, which both] craft and enforce policies and procedures to be utilized

within their hospitals").  However, the Sports Medicine Handbook expressly states:

---

[11] "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted).  Therefore, because the plaintiff incorporates the Sports Medicine Handbook into her Amended Complaint, see Removal Notice, Ex. 5 (Am. Compl.) ¶ 42, the Court will consider the Sports Medicine Handbook in its analysis.

> This handbook consists of guidelines for each institution to consider in developing sports medicine policies appropriate for its intercollegiate athletics program. . . . These recommendations are not intended to establish a legal standard of care that must be strictly adhered to by member institutions. . . . [Additionally,] [t]hese general guidelines are not intended to supersede the exercise of medical judgment in specific situations by a member institution's sports medicine staff. In all instances, determination of the appropriate care and treatment of student-athletes must be based on the clinical judgment of the institution's team physician or athletic health care team that is consistent with sound principles of sports medicine care.

NCAA Mot., Ex. B (Sports Medicine Handbook) at 2. Therefore, the NCAA, through the Sports Medicine Handbook and its policies, only provides guidance for the consideration of its member institutions and does not establish a standard of care, instead deferring to the member institutions the responsibility of developing sports medicine policies for he care and treatment of their student-athletes.

Alternatively, the plaintiff contends that the "NCAA is vicariously liable for the actions and inactions of [the University] and its agents, servants, and/or employees that failed to fall in line with policies and procedures as [they] pertain to a concussion management plan." Pl.'s NCAA Opp'n at 22. As support for this position, the plaintiff argues that "the NCAA Constitution and the policies and procedures developed by [the] NCAA created a right to control and direct the healthcare providers treating [her] in creating and enforcing an appropriate concussion management plan." Id. at 21. However, the "NCAA Bylaws state '[i]t is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating athletes.'" Id. (alteration in original). And, even if the NCAA could "suspend[] or terminate[] or . . . otherwise discipline[]" the University if it "fail[ed] to meet the conditions and obligations of membership or fail[ed] to adhere to the purposes and policies of the [NCAA]," id., the NCAA could not likewise punish the healthcare providers employed by the University who treated the plaintiff. Furthermore, the Sports Medicine Handbook only provided

31

guidance for its member institutions' consideration and did not grant the NCAA the right to control or direct the healthcare providers who treated the plaintiff at the University. See generally NCAA Mot., Ex. B (Sports Medicine Handbook) at 2. Consequently, the plaintiff has failed to proffer facts sufficient to plausibly state a claim of entitlement to relief either through direct or vicarious liability against the NCAA. Accordingly, the Court must dismiss the plaintiff's medical malpractice claim against the NCAA.

### C. The Plaintiff's Claims Against the Patriot League

#### 1. The Negligence Claim

Count III of the plaintiff's Amended Complaint alleges that the Patriot League was "careless and negligent by breaching the duties of care [it] assumed for the benefit of [the p]laintiff." Removal Notice, Ex. 5 (Am. Compl.) ¶ 164. Specifically, the plaintiff asserts that the Patriot League failed to "provide and oversee a management system for [the treatment of the] concussion" that she suffered. Pl.'s Patriot League Opp'n at 15; see also Removal Notice, Ex. 5 (Am. Compl.) ¶ 164(a)–(p) (alleging that the defendants failed to implement policies and procedures to treat, care, and manage student-athletes who sustain concussions). And, the plaintiff argues that the Patriot League is vicariously liable under the doctrine of respondeat superior because it "had a right to control and direct [the University] and the healthcare providers treating [the plaintiff]." Pl.'s Patriot League's Opp'n at 18; see also Removal Notice, Ex. 5 (Am. Compl.) ¶ 165.

As noted earlier, a claim of negligence under District of Columbia law requires the plaintiff to establish that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of [the] duty proximately caused damage to the plaintiff." Haynesworth, 645 A.2d at 1098. The Patriot League contends that the plaintiff's negligence

32

claim against it must be dismissed as a matter of law because "there is no legal basis upon which to find a 'duty' on behalf of the Patriot League in this case [and t]here is no 'special relationship' between [t]he Patriot League and [the p]laintiff that would result in [the] establishment of a duty or justify the imposition of a duty." Patriot League's Mem. at 17.

"[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care." Presley v. Commercial Moving & Rigging, Inc., 25 A.3d 873, 888 (D.C. 2011) (alterations in original) (quoting Youssef v. 3636 Corp., 777 A.2d 787, 792 (D.C. 2001)). "In general, courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the [plaintiff] in a negligence action and examine whether the risk to the [plaintiff] was 'reasonably foreseeable' to the defendant." Hedgepeth, 22 A.3d at 793. And, "[t]he relationship between the plaintiff and the defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty." Id. at 794. However, a "determination of whether a duty exits is the result of a variety of considerations and not solely the relationship between the parties." Jefferson v. Collins, 905 F. Supp. 2d 269, 291 (D.D.C. 2012) (Walton, J.) (quoting Presley, 25 A.3d at 888). "[T]he existence of a duty is also shaped by considerations of fairness and results ultimately from policy decisions made by the courts and the legislatures." Id. (quoting Presley, 25 A.3d at 888). "Whether there is a duty of care is a question of law." Presley, 25 A.3d at 883 (citing Tolu v. Ayodeji, 945 A.2d 596, 601 (D.C. 2008)).

"[V]icarious liability is a legal concept that transfers an agent's liability to his or her principal, and includes the theory of [respondeat superior]." Stevens v. Sodexo, Inc., 846 F. Supp. 2d 119, 129 (D.D.C 2012) (citing Convit v. Wilson, 980 A.2d 1104, 1114 (D.C. 2009)). "Under that theory, the responsibility of an agent for his own legally careless action is imputed to

33

the principal." <u>Convit</u>, 980 A.2d at 1114. "[T]he decisive test is whether the [principal] has a right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done." <u>Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.</u>, 758 F.3d 378, 386 (D.C. Cir. 2014) (quoting <u>Schecter v. Merchs. Home Delivery, Inc.</u>, 892 A.2d 415, 423 (D.C. 2006)).

Here, the plaintiff has not pleaded facts sufficient to demonstrate that the Patriot League owed her a duty of care. In her Amended Complaint, the plaintiff states that the Patriot League "assumed the same duties and responsibilities as the NCAA has both promised and acknowledged pertaining to the protection of the health and safety of student-athletes" because the Patriot League's Policies and Procedures provides that "Patriot League institutions are expected to abide by all rules and procedures set forth in both the NCAA and Patriot League Materials." Removal Notice, Ex. 5 (Am. Compl.) ¶ 77; <u>see also</u> <u>id.</u> Ex. 5 (Am. Compl.) ¶ 80 (noting that because the Patriot League has not implemented a policy "for the management of concussions/brain injuries to student-athletes," the Patriot League incorporated the concussion management plan outlined by the NCAA). However, contrary to the plaintiff's position, such a broad requirement by the Patriot League does not suggest, nor has the plaintiff alleged any plausible facts that conceivably might suggest, that the Patriot League assumed an "affirmative duty to oversee that [ ] a [concussion management] plan was in fact implemented and being complied with by [the University]," Pl.'s Patriot League Opp'n at 14, or became an enforcement arm on the matter for the NCAA.

Moreover, and also contrary to the plaintiff's position, <u>see</u> <u>id.</u> at 13–14, the relationship between the plaintiff and the Patriot League is "closely related to [the C]ourt's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the [Patriot League's]

34

duty." Hedgepeth, 22 A.3d at 794. As the Patriot League notes, see Patriot League's Reply at 7,

its Policies and Procedures does not create a relationship between it and the plaintiff that gives

rise to a legal duty of care owed to the plaintiff. If anything, the manual creates a relationship

between the Patriot League and its respective member institutions, such as the University. In

fact, the Patriot League's Policies and Procedures[12] states:

> Member institutions are responsible for compliance by student-athletes and
> employees at their institutions. Students enrolled in a regular or associate
> member institution do not, by virtue of such enrollment, acquire membership in
> the [Patriot] League. The [Patriot] League has no direct jurisdiction over any
> student enrolled in a regular or associate member institution or any employees,
> and no individual students or employees have any membership rights in the
> [Patriot] League.

Patriot League's Mot., Ex. 1 (Constitutional Bylaws excerpted from the Patriot League Policies

& Procedures Manual) at 1. Thus, the record does not support the plaintiff's position that the

Patriot League had a relationship with the plaintiff that made the injuries she allegedly sustained

reasonably foreseeable, resulting in a legal duty of care that the Patriot League owed to the

plaintiff.

Moreover, the Patriot League cites various cases outside of this District, see Patriot

League Dismiss Mem. at 13–16,[13] as legal authority of "a consistent and understandable

reluctance on the part of courts to hold the governing bodies of sport associations liable for

negligence in the absence of direct involvement in decisions made with respect to the injured

athlete," id. at 16. Through these cases, the Patriot League contends, on public policy grounds,

that "[p]ermitting liability against a governing organization (or athletic conference) based upon

---

[12] Because the plaintiff incorporates the Patriot League's Policies and Procedures in her Amended Complaint, see Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 76-80, the Court, as mentioned earlier regarding such documents, see supra Part III.B.6 n.11, will consider the Patriot League's Policies and Procedures in its analysis.

[13] The Court finds it unnecessary to conduct an analysis of these cases because the Patriot League primarily cites them for the proposition that an athletic conference owes no duty to student-athletes of its member institutions, and independent of these cases, the Court finds that the Patriot League did not owe a duty of care to the plaintiff.

an athlete's mere participation in a sport places an unfair burden upon the governing organizations, would make it difficult for the governing bodies to function, and would open the door to a flood of litigation." Id. at 17. The Patriot League also argues that

> post-concussion treatment is [a] medical decision, involving individual considerations between the doctor and patient. Medical providers should not be second-guessed by bureaucrats in an athletic conference. Rather, medical decisions as to whether an athlete is physically cleared to play should be left within the sound discretion of trained health care providers, not organizations whose purpose is to provide referees, arrange for competitive fields / courts, and facilitate tournament and championship play.

Patriot League's Reply at 10–11. Because considerations of fairness and public policy play a role in a court's analysis of foreseeability in determining duty, the Court agrees with the Patriot League that such public policy considerations provide support for shielding athletic conferences from litigation involving an injury to an athlete based on an athlete's participation in a sporting event sanctioned by the athletic conference, without a showing that the athletic conference took affirmative steps to establish a requisite duty of care.

Nonetheless, the plaintiff argues that the "Patriot League is vicariously liable for the actions and inactions of [the University] that failed to fall in line with policies and procedures that [the University] failed to uphold," Pl.'s Patriot League Opp'n at 19, because it "had a right to control and direct [the University] and the healthcare providers treating [the plaintiff]," id. at 18. To support her position, the plaintiff cites the NCAA bylaws, the Sports Medicine Handbook, and the Patriot League's Policies and Procedures, which provide the Patriot League with the authority to terminate an institution's membership. Id. at 18–19. But, none of these documents grant the Patriot League the right to control and direct the University in its day-to-day operations, its hiring and firing decisions, or its responsibility for the performance of its employees' duties. Simply, the plaintiff has not alleged plausible facts to allocate or transfer

liability to the Patriot League under the doctrine of <u>respondeat superior</u>.

Accordingly, because the plaintiff's bald assertions do not permit the Court to draw a reasonable inference that the Patriot League owed her a legal duty of care, the Court must grant the Patriot League's motion to dismiss the plaintiff's negligence claim against it.

### 2. The Negligent Infliction of Emotional Distress Claim

Count IV of the plaintiff's Amended Complaint also asserts a negligent infliction of emotional distress claim against the Patriot League. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73. As the Court previously noted, <u>see</u> <u>supra</u> Part III.B.3, a plaintiff, who was not in the "zone of physical danger," may recover for a claim of negligent infliction of emotional distress if she can make a showing that

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

<u>Hedgepeth</u>, 22 A.3d at 810–11. The Patriot League contends that it "neither undertook to protect against [the plaintiff's] emotional distress, nor is there any special relationship with [the p]laintiff that could create the duty necessary to form the basis for a negligent infliction of emotional distress claim." Patriot League's Reply at 12.

The plaintiff argues in response that the Patriot League "undertook an obligation to the plaintiff to oversee and monitor [the University]'s compliance with both its own and the NCAA's policies and procedures, specifically the concussion management procedure" and that "the acceptance of this duty to oversee [the University's] compliance with the applicable policies and procedures . . . create[d] the 'special relationship' with the [p]laintiff." Pl.'s Patriot League Opp'n at 20. However, even accepting the plaintiff's allegation as true, as the Court must at the

37

motion to dismiss stage, the plaintiff has not established that "[t]he purpose of the relationship

. . . involved care for [the plaintiff's] emotional well-being." Lesesne, 146 F. Supp. 3d at 196

("If the object of the relationship is not such care, but is rather 'to obtain a financial, commercial

or legal objective,' emotional well-being is not necessarily implicated.  In other words, even if

the purpose of a relationship is to achieve an objective for the benefit of a client, if that objective

does not necessarily implicate the client's emotional wellbeing—even if it has an effect on it—

the relationship is not 'special' for purposes of [negligent infliction of emotional distress]."

(internal citations omitted)).  And the plaintiff has not demonstrated that the Patriot League's

alleged negligence, rather than the alleged physical injuries she sustained, caused serious

emotional distress.  See Pl.'s Patriot League Opp'n at 20 ("As vastly pled throughout the

Complaint, multiple concussions and post-concussive syndrome has been vastly implicated with

physical and emotional well-being.").  Thus, similar to the circumstances regarding the NCAA,

the plaintiff has not alleged facts sufficient to plausibly state a claim of negligent infliction of

emotional distress against the Patriot League.  Accordingly, because the plaintiff's conclusory

allegations do not rise to the level necessary for the plaintiff to state a claim of entitlement to

relief, the Court must dismiss the plaintiff's negligent infliction of emotional distress claim

against the Patriot League.

### 3. The Breach of Contract Claim

The plaintiff predicates Count VII of her Amended Complaint against the Patriot League

on a breach of contract theory.  As noted above, to state "a claim for breach of contract, the

complaint must allege four necessary elements in order to effect fair notice: (1) a valid contract

between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by [the] breach."  Ihebereme, 730 F. Supp. 2d at 47 (internal quotation

38

marks and citation omitted). The Patriot League argues that the "[p]laintiff has failed to identify a governing contract which places [it] and [the p]laintiff in privity, and/or which gives rise to a duty or obligation by the Patriot League." Patriot League's Mem. at 23. The Court agrees.

The plaintiff relies on two contracts she entered into with the University: an August 11, 2009 HIPPA authorization and a 2010–2011 Student-Athlete Concussion Statement. See Pl.'s Patriot League Opp'n at 21–23. Pursuant to these contracts, the plaintiff argues that the Patriot League is a third party beneficiary. See id. at 22. "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (quoting Alpine Cty., Ca. v. United States, 417 F.3d 1366, 1368 (Fed. Cir. 2005)). However, the plaintiff has not alleged or proffered any facts that the Patriot League claims third party beneficiary status or that the plaintiff and the University, the actual parties to the two contracts, "had an express or implied intention to benefit directly [the Patriot League]." Parker v. John Moriarty & Assocs., __ F. Supp. 3d __, __, No. 15-1506 (CKK), 2016 WL 7235637, at *9 (D.D.C. Dec. 14, 2016) (citation and internal quotation marks omitted). Furthermore, as the Patriot League correctly notes, see Patriot League's Reply at 13, even if the Patriot League claimed third-party beneficiary status and the plaintiff and the University intended to benefit the Patriot League, the plaintiff would still be unable to pursue a breach of contract claim it because the Patriot League would be the party that maintains the right to enforce the contractual obligations against the plaintiff and the University, not vice versa. See Fort Lincoln Civic. Ass'n, 944 A.2d at 1064 (noting that "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty" (alteration in original) (citation omitted)). Therefore, because the plaintiff has failed to

39

identify a valid contract between her and the Patriot League to proceed with a breach of contract claim, the Court must grant the Patriot League's motion to dismiss the plaintiff's breach of contract claim against it.

### 4. The Medical Malpractice Claim

As noted above, Count VIII of the plaintiff's Amended Complaint asserts a medical malpractice claim against defendant Patriot League. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 195–96. Akin to the position of the NCAA, the Patriot League argues that the plaintiff's medical malpractice claim against it must be dismissed as a matter of law because it "is not a 'healthcare provider' under District of Columbia law." Patriot League's Mem. at 25. The Court agrees.

The plaintiff cannot plausibly state a claim of medical malpractice against the Patriot League because she has not alleged or proffered any facts demonstrating that the Patriot League is an "entity licensed or otherwise authorized under District law to provide healthcare service[s]." D.C. Code § 16-2028(2). In her attempt to salvage her medical malpractice claim, the plaintiff argues that the Patriot League "is vicariously liable for the conduct of the healthcare providers who treated [the p]laintiff at [the University]" because it was "aware of the implementation of the [NCAA's] concussion management plan and had a duty to oversee that the [concussion management plan] was being adhered to by [the University] and the healthcare providers treating [her]." Pl.'s Patriot League's Opp'n at 24. However, as the Court previously concluded, see supra Part III.C.1, the plaintiff has not alleged any plausible facts demonstrating that the Patriot League had a right to control the day-to-day operations of the athletic operations at the University and its employees, or even had a right to control the medical treatment the plaintiff received, see Interstate Fire & Cas. Co., 758 F.3d at 386 (D.C. Cir. 2014). Therefore,

the plaintiff has not pleaded facts sufficient to allocate or transfer liability to the Patriot League under the doctrine of <u>respondeat superior</u>. Accordingly, because the plaintiff has not demonstrated that the Patriot League is an authorized healthcare provider under District of Columbia law or that the Patriot League is vicariously liable for the plaintiff's alleged injuries, the Court must dismiss the plaintiff's medical malpractice claim against defendant Patriot League.[14]

### D. The Plaintiff's Claims Against the University

#### 1. The Negligence Claim

Count III of the Amended Complaint asserts that the University was "negligent by breaching the duties of care [it] assumed for the benefit of [the p]laintiff." Removal Notice, Ex. 5 (Am. Compl.) ¶ 164. The University contends that the plaintiff's negligence claim against it must be dismissed because the plaintiff "cannot establish a requisite duty" to support her claim. Am. Univ. Mem. at 5.[15]

The University primarily relies on case law from other districts in its effort to demonstrate that it, as an academic institution, does not owe any duty of care to the plaintiff, a former student-athlete at the University. <u>See</u> Am. Univ. Mem. at 5–13. However, the University's reliance on these cases is to no avail because the facts in those cases are distinguishable from the facts in this case. Initially, the University cites various cases for the

---

[14] Through a separate motion, the Patriot League requests that the Court hold "a hearing on its Preliminary Motion to Dismiss." Patriot's League's Hearing Request at 1. However, because the Court has now ruled on the Patriot League's preliminary motion to dismiss, the Court will deny its hearing request as moot.

[15] The plaintiff also alleges that the University is vicariously liable for its employees' conduct based on the doctrine of <u>respondeat superior</u>, <u>see</u> Removal Notice, Ex. 5 (Am. Compl.) ¶ 165, and the University does not dispute this allegation, <u>see</u> Am. Univ. Mem. at 30 ("To be clear, [the] University is not asserting an absence of vicarious liability for the actions of its coach or trainers."). Thus, the Court will treat the University's motion to dismiss with respect to the plaintiff's negligence claim against it as a partial motion to dismiss.

proposition that "[c]ourts have been less inclined to find that institutes of higher education owe a special duty to their students on account of their status as adults in society." Id. at 7.[16] But, these cases do not involve either an injury to one of the institution's scholarship student-athletes during the course of an intercollegiate game or an injury that occurred on the institution's campus as is the case here. Thus, the Court does not find these cases instructive.

Additionally, the University cites various cases, one of which is from this District, as support for its position that institutions of higher education do not owe a legal duty of care to their student-athletes. See id. at 7–11. All of these cases were decided on motions for summary judgment after discovery was conducted, three in which the courts did not apply an ordinary negligence standard for injuries sustained in contact team sports, but elected to use a reckless or intentional conduct standard of care, see Mercier v. Greenwich Acad., Inc., No. 3:13-CV-4 (JCH), 2013 WL 3874511, at *2 (D. Conn. July 25, 2013); Karas v. Strevell, 884 N.E.2d 122, 130 (Ill. 2008); Kahn v. E. Side Union High Sch. Dist., 31 Cal. 4th 990, 1011 (2003), which the University encourages this Court to adopt, see Am. Univ. Mem. at 14. Additionally, all but one of these cases involved initial injuries sustained during a school-sponsored sporting event, where the courts dismissed the plaintiffs' negligence claims on the grounds that the plaintiffs assumed the risks inherent in playing contact sports. See Breheny v. Catholic Univ. of Am., No.

---

[16] Bradshaw v. Rawlings, 612 F.2d 135, 143 (3d Cir. 1979) (finding that the college did not have "a duty of custodial care" to protect one of its student from a drinking-and-driving accident that occurred off campus); Coghlan v. Beta Theta Pi Fraternity, 133 Idaho 388, 400 (1999) (holding that "Idaho universities [do not] have the kind of special relationship creating a duty to aid or protect adult students from the risks associated with the students' own voluntary intoxication"); Univ. of Denver v. Whitlock, 744 P.2d 54, 61 (Colo. 1987) (concluding "that the student-university relationship is not a special relationship of the type giving rise to a duty of the University to take reasonable measures to protect the members of fraternities and sororities from risks of engaging in extra-curricular trampoline jumping"); Beach v. Univ. of Utah, 726 P.2d 413, 415–17 (Utah 1986) (finding no special relationship between the plaintiff and the University that gave rise to a duty to protect the plaintiff after she became voluntarily intoxicated); Nickel v. Stephens Coll., 480 S.W.3d 390, 401 (Mo. 2015) (declining to recognize "a duty [based on the student-university relationship] in connection with administrative decisions related to a student's enrollment status"); Doe v. Va. Wesleyan Coll., Nos. CL14-6942-01, CL14-6942-00, 2015 WL 10521466, at *12 (Va. Cir. Ct. June 20, 2015) (concluding that it could not find, "as a matter of law, that [the college] had a duty to warn or protect students against third-party criminal acts").

42

88-3328-OG, 1989 WL 1124134, at \*1 (D.D.C. Nov. 22, 1989); see also Kelly v. McCarrick,

841 A.2d 869, 872 (Md. Ct. Spec. App. 2004); Hammond v. Bd. of Educ., 639 A.2d 223, 225

(Md. Ct. Spec. App. 1994). In this case, discovery has not commenced, and at the motion to

dismiss stage, the Court is only tasked with testing the legal sufficiency of the allegations in the

plaintiff's complaint, not the "plaintiff's likelihood of success on the merits." Ananiev v. Wells

Fargo Bank, N.A., 968 F. Supp. 2d 123, 130 (D.D.C. 2013). Moreover, unlike the cases relied

upon by the University where the plaintiffs were suing based on the injury initially sustained, the

plaintiff here does not allege that

> [the University] was negligent in allowing [her] to suffer the initial concussion;
> the clear language of the [Amended] Complaint states that it was [the
> University's] failure to take certain precautions to protect and enhance [the
> p]laintiff's physical and educational well-being and to protect the health of, and
> provide a safe environment for [the p]laintiff in order to protect her from the
> additional and compounded effects suffered.

Pl.'s Am. Univ. Opp'n at 14. Therefore, the Court does not find these cases particularly

instructive either.

As the Court noted above, see supra Part III.C.1, courts generally "rely on the concept of

'foreseeability' to determine whether [a] defendant owed a duty to [a plaintiff] in a negligence

action and examine whether the risk to [a plaintiff] was 'reasonably foreseeable' to [a]

defendant." Hedgepeth, 22 A.3d at 793. The plaintiff alleges that she reported on numerous

occasions symptoms that she was experiencing after sustaining a head injury in one of her field

hockey games. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 100–15. Given the plaintiff's

relationship with the University as one of its student athletes, the Court agrees that it was

reasonably foreseeable that

> [o]nce [the p]laintiff reported her concerns and symptoms to [the University] and
> its agents, servants, and employees, [it] owed a special duty to [her to] act
> reasonably to take precautions and to minimize the risk of injury[, . . .] to protect

and enhance her physical and educational well-being[,] and to protect the health of, and provide a safe environment for her.

Pl.'s Am. Univ. Opp'n at 18. Additionally, at this stage of the case, the Court finds that it was reasonably foreseeable that the University's alleged negligence regarding its duties to take precautions to minimize additional risks by prohibiting the plaintiff from further participation in field hockey activities would likely cause additional injuries. Accordingly, the Court concludes that the plaintiff has alleged facts sufficient to give rise to a duty of care to pursue her negligence claim against the University, and therefore, the Court must deny the University's motion to dismiss this claim.

### 2. The Negligent Infliction of Emotional Distress Claim

The plaintiff also asserts a negligent infliction of emotional distress claim against the University in Count IV of her Amended Complaint. Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73. The University again "argues that no special relationship exists between the [p]laintiff and [the University] such that liability for the negligent infliction of emotional distress can exist." Am. Univ. Mem. at 16. With respect to this claim, the Court agrees.

The plaintiff predicates her negligent infliction of emotional distress claim against the University on the existence of a special relationship between her and the University because the University "undertook an obligation to the plaintiff to act in compliance with both its own and the NCAA and Patriot League's policies and procedures, specifically the concussion management procedure." Pl.'s Am. Univ. Opp'n at 23. Even accepting as true the existence of a special relationship due to the University's undertaking to protect its student-athletes from subsequent head injuries, particularly after a student-athlete complains of experiencing concussive symptoms, the plaintiff has not alleged facts sufficient to show that the University "ha[d] a relationship with [her], or ha[d] undertaken an obligation to [her], of a nature that

44

necessarily implicate[d] [her] emotional well-being." Hedgepeth, 22 A.3d at 810. The plaintiff contends solely that her special relationship with the University implicated her emotional well-being because the University and its field hockey medical staff were purportedly aware of the medical research and literature concerning the "failure to protect student-athletes from [further head] injuries" and the likelihood that such failure would "cause serious emotional distress." Pl.'s Am. Univ. Opp'n at 23. In her Amended Complaint, the plaintiff cites in support of her position various published studies performed by other universities and NCAA personnel on the impact resulting from suffering concussions, the increased risk resulting from subsequent concussions, and the likelihood of latent brain injuries such as Alzheimer's disease, mild cognitive impairment, and amyotrophic lateral sclerosis resulting from concussions. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58. However, without identifying any studies or research, the plaintiff alleges in conclusory fashion that "[t]here has long been clinical and neurological studies that multiple head injuries or concussions can cause severe cognitive problems such as depression." Id., Ex. 5 (Am. Compl.) ¶ 56. Nonetheless, even accepting as true that the University was aware of such medical information, that knowledge did not create a relationship between the plaintiff and the University that necessarily implicated the plaintiff's emotional well-being. And, although the Court recognizes that "care for the body and the emotions are so interlinked . . . [that patients] are susceptible to suffer emotionally as well as physically," Hedgepeth, 22 A.3d at 813, the plaintiff has not demonstrated that "[t]he purpose of the relationship" between her and the University "involved care for [her] emotional well-being," Lesesne, 146 F. Supp. 3d at 196.

Furthermore, the plaintiff has not alleged facts sufficient to demonstrate that the University's alleged negligence in breaching an undertaking owed to the plaintiff "would cause

45

[her] serious emotional distress," Hedgepeth, 22 A.3d at 811, rather than emotional distress caused solely by the alleged concussion or subsequent injuries she purportedly sustained, see Pl.'s Am. Univ. Opp'n at 23 ("[M]ultiple concussions and post-concussive syndrome has been vastly implicated with physical and emotional well-being."). As the Hedgepeth Court clarified, "it must be especially likely that there would be serious emotional distress, i.e., a deeply emotional response, . . . in the event that the underlying obligation is breached." 22 A.3d at 813 (internal quotation marks and citations omitted). Here, the plaintiff has alleged only that sustaining multiple head injuries can potentially lead to depression or other brain injuries, but not that serious emotional distress would result from the University's purported negligent breach of its undertaking. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58 (failing to allege that the University's negligent performance of its undertaking caused the plaintiff emotional distress).

In sum, bald assertions and conclusory allegations that a viable intentional infliction of emotional distress claim exists do not satisfy the pleading requirements required by Iqbal. Accordingly, because the plaintiff has failed to allege plausible facts sufficient to establish that the University had a "special relationship" with her that implicated her emotional well-being, the Court must dismiss the plaintiff's negligent infliction of emotional distress claim against the University.

### 3. The Breach of Contract Claim

The plaintiff also asserts a breach of contract claim against the University in Count VII of her Amended Complaint, see Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 189–94, and like the other defendants already discussed, the University argues that dismissal of this claim is justified because the plaintiff has not identified the existence of a valid contract that it breached as the basis for proceeding with her breach of contract claim, see Am. Univ. Mem. at 17–18. The

46

Court agrees.

As previously discussed, see supra Part III.C.3, the plaintiff cites two contracts that form the basis of her breach of contract claim against the University: (1) an August 11, 2009 HIPAA authorization, which permitted the "University, its agents, and its authorized licensees to make copies of, use, sell, and distribute any photographic images of [the plaintiff] which were taken in connection with [her] participation in the athletics programs of, or otherwise in connection with [her] status as a student-athlete at, [the] University"; and (2) a "2010–2011 Student-Athlete Concussion Statement, wherein the plaintiff "agree[d] to obey all safety rules [and] report fully any problems related to [her] physical condition to appropriate University personnel including medical personnel and coaches." Pl.'s Am. Univ. Opp'n at 24. However, the plaintiff fails to identify any provisions in either of these contracts that include an obligation or duty owed by the University "to abide by all rules and regulations promulgated by [d]efendant NCAA." Removal Notice, Ex. 5 (Am. Compl.) ¶ 190. Therefore, because the plaintiff has not identified a valid contract creating such an obligation owed by the University as she alleges in her Amended Complaint, see In re Fort Totten, 808 F. Supp. 2d at 159 (noting that "one cannot breach a contract without breaching a particular obligation created under the contract" (internal citation and quotation marks omitted)), the Court must dismiss her breach of contract claim against the University.

#### 4. The Medical Malpractice Claim

Count VIII of the plaintiff's Amended Complaint also asserts a medical malpractice claim against the University. See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 195–204. The University argues that dismissal of the plaintiff's medical malpractice claim is warranted because the University, its field hockey coach, or athletic trainers are not "healthcare providers" within the meaning of District of Columbia Code section 16-2801(2). See Am. Univ. Mem. at 23.

47

Based on what is asserted in the plaintiff's Amended Complaint, she has alleged facts sufficient to demonstrate that the University and its athletic and medical staff provided healthcare services that qualify them as healthcare providers in the District to withstand a motion to dismiss. There does not appear to be a case in this jurisdiction that has addressed whether a university, coach, or athletic trainer qualify as a "healthcare provider" under District of Columbia law, as the Court has been unable to identify one. However, the clear language of District of Columbia Code section 16-2801(2) provides an extensive list of individuals and entities that qualify as healthcare providers in the District. And, although a university, coach, or athletic trainer are not expressly listed in the statute, see id., the list of a healthcare providers identified in this provision is not exhaustive, as the definition explicitly includes the phrase "or other individual health care practitioner," id.

The University argues that the term "healthcare provider" should be given only its ordinary meaning, and therefore a university, coach, or athletic trainer does not qualify. See Am. Univ. Mem. at 24–27. To support its positions, the University relies on cases both from and from outside of this District. See id. However, the Court does not find these cases to be particularly instructive in its determination at this stage of the litigation. Primarily, the two cases from this District, Coleman v. Wash. Hosp. Ctr. Corp., 734 F. Supp. 2d 58, 62 (D.D.C. 2010) and Smith v. Corr. Corp. of Am., Inc., 674 F. Supp. 2d 201, 209 (D.D.C. 2009), addressed the applicability of section 16-2801(2) to radiologists and a private prison that contracted with third party vendors to provide medical services to District of Columbia inmates, but did not address the question of who qualifies as an "other individual health care practitioner" under District law. The other cases cited by the University from courts outside of this District, did not examine state laws containing language analogous to the language at issue here (i.e., the "or other individual

48

health care practitioner" clauses). See Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't. of Health & Human Servs., 455 F.3d 500 (5th Cir. 2006) (addressing whether athletic trainers that provided therapy services incident to physician services could seek reimbursement of the services provided under Medicare Part B); see also Miles Labs., Inc. Cutter Labs. Div. v. Doe, 556 A.2d 1107, 740–41 (Md. 1989) (determining that Red Cross was not a "health care provider" as defined by Maryland state law that provided an exhaustive definition of "health care provider"); Grp. Health Ass'n v. Blumenthal, 453 A.2d 1198, 1203 (Md. 1983) (finding that, even though a health maintenance organization is not a healthcare provider as defined under Maryland law, it could nonetheless be liable for the negligent acts of its employees who are healthcare providers under Maryland law); Morris v. Adm'rs of Tulane Educ. Fund, 891 So.2d 57, 61 (La. Ct. App. 2004) (holding that the record was devoid of facts sufficient to determine whether Tulane University or its athletic trainers qualified as healthcare providers under Louisiana law that broadly defines "healthcare provider" without any related catchall phrase).

Moreover, the plaintiff has alleged that the University "provid[ed] healthcare and healthcare providers to its student-athletes." Removal Notice, Ex. 5 (Am. Compl.) ¶ 198. The plaintiff has also alleged that the University field hockey team's athletic trainers and physicians gave her "SCAT2 tests" to assess her concussion-related symptoms. Id., Ex. 5 (Am. Compl.) ¶¶ 103–04. Such medical tests and assessments could reasonably qualify as medical services. Thus, the Court is compelled to afford the plaintiff the opportunity to conduct discovery to determine whether the University and its field hockey athletic and medical staff qualify as healthcare providers. Accordingly, the Court will deny without prejudice the University's motion to dismiss the plaintiff's medical malpractice claim against it.

49

### E.     The Plaintiff's Claims Against the Medicine Center

The Medicine Center, Dr. Higgins, and the Higgins Practice (collectively, the "Medical Defendants") also move to dismiss Count IV of the plaintiff's Amended Complaint, which asserts a claim of negligent infliction of emotional distress against them.  <u>See</u> Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 169–73.  In particular, the Medical Defendants contend that the plaintiff's conclusory allegations do not demonstrate that they had a relationship with the plaintiff that implicated her emotional well-being, that their alleged negligence would likely cause serious emotional distress, or that their alleged negligence actually caused her serious emotional distress. <u>See</u> Medical Defs.' Mem. at 4–8.

The Court agrees that the plaintiff has not pleaded facts sufficient to establish that the Medical Defendants owed her the requisite legal duty of care to state a claim of negligent infliction of emotional distress against the Medical Defendants.  Again, to establish the requisite duty, the plaintiff must allege facts that demonstrate "(1) a relationship or undertaking to the plaintiff that necessarily implicates the plaintiff's emotional well-being, and (2) the special likelihood that the defendant's negligence in the course of performing obligations pursuant to such relationship or undertaking will result in emotional distress."  <u>Hedgepeth</u>, 22 A.3d at 815. In her Amended Complaint, the plaintiff asserts that the medical defendants "undertook a duty to protect [her] physical and mental well-being."  Removal Notice, Ex. 5 (Am. Compl.) ¶ 170. Although the plaintiff, as an athlete of the University's field hockey team, had a relationship with the Medical Defendants who served as part of the University's field hockey team's medical staff, it cannot be said that this relationship, without more, necessarily implicated the plaintiff's emotional well-being.  <u>See</u> <u>Hedgepeth</u>, 22 A.3d at 792 ("A duty to avoid negligent infliction of serious emotional distress will be recognized only where the defendant has an obligation to care

50

for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff.").

Nonetheless, the plaintiff argues that the Medical Defendants had "knowledge and understanding of the effects of concussions and the manner in which student-athletes suffering from concussions were to be observed, monitored, and treated," including the likelihood of experiencing emotional distress. Pl.'s Medical Defs.' Opp'n at 7. But, the Medical Defendants' awareness of medical research surrounding concussions and the impact concussions may have on an individual, taking the plaintiff's allegation as true, does not heighten the Medical Defendants' relationship with the plaintiff whereby a "special likelihood of [their] negligence . . . [would] result in emotional distress" as contemplated in Hedgepeth.  22 A.3d at 815.  Otherwise, any medical staff attending to an athletic team "would be expected, as a matter of reasonable care, to take precautions to avoid causing serious emotional distress, just as the care a doctor would take to use sterile instruments in order to prevent a serious infection during the course of an operation."  See id. at 813.  Additionally, the plaintiff does not allege that the Medical Defendants' purported negligent performance of their undertaking caused her serious emotional distress; instead, as the Court noted earlier, she relies upon medical research that suggests that multiple head injuries may potentially lead to depression or other brain diseases or injuries.  See Removal Notice, Ex. 5 (Am. Compl.) ¶¶ 26–58.  Because, the plaintiff has not alleged facts sufficient to establish the requisite duty needed to proceed with her negligent infliction of emotional distress claim against the Medical Defendants, the Court must dismiss Count IV of the plaintiff's Amended Complaint against these defendants.

## IV.    CONCLUSION

For all of the foregoing reasons, the Government's motion to dismiss, or in the alternative, for summary judgment is denied.  The NCAA's motion to dismiss is granted with

respect to the plaintiff's claims of gross negligence, negligent infliction of emotional distress, fraudulent misrepresentation, breach of contract, and medical malpractice, which are dismissed with prejudice, but denied in all other respects. The Patriot League's motion to dismiss is granted, and its request for a hearing is denied as moot. The University's motion to dismiss is granted with respect to the plaintiff's claims of negligent infliction of emotional distress and breach of contract, which are dismissed with prejudice, but denied in all other respects. Finally, the Medical Defendants' partial motion to dismiss is granted.

     **SO ORDERED** on this 12th day of April, 2017.[17]

REGGIE B. WALTON
United States District Judge

---

[17] An Order consistent with this Memorandum Opinion is issued simultaneously with this opinion.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

)
JENNIFER BRADLEY,                        )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        Civil Action No. 16-346 (RBW)
                                         )
UNITED STATES OF AMERICA,                )
                                         )
            Defendant.                   )
                                         )

## MEMORANDUM OPINION

The plaintiff, Jennifer Bradley, brings this civil action against the defendant, the United

States of America, asserting common law claims of negligent infliction of emotional distress and

medical malpractice resulting from the medical treatment provided to her by Dr. Aaron

Williams, who was employed by the defendant when the plaintiff was under his care.[1]  See

Notice of Removal of a Civil Action ("Removal Notice"), Exhibit ("Ex.") 5 (Amended

Complaint ("Am. Compl.")) ¶¶ 137–46, 157–73, 195–205.  A bench trial addressing the

plaintiff's claims began on September 9, 2021, and the presentation of the evidence concluded on

September 14, 2021.  Thereafter, the parties submitted their proposed findings of fact and

conclusions of law.  See Plaintiff's Ren[e]wed Proposed Findings of Fact and Conclusions of

Law ("Pl.'s Mem."), ECF No. 191; Defendant United States of America's Proposed Findings of

---

[1] In her Amended Complaint, the plaintiff also brought claims against the National Collegiate Athletic Association
("NCAA"); the Patriot League; American University; the Maryland Sports Medicine Center; David L. Higgins,
M.D. P.C. ("the Higgins Practice"); and David L. Higgins, M.D.  See Am. Compl. ¶¶ 4–10.  On April 12, 2017, the
Court granted the Patriot League's motion to dismiss and dismissed the plaintiff's claims against the Patriot League.
See Bradley v. Nat'l Collegiate Athletic Ass'n, 249 F. Supp. 3d 149, 156 (D.D.C. 2017) (Walton, J.) ("Bradley I").
On May 29, 2022, the Court granted motions for summary judgment filed by American University, the Maryland
Sports Medicine Center, the Higgins Practice, and Dr. Higgins, jointly, and by the NCAA, see id. at Bradley v. Nat'l
Collegiate Athletic Ass'n, 464 F. Supp. 3d 273, 280 (D.D.C. 2020) (Walton, J.) ("Bradley II"), and entered
judgment in their favor, see Order at 1 (May 29, 2020), ECF No. 137.  Accordingly, the United States of America is
the sole remaining defendant in this case.

Fact and Conclusions of Law ("Def.'s Mem."), ECF No. 185; see also Plaintiff's Suppl[e]mental Bench Memo on Non-Economic Damages ("Pl.'s Supp."), ECF No. 192. On April 22, 2022, the Court issued an oral ruling in favor of the plaintiff on her medical malpractice claim against the defendant. What follows are the Court's detailed factual findings and legal conclusions.

## I.    FACTUAL FINDINGS

During the bench trial in this case, the plaintiff presented the following witnesses: (1) the plaintiff; (2) the plaintiff's father, Thomas M. Bradley; (3) the plaintiff's mother, Lori Bradley; (4) Dr. Robert Clark Cantu, as an expert in the field of neurosurgery and, specifically, on concussions; and (5) Dr. Joseph Crouse, as an expert in the field of vocational rehabilitation and economics, regarding damages. The defendant presented the following witnesses: (1) Jenna Earls, the American University field hockey team athletic trainer; (2) Dr. Williams, whose treatment of the plaintiff is at issue in this case; (3) Dr. Katherine Margo, as an expert in the field of family medicine; (4) Dr. Kevin deWeber, the director of the medical fellowship in which Dr. Williams was participating at the time of his treatment of the plaintiff; (5) Sean Dash, the head athletic trainer at American University; and (6) Dr. David Higgins, the sports team physician at American University who was allegedly responsible for supervising Dr. Williams during his treatment of student-athletes at American University. In addition, both parties introduced the deposition testimony of Dr. William R. Vollmar II, the plaintiff's primary care physician who treated the plaintiff for symptoms related to her concussion from January 2012 through, at least, June 2016. See Sept. 10, 2021 Tr. at 354:5–389:20 (designation by the plaintiff); Sept. 14, 2021 Tr. at 798:11–804:19 (designation by the defendant).

2

## A. The Plaintiff's Injury

In 2011, the plaintiff was an undergraduate student in the District of Columbia at American University, where she played varsity field hockey. See Transcript of Bench Trial – Day 1 ("Sept. 9, 2021 Tr.") at 30:17–24, ECF No. 179. Prior to the Fall 2011 field hockey season, the plaintiff signed an Acknowledgement of Risk form, which stated:

> I desire to participate in the sport identified below ("Sport") at American University ("University"), and, in consideration of being allowed to participate in the sport, I hereby acknowledge and agree as follows:
>
> I acknowledge that I am participating in these activities voluntarily.
>
> I have consulted with a medical doctor regarding my personal medical needs. I represent that I am fit to participate in sport[-]related activities and that there are no health-related reasons or problems, which preclude or restrict my participation in sport[-]related activities.
>
> I understand that participation in intercollegiate athletics involves a risk of injury which may range in severity from minor to catastrophic, including, but not limited to[,] serious permanent paralysis, bone/joint or other bodily injury, concussions, other chronic disabling conditions[,] and even death. I further understand that such injuries may occur in the absence of negligence.
>
> To minimize the risk of injury, I agree to obey all safety rules, to report fully any problems related to my physical condition to appropriate University personnel, including medical personnel and coaches, to follow prescribed conditioning programs[,] and to inspect my athletic equipment daily.
>
> My signature below indicates that I am aware of the risks of injury inherent in athletic activities and that such risks may include death, paralysis[,] and other serious permanent bodily injury. I am willing to assume responsibility for any and all such risks of injury while participating in intercollegiate athletics at the University.
>
> I (including my parents, legal guardians, and legal representatives) hereby agree to indemnify, defend[,] and hold harmless the University and its employees, officers, agents from any claims, demands, or suites for damages which may arise from my participation in the University's Intercollegiate Athletic Programs; or from any treatment, medical, or otherwise provided to me by the University's Sports Medicine Staff. Further, I absolve, indemnify, defend[,] and hold harmless American University from any breach of these presentations.

Def.'s Ex. 15-2 (emphasis added).[2]

On September 23, 2011, see Sept. 9, 2021 Tr. at 40:19–21, during a field hockey game in Richmond, Virginia, see id. at 37:23–25, the plaintiff was struck in the head by an opposing player's shoulder, see id. at 38:16–18. The plaintiff testified that, following the impact, she "felt strange[,]" id. at 38:21, and "a little, like[,] confused[,]" id. at 39:6. However, the plaintiff heard her coach "yelling, 'Get back, get back[,]"so she "just listened to [her coach] and played[,]" id. at 38:21–23. Two days later, on September 25, 2011, the plaintiff began to experience issues with her vision, including that her "eyes were not tracking correctly[,]" id. at 42:19–20, and felt "that [she] could[ ]n[o]t really think[,]" id. at 43:1–2. See Pl.'s Ex. 44.[3]

Despite these symptoms, the plaintiff continued to practice and play in games with the field hockey team from September 25, 2011, through October 2, 2011. See Sept. 9, 2021 Tr. at 41:11–16, 42:16–25 (playing in a game against Boston College on September 25, 2011); id. at 44:3–5 (practicing from September 27, 2011, to September 30, 2011); id. at 126:1–4 (playing in a game against Lehigh University on October 1, 2011); id. at 126:5–6 (playing in a game against Temple University on October 2, 2011). Nonetheless, the plaintiff testified that she "was scared and confused" and "felt like [her symptoms were] going to go away, but [they] didn't." Id. at 43:21–22.

**B.     The Plaintiff's Reporting of Her Injury**

On October 1, 2011, after a game against Lehigh University, the plaintiff reported her symptoms to her field hockey coach, Steve Jennings, and the field hockey team's athletic trainer,

---

[2] Both the plaintiff and the defendant cite the Acknowledgement of Risk form as defendant's Exhibit 11, however, the binder provided to the Court with the defendant's exhibits does not include this form at Exhibit 11. Rather, the Acknowledgement of Risk form is located at the defendant's Exhibit 15-2.

[3] Plaintiff's Exhibit 44 is a timeline prepared by the plaintiff and her mother "in the fall of 2012[,] . . . probably September or October of 2012." Sept. 9, 2021 Tr. at 174:8–12.

4

Jenna Earls.  See id. at 44:19–45:19.  The plaintiff testified that she told Jennings and Earls that she "c[ould]n't think, and it[ wa]s scaring [her], and [she] c[ould]n't see correctly."  Id. at 45:2–3.  She also told Earls that she "couldn't think and [ ] couldn't understand, and [ ] couldn't see correctly."  Id. at 45:18–19.  The plaintiff testified that Jennings told her to "eat some ice cream and get some rest."  Id. at 45:8.

As the team athletic trainer, see id. at 17:24–25, Earls was the team's "liaison[.]"  Id. at 37:3.  This meant that "if something was wrong physically, like [a player] felt hurt, then [Earls wa]s the person [the player] would go to first, or the person . . . that[ wa]s going to take care of [an injured player,]" such as by "get[ting a player] a doctor appointment, or [ ] wrapping a[ player's] ankle."  Id. at 37:4–9.

On October 2, 2011, the plaintiff, along with her mother, Lori Bradley, spoke to Earls after the game against Temple University.  See Pl.'s Ex. 3 at 10032.  In her notes of the conversation, Earls wrote that the plaintiff

> approached [Earls] after [the] game with her mother on [October 2, 2011,] saying she has been having difficulty with her vision while playing, an increase in fatigue, and getting dizzy while playing.  [The plaintiff] says she's been experiencing it for about [two] weeks.  [The plaintiff] has a history of hypoglycemia, mono[nucleosis], and low blood pressure.  When asked if she remembers getting hit in the head in a game[,] she replied[,] "I mean, nothing worse than usual.  I got hit in Richmond by some girl's shoulder[,] but I get hit like that all the time, I didn't think it was anything significant."  [The plaintiff] did not notify [Earls earlier] of being hit nor complain[] of any [symptoms] following.

Id.  On October 3, 2011, the plaintiff sent an email to Earls, stating:

> I think I might have been a little confusing with how I described the way I was feeling before.  I wrote out all my symptoms for you more clearly—
>
> - Always extremely tired[.  E]ven after sleeping a good amount[,] sometimes I feel like I can't keep my eyes open and I always feel like I could fall asleep.

5

- Cannot concentrate for any amount of time[. It] takes me a long time to finish tasks or read and have to take frequent breaks. My sense of time seems off as well[.]
- Fast things seem like they are moving in snapshots rather than a fluid motion and it[']s hard to focus my eyes on something.
- When playing, I feel dizzy and unfocused[. I]t's hard to concentrate on tactical things like the press[.]
- Feel like things are not real and easily forget things. Also hard for me to analyze something. (When I am playing I'm not really sure if what I'm doing is "good" or not)[.]
- When I have to interact with someone, I feel like my answers/[]actions are delayed[.]
- When walking among people I feel like I'm in a daze[,] like maybe I'm not actually there ("dream[-]like" feeling)[.]
- Pressure in my head[. N]ot a headache, but have a constricting feeling in my forehead[.]

I've been having these symptoms for over a week and cannot pinpoint a cause. I tried to sleep more, eat better and more, and to take more sugar in and none of this has improved the situation.

Pl.'s Ex. 1.

Earls testified that, after receiving the plaintiff's October 3, 2011 email, a concussion was one of the most serious possibilities on her "list of concerns[.]" Transcript of Bench Trial – Day 3 (Sept. 13, 2021) ('Sept. 13, 2021 Tr.") at 428:20–22, 429:4–8, ECF No. 181. Earls then scheduled a doctor's appointment for the plaintiff with Dr. Aaron Williams for October 5, 2011. See Sept. 9, 2021 Tr. at 48:20–23. Dr. Williams was a fellow with the Military Primary Care Sports Medicine Fellowship (the "fellowship"), see Def.'s Ex. 5, who, as part of his fellowship, was working for Dr. David Higgins, the sports "team physician for American University[,]" Sept. 13, 2021 Tr. at 468:24–25.

Earls led the plaintiff through a series of Special Concussion Assessment Tool 2 ("SCAT2") tests. See Pl.'s Ex. 2. A SCAT2 test is a tool for "the acute [ ] assessment of a concussion" that "involves a symptom checklist" and "a number of cognitive tests[.]" Transcript of Bench Trial – Day 2 (Sept. 10, 2021) ("Sept. 10, 2021 Tr.") at 219:18–21, ECF No. 180; see

also Pl.'s Ex. 17 at 11000 ("This tool represents a standardized method of evaluating injured athletes for concussion[.]"). The plaintiff had previously taken a baseline SCAT2 test on August 10, 2010, see Pl.'s Ex. 17; Def.'s Ex. 11A, at a time when she was still recovering from mononucleosis, see Pl.'s Ex. 16 at 10016. According to this baseline test, the plaintiff was experiencing 8 out of 22 concussion-associated symptoms at that time, including mild pressure in her head and neck pain; moderate feels of being "slowed down" and "not right[;]" mild difficulties in remembering; severe fatigue; moderate drowsiness; and mild nervousness and anxiety. Pl.'s Ex. 17 at 11000. The severity of the symptoms was scored at 21 out of 132, but the plaintiff noted that the symptoms did not worsen with physical or mental activity. See id. In the cognitive assessment portion of the SCAT2 test, the plaintiff received a score of 5 out of 5 in orientation, 15 out of 15 in immediate memory, 4 out of 5 in concentration, and 2 out of 5 in delayed recall. See id. at 11001–02. The plaintiff scored 23 out of 30 in regards to her balance and 1 out of 1 as to coordination. See id. at 11002.

On October 4, 2011, at 10:30 a.m., the plaintiff took another SCAT2 test. See Pl.'s Ex. 2 at 11004–07. At the top of this test, Earls wrote a note, stating "Richmond dizziness after getting shoulder to head. Whole week after felt fine. B[oston ]C[ollege] game when symptoms began again." Id. at 11004. The test reflects that the plaintiff reported 17 symptoms associated with concussions, including moderate pressure in her head; mild dizziness, blurred vision, balance problems, sensitivity to noise, and feelings of being slowed down; moderate feelings of being "in a fog" or not right; severe difficulty in concentration; moderate difficulty in remembering; moderate fatigue, confusion, drowsiness, and increased emotions; and mild irritability, sadness, and anxiety. See id. The plaintiff reported on the test that these symptoms increased with physical or mental activity and had a severity rating of 45 out of 132. See id. In the cognitive

7

assessment portion of the SCAT2 test, the plaintiff received a score of 5 out of 5 in regards to her orientation, 14 out of 15 in immediate memory, 5 out of 5 in concentration, and 4 out of 5 in delayed recall.  See id. at 11005.  The plaintiff scored 27 out of 30 in regards to her balance, and 1 out of 1 as to her coordination.  See id. at 11006.  The test also noted that riding a bike was "ok" but that "lifting [with] jerk felt dizzy."  Id. at 11007.

On October 5, 2011, at 6:00 a.m., the plaintiff took an additional SCAT2 test.  See Pl.'s Ex. 17 at 11008–11; Sept. 13, 2021 Tr. at 416:15–18, 494:8–15.  The plaintiff reported 16 out of 22 concussion-related symptoms, including mild pressure in her head, dizziness, blurred vision, sensitivity to noise, feeling slowed down, feeling "in a fog[,]" feeling not right, difficulty concentrating, difficulty remembering, fatigue, confusion, drowsiness, increased emotion, irritability, sadness, and anxiety, which increased with physical or mental activity.  See Pl.'s Ex. 17 at 11008.  However, the plaintiff's cognitive assessment, balance, and coordination results are not visible on the copy of the test provided to the Court.  See id. at 11008–10.

That same day, at 11:00 a.m., the plaintiff took another SCAT2 test.  See id. at 11012–15.  On this test, the plaintiff reported 19 out of 22 concussion-related symptoms, including mild headache; moderate pressure in her head; mild dizziness, blurred vision, and balance problems; moderate sensitivity to light; mild sensitivity to noise and feeling slowed down; moderate feelings of being in a fog; mild feelings of being not right; moderate difficulty concentrating; mild difficulty remembering, fatigue, and confusion; moderate drowsiness; and mild increase in emotions, irritability, sadness, and anxiety.  See id. at 11012.  The plaintiff reported that these symptoms increased with physical or mental activity and had a severity rating of 40 out of 132.  See id.  On the cognitive assessment portion of the test, the plaintiff scored 5 out of 5 regarding her orientation, 15 out of 15 in immediate memory, 5 out of 5 in concentration, and 3 out of 5 in

8

delayed recall.  See id. at 11013–14.  The plaintiff scored 26 out of 30 in regards to her balance and 1 out of 1 as to her coordination.  See id. at 11014.

Based on the testimony of the plaintiff, Earls, and Dr. Vollmar, as well as the plaintiff's SCAT2 test results and the expert testimony of Dr. Cantu and Dr. Margo, which is discussed infra, see infra Sections I.M.1–2, the Court finds that, by the time that the plaintiff took the first SCAT2 test administered by Earls on October 4, 2011, she had suffered a concussion and was experiencing concussion-related symptoms.

## C.       The Plaintiff's Appointments with Dr. Williams

Prior to the plaintiff's October 5, 2011 appointment with Dr. Williams, Earls informed Dr. Williams that she wanted him to evaluate the plaintiff for a concussion.  See Sept. 13, 2021 Tr. at 491:20–24.  Earls's and Dr. Williams's testimony differed as to whether Earls informed Dr. Williams that the plaintiff may have been hit in the head.  According to Earls, she "shar[ed] with Dr. Williams] that [the plaintiff] may have been hit by a girls' shoulder during a game[,]" id. at 416:6–8, however, according to Dr. Williams, "Earls said that [the plaintiff] was complaining of some dizziness, headaches, some pressure in her head, but that [the plaintiff did] not remember taking any kind of shot to the head[,]" id. at 495:18–20.  Earls also testified that she provided Dr. Williams with the plaintiff's "one[-]page history [form]" and "three" "SCAT[2] forms[.]"  Id. at 416:15–18.  However, Dr. Williams testified that he only recalled receiving the plaintiff's October 5, 2011 11:00 a.m. SCAT2 test result and did not recall reviewing either the October 4, 2011 or October 5, 2011 6:00 a.m. SCAT2 test results.  See id. at 495:1–15, 523:10–16.  Dr. Williams stated that he did not ask Earls whether the plaintiff had taken any other SCAT2 tests aside from the October 5, 2011 11:00 a.m. test "because [Earls] should tell [him] whether they've done one or not."  Id. at 495:8–9.  In any event, Dr. Williams testified that he

9

"was only focused on the one at 11 o'clock" on October 5, 2011, "because that was the one that was done at the time the day I saw her." Id. at 523:14–16.

According to the plaintiff, during the appointment, she told Dr. Williams "everything that [she had] told [Earls,]" including "everything that was in the email" that she had sent Earls on October 3, 2011. Sept. 9, 2021 Tr. at 52:8–14. Dr. Williams testified that he asked the plaintiff "the same question multiple different ways to try and get a mechanism[[4]] or time frame when her symptoms started[,]" but the plaintiff "could not give [him] one." Sept. 13, 2021 Tr. at 492:1–3. On the Physician's Exam Report for the plaintiff's October 5, 2011 appointment with Dr. Williams, see Pl.'s Ex. 3 at 10018, Earls wrote, "Athlete complains of extreme fatigue, lack of concentration, dizziness, unable to focus on ball and games, pressure in head, does not recall a mechanism[,]" id.; see also Sept. 13, 2021 Tr. at 436:3–9 (testimony by Earls confirming that she wrote the note on October 5, 2011). However, Earls testified that the plaintiff "didn't recall [the shoulder to the head in the Richmond game] being a significant mechanism at the time[,]" Sept. 13, 2021 Tr. at 436:17–18, and so Earls understood her note to mean that the plaintiff did not precisely recall what had happened, see id. at 436:19–437:2.

Dr. Williams reviewed the October 5, 2011 11:00 a.m. SCAT2 test results and compared the results with the plaintiff's baseline SCAT2 test result, concluding that the plaintiff was "dealing with an illness compared to her baseline[.]" Id. at 501:16–17. However, the plaintiff's "overall score was at her baseline, actually slightly improved from baseline minus the symptom score" and, therefore, the SCAT2 result led Dr. Williams to conclude that the plaintiff was not suffering from a concussion because "she was neurologically intact" and "had no mechanism."

---

[4] A "mechanism" in regards to a concussion is "the blow that caused the concussion symptom" or symptoms, Sept. 10, 2021 Tr. at 222:13–25, such as a "fall or [a] stick hitting the head[,] "people colliding[,]" "heads collid[ing,]" or "other body parts like a shoulder collid[ing] with the head[,]" id. at 246:5–10.

Id. at 502:22–503:6.  Instead, Dr. Williams considered whether the plaintiff had "ethmoid sinusitis[,]" "migraines[,]" "endemia[,]" or a "thyroid issue."  Id. at 503:3–4.

After tapping on the plaintiff's frontal sinuses and determining that her sinuses were inflamed, Dr. Williams treated the plaintiff for sinusitis.  Id. at 503:17–21, 504:25–505:1.  He testified that "a concussion [ ] would[ ]n[o]t have th[e] kind of reflexive response" to his tapping that the plaintiff exhibited, which indicated that she had "inflamed sinusitis."  Id. at 503:17–24.  Dr. Williams documented that the plaintiff had a "headache located in the middle of [her] head and frontal sinus region[,] dizziness, photophobia and phonophobia, concentration issues[,] and fatigue[,]" id. at 499:15–19; see Def.'s Ex. 12A, but concluded that he "d[id] not believe [that the plaintiff had experienced a] concussion due to [not being able to identify a mechanism that would have caused a concussion,]" Pl.'s Ex. 3 at 10018.  Dr. Williams further testified that he deemed the lack of a known mechanism significant "[b]ecause every athlete [he had] ever seen with a concussion c[ould] narrow it down to a mechanism" and "down to a very almost narrow window of time when they were fine and when they weren't fine."  Sept. 13, 2021 Tr. at 500:8–13.  Dr. Williams "gave [the plaintiff] Augmentin, which is an antibiotic . . . take[n] twice a day for ten days[,]" and advised the plaintiff to "stay out of practice and games until that Friday[,]" October 7, 2011, id. at 505:9–11, but he did not place the plaintiff into a concussion management protocol, see Pl.'s Ex. 3.

Dr. Williams did not reevaluate the plaintiff prior to her returning to participate in field hockey.  See Sept. 13, 2021 Tr. at 505:12–14.  Instead, he testified, he "left that up to" Earls with the instruction that, if the plaintiff's "symptoms improved[, then] she was allowed to play[,]" id. at 505:14–15.  Following her October 5, 2011 appointment with Dr. Williams, the plaintiff continued to play field hockey, including in an October 8, 2011 game against Holy Cross.  See

Sept. 9, 2021 Tr. at 55:10–12; see also Pl.'s Ex. 3 at 10032 (including a notation by Earls that the plaintiff "played in game at Holy Cross, although [she] did not start"); Pl.'s Ex. 44 at 23000 (a notation by the plaintiff on the timeline she compiled that she had "warmed up/playing 15 minutes of each half"). The plaintiff recorded that, during the Holy Cross game, she "felt very sick, dizzy, [and] tired[;] had vision problems[;] and felt awful." Pl.'s Ex. 44 at 23000. According to the plaintiff, she understood that she was required to keep playing in the games because she had not been diagnosed with a concussion. See Sept. 9, 2021 Tr. at 57:18–19.

On October 12, 2011, the plaintiff saw Dr. Williams for a follow-up appointment. See id. at 56:20–57:2. According to Dr. Williams, during that appointment, the plaintiff "complained of dizziness and difficulty seeing upon onset of activity[;]" worsening symptoms "throughout the day[;]" "headache[;] and [ ] difficulty concentrating[,]" however she had "no fevers, chills, nause[a], [or] vomiting." Sept. 13, 2021 Tr. at 506:13–18. Dr. Williams reviewed the plaintiff's laboratory results with her, which [he concluded] were normal, and diagnosed her with ethmoid sinusitis." Id. at 507:2–3. Dr. Williams "advised [the plaintiff] to finish off the antibiotics and to take the next couple of days off[,]" and instructed her that, "if she felt the need for other medications . . . , [he] would work on referrals and other studies." Id. at 507:4–7. Dr. Williams also said that he would "see [the plaintiff] prior to the game [on Saturday, October 15, 2011,] to see if she[ wa]s able to play[,]" id. at 507:9–10, however, despite making this commitment, Dr. Williams did not meet with the plaintiff prior to the game, see Sept. 9, 2021 Tr. at 59:9–10; Sept. 13, 2021 Tr. at 418:21–25.

The plaintiff chose to "s[i]t out" the game on October 15, 2011, against Colgate University, see Sept. 9, 2021 Tr. at 58:1–7, because she was still feeling fatigued and weak, and having headaches, see id. at 58:16–58:18; see also Pl.'s Ex. 44 at 23000. She also chose not to

12

participate in the game on October 16, 2011, against the University of Maryland. See Sept. 9, 2021 Tr. at 58:22–25.

According to the plaintiff and her parents, she met briefly with Dr. Williams on October 16, 2011, following the University of Maryland game, and Dr. Williams instructed her to drink more coffee and see a neurologist. See id. at 59:16–25, 143:9, 182:6–7. Dr. Williams testified that he did not recall this meeting. See Sept. 13, 2021 Tr. at 418:21–25.

**D.      The Remainder of the Field Hockey Season**

On the day after the plaintiff saw Dr. Williams at the conclusion of the University of Maryland game, the plaintiff's mother took the plaintiff to the emergency room at Georgetown University Hospital, see Sept. 9, 2021 Tr. at 60:16–18; see also Def.'s Ex. 12C, where her symptoms were recorded as dizziness, lightheadedness, headache, unfocused vision, and feeling like the room is spinning, see Sept. 9, 2021 Tr. at 100:14–101:13. The plaintiff testified that she told the doctors in the emergency room that Dr. Williams had ruled out a concussion. See id. at 100:24–101:1. The plaintiff underwent a blood test, a chest x-ray, a head CT scan, EKGs, and an MRI, all of which were assessed as normal. See id. at 60:16–61:21; Def.'s Ex. 12C; Pl.'s Ex. 19 at 100008–12. She was discharged with a diagnosis of vertigo and instructed to schedule an appointment within three days with an ear, nose, and throat specialist ("ENT"). See Def.'s Ex. 12C; Sept. 9, 2021 Tr. at 104:6–15.

On October 20, 2011, the plaintiff saw Dr. Michael S. Morris, an ENT. See Def.'s Ex. 12D; Sept. 9, 2021 Tr. at 108:2–4. Dr. Morris recorded the plaintiff's symptoms as having a headache and being unable to play, read, or do schoolwork; he diagnosed the plaintiff with "[v]ertigo and disorder, mentation symptoms with school[]work, difficulty vestibular nerve, viral illness is possible." Def.'s Ex. 12D.

13

Throughout the remainder of the field hockey season, which concluded on November 4, 2011, the plaintiff's symptoms did not improve. See Sept. 9, 2021 Tr. at 62:25–63:12. Despite the plaintiff continuing to experience headaches, dizziness, lack of focus, and issues with her vision, see id., she was not removed from practice or games. See id. at 61:24–25 (stating that the plaintiff participated in practice on October 21, 2011); Pl.'s Ex. 44 at 23000 (stating that the plaintiff "played in [a one-]hour practice" on October 21, 2011); Sept. 9, 2021 Tr. at 62:14–22 (stating that the plaintiff played against Bucknell University on October 22, 2011; Georgetown University on October 23, 2011; Lafayette University on October 29, 2011; and Bucknell University for a second time on November 4, 2011); id. at 62:18–20 (stating that the field hockey season ended after the team lost its final game against Bucknell University in the playoffs); see also Pl.'s Ex. 3 at 10032 (stating that the plaintiff "played in home game vs Bucknell, although [she] did not start[;]" "played in home game vs. Georgetown[;]" "started in game [at] Lafayette[;]" "played in home game vs. Bucknell for Patriot League semifinals"). On October 24, 2011, Earls noted that the plaintiff reported "still feel[ing] kind of weird after playing this weekend." Pl.'s Ex. 3 at 10032. On November 10, 2011, Earls noted that she "texted [the plaintiff] because one of her teammates notified [Earls] that [the plaintiff] left practice because she wasn't feeling well" and that the plaintiff responded, "The same stuff and this time to get better, so I[']m trying not to push myself." Id. On November 14, 2011, Earls noted that she "texted [the plaintiff] to see how [the plaintiff] was feeling" and the plaintiff "replied[,] 'Hey I[']m feeling pretty much the same. We decided I[']m not practicing this week tho[ugh]." Id.

14

### E. The Plaintiff's Concussion Diagnosis

On November 23, 2011, while at home for the Thanksgiving holiday, the plaintiff's mother took her to see her family physician, Dr. Shakhti Kumar. See Sept. 9, 2021 Tr. at 63:16–23; see also Pl.'s Ex. 13 at 7031. On December 26, 2011, Earls noted that, in response to an email from Earls "inquiring on how [the plaintiff's] progression ha[d] gone so far[,]" the plaintiff responded:

> So far since I've been back things have gotten worse for some reason. Sometimes I can barely get out of bed and as soon as I get out of bed all I want is to get back in it.[] I've also been standing up and my vision goes black for a few seconds so I just have to stand there until it comes back. . . . I spent most of Christmas in bed because after we ate breakfast and opened presents, I took a nap and woke up with a pounding headache and stayed in bed until around 4[:00 p.m.] Jenna, I'm really nervous at this point. I thought by now that I would be better and I'm not and I think I'm getting worse. I just don't know what to do anymore. I feel so weak and I'm afraid that I will never regain my strength back.

Pl.'s Ex. 3 at 10032; Pl.'s Ex. 18 at 12001–02. On January 4, 2012, the plaintiff had a follow-up appointment with Dr. Kumar, see Pl.'s Ex. 44 at 23001, who referred the plaintiff to a neurologist, Dr. Puneet Singh, see id.; Pl.'s Ex. 13 at 7034–35.

On January 6, 2012, Earls noted that the plaintiff had reported via email the following:

> So I have been feeling a little better, able to do some things like yoga and walking on the treadmill. I went again to my doctor and an eye doctor[5] and my doctor recommended going to a neurologist. We set up an appointment for Monday so I'll let you know what happens with that. She also put me on Melatonin because she wants to regulate my sleeping. I'm just kind of worried about what all this means for me in the Spring. Like, I'm not even jogging right now and I don't know if I'll be able to do any of the workouts [Jennings] has planned for us at least in the beginning. I don't want to sit out anymore but I want to get better.

Pl.'s Ex. 3 at 10031; Pl.'s Ex. 18 at 12001.

---

[5] On January 5, 2012, the plaintiff underwent an eye exam and visual field test at Quarryville Eye Care. See Pl.'s Ex. 44 at 23001.

On January 9, 2012, the plaintiff saw Dr. Singh, who determined that potential diagnoses included "post-concussive syndrome though no clear history of significant head injury[,]" "mononucleosis[,]" "meningitis[,]" and "Lyme disease[.]" Sept. 9, 2021 Tr. at 116:23–117:4; see Pl.'s Ex. 13 at 7034–35; Def.'s Ex. 12F. On January 9, 2011, Earls contacted the plaintiff regarding her neurologist appointment and noted that the plaintiff said, "I have to get [a L]yme[ disease] blood test, they're doing a test on my brainwaves and I have to get a lumbar puncture test[,] which is a spinal tap. I[']m getting the tests done on Friday." Pl.'s Ex. 3 at 10031. Earls also noted that the plaintiff sent an email to her, as well as Jennings and Sarah Krumbolz Thorn, the associate head coach of the American field hockey team, stating:

> I wanted to update you on my health and doctor visits I've had this break so far:
>
> I've been to my primary doctor[s], Dr. Kumar and Dr. Fennemore, three times. They told me that the Epstein-Barr levels have gone down again in my blood, so that's good! My symptoms, however, are not really subsiding, so they are worried about that. I've been trying to do yoga and the walking [Earls] gave me to do and still am feeling dizzy after. In the beginning of this break, I felt really bad to the point of not really being able to get out of bed and getting headaches when I got up. I'm starting to get better with this, but Dr. Kumar wanted to try to regulate my sleeping so she put me on Melatonin, which is a natural sleep aid. This hasn't really done anything for me yet, but I'm still taking it. As far as things I'm taking, I'm only taking a daily vitamin, [the] B[-]12, and the Melatonin.
>
> Besides the visits with my primary doctors, I went to an eye doctor and got a full eye exam and visual field test. The visual field test came back basically normal he said, but he feel[s] that my eyes have to work a lot to stay balanced and he also said that I have an astigmatism and wants me to get reading glasses to help relax my eyes more. I should be getting them within a week or two.
>
> Dr. Kumar also referred me to a neurologist and I had my visit today with Dr. Singh (Neurologist). I had called Georgetown Hospital to get my MRI cd for her to look at last week as well. M[y] visit with her was very long and we talked for a while and basically she wants me to get a few more tests before she can really help me. She is having me get three tests. A Lyme Blood Test. (I got the blood drawn today.) An EEG, which is a test that will monitor my brain waves, and a lumbar puncture test, which is a spinal tap. I'm getting the EEG some time this week as soon as possible and I'm scheduled to get the spinal tap on Friday. She'll have the results from the Lyme test [on] Friday.

Id.; Pl.'s Ex. 18 at 12004.

On January 13, 2012, the plaintiff underwent the EEG and three spinal taps. See Pl.'s Ex. 44 at 23001. She testified that "it was very, very scary[.]" Sept. 9, 2021 Tr. at 65:21. Earls noted that the plaintiff had reported that she "just had three spinal taps done[,]" but that "barely any fluid came out[,]" so her doctor decided to do "a test to see if it is actually a leak that is causing the low pressure in [her] spinal fluid." Pl.'s Ex. 16 at 10031. From January 18, 2012, to January 20, 2012, the plaintiff underwent treatment at Lancaster General Hospital, having "pledgets[6] inserted [into her] nose, radioactive isotopes injected into [her] spine, scans of [her] spine, [and an] MRI." Pl.'s Ex. 44 at 23001; see Pl.'s Ex. 12 at 6001–02 (noting that the plaintiff underwent a "radionuclide injection" and "[p]ledgets were placed in [her] nasopharynx"); Pl.'s Ex. 13 at 7037.

On January 19, 2012, Earls noted that the plaintiff had reported that "all the scans and [the] MRI couldn[']t find [the] location of [the] leak" because her cerebral-spinal fluid "pressure is so low in [her] spine that the isotopes didn[']t really travel[,]" and that she was "having a blood patch" to address the suspected leak. Pl.'s Ex. 16 at 10031. On January 25, 2022, Earls noted that she had received an email from the plaintiff, stating that she had told her doctor that she "was still having headaches and some back pain," and the doctor had "asked [her] to try to be on bed rest to see if the blood patch just needs a little more time." Id.

On February 2, 2012, the plaintiff underwent a cervical spinal tap, see Pl.'s Ex. 44 at 23001, and a CT of her thoracic spine and cervical spine, see Pl.'s Ex. 13 at 7038–40. On

---

[6] A pledget is "a compress or pad used to apply medication to or absorb discharges (as from a wound)[.]" Pledget, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/pledget (last visited July 28, 2022).

February 3, 2012, the plaintiff again saw Dr. Singh for "fatigue, dizziness, and headache[,]" Sept. 9, 2021 Tr. at 117:10–14; Def.'s Ex. 12G, and Dr. Singh ordered diagnostic testing, see Sept. 9, 2021 Tr. at 117:21–22. Following the testing, Dr. Singh diagnosed the plaintiff with post-concussive syndrome. See id. at 117:15–16.

## F.    The Spring 2012 Semester

The plaintiff testified that her return to school for the Spring 2012 semester was "[h]orrible" because she was "expected to be the person [she] was last year when [she] didn't have all these problems[,]" and that she "felt [ ] hopeless." Id. at 66:5–10. The plaintiff further testified that she "was having so much trouble with [her] schoolwork because [she] couldn't concentrate and reading was so hard[,]" requiring breaks every 30 minutes, however, she was told, "well, you're not diagnosed with a concussion, we can't do anything."[7] Id. at 67:1–4; 67:7–8. The plaintiff also testified that she "felt [ ] overwhelmed[.]" Id. at 68:8.

On February 10, 2012, the plaintiff sent an email to Jennings, Earls, Thorn, Melissa Katz,[8] and her teammates, stating that she was "still having headaches[;] dizziness[;]" "fatigue[;]" "memory loss[;]" "loss of concentration and analytical skills[;]" "problem-solving skills[;]" and "difficult[ies]" "interacting socially[;]" and that "more psychological symptoms are coming into play for [her,]" including "a very high rate of anxiety[,]" "mood swings[,] and irritability[.]" Pl.'s Ex. 18 at 12006–07.

On February 29, 2012, the plaintiff had a follow-up appointment with Dr. Williams, during which Dr. Williams noted that he had reviewed information from the plaintiff's neurologist diagnosing the plaintiff with post-concussive syndrome and that the plaintiff reported

---

[7] The plaintiff did not specify who said that if she was "not diagnosed with a concussion, [they] c[ould]n't do anything." Sept. 9, 2021 Tr. at 67:7–8. See generally id. at 66:18–67:11.

[8] The identity of Melissa Katz and what, if any, association she had with this case is unclear from the record.

ongoing headaches on a daily basis, although her symptoms had improved over the last two-to-three weeks.  See Pl.'s Ex. 16 at 10022.  Dr. Williams informed the plaintiff that she should not engage in any physical activity until she had no symptoms for at least 48 hours.  See id.

On March 19, 2012, the plaintiff started treatment with Dr. Mindy Bixby, a neurologist at MedStar National Rehabilitation Hospital here in the District of Columbia, for post-concussive syndrome.  See Pl.'s Ex. 9 at 3003.  During her first appointment with Dr. Bixby, the plaintiff reported symptoms of headaches, photophobia, visual changes, balance problems, dizziness, cognitive difficulties, and sleep disturbances.  See id.  The plaintiff was prescribed Propranolol as a preventative medication for her headaches, as well as Zoloft for anxiety and depression, and was referred for neuropsychological testing.  See id. at 3003–05.  On March 28, 2012, the plaintiff had a follow-up appointment with Dr. Williams, who noted that the plaintiff reported ongoing visual problems that were exacerbated by activity and advised the plaintiff that the policy was to preclude athletes from exercising while symptomatic.  See Pl.'s Ex. 16 at 10023.  On March 30, 2012, the plaintiff began receiving psychotherapy and biofeedback treatment at the Brain Wellness and Biofeedback Center of Washington.  See Pl.'s Ex. 10.

During the Spring 2012 semester, the plaintiff also participated in a one-week "alternative spring break" trip to Moldova, for which she had applied before being injured.  See Sept. 9, 2021 Tr. at 78:1–2; Pl.'s Ex. 10 at 3000 (notes from the plaintiff's March 30, 2012 biofeedback appointment with Dr. Barbara Blitzer including a timeline demonstrating that the plaintiff's Moldova trip occurred between December 2011 and the date of the appointment).  The plaintiff was cleared to take the trip by her treating physicians, see Sept. 9, 2021 Tr. at 78:21–23, and she informed the "fa[c]ulty professor" on the trip, who was also the plaintiff's professor at American University, "all about [her] situation[,]" id. at 78:13–15.  Although the trip was

19

intended to "be for a credit[,]" id. at 79:7–8, the plaintiff was unable to complete the paper that was required to receive the credit, and thus she "didn't get the credit[,]" id. at 79:8–10.

On April 4, 2012, the plaintiff again saw Dr. Bixby, who noted that the plaintiff's "[h]eadache[s] improved in frequency and duration since starting [P]ropranolol[,]" but that she was still experiencing "[i]ntermittent headaches . . . that [were] sharp in character" and "last[ed] [ ] approximately 20 minutes, occurring during class." Pl.'s Ex. 9 at 3007. According to Dr. Bizby's notes, the plaintiff reported that she was "currently attending classes[,] but no homework or testing at this time[.]" Id.

## G. The Plaintiff's Leave of Absence from American University

The plaintiff testified that she "stayed in school until [she] was told by [Dr. Singh] what was going on and how dangerous it was, and [then she] immediately stopped[,]" Sept. 9, 2021 Tr. at 68:21–25, and took "temporary leave[,]" id. at 69:4–5, from her studies at American University. Consequently, for the Spring 2012 semester, the plaintiff received an F in all of her classes, which was ultimately changed to either an "I" for Incomplete or a "W" for withdrawal after the plaintiff advocated for the grade corrections. See id. at 69:10–70:1; Pl.'s Ex. 6 (the plaintiff's academic transcript from American University). Following the Spring 2012 semester, the plaintiff did not return to continue her education for a year and a half. See Sept. 9, 2012 Tr. at 73:17–18. While the plaintiff was on temporary leave, she provided voluntary language education to Nepalese refugees in Lancaster, see id. at 76:18–21, 77:3–22, while residing with her parents, see id. at 73:17–18. The plaintiff testified that she spent "an hour or so here and there just teaching adult refugees things like the ABC's and, "Hi, how are you[,]" i.e., "just the very basics." Id. at 77:20–22.

On May 5, 2012, during a psychotherapy session, the plaintiff reported that her headache pain "completely interfere[d]" with her day-to-day general activities and the normal duties of her job, and significantly interfered with her ability to engage in household chores, participate in normal recreational and social activities, maintain social relationships, obtain adequate restful sleep, and maintain a normal good mood. See Pl.'s Ex. 10 at 40262. The plaintiff also reported that, over the previous month, she was dissatisfied with her life in general and that she felt significantly sad/depressed, anxious/nervous, and irritable. See id.

From May 3, 2012, to June 22, 2012, see Pl.'s Ex. 44 at 23002–04, the plaintiff underwent a neuropsychological examination conducted by Dr. Jon Bentz, Ph.D., during which she reported

> pressure in the head; dizziness; fatigue; phonophobia and [ ] sensitivity to the sun that increase[d a] pressured feeling in the head; occasional problems with balance; visual disturbance when reading[, e.g.,] difficulty with tracking and the words 'jumping'; cognitive symptoms of feeling foggy with her thinking, difficulty with word retrieval, mental slowing and difficulty thinking critically; increased sense of sadness, anxiety and irritability; and lack of restful, restorative sleep.

Pl.'s Ex. 12 at 6094; Pl.'s Ex. 4 at 6094–98. Dr. Bentz recommended that the plaintiff not return to school until her condition improved and that she "pace [her]self in all activities (social, physical, [and] cognitive)." Pl.'s Ex. 12 at 6097. On July 5, 2012, the plaintiff transferred to a new team of primary care physicians, Dr. William R. Vollmar II and Dr. Zachary A. Geidel, after she transitioned out of pediatric care with Dr. Kumar. See Pl.'s Ex. 20, at 110002; Sept. 9, 2012 Tr. at 121:24–122:23. Over the summer of 2012, the plaintiff attempted to work, but quit her job after two months because she was unable to handle the physical demands of the job. See Pl.'s Ex. 20 at 110103.

From August 14, 2012, through September 14, 2012, the plaintiff saw Dr. John Vakkas for treatment of temporomandibular joint ("TMJ") issues. See Pl.'s Ex. 11 at 5000. As part of

21

this treatment, the plaintiff underwent a closed-bite MRI. See id. On September 28, 2012, the plaintiff saw Dr. Geidel for a follow-up appointment regarding her post-concussive syndrome. See Pl.'s Ex. 20 at 110016. During that appointment, Dr. Geidel noted that the plaintiff was experiencing headaches, dizziness, vision difficulty, sleep issues, and concentration issues, although her "[m]ood had improved on [Z]oloft." Id. On November 7, 2012, the plaintiff again saw Dr. Geidel, who noted that she reported malaise, headaches, photophobia, nausea, dizziness, and sleep disturbances. See id. at 110019–20. Dr. Geidel instructed the plaintiff to undergo cognitive rest and to avoid "any significant stimulation and physical activity." Id. at 110021. He also took the plaintiff off of Zoloft, as she no longer reported any anxiety or depression. See id. On December 27, 2012, the plaintiff saw Dr. Vollmar for a follow-up appointment, who noted that the plaintiff reported malaise, headache, photophobia, nausea, dizziness, and sleep disturbances. See id. at 110023. Dr. Vollmar also noted that the plaintiff "had mild difficulty with short[-]term recall, remembering only [two] out of the [three] words [she was] instructed to remember." Id. at 110024. After a discussion with Dr. Vollmar during the December 27, 2012 appointment, see id., the plaintiff began taking Adderall, see Pl.'s Ex. 4 at 9012. On January 10, 2013, and January 24, 2013, the plaintiff again saw Dr. Vollmar, who noted that the plaintiff was still experiencing headaches, occasional dizziness, concentration issues, and difficulty falling asleep, although her focus and concentration had improved since being prescribed Adderall. See Pl.'s Ex. 20 at 110025. The plaintiff also reported experiencing increased anxiety since she sustained the concussion. See id. On February 14, 2013, Dr. Vollmar noted that the plaintiff still experienced persistent dizziness, headaches, anxiety, and visual disturbances, but that there had been significant improvements in her symptoms and that she had started jogging over the past couple of days without experiencing headaches. See id. at 110030.

22

## H. The Plaintiff's April 2013 Concussion

On April 18, 2013, the plaintiff saw Dr. Vollmar for a further follow-up visit, during which Dr. Vollmar noted that the plaintiff had reported hitting her head on the ground on April 13, 2013,[9] and being dazed, dizzy, and lethargic. See id. at 110031. During the appointment, the plaintiff reported experiencing headaches, difficulty tracking moving objects, and "some dizziness and visual loss when she stands from sitting or supine." Id. Dr. Vollmar assessed that the plaintiff had experienced a concussion. See id. at 110032; Sept. 14, 2021 Tr. at 803:9–11. Based on Dr. Vollmar's testimony and treatment notes, the Court finds that the plaintiff suffered a concussion on April 13, 2013.

## I. The Plaintiff's Return to American University

During the April 18, 2013 appointment, Dr. Vollmar discussed with the plaintiff her returning to college and noted that the plaintiff stated that "she would like to return under scholarship[,] but [that her scholarship was] conditional on her taking a manager's position." Pl.'s Ex. 20 at 110033. Dr. Vollmar advised her that she should "return with a partial course work[]load and no added stress from a manager's position[,]" so as not to "set back her progress in resol[ving her] concussion symptoms[.]" Id. Ultimately, when the plaintiff returned in school, she returned "only part-time . . . because of the symptoms and [because her] doctor felt that it was just the way we should do this." Sept. 9, 2021 Tr. at 74:11–13. She initially took two classes during the summer of 2014, before returning to a full courseload at the end of 2014. See id. at 94:2–14. She also "registered in the disabilities office[ at American University], and they" provided her with accommodations, including additional time on exams and assignments, and

---

[9] On April 18, 2013, Dr. Vollmar noted, "Hit back of head on [S]at on ground[.]" Pl.'s Ex. 20, at 110031. The Court takes judicial notice of the fact that April 18, 2013, was a Thursday and, thus, the prior Saturday would have been April 13, 2013. See Brown v. Piper, 91 U.S. 37, 42 (1875) ("Among the things of which judicial notice is taken are . . . the coincidences of the days of the week with those of the month[.]").

23

access to class notes from a fellow student.  See id. at 73:24–74:8.  In the spring of 2013, the plaintiff traveled to Germany with her then-girlfriend.  See id. at 93:17–21.

On May 16, 2013; July 18, 2013; and August 15, 2013, the plaintiff saw Dr. Vollmar again, reporting mild headaches every two-to-three days, sleeping problems, and visual tracking issues.  See Pl.'s Ex. 20 at 110037–45.  On October 26, 2013, the plaintiff saw a physician's assistant, Jamie L. Hamid, at Dr. Vollmar's and Dr. Greidel's medical office, reporting that she was doing well following her return to school; the medications Adderall and Sertraline had improved her concentration and headaches, although she still experienced mild headaches every two-to-three days; and she was having difficulty sleeping.  See id. at 110046.

On December 16, 2013, the plaintiff underwent a second neuropsychological examination, which was conducted by Dara S. Fisher, Psy.D.  See Pl.'s Ex. 4 at 9010–17.  During the examination, the plaintiff reported that

> overall, her symptoms have improved since the acute phase following the concussion.  She has noticed improvement in her ability to read and comprehend information.  She finds that reading becomes difficult after 30 minutes, as the lines become "wavy."  While it is harder to focus and concentrate, she finds that she is able to at times, but it is effortful.  She has found Adderall to be somewhat effective.  She does have a tendency to lose her train of thought and think less clearly[] but feels she has gotten "used to it."  She continues to experience word-finding difficulties, finding that she is "grasping" for words, with no improvement.  [She] reports that while her headaches have declined in frequency, she continues to feel pressure in her head and finds that it is extremely painful during her menstrual period.  She continues to experience significant fatigue with no improvement.  She becomes over-stimulated in noisy, bustling environments such as big stores and is sensitive to loud noise, but not light.  [She] also continues to experience jaw pain, which began [six] months after the injury.  She was diagnosed with TMJ and currently wears a mouth guard when she sleeps.

Id. at 9010.  Dr. Fisher determined that the

> evaluation revealed intact functioning when compared to others her age with regard to multiple domains including attention, language, memory, and visuospatial/constructional abilities[; h]owever, consistent with previous testing, she demonstrated mild impairments in several areas that may represent a mild but

24

noticeable decline from her level of functioning prior to the concussion, which was likely in the high average range.

Id. at 9015. Dr. Fisher elaborated that the plaintiff "demonstrated slightly slower processing speed and inefficient learning strategies with lower[-]than[-]expected semantic, meaningful organization of material." Id. Dr. Fisher noted that the plaintiff's "performance did not significantly improve since the previous evaluation conducted in May 2012." Id. Dr. Fisher further noted that the plaintiff "is continuing to experience significant fatigue and sleep disturbance" and "[s]he should continue to monitor her energy level, be flexible, and allow herself breaks as needed[,]" which "may include giving herself permission to nap, allowing herself to take breaks and walk around during lecture[s], and being sensitive to levels of activity that results in over-exertion." Id. Moreover, according to Dr. Fisher, the plaintiff's "[c]ognitive symptoms[,] such as slower information processing and depth of processing[,] continue to be in the low average range[, but] while this is a personal decline, they should not, from a neuropsychological perspective, interfere with [her] reported aspirations regarding educational and career decisions." Id. at 9016.

On May 23, 2014, the plaintiff was instructed by a physician's assistant at Dr. Vollmar's and Dr. Giedel's medical office, Elizabeth L. Messick, to begin to wean herself off of taking Adderall. See Pl.'s Ex. 20 at 110059. When the plaintiff saw Dr. Vollmar again on August 22, 2014, he noted that she "has been doing well since" lowering her dosage of Adderall "for the past month" and is "able to focus well without the medication." Id. at 110066.1. He further noted that the plaintiff reported that she "still gets headaches almost daily[,] but she barely notices them anymore" and they "have improved since she ha[d] become more physically active with activities like yoga and biking." Id. Dr. Vollmar also noted that the plaintiff reported

25

getting "dizzy with fast movements[,] but not as severely as it used to be." Id. Dr. Vollmar further reduced the plaintiff's Adderall dosage. See id. at 110066.3.

On March 11, 2015, the plaintiff reported to Dr. Vollmar that she was experiencing significant fatigue, "trouble focusing that was initially present after the concussion and had initially been improving[,]" short-term memory issues, headaches that lasted "approximately three[-]to[-]four days[,]" and nausea. Id. at 110066.6.

## J.     The Plaintiff's Post-Graduation Work in Nepal

In Spring 2015, the plaintiff graduated from American University, two years after she should have graduated. See Sept. 9, 2021 Tr. at 74:16–20. The plaintiff earned an award for her "work with [ ] refugees" and for the best oral presentation for undergraduate research. See id. at 94:15–20. After the plaintiff graduated, she traveled to Nepal with Nyingthop, a Nepalese nonprofit organization. See id. at 80:16–19, 81:18–24; Pl.'s Ex 20 at 110066.12 (treatment notes from Dr. Vollmar recorded on September 8, 2015, noting that the plaintiff "[wa]s going to Nepal for 5 months"). The plaintiff worked on Nyingthop's "longtime memory project," Sept. 9, 2021 Tr. at 82:12–13, which created an archive of the losses due to the April 2015 earthquake in Nepal that caused an avalanche, leading to the destruction of a village, see id. at 82:14–21. During the project, the plaintiff "worked with Austin Lord[,]" who was "finishing his Ph.D at Cornell [University]." Id. at 82:23–24. The plaintiff testified that Lord "kn[e]w[] everything about [her] head injury" and was "always there to make sure it's okay." Id. at 83:1–2.

At trial, the plaintiff testified that she still "spend[s] a substantial amount of time in Nepal" and that, for her work, she receives "something like a stipend where, you know, you can eat and live, but you don't go to restaurants everyday" and cannot "save any money[.]" Id. at 84:11–16.

26

## K.    The Diagnosis of Moderate Traumatic Brain Injury

After returning from Nepal, the plaintiff saw Dr. Vollmar again for an appointment on June 1, 2016, during which she reported difficulties in concentration and depression, and stated that she wanted to discuss with Dr. Vollmar resuming her medication.  See Pl.'s Ex. 20 at 110066.15.  Following this appointment, Dr. Vollmar noted that his diagnosis had changed from post-concussive syndrome to a moderate traumatic brain injury, see id. at 110066.16, which he described as "permanent defects based on head injury[,]" Sept. 10, 2021 Tr. at 374:14–15.  In his deposition testimony, Dr. Vollmar noted that he "based [his diagnosis of a moderate traumatic brain injury] on the fact that [the plaintiff] ha[d] continuing symptoms and deficits from a cognitive standpoint in focus and headaches that ha[d] lasted longer than a year[, s]o [he] ha[d] no reason to believe that they [we]re going to resolve."  Id. at 386:17–22.  Dr. Vollmar further stated that he "expect[ed the plaintiff] to have deficits indefinitely[,]" which "means permanent[ly]."  Id. at 388:6–16.  On December 5, 2016, Dr. Vollmar noted that the plaintiff reported headaches; anxiety; and "issues with attention span, word[-]finding, and recall mostly when in stressful situations[;]" but that she was feeling better after stopping her anti-depressant medications two months earlier.  Pl.'s Ex. 20 at 110066.28–29.  On January 2, 2017, Dr. Vollmar diagnosed the plaintiff with attention deficit disorder ("ADD").  See id. at 110066.40.

## L.    Testimony Regarding Dr. Williams's Relationship with American University and Dr. Higgins

As noted earlier, while he was treating the plaintiff, Dr. Williams was participating in the Military Primary Care Sports Medicine Fellowship (the "fellowship"), which is operated by the National Capital Consortium ("Consortium").  See Def.'s Ex. 5.  In 2011, Colonel Kevin deWeber was the Program Director of the fellowship.  See id. at 1.  One of the fellowship's placements was at American University, under the supervision of Dr. David Higgins, who

27

operated the Higgins Practice and served as the physician for the sports teams at American University.  See id.

The relationship between Dr. Higgins and the Consortium was governed by three documents: the Memorandum of Understanding Between the Medical Practice of David L. Higgins, M.D. and the National Capital Consortium ("Memorandum of Understanding"); the Letter of Agreement Between the National Capitol Consortium and Dr. David Higgins, American University and Good Counsel High School ("Letter of Agreement"); and the Fellowship Manual.  The Memorandum of Understanding was signed by Dr. Higgins and Colonel deWeber, and sets forth, inter alia, the responsibilities of Dr. Higgins and the Higgins Practice, the responsibilities of the Consortium, provisions regarding liability, and points of contact.  See generally Def.'s Ex. 1.  The Letter of Agreement "describes in more detail the practicum rotation, educational goals and objectives, the scope of the affiliation[ between the Consortium and Dr. Higgins], [the] resources available, [the] fellow's duties and responsibilities, the relationship between the fellowship program and the practicum site, supervisory relationships, and procedures for handling problems."  Def.'s Ex. 2 at 1.  The Fellowship Manual sets forth the educational goals of the fellowship program, the faculty and instructors, the evaluation methods, and the program policies.  See Def.'s Ex. 5 at 2.

According to the Memorandum of Understanding, Dr. Williams was under the supervision of Dr. Higgins when he was providing medical treatment during his fellowship.  See, e.g., Def.'s Ex. 1 ¶¶ 5, 11, 15, 17–20, 23, 31.  However, the Consortium maintained responsibility for several aspects of Dr. Williams's experience at American University, including coordinating assignments and attendance at clinics, conferences, courses, and programs; maintaining personnel records and reports; and ensuring compliance with the rules and

regulations of Dr. Higgins's practice.  <u>See</u> <u>id.</u> ¶¶ 25–28, 32.  Similarly, the Letter of Agreement and Fellowship Manual reflect that Dr. Higgins and the Consortium shared supervisory responsibilities over Dr. Williams during his fellowship.  <u>See</u> Def.'s Ex. 2 at 1–2, 4–6; Def.'s Ex. 5 at 66.

Despite provisions in both the Memorandum of Understanding, the Letter of Agreement, and the Fellowship Manual indicating that Dr. Williams would be supervised by Dr. Higgins directly and, more indirectly, by the Consortium staff, testimony at trial revealed that no one directly supervised Dr. Williams in regards to his treatment of American University student-athletes, such as the plaintiff.  <u>See, e.g.</u>, Sept. 13, 2021 Tr. at 475:10–14, 564:14–17; Transcript of Bench Trial – Day 4 (Sept. 14, 2021) ("Sept. 14, 2021 Tr.") at 773:6–10, 773:21–25, 775:5–25, ECF No. 182.  Moreover, Dr. Williams did not consult regularly with Dr. Higgins about the student-athletes treated by Dr. Williams, and there was no evidence that Dr. Higgins ever reviewed Dr. Williams's work or his treatment of any student-athlete.  <u>See</u> Sept. 14, 2021 Tr. at 773:21–25, 775:5–25.

## M.    Expert Testimony

### 1.  The Plaintiff's Experts

#### a.       Dr. Robert Cantu

Dr. Robert Cantu testified for the plaintiff.  <u>See</u> Sept. 10, 2021 Tr. at 204.  The Court qualified Dr. Cantu as an expert in the field of neurosurgery, specifically with respect to concussions.  <u>See</u> <u>id.</u> at 216:13–24.  Dr. Cantu testified that the symptoms associated with a concussion include (1) "cognitive symptoms[,]" <u>e.g.</u>, "difficulty with memory, difficulty with concentration, difficulty with focus, [difficulty with] doing cognitive tasks such as learning words or repeating digits correctly[,]" <u>id.</u> at 221:11–14; (2) "physical domain symptoms[,]" <u>e.g.</u>, "headache[,]" "neck pain[,]" "sensitivity to light, sensitivity to noise, difficulty with dizziness[,]"

id. at 221:16–19; (3) "vestibular ocular symptoms[,]" e.g., "blurred vision[,]" "double vision[,]" or "difficulty with balance[,]" id. at 221:19–21; (4) "sleep symptoms[,]" e.g., "sleeping more than usual[ right after a concussion], but after some period of days or weeks after [a] concussion[,] it's the opposite where you're sleeping less than usual[,]" id. at 221:22–222:1; and (5) "emotional symptoms[,]" e.g., "depression, anxiety, short fuse, impulsive[-]type behavior or emotionality, inappropriate laughing or crying for events where it would not be appropriate[,]" id. at 222:2–6. Dr. Cantu further testified that the standard of care requires that, when treating an individual experiencing the symptoms of a concussion, the doctor must treat the individual as having a concussion, unless he or she is able to definitively eliminate any possibility of a concussion. See id. at 274:22 – 275:5. He stated that awareness of a mechanism is not necessary for the diagnosis of a concussion and that, frequently, a mechanism is unable to be identified, particularly when the onset of symptoms is delayed. See id. at 222:13–25. Accordingly, Dr. Cantu testified that, even if a patient is unable to identify the mechanism of a concussion, he or she should be treated as having a concussion if the doctor cannot rule out a concussion. See id. at 271:1–4. According to Dr. Cantu, treating an individual for a concussion would require that the individual be removed from practice and game participation, and, if appropriate, receive academic accommodations. See id. at 274:11–20.

Dr. Cantu testified that, in light of the plaintiff's symptoms and SCAT2 test results, the standard of care required the diagnosis of a concussion and the plaintiff being removed from practice and game participation until her concussion-related symptoms had ceased. See id. at 229:2–11. Dr. Cantu testified that both the plaintiff's October 4, 2011 and October 5, 2011 11:00 a.m. SCAT2 test results were sufficient to diagnose a concussion. See id. at 227:12–17, 228:6–14. Although Dr. Williams testified that he did not see the October 4, 2011 or October 5,

2011 6:00 a.m. SCAT2 test results, see Sept. 13, 2021 Tr. at 495:1–15, Dr. Cantu stated that the standard of care would require a doctor to review the results of prior testing, including "go[ing] through the medical records that are relevant to the possibility of a concussion[,]" which would include "the SCAT[2 test] that was done on [October 4, 2011,]" and "the two SCAT[2]s on [October 5, 2011.]" Sept. 10, 2021 Tr. at 227:18–228:2.

According to Dr. Cantu, if the plaintiff had been removed from practice and game participation on October 5, 2011, or within approximately one week of her concussion, she would have recovered at least to the level of her baseline SCAT2 test result. See id. at 230:9–12, 260:9–15. He stated that her continued symptoms were due to the failure to diagnose the plaintiff's concussion and remove her from practice and game participation, see id. at 235:5–7, and her symptoms were now permanent, id. at 229:25–230:1, 241:15–16.

      **b.**    **Dr. Joseph Crouse**

Dr. Joseph Crouse testified for the plaintiff. See id. at 280:9–13. The Court permitted Dr. Crouse to testify as an expert in the areas of vocational rehabilitation and economics. See id. at 287:6–9. Dr. Crouse testified that the plaintiff "would have reduced annual earnings and reduced life expectancy as a result of her cognitive functional limitations, and that would translate into an overall loss of earning capacity of $1,037,047 to $1,210,108[,]" depending on whether the plaintiff acquired a Bachelor's or graduate degree. Id. at 289:22–290:14. Dr. Crouse testified that he used the methodology that was generally used within his field. See id. at 293:13–16. Specifically, he relied upon the United States Census Bureau's American Community Survey ("ACS"), which is "the largest survey that the [United States] does on an annual basis" and is "routinely used" by "disability researchers across the country . . . in order to understand more about the population in the [United States] that has disabilities." Id. at 290:24–

31

291:7; see id. at 292:2–3 (testimony of Dr. Crouse that the Disabilities Statistics Rehabilitation Research and Training Center for Economic Research on Employment Policies for Persons with Disabilities "uses the [ACS] data" and "there's a wide variety of groups that use that data and come up with disability statistics compendiums"). According to Dr. Crouse, the ACS "is frequently relied on due to the fact that its sample size is so large[,]" and thus, "any sampling errors or any other type of errors that you could think of in a survey research would be nearly eliminated[.]" Id. at 291:14–21.

Dr. Crouse also interviewed the plaintiff and "reviewed [her] medical records, [including the neuropsychological reports and her] academic records[,]" as well as Dr. Cantu's expert report "to understand his opinion regarding prognosis and causation." Id. at 293:4–12; 296:24–297:7. Dr. Crouse also "conducted three different vocational tests[:]" id. at 292:6, "the COPS[ Interest Inventory], the Beta-4[,] and the [Wide Range Achievement Test ('WRAT')]," id. at 292:9, which are regularly used by vocational rehabilitation experts, see id. at 292:25–293:3. According to Dr. Crouse, "[t]he Beta-4 is a test of an individual's nonverbal intellectual functioning[,]" which includes "different tests like coding, clerical checking, [and] looking at matrix reasoning[,]" id. at 292:13–16; the WRAT "measures academic achievement[,]" id. at 292:20–21; and the COPS "looks at where an individual's career interests lie[,]" id. at 292:23–24.

Dr. Crouse "determined that [the plaintiff] met the [ACS] definition of an individual that has a non-severe cognitive disability based on her cognitive functional impairments[,]" id. at 294:1–4, which is based on whether "the individual ha[s] difficulty remembering, concentrating[,] or making decisions[,]" id. at 296:7–8. Dr. Crouse then "used data that pertains to non-severe" impairments, i.e., impairments where the individual "does not have problems

32

going outside the home alone or with dressing or bathing," in order "to eliminate [from his analysis] individuals [who] have the most severe cognitive impairments." Id. at 296:11–15.

From the Beta-4 test, Dr. Crouse determined that the plaintiff "had an average level of nonverbal intellectual functioning[,]" id. at 298:4–5, in the 58th percentile, see id. at 298:17, which demonstrated a decrease in functioning from the plaintiff's results on the Scholastic Aptitude Test, on which "she [ ] scored in the 89th percentile[,]" id. at 298:6–7. On the WRAT, the plaintiff's "scores were similar to someone that had some college education, but no degree[,]" with her performing "well with the spelling section of the test[,]" but "weaker in the math computation[,] . . . word reading[,] and sentence comprehension" components of the test. Id. at 299:7–11. According to Dr. Crouse, the plaintiff's WRAT results were "just another part of the equation that led [him] to determine that [the plaintiff] could be classified as having a non-severe cognitive disability." Id. at 299:14–16. From the COPS test, Dr. Crouse determined that the plaintiff's career interests lay "in the science professional career cluster[,]" and, specifically, in anthropology. Id. at 299:19–23. Based on his assessment of the plaintiff's functional capacity and his application of "the employment data from the" ACS, Dr. Crouse determined that "her limitations [in] memory concentration, organization, multitasking, [and] information processing . . . would impede her future ability to attain[ and] retain a position, and it would likely also necessitate that she retire sooner or that her job transitions would be harder[.]" Id. at 300:16–23.

Dr. Crouse also analyzed the plaintiff's "earning capacity and work life expectancy." Id. at 301:3–4. To determine the plaintiff's earning capacity, Dr. Crouse compared a "pre-injury scenario" of "average earnings for females that have a Bachelor's degree and no disability" with a "post-injury scenario" of "earnings for females that have a Bachelor's degree, but have a

non[-]severe cognitive disability." Id. at 301:5–13. To determine her work-life expectancy, Dr. Crouse looked at the ACS data for a pre-injury scenario of "females with a Bachelor's degree and no disability[,]" and a post-injury scenario of "females with a Bachelor's degree [with] a non-severe cognitive disability." Id. at 301:25–302:4.

Before calculating the plaintiff's "year-by-year earning capacity and employment levels[,]" id. at 302:8–9, Dr. Crouse applied the "total offset approach[,]" wherein "growth rate and compensation is offset by [a] discount rate . . . at the present value[,]" id. at 295:4–7, i.e., the "current worth of a future stream of income given a specified discount rate[,]" id. at 294:25–295:1. Dr. Crouse testified that the total offset approach is a reasonable approach within the field of economics because "historical data" demonstrates that "the growth rate in compensation is approximately equal to the risk[-]free rates that a person could receive on a lump sum award[,]" id. at 295:15–17; certain states require its application, see id. at 295:13–14; and "peer[-]reviewed literature in recent years has supported it more and more[,]" id. at 295:21–24. Then, Dr. Crouse generated two tables that reflect his determination of the plaintiff's pre- and post-injury earning capacity and employment levels, see id. at 303:13–19, with one table reflecting the plaintiff's attainment of a Bachelor's degree and the other table based on her attaining a graduate degree, see Pl.'s Exs. 54A, 54B. Specifically, Dr. Crouse testified that the plaintiff "would have reduced annual earnings and reduced life expectancy as a result of her cognitive functional limitations, and that would translate into an overall loss of earning capacity of $1,037,047[, if she would have only obtained a Bachelor's degree,] to $1,210,108[,]" if she would have also obtained a graduate degree. Sept. 10, 2021 Tr. at 289:22–290:14.

34

## 2. The Defendant's Expert

### a. Dr. Katherine Margo

Dr. Katherine Margo testified for the defendant. See Sept. 13, 2021 Tr. at 565:7–11. Over the plaintiff's objection,[10] the Court recognized Dr. Margo as an expert in the field of family medicine. See id. at 583:17–19, 588:1–2. During the plaintiff's questioning of Dr. Margo regarding her qualifications, Dr. Margo admitted that she may have seen only between twenty and twenty-five patients with suspected concussions during the course of her career and that she did not have any specific qualifications regarding concussions or neurology. See id. at 579–88. Dr. Margo testified that it was "most likely" that the plaintiff suffered a concussion in September 2011, see Sept. 14, 2021 Tr. at 660:6–12, and that the symptoms identified by the plaintiff in her October 3, 2011 email to Earls were consistent with a concussion, among "so many different things[,]" Sept. 13, 2021 Tr. at 618:2–11. She further testified that a hit to the head by a shoulder could be a mechanism that would cause a concussion. See Sept. 14, 2021 Tr. at 650:11–13.

Dr. Margo testified that a doctor need only treat a patient as if they have a concussion "if [the doctor] know[s] that there's a mechanism of injury[,]" and, "if [the doctor] do[es]n't think there's an injury then concussion really isn't on [the list of] differential" diagnoses. Id. at 649:18–22. She further testified that "a physician would either have to "rule[] out" a concussion or treat a patient as if he or she had suffered a concussion. Sept. 13, 2021 Tr. at 622:6–13.

---

[10] The plaintiff objected to Dr. Margo "being identified as an expert in the standard of care with respect to the diagnosis of [a] concussion." Sept. 13, 2021 Tr. at 583:14–16. After the government clarified that Dr. Margo was being offered as an expert in family medicine regarding "the national standard of care with respect to how a physician would be able to assess a patient presenting with nonspecific symptoms[,]" id. at 587:11–13, the Court ruled that, "over objection[,]" it would "permit [Dr. Margo] to testify[,]" id. at 588:1–2, because the plaintiff's challenge "only goes to the question of how much weight [should] be given to her testimony as compared to others[, such as Dr. Cantu,] who have more experience in the field[ of concussions,]" id. at 587:24–588:1. For the reasons discussed infra, see infra Section II.C.1–2, the Court assigns more weight to Dr. Cantu's testimony than it does to Dr. Margo's testimony, in light of her lack of experience regarding the standard of care for diagnosing and treating a concussion and the inconsistent testimony that she presented.

However, Dr. Margo stated that she could not cite any research to support the proposition that the standard of care permits a doctor to rule out a concussion if the doctor cannot identify the mechanism of the concussion. See Sept. 14, 2021 Tr. at 637:1–9.

## II. CONCLUSIONS OF LAW

For the following reasons, the Court finds in favor of the plaintiff on her medical malpractice claim against the defendant. The Court will address in turn (1) the defendant's affirmative defenses of waiver and the borrowed servant doctrine; (2) the plaintiff's claims of medical malpractice and negligent infliction of emotional distress; (3) the defendant's affirmative defense of contributory negligence; and (4) the damages that the plaintiff is entitled to receive.

### A. The Defendant's Waiver Defense

The defendant argues that the waiver of liability contained in the Acknowledgement of Risk form signed by the plaintiff precludes a finding of liability against the defendant, standing in the shoes of Dr. Williams, because "Dr. Williams was an 'agent' of American University at the time that he treated [the p]laintiff for her alleged injury." Def.'s Mem. at 54. In response, the plaintiff argues that "Dr. Williams was not acting as an agent, servant, employee, or even an[] independent contractor of American University[,]" and he therefore is not covered by the waiver of liability in the Acknowledgement of Risk form. Pl.'s Mem. at 67.[11] For the following

---

[11] As an initial matter, the waiver of liability in the Acknowledgement of Risk form clearly and unambiguously waives liability against "the University and its employees, officers, [and] agents[.]" Def.'s Ex. 15-2 at 1; see id. ("I (including my parents, legal guardians, and legal representatives) hereby agree to indemnify, defend[,] and hold harmless the University and its employees, officers, agents from any claims, demands, or suites for damages which may arise from my participation in the University's Intercollegiate Athletic Programs; or from any treatment, medical, or otherwise provided to me by the University's Sports Medicine Staff."). Accordingly, and because there is no dispute that Dr. Williams was neither an employee nor an officer of American University, see Def.'s Mem. at 54 (asserting that "[t]he sole issue before this Court now is whether Dr. Williams was an 'agent' of American University at the time that he treated [the p]laintiff for her [ ] injury"), the question for the Court to determine is whether the defendant, standing in the shoes of Dr. Williams, qualifies as an agent of American University. See id.

reasons, the Court concludes that the waiver of liability in the Acknowledgement of Risk form does not apply to the defendant standing in the shoes of Dr. Williams.

"The existence of an agency relationship is a question of fact, for which the person asserting the relationship has the burden of proof." Henderson v. Charles E. Smith Mgmt., Inc., 567 A.2d 59, 62 (D.C. 1989). Under District of Columbia law,[12] there is "a twofold test for determining whether [an agency] relationship exists: [(1)] the [C]ourt must look for evidence of the parties' consent to establish a principal-agent relationship[, and (2)], the [C]ourt must look for evidence that the activities of the agent are subject to the principal's control." Jackson v. Loews Wash. Cinemas, Inc., 944 A.2d 1088, 1097 (D.C. 2008) (internal quotation marks omitted and emphasis added). Although "[w]hether an agency relationship exists in a given situation depends on the particular facts of each case[,] [ ] factors to be considered include '(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.'" Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) (quoting LeGrand v. Ins. Co. of N. Am., 241 A.2d 856, 860 (D.C. 1982)). "Of these factors, the determinative one is usually 'whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.'" Id. (quoting LeGrand, 241 A.2d at 860).

The Court begins with the first factor, namely whether there is any "evidence of the parties' consent to establish a principal-agent relationship."[13] Jackson, 944 A.2d at 1097. There

---

[12] As the parties correctly note, see Pl.'s Mem. at 2; Def.'s Mem. at 51, the law of the District of Columbia applies in this case as it is the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

[13] Instead of citing the standard for whether an individual is acting as an agent for a principal, the defendant cites the standard for whether a government employee acted within the scope of his or her employment such that the Westfall Act applies, see Def.'s Mem. at 54, and argues, inter alia, that "Dr. Williams' treatment of [the p]laintiff took place

(continued . . .)

37

was no evidence presented during the trial that American University consented to Dr. Williams

acting as its agent. As the plaintiff correctly argues, see Pl.'s Mem. at 69, the defendant did not

present testimony from any official representative of American University.[14] Moreover, the

defendant fails to identify—and the Court is unaware of—any documentary evidence showing

American University's consent to Dr. Williams acting as its agent. See Def.'s Mem. at 51–56.

Although the defendant points to the Memorandum of Understanding and Letter of Agreement

between the Consortium and Dr. Higgins, see Def.'s Mem. at 56, these agreements are between

Dr. Higgins and the Consortium. See Def.'s Ex. 1 at USASUPP000013; Def.'s Ex. 2 at 6.

American University is not a party to either agreement. See generally Def.'s Ex. 1; Def.'s Ex. 2.

Moreover, the Professional Services Agreement between Dr. Higgins and American University

explicitly states that Dr. Higgins "is retained by the University and shall perform the services

under this [a]greement as an independent contractor[,]" Def.'s Ex. 14 ¶ 6, and "shall not be

considered under the provisions of this Agreement or otherwise as having an employee status[,]"

id. Likewise, under the Professional Services Agreement, Dr. Higgins "ha[d] no power or

authority to act for, represent, or bind the University in any manner." Id. Thus, Dr. Higgins did

not have the authority to consent on American University's behalf.

---

(. . . continued)

within the time and space limits of his sports medicine fellowship[,]" id. at 55, and thus Dr. Williams "was clearly a member of the American University sports medicine staff[,]" id. at 56. However, there is no dispute here that the Westfall Act applies. See Pl.'s Mem. at 1 (noting that Dr. Williams "was a federal employee at the time of the alleged negligence and was certified under a Westfall Certification to have been operating within the scope of his employment during the treatment in question"); Def.'s Mem. at 53 (noting the defendant's argument that "the United States stood in the place of Dr. Williams pursuant to the Westfall Act"). Accordingly, as the defendant's arguments to these ends are irrelevant, the Court need not consider them.

[14] The defendant identifies the testimony of Sean Dash, the head athletic trainer, who stated that "[t]he larger sports medicine staff also include[d the] physicians[,]" which would have included Dr. Williams, Sept. 14, 2021 Tr. at 738:14–15. See Def.'s Mem. at 56. However, there was no evidence introduced at trial that the head athletic trainer had authority to consent on American University's behalf to have Dr. Williams act as its agent.

38

Accordingly, the Court concludes that there is no evidence that American University consented to Dr. Williams acting as its agent and, thus, Dr. Williams was not an agent of American University.[15]  Having addressed the defendant's waiver defense, Court now turns to the defendant's borrowed servant doctrine defense.

**B.      The Defendant's Borrowed Servant Doctrine Defense**

The defendant argues that it "cannot be held liable for [Dr. Williams'] actions under District of Columbia law because Dr. Williams, as an American University Sports Medicine Fellow, was under the exclusive control of Dr. Higgins and his medical practice during the treatment of [the plaintiff] at American University."  Def.'s Mem. at 56.  In response, the plaintiff argues that "Dr. Williams was not acting under the supervision of . . . Dr. Higgins[, rather,] he was acting under his own accord under his duties as a military physician enrolled in the . . . [f]ellowship[.]"  Pl.'s Mem. at 67.  For the following reasons, the Court concludes that Dr. Williams was not the borrowed servant of Dr. Higgins.

Under District of Columbia law, "a person [who is] generally the servant of one master [i.e., the general employer,] can become the 'borrowed' servant of another[, i.e., the special employer]."  Dellums v. Powell, 566 F.2d 216, 220 (D.C. Cir. 1977).  If the "borrowed servant commits a tort while carrying out the bidding of the [special employer], vicarious liability for that tort attaches to the [special employer] and not to the general [employer]."  Id.  To determine whether the person was a "borrowed servant[,]" courts look to "whether the [special] employer had the 'power to control and direct [the employee] in the performance of [his or her] work."

---

[15] Because the Court concludes that there is no evidence that American University consented to Dr. Williams acting as its agent, the Court need not reach the question of whether Dr. Williams' activities were subject to American University's control.  See Henderson v. Charles E. Smith Mgmt., Inc., 567 A.2d 59, 62 (D.C. 1989) (noting that both factors—consent and control—must exist for a principal-agent relationship to exist).

Harris-DeVaughn v. United States, 241 F. Supp. 3d 186, 189 (D.D.C. 2017) (quoting Dellums, 566 F.2d at 221) (alterations in original). For liability to attach to the special employer, the general employer must have entirely "relinquished control" of the employee's work and cannot be "a joint master" with the special employer. Id. Moreover, "there is a presumption that an actor remains in his general employment[,]" Dellums, 566 F.2d at 221.

The Restatement of Agency sets forth the following factors that are helpful to determining whether the "general or special employer, or both, have the right to control an employee's conduct[:]"

> the extent of control that an employer may exercise over the details of an employee's work and the timing of the work; the relationship between the employee's work and the nature of the special employer's business; the nature of the employee's work, the skills required to perform it, and the degree of supervision customarily associated with the work; the duration of the employee's work in the special employer's firm; the identity of the employer who furnishes equipment or other instrumentalities requisite to performing the work; and the method of payment for the work.

Restatement (Third) of Agency § 7.03 cmt. d(2) (Am. L. Inst. 2006).[16]

The Court finds that both the Consortium and Dr. Higgins exercised some control "over the details[,]" id., of the medical services that Dr. Williams provided to student-athletes at American University. To start, the documents governing the agreement between Dr. Higgins and the Consortium each reflect a sharing of authority between the Consortium and Dr. Higgins. For example, the Memorandum of Understanding states that "Consortium residents, while training at th[eir fellowship] Practice, will be under the exclusive control and supervision of the Practice or its designated medical officials[,]" Def.'s Ex. 1 ¶ 11, and that, "[w]hile training at the Practice,

---

[16] The District of Columbia Court of Appeals has looked to the Restatement for guidance. See, e.g., Convit v. Wilson, 980 A.2d 1104, 1114 n.15 (D.C. 2009) (quoting § 7.03 for the proposition that "a principal's vicarious liability turns on whether the agent is liable" (quoting Restatement (Third) of Agency § 7.03 cmt. b (Am. L. Inst. 2006)).

trainees will be under the supervision of Practice officials[—i.e., Dr. Higgins—]for training

purposes and will be subject to, and be required to abide by, all applicable Practice rules and

regulations[,]" id. ¶ 5. However, the Memorandum of Understanding further provides that "[t]he

Consortium will have its faculty or staff members coordinate with Practice physicians the

assignment trainees will assume and their attendance at selected clinics, conferences, courses,

and programs conducted under the direction of the Practice[,]" id. ¶ 25, and "will ensure

compliance with all applicable Practice rules and instructions and those of its physicians[,]" id.

¶ 27. Moreover, the Memorandum of Understanding contemplates that, "[w]hile assigned to the

Practice and while performing services pursuant to this agreement, Consortium trainees remain

employees of the United States performing duties within the course and scope of their federal

employment." Id. ¶ 32.

Similarly, the Letter of Agreement indicates that responsibilities regarding Dr. Williams

were divided between the Consortium and Dr. Higgins. For example, it states that Dr. Williams

was to "work directly under the supervision of Dr. [ ] Higgins" and to "assist [Dr. Higgins] in the

clinic with the care of patients with orthopedic problems" and "athlete rehabilitation." Def.'s

Ex. 2 at 1. Moreover, the Letter of Agreement also provided that Dr. Higgins had "the overall

responsibility for [Dr. Williams] at the rotation site[,]" i.e., American University. Id. at 4–5.

However, "[a]lthough [Dr. Williams wa]s assigned to [Dr. Higgins] for the duration of the

rotation," Colonel deWeber, as "the Fellowship Director[, wa]s ultimately responsible for the

quality of the rotation and the Fellow's educational experience." Id. at 4.

Finally, the Fellowship Manual demonstrates that both Dr. Higgins and the Consortium

were responsible for supervising Dr. Williams. See Def.'s Ex. 5 at 66 ("The lines of resident

supervision are as follows:" (1) "First line: faculty from the site at which residents are currently

41

rotating[,]" (2) "Second line: Program Director[,]" and (3) "Third line: Associate Program Director.").

Testimony presented during the trial indicated that, despite the provisions regarding supervision in these agreements, the medical services provided by Dr. Williams at American University were not regularly supervised by anyone. No one from the Consortium, including Colonel deWeber, supervised Dr. Williams's treatment of patients at American University. <u>See</u> Sept 13, 2021 Tr. at 475:10–14. And, "for any issues that came up at a game or in a clinic that were brought to Dr. Williams[,]" Dr. Higgins would not directly supervise Dr. Williams, but rather Dr. Williams "could treat [the patient] on his own." Sept. 14, 2021 Tr. at 773:6–10. Moreover, even though Dr. Higgins considered himself to be Dr. Williams' supervisor, he did not engage in direct supervision of Dr. Williams and simply made himself available to Dr. Williams, if needed. <u>See</u> <u>id.</u> at 775:5–25. Dr. Higgins testified that "none of the fellows" with whom Dr. Higgins worked, including Dr. Williams, "consulted [Dr. Higgins] regularly" about patients. <u>Id.</u> at 773:21–25. Similarly, although Dr. Higgins had the authority to review Dr. Williams's work or evaluation of patients, there was no testimony as to a specific instance or a practice of Dr. Higgins doing so. Dr. Williams testified that he was "acting independently" of Dr. Higgins when providing primary care treatment at American University, Sept. 13, 2021 Tr. at 564:14–17, and he never briefed Dr. Higgins on patients "unless it had to do with an orthopedic injury[,]" <u>id.</u> at 474:24, because, "[a]s an orthopedic surgeon that was outside [Dr. Higgins'] scope to talk about colds, rashes[, <u>i.e.</u>, non-orthopedic issues,]" <u>id.</u> at 474:19–22. Dr. Williams further testified that he "did not [discuss his treatment of the plaintiff with Dr. Higgins] because this was a medicine issue[,] not an orthopedic issue." <u>Id.</u> at 491:14–17; <u>see also</u> Sept. 14, 2021

42

Tr. at 790:22–23 (testimony of Dr. Higgins that he did not discuss the plaintiff's case with Dr. Williams).

Furthermore, discipline, if it became necessary, would be jointly imposed by Dr. Higgins and the Consortium. See Def.'s Ex. 2 at 5 (stating that "[t]he Fellow Preceptor is encouraged to contact the Fellowship Director at any time if there are any issues or concerns" and "[t]he Fellowship Director must be notified immediately of any problems"); Sept. 14, 2021 Tr. at 776:4–8 (testimony of Dr. Higgins that he "d[id]n't know" how discipline would be handled "because [he had] never had that issue with any of the fellows . . . , so [he was] not sure whether [he had] that ability or not[,]" but his "assumption [is that he] would talk to the program chair[,]" i.e., Colonel deWeber).

Finally, even though Dr. Higgins would arrange the clinic hours at American University around Dr. Williams's schedule, Dr. Williams's schedule was ultimately controlled by the Consortium. See Sept. 14, 2021 Tr. at 759:22–760:16. The Consortium did not provide the location and equipment for Dr. Williams to treat patients, see id. at 759:13–21; Def.'s Ex. 1 ¶ 17 (requiring Dr. Higgins to make facilities available to Dr. Williams), although it retained the right to conduct a site visit, see Def.'s Ex. 1 ¶ 22.

Based on this evidence, the Court concludes that, when Dr. Williams was treating patients at American University, he was theoretically subject to the control of both Dr. Higgins and the Consortium. However, for liability to shift solely to Dr. Higgins, Dr. Higgins must have had exclusive authoritative direction and control over Dr. Williams. See Dellums, 566 F.2d at 222 (noting that "the borrowed servant doctrine . . . conceives of authoritative direction and control vesting in one master to the exclusion of the other" (emphasis added)). Because a preponderance of the evidence does not support the position that Dr. Higgins exercised exclusive

43

authoritative direction and control over Dr. Williams,[17] the Court concludes that the defendant

did not satisfy its burden of showing that Dr. Williams was the borrowed servant of Dr.

Higgins.[18]

---

[17] Arguing against the proposition that Dr. Higgins exercised authoritative control over Dr. Williams, the defendant asserts that, "[f]ar from establishing direction and control, [Colonel] deWeber's dormant availability demonstrates the power to merely 'suggest details' regarding Dr. Williams'[] clinical treatment of student[-]athletes at American University, which is patently insufficient to establish joint control between the United States and Dr. Higgins." Def.'s Mem. at 63–64. The defendant is correct that, in Dellums, the District of Columbia Circuit distinguished between "authoritative direction and control" over an employee and "the power merely to suggest details or the necessary cooperation." 566 F.2d at 221. However, the evidence here does not support that the Consortium lacked "authoritative direction and control[,]" id., over Dr. Williams. For example, the Consortium had the responsibility to "ensure compliance with all applicable Practice rules and instructions and those of its physicians[,]" Def.'s Ex. 1 (Memorandum of Understanding) ¶ 27.

[18] In arguing that Dr. Higgins had exclusive control of Dr. Williams, the defendant cites two cases: McBee v. United States, 101 Fed. App'x 5 (5th Cir. 2004), an unpublished decision by the United States Court of Appeals for the Fifth Circuit, and Afonso v. City of Boston, 587 F. Supp. 1342 (D. Mass. 1984), a decision from the District of Massachusetts. See Def.'s Mem. at 60–61.

In McBee, "[t]he McBees sued the [g]overnment after the death of their son for the alleged negligence of Dr. Timothy Porea, who was an active member of the United States Navy at the time of their son's death" and was working at the Baylor College of Medicine. 101 Fed. App'x at 5. Citing the facts that (1) the agreement between the Navy and Baylor stated that "Porea was directly supervised by Baylor staff, not independent contractors" and (2) testimony "establish[ed] that Baylor directly controlled the patient care rendered by Porea[,]" the Fifth Circuit concluded that "the district court did not err in concluding that Porea was the 'borrowed servant' of Baylor for vicarious liability purposes." Id. at 6. However, the facts in this case are distinguishable from McBee. Here, Dr. Williams was not "directly supervised" by Dr. Higgins and Dr. Higgins did not "directly control[] the patient care rendered by" Dr. Williams. Id. Moreover, the agreements between Dr. Higgins and the Consortium demonstrate that the supervisory duties were shared by both the Consortium and Dr. Higgins. Accordingly, McBee does not contradict the Court's conclusion that Dr. Williams was not the borrowed servant of Dr. Higgins.

In Afonso, the District of Massachusetts concluded that a doctor "on military duty with the [United States] Air Force[,]" who was "detailed to a private university, where he was training in a residency program at the hospital[,]" 587 F. Supp. at 1343, was "not under the control of the Air Force" because (1) "[n]o military personnel were involved in the direction of either the hospital or the university residency program[,]" (2) "[t]he only interest of the Air Force in this residency was the education and training that [the resident] received[,]" and (3) "[t]he military retained no right to control [the resident's] provision of medical services in the hospital[,]" id. at 1347. Even though the resident "received a salary from the Air Force and . . . may have been subject to military discipline for activities other than his provision of medical care[,]" these factors did not "contradict the conclusion that [the resident] was not under the Air Force's control in the performance of his medical functions." Id. Similar to McBee, Afonso is distinguishable from this case. Unlike in Afonso, here the military itself—through the Consortium—directed the fellowship in which Dr. Williams was participating and, as discussed above, the Consortium retained aspects of supervision and control over Dr. Williams. Accordingly, Afonso also does not undermine the Court's conclusion that Dr. Williams was not the borrowed servant of Dr. Higgins.

## C.     The Plaintiff's Claim of Medical Malpractice

The Court now turns to the plaintiff's medical malpractice claim.  Under District of

Columbia law, "[i]n a medical malpractice negligence action[,] the plaintiff must present medical

expert testimony to establish the standard of care, expert testimony that the defendant's conduct

deviated from that standard of care, and expert testimony establishing that the alleged deviation

proximately caused the plaintiff's injuries."  Cleary v. Grp. Health Ass'n, 691 A.2d 148, 153

(D.C. 1997).  Upon the presentation of such evidence, "the Court evaluates the evidence to

determine whether the plaintiff has established each element of the negligence claim against the

defendant by a preponderance of the evidence."  Rhodes v. United States, 967 F. Supp. 2d 246,

287 (D.D.C. 2013).  Therefore, the Court will begin by first addressing the applicable standard of

care, before analyzing whether Dr. Williams breached that standard.

### 1.  The Applicable Standard of Care

In order to establish the applicable standard of care, "the plaintiff must establish through

expert testimony the course of action that a reasonably prudent doctor with the defendant's

specialty would have taken under the same or similar circumstances."  Meek v. Shepard, 484

A.2d 579, 581 (D.C. 1984).  The expert "must establish that a particular course of treatment is

followed nationally either through reference to a published standard, [discussion] of the

described course of treatment with practitioners outside the District at seminars or conventions,

or through presentation of relevant data."  Strickland v. Pinder, 899 A.2d 770, 773–74 (D.C.

2006) (alteration in original).  There must be an "attempt to link [ ] testimony to any certification

process, current literature, conference or discussion with other knowledgeable professionals,"

etc.  Id. at 774.  Accordingly,

> [e]xpert testimony "is not sufficient if it consists merely of the expert's opinion as
> to what he or she would do under similar circumstances.  Nor is it enough for the
> expert simply to declare that the [defendant] violated the national standard of

care. Rather, the expert must clearly articulate <u>and reference</u> a standard of care by which the defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable . . . facilities or to some standard nationally recognized by such units."

<u>Briggs v. Wash. Metro. Area Transit Auth.</u>, 481 F.3d 839, 846 (D.C. Cir. 2007) (emphasis and

all but first alteration in original) (quoting <u>Clark v. District of Columbia</u>, 708 A.2d 632, 635

(D.C. 1997)).

 Here, the parties offered two expert witnesses to establish the applicable standard of care:

(1) Dr. Cantu, the plaintiff's expert; and (2) Dr. Margo, the defendant's expert. Relying upon Dr.

Cantu's testimony, the plaintiff argues that the "standard of care required that Dr. Williams

should have diagnosed a concussion on October [5], 2011[,[19]] and that he [should have] placed

[the plaintiff] into a concussion protocol until she was asymptomatic." Pl.'s Mem. at 60. In

contrast, relying upon Dr. Margo's testimony, the defendant argues that Dr. Williams was only

required to take "the SCAT[]2 [results] into consideration along with [the plaintiff's] history,

physical exam, and neurocognitive tests before diagnosing and treating [her]" and "the standard

of care did not require Dr. Williams to immediately remove [the plaintiff] from practice and

[game participation]." Def.'s Mem. at 69. For the following reasons, the Court finds that the

standard of care required the diagnosis of a concussion on October 5, 2011, and the removal of

the plaintiff from practice and game participation until she fully recovered.

 The Court begins by addressing the relative weight it assigns to the testimony offered by

the experts. The plaintiff's expert regarding the standard of care, Dr. Cantu, was qualified by the

---

[19] In this sentence in her proposed findings of fact and conclusions of law, the plaintiff refers to October 4, 2011, rather than October 5, 2011. <u>See</u> Pl.'s Mem. at 60 (arguing that "the standard of care established that Dr. Williams should have diagnosed a concussion on October 4, 2011"). Because Dr. Williams's appointment with the plaintiff did not occur until October 5, 2011—and therefore it would not have been possible for Dr. Williams to diagnose a concussion on October 4, 2011—the Court construes the reference to October 4, 2011, as a typographical error.

46

Court as an expert in the field of neurosurgery, specifically with respect to concussions. <u>See</u>
Sept. 10, 2021 Tr. at 204. Dr. Cantu testified to his extensive work regarding concussions, <u>see</u>
<u>id.</u> at 206:15–216:11, including "running a concussion center" that is "active in athletic head and
spine injuries, their prevention, [and] their treatment[,]" <u>id.</u> at 206:16–19; serving as "a clinical
professor of neurosurgery and neurology" and "co-found[ing]" a center related to "[c]hronic
traumatic encephalatrophy[,]" a "progressive neurodegenerative disease related to repetitive head
trauma[,]" at Boston University, <u>id.</u> at 207:3–6; "lecturing on concussions" and "writing on
concussions" since the 1970s, <u>see id.</u> at 210:6–7; "publishing" the standards related to treatment
of athletes with concussions, <u>see id.</u> at 210:23–211:9; and serving as a consultant regarding the
treatment of athletes with concussions, <u>see id.</u> at 211:12–212:4. He also stated that, during his
career, he has "treated thousands of athletes" with concussion-related symptoms. <u>Id.</u> at 210:15.

In contrast, the defendant's expert regarding the standard of care, Dr. Margo, was
qualified by the Court as an expert in the field of family medicine, <u>see</u> Sept. 13, 2021 Tr. at 565,
582, and did not testify to any specific qualifications regarding either concussions or neurology,
<u>see id.</u> at 579–88. Specifically, Dr. Margo testified that she had never been asked to diagnose an
athlete with a concussion, <u>see id.</u> at 581:10–12, although she did testify that she had assessed
approximately twenty individuals over the course of her career to determine whether they had a
concussion, <u>id.</u> at 585:14–17. Dr. Margo testified that her testimony regarding the applicable
standard of care for the diagnosis of a concussion in the plaintiff's situation would be based on a
family medicine doctor's "curriculum and training[,]" of which "sports medicine is [one] part[,]"
and "journals" that "publish articles on every topic that [a family medicine doctor] cover[s] on a
regular basis[,]" including "one on concussion just a few years ago[.]" <u>Id.</u> at 586:6–11.

As the defendant correctly noted at trial, "someone with Dr. Margo's background can certainly speak to the national standard of care with respect to how a [family medicine] physician would be able to assess a patient presenting with nonspecific symptoms[,]" in light of the fact that "someone trained in internal family medicine needs to be able . . . to diagnose a particular ailment out of [ ] [a] nearly [ ] endless supply of possibilities[.]" Id. at 587:2–13. Moreover, as the defendant notes, Dr. Cantu is not "a family medicine doctor" like Dr. Williams, see Def.'s Mem. at 67, and the Court is obligated to determine the standard of care for a "reasonably prudent doctor with [Dr. Williams's] specialty[,]" Meek, 484 A.2d at 581. However, the Court is mindful that the particular issue in this case is not merely whether Dr. Williams took the correct steps during his appointment with the plaintiff on October 5, 2011, as Dr. Margo testified that the national standard of care for family medicine doctors required, but rather whether the national standard of care for a family medicine doctor with Dr. Williams's background and training required Dr. Williams to diagnose a concussion and remove the plaintiff from practice and game participation until she recovered.[20]

---

[20] The defendant asks the Court to disregard Dr. Cantu's testimony in favor of Dr. Margo's testimony, because "Dr. Williams is a family medicine doctor, [and thus] Dr. Margo's expert testimony establishes the standard of care for a reasonably prudent family medicine doctor[,] not . . . Dr. . . . Cantu, an expert in the field of neurosurgery, specifically with respect to concussions." Def.'s Mem. at 67. Specifically, the defendant argues that the standard of care only required Dr. Williams to "(1) take a medical history, (2) conduct a physical exam, (3) evaluate any laboratory test results, (4) make a differential diagnosis, and (5) 'narrow down the differential diagnosis and come up with what [he thought] the problem is and then [ ] treat it.'" Id. at 67–68 (quoting Sept. 13, 2021 Tr. at 590:23–591:3). However, the defendant misstates the relevant inquiry, as there is no dispute regarding the steps Dr. Williams took in examining the plaintiff. Rather, the issue in this case concerns Dr. Williams's diagnosis, i.e., whether he breached the standard of care by ruling out—and, accordingly, failing to treat—the plaintiff's concussion. Moreover, in regards to the standard of care applicable to diagnosing and treating a patient with concussion-associated symptoms, Dr. Margo and Dr. Cantu testified that the symptoms that the plaintiff was experiencing at the October 5, 2011 appointment were sufficient to diagnose a concussion, a lack of a known mechanism was an insufficient basis to rule out a concussion in an athlete, and concussion treatment should be implemented until a concussion can be ruled out. See Sept. 10, 2021 Tr. at 270:21–271:4 (testimony of Dr. Cantu); Sept. 13, 2021 Tr. at 460:24–461:7 (testimony of Dr. Margo); accord Sept. 10, 2021 Tr. at 381:17–19 (testimony of Dr. Vollmar). Accordingly, because Dr. Cantu's and Dr. Margo's testimony aligns concerning the key issues regarding the standard of care in this case, the Court disagrees with the defendant that Dr. Cantu's testimony should be disregarded.

To that end, Dr. Cantu's testimony is both pertinent and compelling, as it is based on his extensive participation in setting the national standards for the diagnosis and treatment of athletes with concussions.  See, e.g., Sept. 10, 2021 Tr. at 210:23–211:9.  In contrast, Dr. Margo's ability to speak to that particular issue is limited.  She cited no specific support for her opinion regarding whether the national standard of care required a diagnosis of a concussion in the plaintiff's situation, absent vague references to sports medicine curricula and training, see Sept. 13, 2021 Tr. at 586:6–8 ("So sports medicine is part of our curriculum and training, so that's one place you would see concussions primarily."), and a journal article on concussions, see id. at 586:8–11 ("We get journals, they have a regular you know they publish articles on every topic that we cover on a regular basis, so there was one on concussion just a few years ago for instance.").  Moreover, she has no background in treating athletes who present with concussion-related symptoms.  See id. at 612:19–23 (in response to a question from the Court whether she had "examined someone who's been involved in athletic activity as it relates to concussion[,]" Dr. Margo testified that she "do[es]n't remember such a case").[21]  Accordingly, to the extent that their testimony conflicts, the Court will credit Dr. Cantu's testimony over Dr. Margo's testimony as to the diagnosis and treatment of concussion-related symptoms in an athlete.  However, the Court will credit Dr. Margo's testimony as to the steps that family medicine doctors take to assess, diagnose, and treat their patients.

In any event, Dr. Margo's testimony and Dr. Cantu's testimony were largely consistent. Both Dr. Cantu and Dr. Margo testified that the plaintiff's symptoms and SCAT2 test results—

---

[21] Additionally, as discussed infra, in general, Dr. Margo was not a compelling witness in regards to concussions. She provided inconsistent testimony between her direct and cross-examination testimony and provided little-to-no support for the opinions she offered.  For this reason as well, the Court assigns less weight to her testimony than to that of Dr. Cantu.

49

both the October 4, 2011 and October 5, 2011 11:00 a.m. test results—were consistent with her

having sustained a concussion.[22]  See Sept. 13, 2021 Tr. at 617:19–622:3 (testimony of Dr.

Margo); Sept. 14, 2021 Tr. at 634:23–635:1 (testimony of Dr. Margo that the October 5, 2011

11:00 a.m. SCAT2 test result reflected elevated concussion-associated symptoms); Sept. 10,

2021 Tr. at 228:18–229:3 (testimony of Dr. Cantu).  Moreover, even though Dr. Williams stated

that he was unable to diagnose a concussion without knowing the mechanism, see Sept. 13, 2021

Tr. at 503:5–6, both Dr. Cantu and Dr. Margo testified that the lack of a known mechanism was

not a sufficient reason to rule out a concussion in the plaintiff's case.[23]  See Sept. 10, 2021 Tr. at

270:21–271:4 (testimony of Dr. Cantu); Sept. 13, 2021 Tr. at 460:24–461:7 (testimony of Dr.

Margo); see also id. at 381:17–19 (testimony of Dr. Vollmar).  Furthermore, Dr. Cantu testified

that the applicable standard of care in 2011 required that "if you can't rule out a concussion, treat

---

[22] As an initial matter, the Court concludes that, to the extent that Dr. Williams did not review the October 4, 2011 and October 5, 2011 6:00 a.m. SCAT2 test results, he breached the standard of care.  As discussed earlier, see supra Section I.C, Dr. Williams and Earls disputed whether Earls presented Dr. Williams with a copy of the plaintiff's October 4, 2011 and October 5, 2011 6:00 a.m. SCAT2 test results.  However, Dr. Cantu testified that the standard of care would require a doctor to review the results of prior testing, including "go[ing] through the medical records that are relevant to the possibility of a concussion[,]" which would include "the SCAT[2 test] that was done on [October 4, 2011,]" and . . . the two SCAT[2]s on [October 5, 2011.]"  Sept. 10, 2021 Tr. at 227:18–228:2. Moreover, Dr. Margo testified that the standard of care for a family physician required the physician to obtain the patient's medical history, which included asking the patient questions and reviewing available medical records.  See Sept. 13, 2021 Tr. at 593:23–594:1.  Accordingly, in light of the requirement that a physician review the patient's medical history, the presence of Earls in the room with Dr. Williams and the plaintiff during the appointment, and Earls's testimony that she had the October 4, 2011, and October 5, 2011 6:00 a.m. test results with her at the October 5, 2011 appointment, the Court concludes that Dr. Williams breached the standard of care by not fully reviewing the plaintiff's medical history, which would have included review of all three SCAT2 test results.

[23] Dr. Margo presented inconsistent testimony on this issue.  On direct examination, she testified that a doctor only has to treat a patient as if they have a concussion "if [the doctor] know[s] that there's a mechanism of injury[,]" and, "if [the doctor] do[es]n't think there's an injury then concussion really isn't on [the list of] differential" diagnoses. Sept. 14, 2021 Tr. at 649:18–22.  However, on cross-examination, Dr. Margo testified that a physician could not rule out a concussion due to a lack of a known mechanism "without further evaluation . . . [b]ecause athletes get shots all the time[.]"  Sept 13, 2021 Tr. at 461:2–7.  Considering (1) Dr. Cantu's testimony that a lack of a known mechanism was an insufficient reason to rule out a concussion, see Sept. 10, 2021 Tr. at 270:21–271:4 (testimony of Dr. Cantu), which was consistent with Dr. Vollmar's fact testimony, see id. at 381:17–19 (testimony of Dr. Vollmar); and (2) the fact that, on cross-examination, Dr. Margo stated that she could not cite any research to support the proposition that the standard of care permits a doctor to rule out a concussion if the doctor cannot identify a mechanism, see Sept. 14, 2021 Tr. at 637:1–9, the Court credits Dr. Margo's testimony that a physician could not rule out a concussion due to lack of a known mechanism, rather than her testimony to the contrary.

50

a concussion until you can rule it out, and if you can't rule it out, treat it as such[,]" Sept. 10, 2021 Tr. at 252:6–13, basing his opinion on a November 2008 consensus statement on concussions in sports, see id. at 251:14–21. Specifically, he testified that "any individual that's symptomatic should not be allowed to continue with their activity" and "should be removed from the participation in whatever sport." Id. at 274:9–14. Dr. Margo also testified that a doctor had to rule out a concussion or treat the individual as having a concussion. See Sept. 13, 2021 Tr. at 622:10–17. Accordingly, the Court finds that the applicable standard of care required that Dr. Williams not rule out that the plaintiff had suffered a concussion when he treated her on October 5, 2011, because the plaintiff was experiencing concussion-associated symptoms that were sufficient for him to diagnose a concussion and the lack of a known mechanism was an insufficient reason to rule out a concussion.

Moreover, Dr. Cantu, an expert superbly qualified to provide testimony regarding concussions, testified that the standard of care required that someone with a concussion be removed from practice and game participation. See Sept. 10, 2021 Tr. at 229:2–3. Therefore, based on Dr. Cantu's and the other expert testimony, the Court also finds that the applicable standard of care required the plaintiff to be removed from participation in practice and games on October 5, 2011, until she had fully recovered.

### 2. Whether Dr. Williams Breached the Standard of Care

Having concluded that the applicable standard of care required doctors not to rule out a concussion based solely on the lack of a known mechanism and to remove an athlete from practice and game participation unless they had ruled out a concussion, the Court now turns to whether Dr. Williams breached the standard of care. For the following reasons, the Court finds that he did.

When the plaintiff saw Dr. Williams on October 5, 2011, Dr. Williams had learned from Earls that the plaintiff "complain[ed] of extreme fatigue, lack of concentration, dizziness, [i]nab[i]l[ity] to focus on ball and games, pressure in head," but "d[id] not recall a mechanism." Sept. 13, 2021 Tr. at 436:2–12. Earls also testified that she informed Dr. Williams that the plaintiff "may have been hit by a girl's shoulder during a game." Id. at 416:3–8. Although Dr. Williams "specifically asked [the plaintiff] [ ] the same question multiple different ways to try and get a mechanism or time frame when her symptoms started[,]" the plaintiff "could not give [him] one." Id. at 491:25–492:3; see also id. at 445:16–23 (testimony of Earls confirming that the plaintiff informed Dr. Williams that she did not remember a hit to the head). Dr. Williams performed a physical examination, including neurocognitive testing as indicated by the SCAT2 test. Because the plaintiff's "overall score [on the SCAT2 test] was at her baseline" or "actually slightly improved from [her] baseline minus the symptom score[,]" id. at 502:22–23, and "[s]he had no mechanism[,]" id. at 503:5, Dr. Williams ruled out a concussion, see id. at 503:4–6.

As discussed above, the purported lack of a known mechanism—particularly in light of the plaintiff's participation in a contact sport where concussing-causing mechanisms could occur frequently, see Sept. 10, 2021 Tr. at 245:14–16—was not a sufficient reason for Dr. Williams to rule out a concussion. Moreover, Dr. Cantu and Dr. Margo testified that the plaintiff's SCAT2 test results were "very much diagnostic of a concussion[,]" id. at 228:14, and that her symptoms, along with the SCAT2 test results, were "consistent with a concussion and she should have been removed from practice and play," id. at 227:14–17. See also id. at 229:16–19 (testimony by Dr. Cantu that, within a reasonable degree of medical certainty, "there[ were] not only sufficient symptoms to make the diagnosis and test results to make the diagnosis"); Sept. 14, 2021 Tr. At 634:23–635:1 (testimony of Dr. Margo that the results of the plaintiff's October 5, 2011 11:00

52

a.m. SCAT2 test result, i.e., the test that Dr. Williams testified that he did see, reflected elevated symptoms associated with a concussion relative to the plaintiff's baseline SCAT2 test result). Therefore, the Court finds that Dr. Williams breached the standard of care by not removing the plaintiff from practice and game participation on October 5, 2011.

### 3. Causation

Having concluded that Dr. Williams breached the applicable standard of care by ruling out that the plaintiff had a concussion and not removing the plaintiff from practice and game participation on October 5, 2011, the Court now turns to whether Dr. Williams's breach proximately caused the injuries alleged by the plaintiff. Under District of Columbia law, "[t]he causal relationship between [a] breach and [an] injury is established through expert testimony[,] 'based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of [the] plaintiff's injuries.'" Perkins v. Hausen, 79 A.3d 342, 344 (D.C. 2013) (quoting Derzavis v. Bepko, 766 A.2d 514, 522 (D.C. 2000)). For the following reasons, the Court concludes that the plaintiff has met her burden to establish by a preponderance of the evidence that Dr. Williams's failure to diagnose a concussion and remove her from practice and participating in games resulted in her injuries.

The evidence presented by the plaintiff during the trial established that she suffers from post-concussion syndrome resulting from a moderate traumatic brain injury, resulting in neurocognitive defects, headaches, mental fog, exhaustion, and concentration issues, among other symptoms. See Sept. 9, 2021 Tr. at 86:18–24, 87:1, 87:14–18, 89:11–15; Sept. 10, 2021 Tr. at 233:6–12, 388:8–14. Dr. Cantu testified that, within a reasonable degree of medical certainty, "if [the plaintiff] had been removed from practice and play on [October 5, 2011,] she would have recovered completely or at least recovered back to what her baseline was on [her baseline SCAT2] test[,]" but that, "[b]ecause she continued to practice and play and take more

53

head trauma in the process, her post-concussion symptoms were aggravated[.]" Sept. 10, 2021 Tr. at 230:9–18. Dr. Cantu also testified that "[p]ost-concussion symptoms are aggravated by physical exertion alone[,]" and, thus, the plaintiff's continuing to practice and play in games during the remainder of the Fall 2011 field hockey season—even absent additional head trauma, about which there is no such evidence in the record—resulted in her continuing symptoms. Id. at 230:25–231:6. Accordingly, the Court concludes that the plaintiff has established, through Dr. Cantu's testimony, that Dr. Williams's failure to remove her from practice and game participation on October 5, 2011, "is more likely than anything else to have been the cause (or a cause) of [the] plaintiff's injuries." Perkins, 79 A.3d at 344 (D.C. 2013) (internal quotation marks omitted).

The defendant argues that the plaintiff has not met her burden because "it is just as likely that the initial alleged blow to her head caused all of [the p]laintiff's injuries[,]" Def.'s Mem. at 74, and, "at no time did Dr. Cantu testify that [the plaintiff's] symptoms were not caused by the initial alleged injury[,]" id. at 73. Certainly, the mechanism that caused the plaintiff's concussion—whether from the Richmond player's shoulder or another, unspecified mechanism—is a cause of the plaintiff's injuries. However, "the defendant's negligence" need not be "the cause" of the plaintiff's injuries, rather it need only be "more likely than anything else to have been . . . a cause[] of [the] plaintiff's injuries[,]" Perkins, 79 A.3d at 344 (emphasis added), i.e., there must be "a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries[,]" Snyder v. George Wash. Univ., 890 A.2d 237, 247 (D.C. 2006). Here, Dr. Cantu's testimony establishes that relationship, based on his expert opinion that, absent Dr. Williams's negligence in failing to remove the plaintiff from practice and game participation on October 5, 2011, the plaintiff "would have recovered

54

completely or at least recovered back to what her baseline was on [her baseline SCAT2] test."
Sept. 10, 2021 Tr. at 230:9–18.

Accordingly, the Court concludes that Dr. Cantu's testimony that the failure to remove the plaintiff from practice and game participation on October 5, 2011, which resulted in her not returning to her baseline SCAT2 level, see Sept. 10, 2021 Tr. at 230:9–18, is sufficient to demonstrate by a preponderance of the evidence that Dr. Williams' negligence is a proximate cause of the plaintiff's injuries.[24]

## D.      The Defendant's Defense of Contributory Negligence

The Court now turns to the defendant's affirmative defense that the plaintiff was contributorily negligent. The defendant argues that the plaintiff should be found to have been contributorily negligent because (1) "[i]nstead of duly reporting her health issues after the Richmond game, while continuing to experience symptoms, she continued to practice and play in games" before alerting Earls; and (2) "she did not disclose a mechanism of injury to Dr.

---

[24] The plaintiff also brought a claim of negligent infliction of emotional distress against the defendant. However, although she sets forth applicable law regarding this claim in the "Applicable Law" section of her proposed findings of fact and conclusions of law, see Pl.'s Mem. at 7–10, she failed to present any argument regarding it in her "Proposed Conclusions of Law Based Upon the Evidence" section, see id. at 60–75. Rather, she cursorily mentions it in her conclusion, stating—without citation to either case law or the record—that

> if for some reason the Court does not believe that Dr. Williams committed medical malpractice, the preponderance of [the] evidence still demonstrates that Dr. Williams had an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being was necessarily implicated by the nature of his undertaking to or relationship with [the plaintiff], and serious emotional distress was especially likely to be caused by his negligence and was so caused.

> The claims of medical malpractice and negligent infliction of emotional distress are two separate claims. [The p]laintiff is entitled to non-economic damages under both claims; however, she is not entitled to duplicative damages. If the Court is to make the finding that [the d]efendant committed medical malpractice, it does not need to also find that [the d]efendant committed negligent infliction of emotional distress in order to award non-economic damages.

Id. at 75. Accordingly, in light of (1) the plaintiff's failure to present any argument related to her negligent infliction of emotional distress claim and (2) the plaintiff's waiver of the claim "[i]f the Court is to make the finding that [the d]efendant committed medical malpractice," id., the Court concludes that the plaintiff's negligent infliction of emotional distress claim is waived and will thus dismiss this claim.

Williams[.]" Def.'s Mem. at 75–76. In response, the plaintiff argues that (1) she "took the steps available to attempt to receive care when her symptoms developed" and (2) "there is no claim that failing to report a specific blow to the head is negligent conduct by a [p]laintiff." Pl.'s Mem. at 71. The Court will address in turn each of the defendant's contributory negligence theories.

"The District [of Columbia] remains one of the few jurisdictions that generally retains a pure contributory negligence defense[,]" Asal v. Mina, 247 A.3d 260, 271 n.11 (D.C. 2021), i.e., a "claimant's contributory negligence can act as a complete defense to the defendant's liability for negligence[,]" Jarrett v. Woodward Bros., Inc., 751 A.2d 972, 985 (D.C. 2000). "Contributory negligence is found where the plaintiff, by encountering the risk created by the defendant's breach of duty, departed from an objective standard of reasonable care." Dennis v. Jones, 928 A.2d 672, 677 (D.C. 2007) (internal quotation marks omitted). Generally, a "plaintiff is barred from recovery if his [or her] negligence was a substantial factor in causing his [or her] injury[.]" Whiteru v. Wash. Metro. Area Transit Auth., 25 F.4th 1053, 1057 (D.C. Cir. 2022) (internal quotation marks omitted). "In medical malpractice cases . . . , contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment." Durphy v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc., 698 A.2d 459, 467 (D.C. 1997). In contrast, conduct that "precedes that of the physician and provides the occasion for medical treatment[,]" e.g., negligent conduct that results in an injury for which the plaintiff seeks medical treatment, does not constitute contributory negligence.[25] Id. Moreover, "subsequent negligence of the patient, which

---

[25] The plaintiff misrepresents this holding in Durphy, arguing that it stands for the proposition that any conduct by the plaintiff that precedes the medical treatment cannot be construed as contributory negligence. See Pl.'s Mem. at 71. However, Durphy clearly states only that actions that precede the allegedly negligent medical treatment and provide the reason for the treatment cannot be the basis for a contributory negligence claim. See Durphy, 698 A.2d at 467 ("[W]here the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment, contributory negligence is not a permissible defense." (internal quotation marks omitted)).

56

aggravates the injury primarily sustained at the hands of the physicians, does not discharge the

physician from liability, but only goes [to] mitigation of damages." Id. (internal quotation marks

and alterations omitted).  Because "[c]ontributory negligence is an affirmative defense, . . . it is

the defendant's burden 'to establish, by a preponderance of the evidence, that the plaintiff failed

to exercise reasonable care.'"  Whiteru, 25 F.4th at 1058 (quoting Poyner v. Loftus, 694 A.2d 69,

71 (D.C. 1997)).

### 1. Whether the Plaintiff Was Contributorily Negligent by Continuing to Practice and Participate in Games Between September 25, 2011, and October 5, 2011

The defendant first argues that the plaintiff was contributorily negligent by continuing to

practice and play in games between the conclusion of the Richmond game on September 23,

2011, and her appointment with Dr. Williams on October 5, 2011.  See Def.'s Mem. at 75.  For

the following reasons, the Court concludes that the defendant has not met its burden to

demonstrate that this conduct by the plaintiff amounts to contributory negligence.

The plaintiff testified that her symptoms began on September 25, 2011, after the

Richmond game, see Sept. 9, 2021 Tr. at 42:16–43:5, but that she did not tell anyone about them

because she "was scared and confused[,]" id. at 43:21, and thought that "this is going to go away

because [she was] supposed to play field hockey[,]" id. at 44:10–13.  The plaintiff finally

reported the symptoms to Jennings and Earls on October 1, 2011, including that she "c[ould]n't

think, and it[ wa]s scaring [her], and [she] c[ould]n't see correctly."  Id. at 44:19–45:5.  Jennings

"told [the plaintiff] to eat some ice cream and get some rest[,]" id. at 45:8, and the plaintiff

followed up with Earls in person on October 2, 2011, see Pl.'s Ex. 3 at 10032, and via email on

October 3, 2011, see Sept. 9, 2021 Tr. at 46:13–14.

Dr. Cantu testified that,

if [the plaintiff] had been removed from practice and play on [October 5, 2011,]
she would have recovered completely or at least recovered back to what her

57

> baseline was on [her SCAT2 baseline] test. Because she continued to practice and play and take more head trauma in the process, her post-concussion symptoms were aggravated, which is the expected situation if you can continue to have somebody even physically exert, much less take head trauma with post-concussion syndrome, and converted it into something which now is permanent.

Sept. 10, 2021 Tr. at 230:9–18. Accordingly, there is expert testimony that, even considering the fact that the plaintiff continued to practice and participate in games prior to October 5, 2011— when she saw Dr. Williams for the first time—she could have made a complete recovery if Dr. Williams had not acted negligently on October 5, 2011. In contrast, the defendant identifies no expert testimony that the plaintiff's practicing and game participation between September 25, 2011—when she first started experiencing symptoms—and October 5, 2011, was a cause, let alone a "substantial factor in causing . . . her injury[,]" Waas, 648 A.2d at 180. See Def.'s Mem. at 74–76. Rather, the defendant only identifies testimony by Dr. Cantu that the plaintiff's practicing and game participation from October 5, 2011, through November 2011, i.e., after Dr. Williams's negligence, resulted in her post-concussion syndrome and permanent symptoms. See id. at 76 (quoting Sept. 10, 2021 Tr. at 229:20–230:18).

Therefore, because any negligence by the plaintiff in continuing to practice and participate in games prior to her October 5, 2011 appointment with Dr. Williams would have "merely precede[d] th[e negligence] of" Dr. Williams and helped to "provide the occasion for [Dr. Williams's] medical treatment[ of the plaintiff,]" Durphy, 698 A.2d at 467, the Court concludes that the defendant has not satisfied its burden of proving that the plaintiff was contributorily negligent by continuing to practice and play in games between September 23, 2011, and October 5, 2011.

## 2. Whether the Plaintiff Was Contributorily Negligent for Failing to Disclose a Mechanism of Injury to Dr. Williams

Second, the defendant argues that the plaintiff's "negligent failure to disclose a mechanism of injury created an unreasonable risk of improper medical treatment." Def.'s Mem. at 76. For the following reasons, the Court concludes that the plaintiff's failure to identify a mechanism to Dr. Williams did not "create[] an unreasonable risk of improper medical treatment[,]" id., and therefore, the defendant has not satisfied its burden of showing that the plaintiff was contributorily negligent.

First, similar to its claim that the plaintiff was contributorily negligent for continuing to practice and participate in games between September 23, 2011, and October 5, 2011, the defendant identifies no expert testimony to support its proposition that the plaintiff's failure to disclose a mechanism to Dr. Williams contributed in any way to her injury. See id. at 74–76. Because the defendant has the burden to "prove all elements of negligence[,]" Burton v. United States, 668 F. Supp. 2d 86, 107 (D.D.C. 2009), its failure to prove causation is fatal to this claim of contributory negligence, see id. at 108.

Second, even if the defendant had introduced evidence of causation, both expert witnesses who testified stated that a lack of information regarding a mechanism was not a sufficient reason to rule out a concussion. See Sept. 10, 2021 Tr. at 270:21–271:4 (testimony of Dr. Cantu); Sept. 13, 2021 Tr. at 460:24–461:7 (testimony of Dr. Margo). Therefore, the plaintiff's failure to tell Dr. Williams about being hit by a shoulder in the Richmond game would not excuse Dr. Williams's negligence in ruling out and thus failing to treat the plaintiff for a

concussion. Accordingly, the Court concludes that the defendant has failed to prove that the plaintiff was contributorily negligent for failing to disclose a mechanism to Dr. Williams.[26]

Therefore, for the above reasons, the Court concludes that the defendant has failed to prove that the plaintiff was contributorily negligent.

## E.     Damages

Having concluded that the defendant is liable for the plaintiff's injuries, the Court now turns to the issue of damages. The plaintiff argues that the Court should award $1,210,108 in "recoverable economic damages[,]" as well as "a fair and justifiable amount of non-economic damages[,] to make [her] whole again from the permanent moderate traumatic brain injury that Dr. Williams' negligence caused." Pl.'s Mem. at 75. In response, the defendant argues that, regardless of liability, the "[p]laintiff is not entitled to any damages." Def.'s Mem. at 81. For the following reasons, the Court concludes that the plaintiff is entitled to $1,037,047 in economic damages and $800,000 in non-economic damages, to be reduced by 5% to account for the effects of the plaintiff's subsequent concussion in April 2013.

---

[26] The defendant also argues that the plaintiff was contributorily negligent for her "continued practice and play up through November 2011,]" Def.'s Mem. at 76, citing Dr. Cantu's testimony that the plaintiff's "permanent symptoms" resulted from her continuing to practice and play from October 5, 2011, through November 2011, see Sept. 10, 2021 Tr. at 229:20–230:18. However, "a patient's non-cooperation with the doctor's instructions after the doctor's alleged negligent act and subsequent negligence of the patient, which aggravates the injury primarily sustained at the hands of the physicians, does not discharge the physician from liability, but only goes in mitigation of damages." Durphy, 698 A.2d at 467 (internal quotation marks and alterations omitted). Therefore, because the basis for this claim of contributory negligence concerns actions by the plaintiff after Dr. Williams's alleged negligence, the Court finds that the plaintiff was not contributorily negligent for continuing to practice and participate in games through November 2011.

Moreover, this case is not a situation where the plaintiff negligently failed to comply with her doctor's instructions, thereby exacerbating her injury. See, e.g., id. To the contrary, Dr. Williams did not instruct the plaintiff to refrain from participating in games and practicing for the remainder of the Fall 2011 field hockey season. And the plaintiff testified that she "continued [to] practice and [participate in games] up through November 2011," Def.'s Mem. at 76, because she "was told that no one [wa]s diagnosing [her] with a concussion, so [she] must play[,]" Sept. 9, 2021 Tr. at 57:18–25. Accordingly, because the defendant has not demonstrated that the plaintiff failed to comply with any of Dr. Williams's or any other doctor's instructions, the Court also concludes that mitigation of damages based on this theory would be inappropriate.

### 1. Economic Damages

To support her calculation for an award of economic damages, the plaintiff cites Dr. Crouse's testimony that she "would have reduced annual earnings and reduced life expectancy as a result of her cognitive functional limitations, and that would translate into an overall loss of earning capacity of $1,037,047 to $1,210,108[,]" depending on whether she acquired only a Bachelor's, as compared to a graduate degree. Pl.'s Mem. at 75; see Sept. 10, 2021 Tr. at 289:22–290:14. In response, the defendant challenges Dr. Crouse's calculations as "misleading, speculative at best, and clearly unsupported by the evidence." Def.'s Mem. at 81. For the following reasons, the Court concludes that Dr. Crouse's calculations are credible and that the plaintiff is entitled to an award of $1,037,047 in economic damages.

### b. The Defendant's Challenge to Dr. Crouse's Methodology

The Court begins with the defendant's challenge to Dr. Crouse's methodology. As discussed above, see supra Section I.M.1.b, Dr. Crouse testified that the plaintiff "would have reduced annual earnings and reduced life expectancy as a result of her cognitive functional limitations, and that would translate into an overall loss of earning capacity of $1,037,047 to $1,210,108[,]" depending on whether the plaintiff acquired only a Bachelor's degree or also obtained a graduate degree. Sept. 10, 2021 Tr. at 289:22–290:14. The defendant argues that (1) the ACS data upon which Dr. Crouse relied is flawed, and (2) the evidence does not support the proposition that the plaintiff "will now earn 20 percent less and work 10 years fewer than another person with her similar educational attainment." Def.'s Mem. at 78–79. The Court will address the defendant's arguments in turn.

"In general, . . . plaintiffs [are not required] to prove their damages 'precisely' or 'with mathematical certainty[,]'" although a plaintiff must "'provide some reasonable basis upon

61

which to estimate damages.'" President, Dirs. of Georgetown Coll. v. Wheeler, 75 A.3d 280, 293 (D.C. 2013) (quoting District of Columbia v. Howell, 607 A.2d 501, 506 (D.C. 1992)).

Beginning with the defendant's challenge to the reliability of the ACS data used by Dr. Crouse, the defendant argues that the ACS "is not applicable for a single individual with a particular disability, as the ACS represents persons with physical and emotional difficulties, including mental difficulties[,]" "does not capture or take into account any changes in the respondent's conditions[,]" and "does not capture those who might be considered disabled who lost some amount of work for whatever reason, but later returned to the workforce." Def.'s Mem. at 78–79. None of the defendant's arguments are persuasive.

First, the defendant fails to consider that Dr. Crouse's opinion is based on both the ACS data and his individual opinion of the plaintiff's limitations, see Sept. 10, 2021 Tr. at 292:1–293:12; 296:24–297:7, as determined by the tests he conducted, his review of the plaintiff's medical and educational records, and his interview with the plaintiff. Therefore, even though the ACS itself is not attuned to a particular individual, Dr. Crouse's opinion is not based exclusively on the ACS and does take into account the plaintiff's particular situation.

Second, although the ACS "does not capture or take into account any changes in [a] respondent's conditions" or whether he or she "later returned to the workforce[,]" Def.'s Mem. at 78–79, the Court has found, based on Dr. Cantu's testimony, that the plaintiff's injuries are now permanent, see Sept. 10, 2021 Tr. at 230:9–18. Therefore, even if the ACS assumes that the disabilities accounted for on the survey are permanent, this assumption does not make the ACS inapplicable to the plaintiff's case.[27]

---

[27] The defendant also cursorily argues that "[t]he ACS [ ] has been challenged in the past due to its limited reliability[,]" Def.'s Mem. at 78, however, the portion of the transcript that the defendant cites to support this proposition only states that "[t]he ACS has been challenged from time to time[,]" Sept. 10, 2021 Tr. at 341:10,

(continued . . .)

The Court next considers the defendant's argument that the evidence does not support the concept that the plaintiff "will now earn 20 percent less and work 10 years fewer than another person with her similar educational attainment[,]" Def.'s Mem. at 79, which the Court finds similarly not persuasive. Evidence cited by the defendant itself demonstrates that, post-concussion, the plaintiff is not achieving at the same level at which she did prior to 2011. For example, the defendant acknowledges that the plaintiff's grade point average decreased from high school to college, but notes that it was "a difference of only .17[,]" and that the plaintiff was able to complete her college education, even though it took a total of six, rather than four, years to acquire her degree. See id. However, although the defendant frames the duration of the plaintiff's undergraduate degree as "only . . . two more years[,]" id., an additional two years to acquire a four-year degree is a fifty-percent increase in the amount of time it took the plaintiff to receive her degree. This is not insignificant.

The defendant also argues that "Dr. Crouse testified that he was aware that [the p]laintiff successfully traveled to Nepal on several occasions after her injury and that she even maintained a blog of her travels, all of which conflicts with the functional limitations that she self-reported to him during his interview." Id. However, Dr. Crouse's opinion does not assume that the plaintiff is fully disabled or not able to perform any work. See, e.g., Sept. 10, 2021 Tr. at 332:25–333:1 (testimony of Dr. Crouse that the plaintiff would still be able to earn a salary of $60,000 per year, with her disability). Moreover, the Court finds credible the plaintiff's explanation concerning why her trips to Nepal were not inconsistent with her functional limitations. See, e.g., Sept. 9, 2021 Tr. at 85:23–86:7 (testimony of the plaintiff that, "in

_____

(. . . continued)

without any supporting testimony regarding either the type of challenges or their accuracy, see generally id. Accordingly, the Court assigns no weight to this testimony.

Nepal . . . [, i]t's actually so much more conducive to my symptoms"); id. at 197:3–9 (testimony of the plaintiff's mother that, "when [the plaintiff] goes to a third[-]world country, . . . she can handle that because it's extremely laid back and there[ are] not a lot of time restraints" and "she isolates when she's away"). Accordingly, the Court concludes that the evidence of the plaintiff's symptoms and functional limitations does not conflict with Dr. Crouse's opinion.

Mindful of the fact that the plaintiff is not obligated to "prove [her] damages 'precisely' or 'with mathematical certainty[,]'" Wheeler, 75 A.3d at 293 (quoting Howell, 607 A.2d at 506), the Court concludes that, through Dr. Crouse's testimony, the plaintiff has met her burden to "provide some reasonable basis upon which to estimate damages[,]" id.

      c.      **Whether the Plaintiff Would Have Obtained a Graduate Degree**

Having concluded that Dr. Crouse's methodology was reasonably accurate, the Court now considers which of the two income amounts that Dr. Crouse opined the plaintiff would not earn as a result of her disability is reasonable: (1) $1,037,047, if the plaintiff obtained only a Bachelor's degree absent the injury, or (2) $1,210,108, if the plaintiff obtained a graduate degree in addition to a Bachelor's degree. See Sept. 10, 2021 Tr. at 289:22–290:14. For the following reasons, the Court concludes that the plaintiff should be awarded $1,037,047, because she failed to reasonably prove that she would have obtained a graduate degree absent her injury.

The plaintiff testified that she "always wanted to keep doing school[,]" Sept. 9, 2021 Tr. at 88:24, and that she has applied to "so many [graduate] programs" in anthropology, but "keep[s] getting rejected because [she] can[not] function," id. at 89:1–2. However, as the defendant correctly notes, see Def.'s Mem. at 41, she did not provide any evidence regarding the number of schools to which she applied, the specific schools, or the relative merit of her application. The plaintiff also failed to present any testimony as to her life plans absent Dr.

Williams's negligence or whether it would be reasonable to expect that she would have obtained

a graduate degree that would have resulted in the additional earnings estimated by Dr. Crouse.

Therefore, concluding that she would have also acquired a graduate degree would be purely

speculative. Accordingly, the Court concludes that the plaintiff failed to provide a reasonable

basis upon which the Court could conclude that she would have obtained a graduate degree

absent her injury and, as a result, she should be awarded economic damages in the amount of

$1,037,047, which comports with her acquiring only a Bachelor's degree absent her injury.

## 2. Non-Economic Damages

The Court will now address the plaintiff's demand for an award of non-economic

damages. The plaintiff requests "a fair and justifiable amount of non-economic damages to

make [her] whole again from the permanent moderate traumatic brain injury that Dr. Williams

caused." Pl.'s Mem. at 75; see also Pl.'s Supp. Mem. The defendant does not address the

plaintiff's request for non-economic damages in its post-trial filing, see generally Def.'s Mem.,

and did not file a response to the plaintiff's post-hearing submission regarding non-economic

damages. The Court will first address whether any award of non-economic damages is merited

and, if so, what amount the plaintiff is entitled to receive.

### a. Whether an Award of Non-Economic Damages Is Warranted in this Case

Awards of non-economic damages are "fact[-]specific and the fact[]finder has broad

discretion in calculating damages for pain and suffering." Rhodes v. United States, 967 F. Supp.

2d 246, 324 (D.D.C. 2013). As the Standardized Civil Jury Instructions for the District of

Columbia state,[28] damages may be awarded for a negligence claim by the factfinder based upon

---

[28] As other members of this court have "use[d] these jury instructions as a 'useful reference' when considering a damages award[,]" Rhodes, 967 F. Supp. 2d at 325, the Court will also look to the instructions for guidance regarding the calculation of non-economic damages in this case.

(continued . . .)

consideration, <u>inter alia</u>, of the following factors: (1) "the extent and duration of any physical injuries sustained by [the plaintiff];" (2) "the effects that any physical injuries have on the overall physical and emotional well-being of [the plaintiff];" (3) "any physical pain and emotional distress that [the plaintiff] has suffered in the past or may suffer in the future;" or (4) "any inconvenience [that the plaintiff] has experienced in the past or may experience in the future." Standardized Civil Jury Instructions for the District of Columbia § 13.01 (2022).[29]

In this case, trial testimony disclosed the severe emotional and mental toll that post-concussion syndrome has had on the plaintiff. The plaintiff's parents testified that she is now unable to complete routine daily tasks, like cleaning or organizing her affairs, <u>see, e.g.</u>, Sept. 9, 2021 Tr. at 146:8–147:7 (testimony of the plaintiff's father); 188:3–18 (testimony of the plaintiff's mother); or going to a store, <u>see id.</u> at 188:3–18, and that her "social life is nonexistent[,]" <u>id.</u> at 190:20. The plaintiff's father also testified that the plaintiff's demeanor

---

(. . . continued)

[29] Section 13.01 of the Standardized Civil Jury Instructions for the District of Columbia lists eight harms for which a factfinder may award damages:

> 1. the extent and duration of any physical injuries sustained by [the plaintiff];
> 2. the effects that any physical injuries have on the overall physical and emotional well-being of [the plaintiff];
> 3. any physical pain and emotional distress that [the plaintiff] has suffered in the past or may suffer in the future;
> 4. any disfigurement or deformity suffered by [the plaintiff], as well as any humiliation or embarrassment associated with the disfigurement or deformity;
> 5. any inconvenience [that the plaintiff] has experienced in the past or may experience in the future;
> 6. any medical expenses incurred by [the plaintiff] in the past or may incur in the future;
> 7. any loss of earnings that [the plaintiff] has incurred in the past or may incur in the future; and
> 8. any damage or loss to [the plaintiff's] personal property.

Standardized Civil Jury Instructions for the District of Columbia § 13.01 (2022). Damages based on the fourth, sixth, and eighth harms are not warranted here because the plaintiff has not asserted any "disfigurement or deformity[,]" and has not presented any evidence regarding the "medical expenses [she] incurred" or "any damage or loss to [her] personal property." <u>See id.</u> Moreover, the plaintiff's "loss of earnings[,]" <u>id.</u>, has already been calculated as part of the economic damages awarded in this case. <u>See supra</u> Section II.E.1. Accordingly, the Court will consider only the first, second, third, and fifth harms listed in § 13.01 in determining whether non-economic damages are able to be awarded in this case.

changed following the concussion, resulting in her being "very touchy" and preventing him from "talk[ing] to her reasonably about" issues like the disorganization and uncleanliness in her household. Id. at 167:14–25. The plaintiff also testified about the emotional toll that post-concussion syndrome has had on her. See id. at 76:18–77:2; 79:17–25; 81:4–6.

Furthermore, the plaintiff has experienced, and continues to experience, physical and mental changes resulting from the post-concussion syndrome. Following the concussion, she "was diagnosed with depression and anxiety," id. at 87:17, for which she takes prescription medication, see id. at 87:14–15. She also continues to suffer from headaches, see id. at 86:12–13; fatigue, see id. at 86:14–24; vision problems, see id. at 87:1–10; and mental processing delays, see id. at 89:11–13. The Court credits the plaintiff's testimony that she did not regularly experience any of these symptoms prior to September 2011. See id. at 118:23–119:13. As indicated earlier, see supra Section II.C.3, Dr. Cantu testified that, if Dr. Williams had not failed to diagnose the concussion and had removed the plaintiff from practice and game participation, she would have made a complete recovery, see Sept. 10, 2021 Tr. at 230:9–12, 260:9–15. Furthermore, according to Dr. Cantu, the plaintiff's continued symptoms are the result of Dr. Williams's failure to diagnose the plaintiff's concussion and treat her accordingly, see id. at 235:5–7, and are now permanent, see id. at 229:25–230:1, 241:15–16.

In addition to numerous hospital, physician, and medical specialist visits to diagnose and treat her post-concussive syndrome and moderate traumatic brain injury after Dr. Williams negligently ruled out a concussion, the plaintiff also endured many invasive and uncomfortable tests, including multiple spinal taps and MRIs. See, e.g., Pl.'s Ex. 44 at 23001; Pl.'s Ex. 13 at 7038–40; Pl.'s Ex. 11 at 5000. She has also been prescribed multiple medications to address her post-concussive symptoms, including Zoloft, Adderall, and Propranolol. See, e.g., Pl.'s Ex. 4 at

9012; Pl.'s Ex. 9 at 3003–05.  In addition to physicians, the plaintiff has also seen biofeedback providers, physical therapists, and psychotherapists for the treatment of her post-concussive symptoms.  See, e.g., Pl.'s Ex. 44 at 23001–03.

The plaintiff has also experienced significant interruption of the plans she had for her future, including graduating two years later than she expected, see Sept. 9, 2021 Tr. at 74:17–20; abandoning her pursuit of a minor in German, see id. at 74:25–75:1; being unable to study abroad for a semester, see id. at 75:2–15; and failing to obtain course credit for the alternative spring recess program in Moldova in which she participated, see id. at 79:7–10.  Although the plaintiff has been able to work in Nepal, see, e.g., id. at 81:18–24, she credibly testified that there are significant differences between American and Nepalese culture that make her employment there possible, including a lack of emphasis on punctuality in Nepal, see, e.g., id. at 85:10–14. She further testified that "this past year has been terrible because this country[,]" i.e., the United States, is "not set up for someone like me[,]" who "do[es]n't know what tomorrow is going to look like" and is "going to get fired" if she is unable to work at least forty hours per week.  Id. at 85:15–22.

Despite these significant limitations, the plaintiff has not been completely incapacitated. In addition to traveling to and working in Nepal, she has maintained a blog related to her experiences in Nepal, see id. at 197:11–15, and learned the country's language during her visits, see id. at 91:18–23.  She also travelled to Moldova in the spring of 2012, although she was not able to receive course credit for the trip, see id. at 196:9–10, and to Germany in the spring of 2013, see id. at 93:17–21.  She was able to complete her Bachelor's degree, see id. at 74:14–17, with disability accommodations, see id. at 73:24–74:13.  And, she provided volunteer services to

68

Nepalese refugees while living with her parents during the year-and-a-half when she took a leave of absence from college, see id. at 76:18–77:22.

Based on the evidence set forth above, the Court concludes that the "extent and duration of" the plaintiff's "physical injuries[,]" "the effects" of those "injuries [ ] on the [plaintiff's] overall physical and emotional well-being[,]" the "physical pain and emotional distress" suffered by the plaintiff, and the "inconvenience [that the plaintiff] has experienced[,]" Standardized Civil Jury Instructions for the District of Columbia § 13.01 (2022), all weigh in favor of awarding the plaintiff non-economic damages.

### b. The Amount of Non-Economic Damages that Is Warranted in this Case

Having determined that the plaintiff is entitled to an award of non-economic damages, the Court now turns to the amount of the award that is warranted. Certainly, "determining an appropriate figure for intangible losses such as emotional suffering is notoriously difficult[.]" Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 86 (D.D.C. 2006). The Court's review of other medical malpractice cases and cases where a plaintiff was awarded non-economic damages for injuries including post-concussion syndrome has yielded a wide range of monetary awards.[30] See, e.g., Rhodes, 967 F. Supp. 2d at 324 (collecting cases); Becerril v. Eas[t] Bronx NAACP Child Development Ctr., 2009 WL 2972992, at *3 (S.D.N.Y. Sept. 17, 2009) (award of $50,000 in non-economic damages for "extreme emotional distress resulting from her depression, migraine headaches, and post-concussive syndrome"); Grajales-Romero v. Am. Airlines, 194 F.3d 288, 300 (1st Cir. 1999) (award of $150,000 for "chronic neck pain and a loss of cognitive functions, including concentration and memory" affirmed); Rufo v. United States, 2020 WL 968973, at *4 (C.D. Cal. Feb. 28, 2020) (award of "$500,000 in past non-economic

---

[30] In their proposed findings of fact and conclusions of law, the parties did not provide any citations to similar cases where non-economic damages were awarded. See generally Pls.' Mem.; Def.'s Mem.; Pl.'s Supp.

damages and $1,500,000 in future non-economic damages is appropriate" for a mild traumatic brain injury); Smith v. Kmart Corp., 177 F.3d 19, 30 (1st Cir. 1999) (award of $500,000 did not "warrant a remittitur" when "[t]he evidence of Smith's physical and emotional pain and suffering [wa]s abundant"); Huber v. United States, 2019 WL 4540225, at *3–4 (D.D.C. Sept. 19, 2019) (awarding a plaintiff $56,032 for his physical injuries; $150,000 "for the effects that the physical injuries had on [the p]laintiff's overall physical and emotional well-being[,]" $60,000 for future pain, and $30,000 for inconvenience); Powell v. Hellenic Lines, Ltd., 347 F. Supp. 855, 861 (E.D. La. 1972) (awarding a plaintiff $15,000 for post-concussion syndrome when the plaintiff's "headaches [we]re intermittent and [we]re relieved by mild sedatives, [ ] the dizziness [wa]s not constant, [ ] the duration of these symptoms c[ould ]not be fixed with any degree of certainty[,] and [ ] the plaintiff [wa]s expected to improve in time"); Bourgeois v. Roudolfich, 580 So. 2d 699 (5th Cir. 1991) (plaintiff's award of $5,000 due to suffering from dizziness, headaches, and post-concussion syndrome affirmed).

The cases also reflect awards in the range of $5,000 to $20,000 for head injuries that were not completely incapacitating and that resolved within a few years. See, e.g., Ware v. United States, 1994 WL 46739, at *11 (N.D. Cal. Feb. 4, 1994) (awarding a plaintiff $23,000 for pain and suffering for "substantial injuries as a result of [an] accident, both orthopedic and neurological" that "resolved at maximum within approximately a year, to a year and an half, after the accident"); Sheehan v. United States, 822 F. Supp. 13, 17 (D.D.C. 1993) (awarding a plaintiff whose "prior symptoms of memory loss, inability to concentrate, severe headaches, amnesia, fatigue, lack of stamina, and impaired mobility were temporarily aggravated by [an] accident" $10,000 in compensation and "$5,000 for emotional distress and pain and suffering"); Powell v. Hellenic Lines, Ltd., 347 F. Supp. 855, 861 (E.D. La. 1972) (awarding a plaintiff

$15,000 for post-concussion syndrome when the plaintiff's "headaches [we]re intermittent and [we]re relieved by mild sedatives, [ ] the dizziness [wa]s not constant, [ ] the duration of these symptoms c[ould ]not be fixed with any degree of certainty[,] and [ ] the plaintiff [wa]s expected to improve in time"); Peterson v. State Farm Ins. Co., 1994 WL 193690, at *6 (E.D. La. May 6, 1994) (awarding a plaintiff $20,000 for pain and suffering for "a scalp laceration, a concussion, and post[-]concussion syndrome with post[-]traumatic emotional difficulties, for approximately two years, with great improvement toward the end of that two[-]year period").

Here, although the plaintiff is not completely incapacitated, her symptoms are not insignificant and are now permanent due to Dr. Williams' negligence. Therefore, the Court concludes that an award that accounts for both the emotional and physical suffering that the plaintiff has already experienced and the suffering that she will continue to experience for the rest of her life is appropriate. Accordingly, the Court will assess damage in the amount of $12,000 per year, which is consistent with the awards for non-severe, temporary injuries in Ware, Sheehan, Powell, and Peterson, and multiply that sum by the years that the plaintiff has already and will continue to suffer from her injuries. To calculate the number of years, the Court begins with the plaintiff's age at the time of Dr. Williams' negligence, i.e., twenty years old, see Pl.'s Ex. 4 at 6094 (Lancaster General Hospital records recording the plaintiff's birthdate), and then adopts the age to which Dr. Crouse identified that it is more probable than not that the plaintiff will live, i.e., 83, see Pl.'s Ex. 54A at 13. Because Dr. Cantu testified that concussions can take a short period of time to resolve even absent negligent treatment, see Sept. 10, 2021 Tr. at 255:21–23 (testimony by Dr. Cantu that "[m]ost of the metabolic issues [related to a concussion] are thought to probably occur in the first week or two after a concussion"), the Court will not award damages to the plaintiff for the first year following her injury. Thus, calculating

the number of years from the year following the plaintiff's injury through her expected lifespan, the Court arrives at a duration of 62 years during which she has or will experience the consequences of her misdiagnosed concussion. Multiplying those years by $12,000 per year, the Court finds that an award of $744,000 is warranted to compensate the plaintiff for the pain and suffering caused by Dr. Williams's negligence.

Additionally, the Court determines that an award is necessary to account for the inconvenience to the plaintiff, including the effect on the plaintiff's academic goals and social life and the battery of invasive medical tests and medical appointments she underwent. In Huber, the court awarded Huber "$30,000 in inconvenience damages" to account for "collapsing in his office; staying five nights in a hospital on three separate occasions; a trip to a neurologist; meeting with multiple doctors to determine the source of his extreme headaches, memory impairments, and double vision; meeting with two brain injury specialists; and performing neurological tests with three neuropsychologists." Huber, 2019 WL 4540225, at *4. In light of the plaintiff's numerous hospital, physician, and medical specialist visits, as well as the many invasive tests that she underwent and the disruption to her plans for her future, the Court will award the plaintiff an additional $56,000 for the inconvenience she has suffered, for a total non-economic damages award of $800,000. See, e.g.,

From the Court's review of the cases with awards for head injuries, and in light of the emotional and physical suffering and inconvenience that the plaintiff has experienced since the concussion and will experience for the rest of her life, the Court determines that an award of $800,000 is reasonable.

### 3. Whether Evidence of a 2013 Concussion Reduces the Amount of Damages

The defendant also argues that "th[e] Court should reduce any damage[s] award equal to the injury and/or exacerbation of symptoms that [the p]laintiff experienced as a result of the

[additional] concussion [she suffered] in 2013[.]"  Def.'s Mem. at 82.  In response, the plaintiff argues that "all of the expert testimony provided within a reasonable degree of medical certainty established that all of [the plaintiff's] damages were permanent by one year, and no other testimony was provided to demonstrate that [a concussion in 2013] caused any additional damages."  Pl.'s Mem. at 74.  For the following reasons, the Court concludes that the damages award should be reduced by five percent to account for the plaintiff's 2013 concussion.

"In the District of Columbia, the primary purpose of compensatory damages in personal injury cases is to make the plaintiff whole."  Calva-Cerqueira v. United States, 281 F. Supp. 2d 279, 293 (D.D.C. 2003) (internal quotation marks omitted).  "The burden of proving that the injured party could have avoided some or all of his [or her] damages rests on the defendant[,]" and "requires a showing that the plaintiff failed to take reasonable action to minimize damages, and that such failure . . . enhanced damages beyond what they otherwise would have been." 3 Damages in Tort Actions § 16.01(3); see also Foster v. George Wash. Univ. Med. Ctr., 738 A.2d 791, 794 (D.C. 1999) ("[T]he burden of proving that damages could have been mitigated rests with the party that committed the breach." (internal quotation marks and alterations omitted)).  Specifically, a "tortfeasor must establish with reasonable certainty the amount of damages that might have been avoided[,]" although "this burden of proof in no way relieves the injured party of the initial burden of proving the damages claimed."  3 Damages in Tort Actions § 16.01(3).

Dr. Vollmar's testimony at trial and contemporaneous medical records from his treatment of the plaintiff support the finding that the plaintiff was diagnosed with an additional concussion in April 2013.  See Sept. 14, 2021 Tr. at 802:9 (testimony by Dr. Vollmar noting that, at an April 18, 2013 appointment with the plaintiff, she reported that "she [had] hit her head on the

ground"); id. at 802:25 (testimony by Dr. Vollmar that he documented a "concussion" in the plaintiff's medical record); id. at 803:23–24 (testimony by Dr. Vollmar that the plaintiff "had some increased symptoms after" this April 2013 concussion). At trial, Dr. Cantu testified that additional "head trauma" can result in "post-concussion symptoms [being] aggravated[.]" Sept. 10, 2021 Tr. at 230:14–18.

However, the record is unclear as to the extent to which this additional concussion enhanced the plaintiff's injuries. Neither party identifies any evidence regarding how long the increased symptoms lasted or their effect on the symptoms that the plaintiff was already experiencing. See Pl.'s Mem. at 73–74; Def.'s Mem. at 81–82. Neither Dr. Cantu nor Dr. Margo provided any testimony regarding the impact of this additional concussion.

Furthermore, the record reflects that the plaintiff was experiencing similar symptoms both prior to and after the April 2013 concussion. For example, on February 14, 2013, at an appointment prior to the April 2013 concussion, Dr. Vollmar noted that the plaintiff was still experiencing persistent dizziness, headaches, anxiety, and visual disturbances, although there had been significant improvements in her symptoms. See Pl.'s Ex. 20 at 110030. Similarly, the two neuropsychologist reports—which are dated June 22, 2012, and December 16, 2013, and therefore pre-date and post-date the April 2013 concussion, respectively—both indicate that the plaintiff reported headaches, fatigue, and difficulties in focusing and concentrating. See Pl.'s Ex. 4 (Neuropsychological Reports).

Moreover, expert testimony at trial confirmed that the permanency of the plaintiff's injury predated the April 2013 concussion. Dr. Cantu testified that the plaintiff's injuries were permanent due to the failure to remove the plaintiff from practice and game participation on October 5, 2011, see Sept. 10, 2021 Tr. at 230:9–18, long before the additional concussion in

74

April 2013. Moreover, prior to April 2013, Dr. Vollmar had already diagnosed the plaintiff with a "moderate traumatic brain injury[,]"—i.e., with "continuing symptoms and deficits from a cognitive standpoint in focus and headaches that ha[d] lasted longer than a year" and were thus believed to be permanent. Id. at 386:17–25. The plaintiff was also already diagnosed with ADD and depression. Id. at 378:23–379:1.

As discussed above, see supra Sections II.E.1–2, the plaintiff has met her burden to "provide some reasonable basis upon which to estimate damages[,]" Wheeler, 75 A.3d at 293 (quoting Howell, 607 A.2d at 506). To successfully challenge the plaintiff's estimation of her damages, the defendant "must establish with reasonable certainty the amount of damages that might have been avoided[,]" 3 Damages in Tort Actions § 16.01(3). Here, the Court finds that the defendant has "establish[ed] with reasonable certainty[,]" id., through Dr. Cantu's and Dr. Vollmar's testimony, that the plaintiff experienced a concussion in April 2013 and that it "aggravated" her "post-concussion symptoms[,]" Sept. 10, 2021 Tr. at 230:14–18, resulting in "increased symptoms after" this April 2013 concussion, Sept. 14, 2021 Tr. at 803:23–24. Accordingly, the Court will reduce the award of damages to account for the effect of the 2013 concussion on the plaintiff's permanent post-concussion symptoms. However, because the defendant did not identify any testimony regarding the extent to which the 2013 concussion aggravated the plaintiff's symptoms, see generally Def.'s Mem., the Court concludes that the damages award should only be reduced by a de minimis amount. Accordingly, the Court will reduce the award by five percent.

### III. CONCLUSION

For the reasons set forth above, the Court finds in favor of the plaintiff on her medical malpractice claim against the defendant, in the amount of $1,745,194.65, which constitutes an

award of $1,037,047 in economic damages and $800,000 in non-economic damages, reduced by five percent.[31]

       **SO ORDERED** this 28th day of July, 2022.[32]

REGGIE B. WALTON
United States District Judge

---

[31] Following the bench trial in this case, the Court directed the parties to submit proposed findings of fact and conclusions of law, addressing, inter alia, (1) "if Dr. Williams was negligent in his treatment of the plaintiff, whether the government bears responsibility for the entirety of the plaintiff's damages, in light of the Court's ruling that American University is not subject to liability because of the Acknowledgement of Risk form signed by the plaintiff;" and (2) "if Dr. Williams was negligent in his treatment of the plaintiff and the government does not bear responsibility for the entirety of the damages, the percentage of the damages for which the government is liable[.]" Order at 1–2 (Sept. 17, 2021), ECF No. 178.  In her proposed findings of fact and conclusions of law, the plaintiff argues that "[t]he District of Columbia follows the law of joint and several liability[,]" i.e., "[a]ny one potential defendant is liable for 100% of the damages[,]" and therefore the defendant is liable for the entirety of the plaintiff's damages.  Pl.'s Mem. at 74–75.  The defendant does not address this issue in its proposed findings of fact and conclusions of law.  See generally Def.'s Mem.

The plaintiff is correct that, under District of Columbia law, "whether joint tortfeasors act independently or in concert, . . . [e]ach is bound to [the injured party] separately and for the full injury[.]"  Beckman v. Farmer, 579 A.2d 618, 655 (D.C. 1990).  Accordingly, the defendant is liable for the entirety of the damages awarded by the Court.

[32] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

|  |  |  |
|---|---|---|
| | ) | |
| JENNIFER BRADLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-346 (RBW) |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

In accordance with the Memorandum Opinion issued on this same date, it is hereby

**ORDERED** that the Court finds in favor of the plaintiff on Count VIII of the plaintiff's

Amended Complaint as to the defendant United States of America.  It is further

**ORDERED** that judgment is **ENTERED** for the plaintiff on Count VIII of her Amended

Complaint in the amount of $1,745,194.65.  It is further

**ORDERED** that Count IV of the plaintiff's Amended Complaint is **DISMISSED** as to

the defendant United States of America.  It is further

**ORDERED** that this case is **CLOSED**.

**SO ORDERED** this 28th day of July, 2022.

REGGIE B. WALTON
United States District Judge